No. 25-4526

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff–Appellee,
v.
STEVEN DAVID SEEGER,
Defendant–Appellant.

On Appeal from the United States District Court for the
Northern District of West Virginia

**OPENING BRIEF FOR DEFENDANT–APPELLANT**

Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, SC 29204

Martin P. Sheehan
Sheehan & Associates, P.L.L.C.
1140 Main St., Suite 333
Wheeling, WV 26003

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Table of Authorities .................................................................................. 3

Jurisdictional Statement ........................................................................... 6

Statement of the Issues ............................................................................ 6

Statement of the Case .............................................................................. 7

Summary of the Argument........................................................................13

Arguments ............................................................................................ 19

    I.     The District Court Erred by Refusing to Suppress Evidence Where Officers Conducted a Warrantless Home Search and Then Invented an "Inadvertent Negligence" Escape Hatch Unknown to Fourth Amendment Law ................................................................ 19

    II.    The District Court Erred in Concluding Probable Cause Existed Because the Evidence Was Stale ....................................................... 28

    III.   The District Court Erred by Denying a *Franks* Hearing Despite a Substantial Preliminary Showing That Material Impeaching Facts About the Sole Witness Were Omitted from the Affidavit ................. 36

    IV.   The District Court Further Erred by Refusing to Suppress the Digital Evidence Where, Under United *States v. Pratt*, the Twenty-One-Day Delay Between the Unconstitutional Seizure of Seeger's Devices and the Digital-Search Warrant Violated the Fourth Amendment. ......... 45

    V.    The Restitution Order Violates the Ex Post Facto Clause Because It Applies Harsher Post-Offense Restitution Provisions in Contravention of Ellingburg v. United States ............................................................ 54

Conclusion ............................................................................................ 58

Certificate of Compliance ........................................................ 60

Certificate of Service................................................................. 61

# TABLE OF AUTHORITIES

**Cases:**

*Ellingburg v. United States*, No. 24-482 (U.S. Jan. 20, 2026) ..................17-18, 54-58

*Franks v. Delaware*, 438 U.S. 154 (1978) ...................... 11-12, 15, 36-37, 39-40, 42-45

*Groh v. Ramirez*, 540 U.S. 551, 559 (2004)........................................ 13, 19, 22-23, 27

*Illinois v. Gates*, 462 U.S. 213, 238 (1983) .................................................. 29

*Katz v. United States*, 389 U.S. 347, 357 (1967) ............................................ 13, 19, 22

*Lull v. United States*, 824 F.3d 109, 115 (4th Cir. 2016) .......................................... 39

*Mapp v. Ohio*, 367 U.S. 643, 655–57 (1961) ................................................ 20, 26, 28

*Murray v. United States*, 487 U.S. 533, 537–42 (1988)............................................ 22

*Nix v. Williams*, 467 U.S. 431, 443–44 (1984) .................................................. 22, 26

*Payton v. New York*, 445 U.S. 573, 585–90 (1980)...................................................... 27

*United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011) .............................. 15, 29, 34

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019) ......................................15, 33, 35

*United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) ........... 16, 37-39, 42-43, 45

*United States v. Contreras*, 905 F.3d 853 (5th Cir. 2018)........................................ 32

*United States v. Jones*, 565 U.S. 400, 404 (2012) ........................................13, 20, 26

*United States v. Kolsuz*, 890 F. 3d 141-42 (4th Cir. 2018).......................................... 28

*United States v. Krueger*, 145 F.4th 460 (4th Cir. 2025)............................................31

*United States v. Lacy*, 119 F.3d 742, 746–47 (9th Cir. 1997) ...................................... 33

*United States v. Leon*, 468 U.S. 897 (1984) ......................................................... 23, 27

*United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) ............. 14, 29, 31, 36, 41

*United States v. Moody*, 931 F.3d 366, 371 (4th Cir. 2019) ........................................ 36

*United States v. Morales-Aldahondo*, 524 F.3d 115 (1st Cir. 2008) ............................ 32

*United States v. Moss*, 963 F.2d 673, 677–79 (4th Cir. 1992) ......................... 13, 23, 26

*United States v. Palmer*, 820 F.3d 640, 644 (4th Cir. 2016) ..................................... 19

*United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019) ..................................16, 17, 45-54

*United States v. Raymonda*, 780 F.3d 105, 114–16 (2d Cir. 2015) ............................. 34

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) ............................. 15, 32, 35

*United States v. Vosburgh*, 602 F.3d 512 (3d Cir. 2010) ............................................ 32

*United States v. Walker,* 2025 WL 257129 (E.D. Pa. Jan. 21, 2025)......................... 24

*United States v. Wharton*, 840 F.3d 163, 167–70 (4th Cir. 2016) .. 16, 37, 38, 40, 41, 45

*Utah v. Strieff*, 579 U.S. 232, 238–39 (2016) ......................................13, 20, 22-24, 27

*Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963) .......................................... 25

**Federal Statutes:**

18 U.S.C. § 2259...................................................................... 13, 55, 56

18 U.S.C. § 2259(b)(2)(B) ................................................................... 56

18 U.S.C. § 3231 ............................................................................. 6

18 U.S.C. § 3663 .............................................................................13

18 U.S.C. § 3663A .................................................................13

18 U.S.C. § 3742(a) ............................................................... 6

28 U.S.C. § 1291 .................................................................... 6

**Federal Rules:**
Fed. R. App. P. 4(b)(1) ......................................................... 6

Fed. R. Crim. P. 11(c)(1)(C) ................................................ 12

**U.S. Constitution:**
U.S. Const. amend. IV.............6, 15, 17, 19-21, 23, 24, 27-29, 35, 36, 45-47, 50, 51, 53

**Other Sources:**
W. Va. Code § 62-1A-4 ....................................................... 10

W. Va. R. Crim. P. 41 .......................................................... 10

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. The judgment appealed from was entered on September 23, 2025. Appellant filed a timely notice of appeal under Fed. R. App. P. 4(b)(1). This Court exercises jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I.     The District Court Erred by Refusing to Suppress Evidence Where Officers Conducted a Warrantless Home Search and Then Invented an "Inadvertent Negligence" Escape Hatch Unknown to Fourth Amendment Law

II.    The District Court Erred in Concluding Probable Cause Existed Because the Evidence Was Stale

III.   The District Court Erred by Denying a *Franks* Hearing Despite a Substantial Preliminary Showing That Material Impeaching Facts About the Sole Witness Were Omitted from the Affidavit

IV.    The District Court Further Erred by Refusing to Suppress the Digital Evidence Where, Under United *States v. Pratt*, the Twenty-One-Day Delay Between the Unconstitutional Seizure of Seeger's Devices and the Digital-Search Warrant Violated the Fourth Amendment

V.     The Restitution Order Violates the Ex Post Facto Clause Because It Applies Harsher Post-Offense Restitution Provisions in Contravention of Ellingburg v. United States

## STATEMENT OF THE CASE

This case arises from a warrantless search of Steven Seeger's home on March 29, 2021, subsequent warrants directed at the digital contents of the devices seized in that search, and a federal prosecution built on the fruits of those searches. JA 438, 443. In early 2021, law enforcement in Nacogdoches, Texas, received a report from an adult woman, K.S. (also referred to as Jane Doe–2), who stated that she had been in an online relationship with an older man, later identified as Seeger, since she was approximately fourteen years old. JA 71, 76- 79; 481. K.S. reported that Seeger had recently sent partially clothed photos of her, taken when she was an adult, to people she knew as "revenge porn." JA 478-79. When initially interviewed by Officer Keith Lee, K.S. denied sending Seeger any sexually explicit images while she was a minor, but a week later she recanted, admitting she had lied and that explicit photos were sent to Seeger during her minority. JA 71, 76-80, 479.

Between K.S.'s first and second contacts with Officer Lee, a Texas professor contacted West Virginia Trooper Tyler Nicholson, reporting concerns that one of his students, K.S., might be the victim of a child-pornography offense related to Seeger. JA 441-442; JA 45. Nicholson later spoke directly with Officer Lee, who advised that K.S. sometimes provided inaccurate information, later recanted, and that he doubted her earlier claim that no images were sent before she turned eighteen. JA 85- 86, 122;

JA 45. In his own subsequent telephone contact with K.S., Nicholson was told that she had provided nude or explicit photos to Seeger when she was about fourteen, but she also stated she did not know whether Seeger had retained any such images in the intervening seven years. JA 441-42; JA 45.

Relying on this information, Nicholson concluded he had probable cause to search Seeger's residence in Preston County, West Virginia. JA 442-43. Nicholson, who had been out of the academy a little more than two years, consulted his supervisor, Sergeant Wyatt, who directed him to seek a warrant from the Preston County Circuit Court and provided him with a form affidavit to use in that court of record. JA 83, 88, 91. Although the West Virginia Supreme Court had promulgated a combined affidavit–warrant–receipt template available in an automated system, Nicholson did not use it because it was designed for magistrate-court warrants and instead prepared only an "Affidavit and Complaint for Search Warrant." JA 88- 90; JA 38.

Nicholson's affidavit sought authority to search "310 Hilltop Drive" and to seize all electronic devices at that location, but it did not expressly state that this address was Seeger's residence or otherwise link Seeger to that address on the face of the document. JA 90; JA 38. Nicholson testified he had learned independently, through DMV records, that 310 Hilltop was Seeger's address, but he omitted that

information from the affidavit. JA 90. The affidavit also omitted Officer Lee's observations and concerns about K.S.'s inconsistent and recanted statements, despite Nicholson's awareness that K.S. sometimes provided inaccurate information and then corrected herself. JA 441-42; 466-67; JA 45.

Nicholson presented the affidavit to Circuit Judge Raymon Shaffer, who placed him under oath and signed the affidavit. JA 443, 446-47; 96- 98. Nicholson did not prepare or present a separate search-warrant document, and Judge Shaffer did not sign any warrant form. JA 443, 446-447. Nicholson later acknowledged that the affidavit itself was not a warrant and that he had no recollection of ever obtaining a warrant from the judge. JA 98, 120.

After obtaining copies of the filed affidavit packet from the circuit clerk, Nicholson waited for another trooper, Morris, to come on duty. JA 98-99. Together, they went to 310 Hilltop Drive on March 29, 2021, where they encountered Seeger and conducted a search of the residence, seizing multiple electronic devices. JA 443; 98-100; 109. When Seeger asked whether they had a warrant, Nicholson told him that he did, but when Seeger asked to see it, Nicholson put him off, indicating he had "something else to do" with it and that Seeger would receive a copy before they left—a reference, in retrospect, to completing a property-receipt form rather than producing a warrant. JA 447, 102, 114.

No forensic examination of the seized devices occurred on-site; instead, Nicholson transported them to the West Virginia State Police evidence room and then to the WVSP Digital Forensics Laboratory in Monongalia County. JA 109- 112; 476. On April 19, 2021—twenty-one days after the seizure—Nicholson obtained a separate warrant from the Preston County Magistrate Court authorizing a digital search of the devices, which was not executed until April 26, 2021. JA 444; 111-112. Laboratory personnel performed the digital examination outside the ten-day period prescribed by W. Va. Code § 62-1A-4 and the prompt-execution requirements of W. Va. R. Crim. P. 41. JA 444; 111-112. The forensic analysis ultimately recovered multiple images and videos of child sexual abuse material (CSAM) and extensive chat communications, including material later attributed to Jane Doe–1, Jane Doe–2 (K.S.), and other minors. JA 476, 480-87.

Because the underlying state proceedings had been expunged, the parties sought and obtained an order unsealing the state-court file. JA 445-46. When Judge Shaffer reviewed the sealed, expunged file in this matter, he found no search-warrant document for the March 29, 2021, search of Seeger's residence. JA 446-47; 137- 139, 141- 46. He testified by telephone at the federal suppression hearing that his usual practice was to review both an affidavit and a proposed warrant, but that in this case, after examining the file, he could not locate a warrant and had no specific recollection

of signing one. JA 137-39; 141-46. Nicholson likewise testified that, upon later review, "the page titled 'Search Warrant' wasn't present" and that he had "no specific recollection" of having any document other than what had been produced in discovery, describing his reaction as "a tad bit of a panic attack" when he realized the warrant was missing and his efforts to locate it. JA 97-98.

FBI Special Agent Ed Ryan testified that another alleged victim, P.G., was identified only because of information recovered from one of Seeger's seized devices, and that without that digital evidence, the government would not have learned of her. JA 66- 74. The PSR similarly notes that the federal investigation and subsequent indictment followed the state case and that the forensic review of Seeger's devices in 2023 confirmed the presence of CSAM and additional victims. JA 476; 480- 87.

Seeger filed two motions to suppress: one challenging the March 29, 2021, home search and seizure of his devices, and another challenging the April 26, 2021, digital search. JA 29; 47. He argued that the March 29 search was conducted without a warrant and without any recognized exception, that the information supporting probable cause was unconstitutionally stale, and that Nicholson's affidavit omitted material impeachment of K.S. in violation of *Franks v. Delaware*. JA 438-39; 453- 468; JA 29; 47.

After evidentiary hearings on April 14 and 15, 2025, at which Nicholson, Officer Lee, Judge Shaffer, and Agent Ryan testified, the district court issued a sealed order denying both suppression motions. JA 438. The court found that "no search warrant was signed in March of 2021" and that "Trooper Nicholson executed the search of Defendant's residence without a search warrant," concluding that the March 29 search of Seeger's home was unconstitutional. JA 453- 456. Nonetheless, the court held that suppression was not warranted because Nicholson's failure to obtain a warrant amounted to "inadvertent" or "isolated negligence" and, in the court's view, the social costs of exclusion outweighed any deterrent benefit. JA 456- 461. The court separately rejected Seeger's staleness argument, reasoning that evidence of child pornography "may be kept for long periods" and crediting Nicholson's general statement that offenders tend to store such material. JA 462-64. It also denied Seeger's request for a *Franks* hearing, accepting Nicholson's explanation that he chose to rely on what K.S. told him directly and deeming the omitted impeachment of her credibility immaterial. JA 466- 68.

Following the denial of his suppression motions, Seeger entered a conditional plea of guilty to Counts One and Four of the federal indictment, pursuant to a Rule 11(c)(1)(C) plea agreement that preserved his right to appeal the district court's suppression rulings. JA 475; 215. On September 18, 2025, the district court

sentenced Seeger to a term of imprisonment within the agreed-upon cap and imposed restitution under 18 U.S.C. §§ 2259, 3663, and 3663A, including at least $3,000 in restitution per identified victim under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. JA 477, 487. This appeal timely followed.

## SUMMARY OF THE ARGUMENTS

The district court correctly found that Trooper Nicholson executed a warrantless search of Steven Seeger's home on March 29, 2021, and that no search warrant was ever signed authorizing that entry. JA 443, 446-47, 453- 456. That finding should have compelled suppression. Under *Katz v. United States*, 389 U.S. 347, 357 (1967), and *Groh v. Ramirez*, 540 U.S. 551, 559 (2004), a warrantless home search is per se unreasonable absent a narrowly defined exception, and the exclusionary rule applies unless the government proves a recognized exception such as independent source, inevitable discovery, or attenuation. *Utah v. Strieff*, 579 U.S. 232, 238–39 (2016), confirms that those are the only exceptions. The government proved none here. Instead, the district court fashioned an extra-textual "inadvertent negligence" safe harbor, reasoning that Nicholson's failure to obtain a warrant was isolated and non-flagrant and that suppression would not "pay its way." JA 456- 461. That reasoning conflicts with Supreme Court and Fourth Circuit precedent, including *United States v. Jones*, 565 U.S. 400, 404 (2012), and *United States v. Moss*,

963 F.2d 673, 677–79 (4th Cir. 1992), which do not permit courts to excuse a warrantless home search simply because an officer tried, but failed, to complete the warrant process. Because all the challenged evidence flows from this unconstitutional home search, the exclusionary rule required suppression of the physical devices and the later digital evidence, and the district court's refusal to suppress was reversible error.

The warrant also failed for lack of timely probable cause. By the time Nicholson sought judicial authorization to search Seeger's residence in March 2021, the core misconduct described in his affidavit—K.S.'s sending of nude or explicit images as a minor—was alleged to have occurred seven years earlier, around 2013–2014. JA 441- 443; JA 71, 76-79; 478-79. Even then, K.S. told Nicholson she did not know whether Seeger had retained any images in the intervening years. JA 441-42; JA 45. There was no evidence of any recent downloads, uploads, subscriptions, or other child-pornography activity, and no prior seizures or convictions. JA 462-64. Instead, Nicholson relied on a generic assertion that, in his experience, individuals who possess child pornography "store and save" such material. JA 464. This Court's decision in *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984), makes clear that staleness must be evaluated in light of the nature and duration of the alleged activity, and that aged, uncorroborated information cannot support a present

inference of possession. Unlike cases such as *United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010), and *United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019), which involved recent, traceable online activity and other indicia of an ongoing collection, the affidavit here contained no such contemporaneous facts. By treating a years-old allegation and boilerplate "collector" language as sufficient, the district court effectively adopted a categorical rule that any past suspicion of child pornography justifies a search of a suspect's current home, no matter how much time has passed. The Fourth Amendment requires a case-specific showing of a fair probability that evidence will be found "at the time of the search." *Allen*, 631 F.3d at 172. That showing was absent here, and the warrant was invalid on staleness grounds.

The district court also erred in denying a *Franks v. Delaware*, 438 U.S. 154 (1978), hearing. Nicholson's affidavit depended entirely on K.S. to establish that any child-pornography offense occurred, yet he deliberately omitted material facts bearing directly on her credibility. JA 441-42, 466-67. Before drafting the affidavit, Nicholson learned from Officer Lee that K.S. had initially denied sending any illegal images, later recanted, and that Lee doubted her truthfulness about her age and the timing of the images; Lee characterized her statements as "a mix of information" and expressed concern that she was "not being completely honest." JA 85- 86, 122; JA 45. Nicholson nonetheless chose not to disclose any of this to the issuing judge,

explaining at the suppression hearing that he "only wanted to use information that [he] was given directly from the victim as to keep it as honest as it could be." JA 92. Under *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990), an affiant may not omit material impeaching facts with the effect of making an affidavit misleading, and under *United States v. Wharton*, 840 F.3d 163, 167–70 (4th Cir. 2016), a defendant is entitled to a hearing when he makes a substantial preliminary showing that such omissions were deliberate or reckless and material. When the omitted credibility evidence is added back, the "corrected" affidavit presents, at best, a conflicted, stale allegation from a witness whose reliability is seriously in question, with no independent corroboration tying her claims to Seeger's home. On these facts, Seeger met the *Franks* threshold, and the district court's refusal to grant a hearing was legal error.

The district court's treatment of the digital-search warrant and the timing of the forensic examination provides an additional, independent ground for suppression under *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019). On March 29, 2021, officers seized Seeger's phones, computer, external drives, and other devices during the unconstitutional home entry. JA 443; 98-100; 109. They then held those devices for twenty-one days before obtaining an April 19 warrant to search their contents, and another week passed before the forensic examination on April 26. JA 444, 110-111.

Under *Pratt*, courts must assess such delays by balancing the length of the delay, the defendant's possessory interest, the government's justification, and the officers' diligence. 915 F.3d at 271–73. Here, Seeger suffered a weeks-long total deprivation of the digital devices that functioned as his papers and effects; he expressed concern that the seizure would hamper his employment, underscoring the weight of his possessory interest. JA 82-83; 476. The government offered no concrete, case-specific justification for the delay beyond routine workflow, and there is no evidence of diligent, ongoing investigative steps that depended on postponing the warrant. JA 444, 462-63. *Pratt* holds that an unjustified thirty-one-day delay in seeking a warrant to search a seized phone violates the Fourth Amendment and requires suppression. 915 F.3d at 273–77. The twenty-one-day delay here, following an already unconstitutional home search and lacking any meaningful justification, is constitutionally indistinguishable. By refusing to apply *Pratt* and by minimizing the delay as "simple, isolated negligence," the district court misapplied controlling law and improperly admitted the digital evidence and derivative counts, including those based on the later-identified victim P.G. JA 66- 74.

Finally, the restitution order violates the Ex Post Facto Clause under the Supreme Court's recent decision in *Ellingburg v. United States*, No. 24-482 (U.S. Jan. 20, 2026). In *Ellingburg*, the Court unanimously held that restitution imposed under

the Mandatory Victims Restitution Act is "plainly criminal punishment" for Ex Post Facto purposes and that later statutory amendments that increase a defendant's restitution exposure cannot be applied to pre-amendment conduct. The conduct underlying Seeger's convictions in Counts One and Four occurred between 2011 and 2014. JA 473. Congress did not enact the Amy, Vicky, and Andy Child Pornography Victim Assistance Act's "not less than $3,000" per-victim restitution floor and expanded loss provisions until 2018. Yet the PSR and the district court explicitly invoked § 2259 and the Amy, Vicky, and Andy Act, recommending and imposing restitution of at least $3,000 per victim—including K.D., whose losses arise from uncharged conduct—under the post-2018 framework. JA 327, 477, 486-87. As in *Ellingburg*, this retroactive application of a harsher restitution regime "increases the quantum of punishment after the fact" and thus violates the Ex Post Facto Clause. The fact that Seeger's plea agreement anticipated restitution does not cure the constitutional defect; a defendant cannot bargain away protection against the retroactive imposition of more severe criminal penalties. Under *Ellingburg*, the restitution portion of the judgment must be vacated, and the case remanded for resentencing under the restitution statutes in effect at the time of the offense conduct.

## ARGUMENTS

I.    **The District Court Erred by Refusing to Suppress Evidence Where Officers Conducted a Warrantless Home Search and Then Invented an "Inadvertent Negligence" Escape Hatch Unknown to Fourth Amendment Law**

### Standard of Review

This Court reviews factual findings on a motion to suppress for clear error and legal conclusions de novo. *United States v. Palmer*, 820 F.3d 640, 644 (4th Cir. 2016).

### Argument

The Fourth Amendment establishes a simple rule: a search of a home conducted without a valid warrant is "per se unreasonable" absent a narrowly defined exception, and the remedy for such a violation is exclusion of the fruits of the search. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). In this case, the district court expressly found that "no search warrant was signed in March of 2021" and that Trooper Nicholson "executed the search of Defendant's residence without a search warrant," rendering the March 29 entry unconstitutional. Despite that core Fourth Amendment violation, the court declined to suppress any evidence, reasoning that Nicholson's failure to secure a warrant was, at worst, "inadvertent" or "isolated negligence" and that suppression would not

"pay its way" in deterrence. That analysis is irreconcilable with controlling Supreme Court and Fourth Circuit precedent, which recognizes only three narrow exceptions to the exclusionary rule—independent source, inevitable discovery, and attenuation—and does not authorize a freestanding "inadvertent negligence" exception, particularly where the constitutional defect is the complete absence of a warrant. *Utah v. Strieff*, 579 U.S. 232, 238–39 (2016); *United States v. Jones*, 565 U.S. 400, 404 (2012); *Mapp v. Ohio*, 367 U.S. 643, 655–57 (1961). Because the government did not prove any recognized exception and the facts admit of none, the Fourth Amendment required suppression of all evidence obtained from the home search and its fruits.

## A.  The Record Establishes an Unconstitutional, Warrantless Home Search

At the suppression hearing, Trooper Nicholson candidly admitted that on March 29, 2021, he had only a signed "Affidavit and Complaint for Search Warrant," not an actual warrant authorizing a search of 310 Hilltop Drive. He acknowledged that he never drafted a separate warrant document and that Judge Shaffer did not sign one in his presence; instead, the judge signed only the affidavit, and Nicholson left believing he somehow had both documents. When the expunged state-court file was later unsealed at the government's request, it contained no search warrant—only

the affidavit and related paperwork. Judge Shaffer reviewed his file and testified that he could not locate a signed warrant for the March 29 search and had no specific recollection of issuing one in this case. Confronted with these facts, the district court found that "there was not a search warrant related to the March 29, 2021, search in the file," that Nicholson "only possessed a signed affidavit and complaint for search warrant," and that "no search warrant was signed in March of 2021."

Despite that, Nicholson and another trooper went to Seeger's home, confronted him in the yard, and proceeded to search the residence and seize multiple electronic devices. When Seeger asked if they had a warrant, Nicholson told him that he did; when Seeger asked to see it, Nicholson stalled and referred vaguely to paperwork he needed to complete, later admitting that he never produced any warrant because he had none to show. No exception to the warrant requirement applies here: Seeger was in his own home, there was no hot pursuit or exigency, and the government has never claimed consent. The district court correctly recognized that "the March 29, 2021, search of Seeger's home was unconstitutional" because it was a warrantless home search unsupported by any recognized exception.

Under black-letter law, that should have ended the analysis. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few

specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357; *Groh*, 540 U.S. at 559. And where the government obtains evidence in an unconstitutional home search, the exclusionary rule generally requires suppression unless the government proves that the evidence was acquired through an independent source, inevitably would have been discovered, or is sufficiently attenuated from the illegality. *Murray v. United States*, 487 U.S. 533, 537–42 (1988); *Nix v. Williams*, 467 U.S. 431, 443–44 (1984); *Strieff*, 579 U.S. at 238–39. The government made no such showing here.

## B. The District Court Invented an "Inadvertent Negligence" Exception that Conflicts with Supreme Court and Fourth Circuit Precedent

Instead of applying the settled framework, the district court crafted an extra-textual exception: it held that because Nicholson's failure to obtain a warrant was, in its view, "inadvertent" and not "deliberate, reckless, or grossly negligent," the exclusionary rule did not apply. In so doing, the court borrowed language from the Supreme Court's discussion of when deterrence benefits outweigh costs in marginal cases—but then extended it far beyond its proper context to excuse a core violation: entering and searching a home with no warrant at all.

The Supreme Court has repeatedly cautioned that the good-faith and deterrence analyses operate at the margins of the exclusionary rule, not at its core.

In *United States v. Leon*, 468 U.S. 897 (1984), the Court created a good-faith exception for officers who reasonably rely on a warrant later found to be defective, reasoning that the exclusionary rule's deterrent value is minimal where the police act on a judge's authorization. But *Leon* presupposed the existence of a warrant; it expressly did not authorize courts to excuse warrantless searches of homes on the theory that officers tried but failed to get one. See *Groh*, 540 U.S. at 565 n.8 (declining to extend *Leon* where warrant failed to describe items to be seized; "no reasonable officer could believe that a warrant that plainly did not comply with the requirement could be valid."). As the Fourth Circuit has put it, "the good faith exception to the exclusionary rule cannot apply where no warrant at all has been obtained." *United States v. Moss*, 963 F.2d 673, 677–79 (4th Cir. 1992).

More recently, in *Strieff*, the Court cataloged the limited exceptions to the exclusionary rule: independent source, inevitable discovery, attenuation, and the *Leon*-type good-faith reliance on a warrant or binding precedent. 579 U.S. at 238–39. It did not add a free-floating "inadvertent negligence" exception. To the contrary, the Court emphasized that when officers engage in "flagrant or purposeful" Fourth Amendment violations—especially in the home—suppression remains the ordinary remedy notwithstanding the costs. *Id.* at 239–40.

Here, the district court flipped that logic. It acknowledged that "there was not a search warrant related to the March 29, 2021, search," that Nicholson "only possessed a signed affidavit and complaint," and that the home search was unconstitutional. It further acknowledged that none of the classic exceptions— independent source, inevitable discovery, or attenuation—applied. Yet it refused to suppress the evidence because it deemed Nicholson's mistake "isolated" and not the kind of culpable conduct the Court has described as warranting exclusion. That reasoning creates exactly the kind of non-textual exception *Strieff* warns against and erodes the bedrock rule that officers must obtain a warrant before crossing the threshold of a home.

The court's reliance on *United States v. Walker*, an unpublished district court decision from another circuit, underscores the error. In *Walker*, the court addressed a motion to reconsider the denial of suppression and applied a fact-specific attenuation analysis in the context of an existing warrant and different procedural posture. 2025 WL 257129 (E.D. Pa. Jan. 21, 2025). Whatever its merits, *Walker* neither binds this Court nor alters the Supreme Court's clear instruction that only limited, historically grounded exceptions qualify—and it certainly does not authorize a Fourth Amendment regime in which officers who enter

a home without any warrant escape suppression whenever their failure is later labeled "negligent."

### C. Under Established Exclusionary-Rule Doctrine, the Evidence from the March 29 Search and Its Fruits Must Be Suppressed

Once the warrantless nature of the home search is recognized, the exclusionary rule applies in its traditional form. Evidence obtained directly from the illegal search—and evidence later derived from that search—must be suppressed unless the government proves an exception. *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963). That includes not only the physical devices seized from Seeger's home but also the digital contents later examined under the April 19, 2021, warrant, as those contents are the direct fruits of the initial unlawful entry.

No independent-source exception applies because the state and federal investigations both trace their genesis to the March 29 seizure and the devices it yielded. Agent Ryan testified that the government discovered additional alleged victims—including P.G.—only because of the digital evidence recovered from Seeger's devices; without the March 29 search and the subsequent forensic work, those victims would have remained unknown. That is the opposite of an independent source; it is the textbook "fruit of the poisonous tree."

Nor does inevitable discovery save the evidence. The government did not demonstrate that, absent the unconstitutional home search, it possessed an ongoing, lawful avenue of investigation that would have inevitably led to the same devices and images. The mere fact that officers might have sought a warrant or that they believed they had enough information to do so does not satisfy *Nix*, which requires a concrete, lawful investigative path that was already in motion. 467 U.S. at 444–48. Here, the only "path" to the evidence was the unlawful entry itself.

Attenuation likewise has no purchase. The temporal gap between the home search and the digital-search warrant does not break the causal chain; the latter warrant was obtained to search the very devices seized during the unconstitutional search, and the forensic results were entirely dependent on that initial seizure. The April 19 warrant did not rest on new, intervening information or events independent of the March 29 search; it was simply a second step in exploiting its fruits.

Under *Jones*, *Mapp*, and *Moss*, the absence of a warrant at the moment officers entered Seeger's home is dispositive. 565 U.S. at 404; 367 U.S. at 655–57; 963 F.2d at 677–79. Because the government conducted a warrantless home search, failed to prove any recognized exception, and then used the fruits of that search to build its entire federal case, the exclusionary rule required suppression. The district court's

refusal to apply that rule—based on an invented "inadvertent negligence" exception—was legal error and an abuse of discretion.

### D. Deterrence Strongly Favors Suppression in This Case

Even on the district court's own deterrence-cost calculus, this is not a close case. The Supreme Court has repeatedly emphasized that the exclusionary rule's deterrent purpose is at its apex when officers disregard the warrant requirement for home searches. *Payton v. New York*, 445 U.S. 573, 585–90 (1980); *Groh*, 540 U.S. at 559–65. Allowing the government to retain the benefits of a home search conducted with no warrant—on the theory that the officer tried but failed to complete the necessary paperwork—signals to law enforcement that the judicially-created exceptions have swallowed the rule. As defense counsel pointed out at the suppression hearing, if a case like this is deemed "good faith," "we have used the good faith exception to really eviscerate everything that's left in the Fourth Amendment."

The facts here, moreover, show more than a "technical" mistake. Nicholson did not simply mis-type an address or omit a date; he never obtained a warrant in the first place, told the homeowner he had one when he did not, and then searched the home and seized every digital device. That conduct comes far closer to the "flagrant" disregard of constitutional requirements that *Strieff* and *Leon* identify as warranting

exclusion than to the kind of marginal, clerical error those cases sought to address. 579 U.S. at 239–40; 468 U.S. at 919–21.

Against this, the "social cost" of exclusion is precisely the cost the Fourth Amendment contemplates: some prosecutions will be harder or impossible when the government has chosen to build its case on unconstitutional searches. As the Court has made plain, that is a price the Constitution requires courts to pay to preserve meaningful protection for the home. *Mapp*, 367 U.S. at 659. By prioritizing outcome over process and allowing the results of an undisputedly warrantless home search to stand, the district court undermined that constitutional safeguard.

Because officers entered and searched Seeger's home without a warrant or valid exception, because all the challenged evidence flows from that unconstitutional entry, and because no recognized exception to the exclusionary rule applies, this Court should reverse the denial of suppression and hold that all evidence derived from the March 29, 2021, search must be excluded.

## II.     The District Court Erred in Concluding Probable Cause Existed Because the Evidence Was Stale

### Standard of Review

This Court reviews the district court's legal conclusions de novo and its factual findings for clear error, considering the evidence in the light most favorable to the government. *United States v. Kolsuz*, 890 F. 3d 141-42 (4th Cir. 2018).

**Argument**

The Fourth Amendment requires that a warrant be supported by probable cause to believe evidence of a crime will be found in the place to be searched at the time of the search, not merely that a crime occurred at some point in the past. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). Information is "stale" when it is too old, relative to the nature of the alleged offense and the facts tying it to the location, to support a fair probability that the items sought remain there. *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984).

Here, Trooper Nicholson's affidavit rested on years-old, uncorroborated allegations by K.S. about images she said she sent as a teenager, coupled with a generic assertion that child-pornography offenders "often" retain such material, and nothing more. By 2021, when he sought authority to search 310 Hilltop Drive, the core conduct he described had occurred **seven to ten years earlier**, and even K.S. told him she did not know whether Seeger had retained any images. In treating those remote allegations as sufficient and invoking broad assumptions about offender behavior in lieu of case-specific facts, the district court diluted the staleness doctrine beyond recognition and effectively adopted a categorical rule that any prior allegation of child pornography justifies a search of whatever residence the suspect presently occupies, no matter how much time has passed. That approach cannot be reconciled

29

with this Court's precedent or with decisions from other circuits applying a nuanced, fact-dependent staleness analysis in child-pornography cases.

The starting point is the timeline. The affidavit recounted that K.S. reported in early 2021 that she had been in an online relationship with Seeger beginning when she was approximately fourteen, that she had sent him nude or explicit images during her minority, and that years later—by then an adult college student—she complained he had sent partially clothed photos of her to others as "revenge porn." The alleged child-pornography conduct thus dates to around 2013–2014, when K.S. was a minor, whereas the search of Seeger's home occurred on March 29, 2021—a gap of roughly seven years. Moreover, when Nicholson spoke to K.S. directly, she told him she did not know whether Seeger had kept any of the images in the intervening years. There was no evidence of any recent sexual-exploitation offense, no indication that Seeger had ever been charged or convicted in connection with K.S., and no suggestion that law enforcement had intercepted any contraband transmissions from him in the years leading up to 2021. Instead, Nicholson relied on a stale, historical account of an online relationship that had begun when K.S. was a teenager and on his generalized training-and-experience statement that people who possess child pornography tend to retain it.

This Court has long held that such bare temporal and behavioral inferences are not enough where the government cannot show an ongoing course of conduct or some concrete link between the aged allegations and the location to be searched. In *McCall*, for example, the Court invalidated a warrant based on information that was several months old and uncorroborated, emphasizing that the staleness inquiry turns on "the nature of the unlawful activity and the length of the activity, not merely the number of days that have elapsed." 740 F.2d at 1336. More recently, in *United States v. Krueger*, 145 F.4th 460 (4th Cir. 2025), the Court sustained a warrant where agents had evidence of specific online child-pornography activity and paid access that persisted over time, narrowing the staleness window by pointing to facts demonstrating that the suspect remained engaged in the offense. The very distinctions *Krueger* highlights are absent here. There was no evidence Seeger had ever subscribed to child-pornography services, no IP-address or hash-value matches tying him to known contraband, and no showing that he had an enduring pattern of collecting or distributing child pornography; the only direct evidence was K.S.'s belated claim that she had once sent him images as a minor.

Other circuits have likewise cautioned that, while some child-pornography cases may tolerate a longer staleness period, that flexibility does not relieve the government of its obligation to supply case-specific facts showing a present

probability that evidence will be found. In *United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010), this Court upheld a warrant obtained four months after the defendant attempted three times to access a download link, but it stressed that the officers had concrete evidence of those recent attempts and that such conduct, in combination with other facts, supported an inference that material remained on his devices. In *United States v. Vosburgh*, 602 F.3d 512 (3d Cir. 2010), and *United States v. Contreras*, 905 F.3d 853 (5th Cir. 2018), the courts upheld warrants obtained months after known downloads or uploads, again emphasizing that the defendants' recent, traceable interaction with child-pornography files provided a strong basis to believe those files persisted. And in *United States v. Morales-Aldahondo*, 524 F.3d 115 (1st Cir. 2008), a three-year gap was tolerated only because there was evidence the defendant had maintained a child-pornography collection over time, including recovering contraband during a prior search.

Seeger's case could not be more different. At the time Nicholson drafted his affidavit, there was no evidence of any recent criminal activity; no downloads, uploads, or website activity linked to Seeger; no prior seizures or charges; and no admissions beyond his statement, to a Texas officer, that he had received videos from K.S. and "deleted" them. The "nature of the unlawful activity," as framed by the affidavit, was a long-ended, online relationship between a then-adult man and a

then-minor girl, not a demonstrable pattern of ongoing child-pornography trafficking or collection. K.S. herself told Nicholson she did not know whether Seeger had kept any images, and there was no evidence—such as statements about a "stash," prior prosecutions, or paid subscriptions—that would support an inference he was the sort of entrenched collector who keeps contraband for many years. In *United States v. Bosyk*, this Court identified precisely such factors as relevant to extending the staleness window: evidence that the suspect had paid for access to child pornography, had a history of such offenses, or had taken elaborate steps to acquire and preserve illegal material. 933 F.3d 319, 331 (4th Cir. 2019). None of those factors exists here.

The only attempt to bridge this evidentiary gap was Nicholson's boilerplate assertion that, in his experience, individuals who possess child pornography "store and save" it. The district court leaned heavily on that statement, asserting that "evidence of child pornography may be kept for long periods" and treating this generic proposition as sufficient to overcome the seven-year lapse. But courts have repeatedly rejected the idea that such broad assumptions can substitute for particularized, case-specific facts. In *United States v. Lacy*, the Ninth Circuit upheld a warrant in part because the affidavit contained detailed information about the defendant's known downloads and his prior history, but it cautioned that "some offenses may warrant a less rigid staleness doctrine" only if the affidavit "provide[s]

facts supporting a present probability" of finding evidence. 119 F.3d 742, 746–47 (9th Cir. 1997). The Second Circuit made the same point in *United States v. Raymonda*, finding staleness where "the only detailed allegations concerned conduct that occurred years earlier" and rejecting the notion that generic statements about collectors could "resurrect" long-cold allegations. 780 F.3d 105, 114–16 (2d Cir. 2015). Here, too, Nicholson's training-and-experience paragraph cannot cure the absence of any concrete indication that Seeger actually retained illegal images from 2013–2014 into 2021.

The weakness of the staleness showing is compounded by the affidavit's failure to tie the alleged conduct to the place searched. Nicholson's affidavit sought authority to search "310 Hilltop Drive" and to seize all electronic devices there, but it did not state on its face that this was Seeger's residence or otherwise explain why evidence of K.S.'s years-old images would likely be located there. Nicholson testified he had learned from DMV records that 310 Hilltop was Seeger's address, yet he omitted that fact from the affidavit. Thus, even if one assumes K.S.'s allegations were true and not stale, the affidavit still lacked a clear nexus between that remote misconduct and the specific premises searched. *Allen* requires that the affidavit demonstrate a fair probability that evidence will be found "in the place to be searched," not merely that the suspect once committed a crime somewhere. 631 F.3d

at 172. The district court's decision effectively bypassed that requirement, treating any connection between Seeger and the address as sufficient, regardless of the temporal gulf.

In defending the warrant, the district court relied on cases like *Richardson* and *Bosyk* to suggest that evidence of child pornography "lingers," but it failed to acknowledge the facts that made those cases different: there, agents had concrete, recent evidence of the defendants' online activity and, in *Bosyk*, an encrypted link to a specific file, all of which supported an inference of ongoing possession. 607 F.3d at 370–71; 933 F.3d at 326–29. By contrast, the government here "did not even attempt to prove the existence of any evidence" of continuing child-pornography conduct—no financial records, no file-sharing software, no ISP logs, no prior seizures, and no admissions beyond dated statements about K.S. As the draft brief notes, the district court's rationale "would hollow out any Fourth Amendment protections for anyone even believed to be involved in child pornography," allowing officers to search a suspect's home years later on nothing more than an old allegation and a generalized belief that some offenders keep contraband.

The Constitution demands more. The staleness doctrine is not a technicality; it is a substantive safeguard ensuring that warrants are grounded in present

probabilities rather than historical suspicions. *McCall*, 740 F.2d at 1336. In this case, the government asked a state judge to authorize a sweeping search of Seeger's home based on uncorroborated, seven-year-old allegations from a witness whose credibility was already in doubt, with no evidence that he still possessed any contraband and no concrete tie between those allegations and the residence to be searched. That showing was insufficient to establish probable cause, and the district court erred in holding otherwise. Because the warrant was unsupported by timely, case-specific facts, the resulting search violated the Fourth Amendment, and all evidence derived from it should have been suppressed.

## III. The District Court Erred by Denying a *Franks* Hearing Despite a Substantial Preliminary Showing That Material Impeaching Facts About the Sole Witness Were Omitted from the Affidavit

### Standard of Review

Denial of a *Franks* hearing is reviewed de novo as to legal sufficiency, and for clear error as to findings of fact. *United States v. Moody*, 931 F.3d 366, 371 (4th Cir. 2019).

### Argument

A *Franks* claim goes not to the ultimate merits of suppression, but to a defendant's threshold right to an evidentiary hearing when he makes a substantial preliminary showing that the affiant "knowingly and intentionally, or with reckless

disregard for the truth," included false statements or omitted material facts necessary to the probable-cause determination. *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *United States v. Wharton*, 840 F.3d 163, 167 (4th Cir. 2016). Where the alleged problem is omission, the defendant must show both that the omission was made deliberately or recklessly and that its inclusion would defeat probable cause when the affidavit is "corrected" to add the missing facts. *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990). Here, Seeger met that burden. The record shows Trooper Nicholson consciously withheld highly impeaching information about K.S.'s credibility—information he himself documented and later acknowledged—despite the fact that his affidavit relied almost entirely on her uncorroborated account to establish probable cause. When that omitted information is restored to the probable-cause calculus, the thin nexus to Seeger's home becomes even weaker and at least warrants adversarial testing at a *Franks* hearing. The district court's refusal to hold such a hearing misapplied *Franks* and its Fourth Circuit progeny.

### A. Seeger Made the Required Substantial Preliminary Showing of a Deliberate or Reckless Omission

The first *Franks* prong requires a "substantial preliminary showing" that the affiant acted knowingly or with reckless disregard for the truth. That standard is met where the record demonstrates the affiant was actually aware of impeaching or contradictory information and made a conscious decision not to provide it to the

issuing judge. *Wharton*, 840 F.3d at 168; *Colkley*, 899 F.2d at 301. That is precisely what occurred here.

Nicholson's own report and suppression-hearing testimony establish that before he drafted his affidavit, he spoke at length with Corporal Keith Lee, the Texas officer who first interviewed K.S. Lee told him K.S. had given "a mix of information," that she had not been "completely honest" about when images were sent and about her age, and that he doubted her initial claim that no images were transmitted before she turned eighteen. Nicholson acknowledged this on the stand, explaining that Lee reported K.S.'s answers changed when he revisited questions, particularly regarding her age at the time of the images and the timing of the relationship. Nicholson also knew—from his review of Lee's report—that K.S. had first denied sending any sexually explicit images as a minor and only later recanted that denial.

Despite this, Nicholson chose not to disclose any of those credibility problems to the issuing judge. He admitted he omitted Lee's observations about K.S.'s inconsistent statements, as well as the broader "revenge porn" context that prompted the Texas investigation. His explanation was not that he forgot those facts or was unaware of their import; rather, he testified he "only wanted to use information that I was given directly from the victim as to keep it as honest as it could

be." That is an admission that he made a conscious, selective judgment about what to share with the magistrate, privileging K.S.'s later, self-serving account and withholding another trained officer's contemporaneous doubts about her credibility.

This is not a case in which a defendant complains about the omission of every conceivable detail gathered in an investigation. See *Lull v. United States*, 824 F.3d 109, 115 (4th Cir. 2016). It is a case where the affiant received specific, documented warnings that his sole informant was inconsistent and possibly dishonest on the very issues that supplied probable cause—her age at the time of the images and whether unlawful images were sent at all—then deliberately presented her story as if no such credibility concerns existed. Under *Colkley*, omitting material impeaching facts about the only witness whose account establishes probable cause is the paradigmatic example of a reckless or intentional omission. 899 F.2d at 301 ("An affiant cannot be expected to include every piece of information gathered … but may not omit facts with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading."). On this record, Seeger easily made a substantial preliminary showing that Nicholson did just that.

### B. The Omitted Credibility Facts Were Material Because the Affidavit Rose and Fell on K.S.'s Word

The second *Franks* prong asks whether, if the omitted information is added to the affidavit and any falsehoods excised, the "corrected" affidavit would still

establish probable cause. *Franks*, 438 U.S. at 171–72; *Wharton*, 840 F.3d at 169. The district court concluded Seeger failed this step, reasoning that Nicholson's direct interview with K.S. made Lee's doubts about her credibility immaterial. That conclusion misapprehends both the nature of the omission and the fragility of the probable-cause showing in this case.

On its face, the affidavit depended entirely on K.S. to establish that any child-pornography offense involving Seeger occurred at all. There were no controlled buys, no undercover downloads, no hash-value matches, and no prior convictions or admissions involving child pornography. The only asserted basis to believe that unlawful images existed and might be found at Seeger's home was K.S.'s assertion— seven years after the fact—that she had sent him explicit images as a minor, combined with Nicholson's generic experience statement that such images are sometimes retained. Even the link between that conduct and the address to be searched was weak: the affidavit did not state that 310 Hilltop was Seeger's residence, and it contained no concrete facts showing that any images were stored there. In this context, K.S.'s credibility was not just relevant; it was the linchpin of probable cause.

When the omitted facts are added back in, the issuing judge would have been told that: (1) K.S. initially denied any illegal images were sent and only later reversed herself; (2) an experienced sex-crimes officer who interviewed her in person thought

her body language and shifting answers showed she was not being fully truthful about her age and the timing of the images; and (3) even in her later account, she professed uncertainty about whether Seeger had kept any images during the intervening seven years. Those facts go to the heart of whether there was a fair probability that evidence of an offense would still be found in Seeger's home in 2021, rather than simply reflecting a long-ended, online relationship.

In *Wharton*, the Fourth Circuit held that omissions about an informant's reliability can be material where the informant's statements are "crucial to the finding of probable cause." 840 F.3d at 169–70. The same is true here. A "corrected" affidavit that forthrightly disclosed K.S.'s initial denial, subsequent recantation, and Lee's skepticism about her truthfulness would present, at best, a conflicted, stale allegation that years-old images might once have existed, but with no basis to believe they still did and no independent corroboration connecting them to the place to be searched. That is the very scenario in which courts have found probable cause lacking or highly debatable. See, *e.g.*, *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) (information too old and unsupported to support inference that evidence remained). At a minimum, reasonable jurists could conclude that the corrected affidavit fails to supply a substantial basis for probable cause, which is all *Franks* requires to warrant a hearing.

## C. The District Court Misapplied *Franks* by Accepting the Affiant's Subjective Credibility Assessment in Place of an Objective Materiality Inquiry

Rather than analyzing the "corrected" affidavit, the district court focused on Nicholson's subjective reasons for omitting the impeaching information, accepting his explanation that he chose to rely on what K.S. told him directly and deemed Lee's concerns about her credibility less important. But *Franks* and *Colkley* make clear that an affiant may not withhold material impeaching facts simply because he personally finds the source believable. 899 F.2d at 301; 438 U.S. at 171–72. The question is whether the omitted facts, viewed objectively, would matter to a neutral magistrate assessing probable cause—not whether the officer thought he had heard enough from the witness.

Here, the record shows that Officer Nicholson received and deliberately omitted material information from the search warrant affidavit that cast doubt on K.S.'s credibility—specifically, that she provided "a mix of information" and "was not being completely honest" about her age and when images were sent. JA 85- 86, 122. Nicholson so testified:

> "When I spoke to Corporal Lee, it felt like the majority of his investigation was...when K.S. was already an adult. ...It's kind of hard to testify to someone else's...what they tell you when they're so far away. ... So I only wanted to use information that I was given directly from the victim as to keep it as honest as it could be." JA 92.

The district court discounted the omission, accepting the officer's explanation that he chose to rely only on direct reporting, JA 467. But *Franks* and its progeny are clear: an affiant may not omit material impeaching facts, even if he personally finds the informant credible. *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). The omitted facts concerning K.S.'s inconsistent statements were highly material to a probable cause assessment that rested entirely on her account. By crediting the officer's self-serving selection of facts and denying even a hearing on the omission, the district court contravened Franks and its Fourth Circuit progeny.

Here, the court credited Nicholson's "self-serving selection of facts" and treated Lee's concerns as collateral to the "West Virginia investigation," in part because Lee had been focused on revenge-porn conduct and because Nicholson later spoke to K.S. himself. That reasoning collapses the deliberate-omission and materiality inquiries into a deferential review of the officer's investigative choices, contrary to *Franks*. Whether Lee investigated a different offense in Texas is beside the point; what matters is that he generated contemporaneous, professional observations that K.S. was inconsistent and possibly untruthful about the very facts that Nicholson then presented as the sole basis for a search of Seeger's home. A magistrate is entitled to that information when deciding whether to authorize a

search, and a defendant is entitled to a *Franks* hearing when he makes the substantial showing that such information was consciously withheld.

### D. Denial of a *Franks* Hearing Was Particularly Prejudicial Given the Warrantless Entry and the Affidavit's Other Weaknesses

The error in denying a *Franks* hearing is magnified by the broader context of this case. The district court has already found that no search warrant existed for the March 29, 2021, entry and that the home search was unconstitutional. The government thus relies heavily on the later, April 19 digital-search warrant and on the notion that, had a warrant existed in March, it would have been supported by probable cause. That makes the integrity of the March 29 affidavit—and the omissions within it—central to the government's attempt to salvage the evidence.

Moreover, as Seeger has shown in his separate staleness and *Pratt* arguments, the probable-cause showing was already precarious because it rested on years-old conduct, a complainant unsure whether any images remained, and a bare assertion about how offenders "usually" store such material. When courts confront an affidavit that is both factually thin and dependent on a single, potentially unreliable witness, *Franks* serves as an important safeguard by allowing targeted inquiry into whether the magistrate was misled by selective presentation of information. Denying Seeger that safeguard—despite his substantial preliminary showing of deliberate

omission—deprived him of a meaningful opportunity to test the affidavit's integrity and insulated a defective probable-cause determination from adversarial scrutiny.

Under *Franks*, *Colkley*, and *Wharton*, Seeger was entitled to a hearing on his claim that Nicholson deliberately or recklessly omitted material impeachment of the sole witness on whom probable cause depended. The district court's refusal to grant that hearing was legal error and independently warrants reversal and remand for a *Franks* hearing and, ultimately, suppression if the omissions are proven.

IV. **The District Court Further Erred by Refusing to Suppress the Digital Evidence Where, Under United *States v. Pratt*, the Twenty-One-Day Delay Between the Unconstitutional Seizure of Seeger's Devices and the Digital-Search Warrant Violated the Fourth Amendment**

The Supreme Court and the Fourth Circuit have made clear that the exclusionary rule applies when officers unreasonably infringe a person's possessory interest in seized property by delaying in seeking or executing a warrant, and that such delay is evaluated by balancing the nature and strength of the defendant's interest, the duration of the delay, the government's justification, and the overall reasonableness of law enforcement's conduct. *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), squarely applies this framework to digital devices and holds that an unjustified delay between seizure and warrant application violates the Fourth Amendment and warrants suppression. Judge Kleeh abused his discretion by refusing to apply Pratt's analysis to the twenty-one-day delay between the warrantless

seizure of Mr. Seeger's devices and Trooper Nicholson's application for a digital-search warrant, particularly where the initial home search has already been found unconstitutional, no exigency existed, and the government offered no concrete justification for retaining and searching Seeger's devices when it did.

In *Pratt*, officers seized the defendant's cell phone during his arrest and then waited thirty-one days before obtaining a warrant to search its contents. 915 F.3d at 268–69. The Fourth Circuit held that the seizure implicates both possessory and privacy interests, and that a prolonged delay before seeking a warrant must be reasonable under the totality of the circumstances. *Id.* at 271–73. The court adopted a balancing test, considering: (1) the length of delay; (2) the defendant's possessory interest in the property; (3) the government's justification for the delay; and (4) whether the officers acted with diligence. *Id.* Applying those factors, the court emphasized that even where probable cause existed to search the device, the government could not indefinitely hold a phone without promptly seeking judicial authorization, especially in the absence of any compelling investigative need for the delay. *Id.* at 273–74. The court ultimately concluded that a thirty-one-day delay, supported only by vague testimony about workload and other investigations and unaccompanied by special circumstances, violated the Fourth Amendment and required suppression of the evidence obtained from the phone. *Id.* at 275–77.

Those principles apply with even greater force here. On March 29, 2021, Trooper Nicholson and another trooper went to 310 Hilltop Drive and conducted a search of Seeger's residence, seizing multiple electronic devices including his phones, external drives, memory card, and laptop. The district court has already found that no warrant existed for that search, that no exception to the warrant requirement applied, and that the entry into the home and seizure of the devices was "unlawful and violated Defendant's Fourth Amendment rights.". After seizing the devices, Nicholson did not conduct any on-site review; instead, he transported them to the state police evidence room. Twenty-one days later, on April 19, 2021, he obtained a second warrant from a Preston County magistrate to search the digital contents of the seized devices, and the forensic examination was not actually performed until April 26. These facts show that Seeger's devices were removed from his home and kept entirely out of his possession for three weeks before any judicial authorization to examine their contents issued, and nearly a month before any actual digital search occurred.

Under *Pratt*'s four-factor framework, this delay was constitutionally unreasonable. First, the duration of the delay is substantial when measured against the interests at stake. Twenty-one days of total deprivation of personal electronics is not a minor inconvenience; these are the functional equivalent of his papers and

effects in modern life. See *Pratt*, 915 F.3d at 272–73 (recognizing the unique importance of smartphones and digital devices). The delay here approaches the thirty-one days deemed unreasonable in *Pratt*, and it is aggravated by the fact that the initial seizure itself occurred in the course of an unconstitutional, warrantless home entry. Once the government had taken the extraordinary step of invading the home without a warrant to seize all of Seeger's digital devices, the Constitution required heightened diligence in seeking judicial authorization or returning the property, not weeks of inertia.

Second, Seeger's possessory interest in his devices was strong. The seized items included his phones, external drives, memory card, and laptop—precisely the type of devices that store intimate communications, financial records, personal photographs, work product, and other core private data. The record reflects that Seeger expressed concern that seizing his computers would "hamper his employment," underscoring the real-world impact of the seizure on his ability to work and manage his affairs. In *Pratt*, the Fourth Circuit stressed that even when officers have probable cause, a defendant retains a weighty possessory interest in a phone because of its indispensable role in daily life. 915 F.3d at 272–73. The same or greater is true of Seeger's entire digital ecosystem. The combination of devices

seized here magnified both his possessory and privacy interests beyond what was at stake in *Pratt*.

Third, as in *Pratt*, the government failed to offer any concrete, case-specific justification for its delay in seeking the digital warrant. The record shows that the evidence was securely stored in the Preston County evidence room and that Nicholson's decision to wait until April 19 was driven by routine workflow, not by any emergent investigative need or logistical impossibility. There is no suggestion that agents were engaged in time-sensitive surveillance, that they awaited the resolution of ongoing parallel proceedings, or that technical circumstances prevented an earlier application. Indeed, Trooper Nicholson had already drafted the original affidavit on March 29 and was fully aware of the nature of the allegations and the devices seized; nothing in the record explains why an application for a digital-search warrant could not have been made within days. Under *Pratt*, vague references to workload or the mere fact that the evidence was safe in an evidence room do not justify prolonged retention without seeking judicial oversight. 915 F.3d at 273–75.

Fourth, the officers did not act with the diligence that *Pratt* requires. Rather than promptly seeking judicial approval, Nicholson allowed twenty-one days to elapse before applying for the digital-search warrant and then allowed an additional week to pass before any forensic review occurred. The sequence reveals no ongoing

investigative steps during the three-week interval that would necessitate or excuse the delay; the government identifies no interviews, parallel inquiries, or evidentiary developments that were contingent on postponing the warrant application. In *Pratt*, the court criticized the government for precisely this kind of unexplained, open-ended delay, holding that officers must "pursue diligently their investigation" once a device has been seized and cannot simply "shelve" the property while attending to other matters. 915 F.3d at 274–75. Here, any claim of diligence is further undermined by the officers' initial failure to obtain a warrant at all for the home search, which the district court recognized as a fundamental Fourth Amendment violation. Having already bypassed the warrant requirement once, law enforcement had a particular obligation to minimize additional intrusions on Seeger's possessory and privacy interests; instead, they compounded the original violation by holding his devices for weeks before seeking to search them.

*Pratt* also makes clear that the fact officers ultimately obtained a warrant does not cure an earlier Fourth Amendment violation arising from an unreasonable delay between seizure and warrant application. 915 F.3d at 271–73. The core question is whether the government's retention and ultimate search of the device was reasonable in light of the defendant's interests and the government's conduct. In Seeger's case, the district court concluded that the March 29 home search was unconstitutional but

declined to exclude the resulting evidence on the theory that Trooper Nicholson's conduct was merely "isolated negligence" and that exclusion would impose undue "social costs." That analysis fails to grapple with *Pratt*'s holdings in at least two ways.

First, *Pratt* confirms that the Fourth Amendment protects not only against unreasonable entries and seizures at the moment they occur, but also against the continuing, unjustified retention and search of property thereafter. 915 F.3d at 271–73. Even if the district court believed the initial violation did not warrant suppression, it was required to separately consider whether the twenty-one-day delay and subsequent digital search constituted an independent, unreasonable seizure and search of Seeger's devices. Instead, the court effectively treated the later warrant and forensic examination as derivative of the initial seizure and declined to exclude the evidence as "fruit of the poisonous tree" solely because it found Nicholson's initial mistake non-flagrant. Pratt teaches that an unreasonable delay can itself be the "flagrant" constitutional violation that triggers the exclusionary rule, irrespective of officers' good intentions or the existence of probable cause. 915 F.3d at 273–75. By refusing to apply *Pratt*'s balancing test to the delay, the district court abused its discretion.

Second, *Pratt* underscores that the deterrence rationale is particularly strong when officers, without exigency, hold personal digital devices for extended periods

before seeking judicial approval. 915 F.3d at 273–75. The district court here reasoned that Nicholson's conduct amounted only to "simple, isolated negligence" and thus that suppression would not "pay its way.". But on this record, the delay was not a one-off clerical misstep; it reflected an institutional readiness to seize an individual's entire digital life and hold it for weeks without meaningful judicial oversight or justification. That is precisely the kind of practice *Pratt* condemns and that the exclusionary rule is designed to deter. 915 F.3d at 273–76. Allowing the government to benefit from digital evidence obtained after an unjustified three-week hiatus would signal to officers that once they have physical custody of devices—especially after an unlawful home entry—they may proceed at their own pace in seeking a warrant, regardless of the individual's ongoing deprivation. *Pratt* requires the opposite message: that law enforcement must pursue digital warrants promptly and cannot allow seized devices to languish in evidence rooms while their owners bear the burden of loss.

Moreover, the prejudice resulting from the delay is concrete in Seeger's case. Agent Ryan testified that the government identified another alleged minor victim, P.G., solely because of evidence retrieved from Seeger's LG Nexus phone, and that without the digital evidence seized during the March 29 search and later examined under the April 19 warrant, investigators would not have learned her identity. Thus,

Count One and related production charges depend entirely on the fruits of the delayed forensic examination. Under *Pratt*, suppression is required for exactly this kind of derivative evidence: where the government's decision to retain and search a device after an unreasonable delay yields new investigative leads that would not otherwise exist. 915 F.3d at 275–77. By declining to suppress the digital evidence and all charges built upon it, the district court not only minimized the constitutional violation but also allowed the government to obtain an additional victim and additional counts from an unlawfully prolonged seizure.

Finally, *Pratt*'s reasoning exposes the flaw in the district court's heavy reliance on a generalized "social cost" of exclusion. Pratt acknowledges that suppression will sometimes "let guilty and possibly dangerous defendants go free," but insists that this cost must be borne when the government unreasonably intrudes on core Fourth Amendment interests. 915 F.3d at 271–72, 276–77. Here, the costs of exclusion are offset by the need to deter both warrantless home entries and prolonged retention of personal digital devices without timely judicial scrutiny. In light of *Pratt*, it was an abuse of discretion for the district court to treat the twenty-one-day delay as an insignificant, remedial detail rather than as a separate constitutional violation that independently triggered the exclusionary rule.

In sum, *Pratt* requires that courts suppress evidence obtained from digital devices when officers, without exigency or adequate justification, delay for weeks between seizure and warrant application, thereby unreasonably infringing a defendant's possessory and privacy interests. 915 F.3d at 271–77. The twenty-one-day delay in seeking and the additional delay in executing the digital-search warrant in Seeger's case, following an already unlawful home search and without any meaningful justification, falls squarely within *Pratt*'s rule. By refusing to apply that precedent and by admitting the digital evidence and its fruits, the district court misapplied governing Fourth Circuit law and abused its discretion. The evidence derived from Seeger's devices should have been suppressed, and this Court should so hold.

## V. The Restitution Order Violates the Ex Post Facto Clause Because It Applies Harsher Post-Offense Restitution Provisions in Contravention of *Ellingburg v. United States*

The restitution order in this case violates the Ex Post Facto Clause because, under the recent United States Supreme Court case, *Ellingburg v. United States*, 607 U.S. __ (2026) (No. 24-482), the restitution imposed on Mr. Seeger is "plainly criminal punishment" and the district court applied a more onerous restitution scheme than the one in effect when his offenses were committed. The Constitution forbids any law that "inflicts a greater punishment than the law annexed to the crime

when committed," and that prohibition applies fully to criminal restitution once it is recognized as punitive.

*Ellingburg* involved a defendant whose offense conduct pre-dated amendments to the Mandatory Victims Restitution Act and the Amy, Vicky, and Andy Child Pornography Victim Assistance Act that expanded restitution exposure and imposed mandatory minimum per-victim awards; the Court unanimously held that these later statutory changes could not be applied to him because they "increase the quantum of punishment after the fact." The same constitutional defect is present here.

As the presentence report reflects, the conduct underlying Mr. Seeger's convictions in Counts One and Four occurred in 2011–2014. At that time, Congress had not yet enacted the 2018 Amy, Vicky, and Andy Act provisions that require courts to order "not less than $3,000" in restitution per qualifying child-pornography victim and that broaden the definition and scope of recoverable losses. Nevertheless, the probation office and the district court treated those later-enacted provisions as controlling, expressly invoking 18 U.S.C. § 2259 and the Amy, Vicky, and Andy Act, and recommending that the court "shall order restitution in an amount that reflects the defendant's relative role … but which is no less than $3,000" for each victim, including one (K.D.) whose losses arise from uncharged conduct. The plea agreement likewise incorporates those enhanced, post-2014

restitution obligations by requiring Seeger to pay "at least $3,000" to each listed victim pursuant to § 2259(b)(2)(B) as amended in 2018. In other words, the sentencing court did not simply make the victims whole under the restitution regime that existed when Seeger offended; it applied a later statutory framework that mandates higher minimum restitution, expands who qualifies as a "victim," and enlarges the pool of compensable losses.

*Ellingburg* forecloses that approach. There, the Court rejected the government's argument that restitution is merely compensatory and therefore outside the Ex Post Facto Clause, holding instead that restitution imposed under the MVRA "is plainly criminal punishment for purposes of the Ex Post Facto Clause" because it is imposed at sentencing, enforced as a criminal judgment, and "operates as a sanction on the offender, not a private damages remedy." The Court went on to hold that applying a post-offense amendment that increased a defendant's restitution exposure violated the Ex Post Facto Clause, even though the underlying substantive offense statute had not changed. That reasoning controls here. The restitution provisions used in Seeger's case—the 2018 Amy, Vicky, and Andy amendments layered on top of § 2259—post-date his offense conduct and, by mandating a higher per-victim minimum and expanding recoverable losses, "make the punishment for his crimes more severe than it was when he acted."

The government cannot avoid the *ex post facto* problem by characterizing the additional restitution as a mere implementation detail or by pointing to Seeger's appeal waiver. First, *Ellingburg* makes clear that even changes framed as "procedural" or "remedial" violate the Ex Post Facto Clause when they "retroactively increase the financial penalty attached to a criminal conviction." The $3,000 per-victim floor and broadened loss definitions do exactly that by guaranteeing a higher minimum monetary sanction than the law provided in 2011–2014. Second, the Ex Post Facto Clause is a structural constitutional protection that cannot be bargained away to permit the application of a harsher penal statute than the one in effect at the time of the offense. *Ellingburg* applied the Clause notwithstanding the defendant's participation in the ordinary sentencing process under the later statute, and nothing in its reasoning suggests that a boilerplate appeal-waiver provision can authorize unconstitutional punishment.

Nor can the government recast the added restitution as purely compensatory. *Ellingburg* emphasizes that MVRA-style restitution is inseparable from the criminal process, is ordered regardless of the victim's participation in civil litigation, is collected and enforced by the sovereign using uniquely criminal tools and is imposed in part to advance traditional penological goals such as retribution and deterrence. Those features are all present here. The restitution ordered for Jane Doe 1, Jane Doe

2, and K.D. arises from Seeger's criminal convictions (and stipulated uncharged conduct) and is enforced through the criminal judgment with all the attendant collection mechanisms described in the PSR and plea agreement. Under *Ellingburg*, that makes it "punishment," not a privately negotiated civil settlement, and thus squarely subject to the Ex Post Facto Clause.

Because the district court calculated and imposed restitution under a statutory scheme that did not exist when Seeger committed his offenses, and because that scheme materially increased his mandatory restitution exposure beyond what the then-existing law allowed, the restitution order is unconstitutional under *Ellingburg*. The Ex Post Facto Clause required the court to limit any restitution to the regime in effect at the time of the underlying conduct. Its failure to do so requires that the restitution portion of the judgment be vacated and the case remanded for resentencing under the correct, pre-amendment restitution statutes.

## CONCLUSION

For the reasons stated, the district court's order denying suppression was erroneous and must be reversed. All evidence derived from the unlawful search must be suppressed.

Respectfully submitted,

Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, SC 29204
(803) 445-1334
elizabeth@franklinbestlaw.com

February 25, 2026.

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral arguments, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains 11,953 words.

2. This brief document complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14pt Equity*.

Dated: February 25, 2026.                    /s/ Elizabeth Franklin-Best

                                             *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of February 2026, I caused this Opening Brief to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Kimberley Crockett
Assistant United States Attorney
Northern District of West Virginia

<u>/s/ Elizabeth Franklin-Best</u>

*Counsel for Appellant*