NO. 25-4526

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

vs.

STEVEN SEEGER,

*Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA, CLARKSBURG
THE HONORABLE THOMAS S. KLEEH, PRESIDING

**JOINT APPENDIX (VOLUME I)**

Elizabeth A. Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 445-1333

Martin P. Sheehan
Sheehan & Associates, P.L.L.C.
1140 Main St., Suite 333
Wheeling, WV 26003
(304) 232-1064

*Attorneys for Appellant*

Kimberley Crockett
U.S. Attorney's Office
217 West King Street, Suite 400
Martinsburg, WV 25401-0000
(304) 262-4807

*Attorney for Appellee*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ........................................................................................ JA1

Indictment, filed July 9, 2024 ............................................................... JA23

Motion to Suppress evidence seized on March 29, 2021 .................... JA29
      Exhibit A, Affidavit and Complaint for search warrant form ............. JA38
      Exhibit B, Affidavit and Complaint for search warrant ...................... JA42
      Exhibit C, Report of Criminal Investigation ....................................... JA45

Motion to Suppress evidence seized on April 26, 2021 ...................... JA47
      Exhibit A, Search Warrant ................................................................. JA53
      Exhibit B, Report of Criminal Investigation ....................................... JA60

Suppression Motion Hearing, held April 14-15, 2025
      April 14, 2025 transcript ................................................................... JA62
      April 15, 2025 transcript ................................................................. JA151

Plea Agreement, filed May 12, 2025 .................................................. JA211

Plea Hearing Transcript before The Honorable Michael John Aloi, held
      May 12, 2025 .................................................................................. JA219

Report and Recommendation Concerning Plea of Guilty in Felony Case,
      filed May 13, 2025 ......................................................................... JA313

Order Adopting the Report and Recommendation, filed June 11, 2025 .......... JA322

Judgment .............................................................................................. JA327

Notice of Appeal, filed September 24, 2025 ...................................... JA335


## VOLUME II - SEALED

US' Response in Opposition to Defendant's Motion to Suppress Evidence Seized
on March 29, 2021, and April 26, 2021, filed April 4, 2025 ........................... JA337

i

Exhibit 1, Affidavit and Complaint for search warrant........................ JA357
Exhibit 2, Affidavit of Steven L. Shaffer ........................................... JA360
Exhibit 3, Order granting access to Seeger's Expunged Record........ JA363
Exhibit 5, Property Receipt ................................................................. JA365
Exhibit 6, West Virginia State Police Evidence Room Receipt........ JA366
Exhibit 7, Search Warrant and Property Receipt .............................. JA367
Exhibit 8, Forensic Lab Case Submission Form ............................... JA370
Exhibit 9, Forensic Lab Case Submission Form ............................... JA371
Exhibit 10, Report of Criminal Investigation................................... JA373

Sentencing Hearing Transcript before The Honorable Thomas S. Kleeh, held
        September 18, 2025............................................................. JA375

Order Denying Defendant's Motions to Suppress ........................... JA438

Presentence Investigation Report ..................................................... JA471

Statement of Reasons ....................................................................... JA506

## VOLUME III (DIGITAL VIDEO FILE-UNDER SEAL)

Government Exhibit 4, Interview and Search with Steven Seeger
        US Response in Opposition to Motions to Suppress Evidence, filed April
4, 2025.
        (Video is confirmed virus-free by Bitdefender Virus
        Scan and is mp4 compatible files for Windows Media Player.)

## U.S. District Court
## Northern District of West Virginia (Clarksburg)
## CRIMINAL DOCKET FOR CASE #: 1:24-cr-00042-TSK-MJA-1

Case title: USA v. Seeger

Date Filed: 07/09/2024

Date Terminated: 09/23/2025

---

Assigned to: Chief District Judge
Thomas S Kleeh
Referred to: Magistrate Judge
Michael John Aloi

**Defendant (1)**

**Steven David Seeger**
*TERMINATED: 09/23/2025*
*also known as*
Stephen David Seeger
*TERMINATED: 09/23/2025*

represented by **Martin P. Sheehan**
Sheehan & Associates, P.L.L.C.
Sheehan & Associates, P.L.L.C.
1140 Main St., Ste 333
26003
Wheeling, WV 26003
304-232-1064
Fax: 304-232-1066
Email: Martin@Msheehanlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Thomas G. Dyer**
Dyer Law Offices
PO Box 1332
Clarksburg, WV 26302-1332
304-622-1635
Fax: 304-622-1870
Email: dyerlawof@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Pending Counts**

**Disposition**

| | |
|---|---|
| COERCION OR ENTICEMENT OF FEMALE (1) | Defendant committed to custody of the BOP for a term of 360 months, to run concurrent with Count 4 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 4; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture |
| SEXUAL EXPLOITATION OF CHILDREN (4) | Defendant committed to custody of the BOP for a term of 360 months, to run concurrent with Count 1 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 1; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| SEXUAL EXPLOITATION OF CHILDREN (2) | Dismissed on motion of the Government |
| ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO (3) | Dismissed on motion of the Government |
| ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO (5) | Dismissed on motion of the Government |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Andrew R. Cogar** |

U.S. Attorney's Office - Clarksburg
320 W. Pike St.
Suite 300
Clarksburg, WV 26301
(304) 626-1625
Fax: (304) 623-7031
Email: andy.cogar@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Daniel Lee Salem**
DOJ-USAO
217 W. King Street
Suite 400
Martinsburg, WV 25401
304-281-5452
Email: Daniel.Salem@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Kimberley D. Crockett (usatty)**
U.S. Attorney's Office - Mrt.
U.S. Courthouse
217 W. King Street, Suite 400
Martinsburg, WV 25401
(304) 262-4807
Fax: (304) 262-0591
Email:
Kimberley.D.Crockett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**Morgan McKee (USA)**
U.S. Attorney's Office - Wheeling
PO Box 591
1125 Chapline Street, Ste. 3000
Wheeling, WV 26003
(304) 234-7703

Fax: (304) 234-0112
Email: morgan.mckee@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: United States Attorney*

**William J. Ihlenfeld - USA , II**
U.S. Attorney's Office - Whg
PO Box 591
Wheeling, WV 26003
304-234-7700
Email: william.ihlenfeld@usdoj.gov
*TERMINATED: 03/21/2025*
*Designation: United States Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/09/2024 | 1 | INDICTMENT with Forfeiture Allegation as to Stephen David Seeger (1) count(s) 1, 2, 3, 4, 5. (Emailed to AUSA, USM, USP) (dk) (Entered: 07/10/2024) |
| 07/09/2024 | 2 | *SEALED* Indictment - Unredacted, re 1 Indictment as to Stephen David Seeger. (Attachments: # 1 Grand Jury Docket Sheet, # 2 Corrected Grand Jury Docket Sheet) (dk) (Entered: 07/10/2024) |
| 07/09/2024 | 3 | MOTION TO SEAL by USA as to Stephen David Seeger. (dk) (Entered: 07/10/2024) |
| 07/09/2024 | 4 | **ORDER TO SEAL granting 3 Motion to Seal as to Stephen David Seeger (1). Signed by Magistrate Judge Michael John Aloi on 7/9/2024. (Copy to USA per MJA (nf)). (dk)** (Entered: 07/10/2024) |
| 07/12/2024 | | Arrest of Stephen David Seeger. (snc) (Entered: 07/15/2024) |
| 07/15/2024 | | Case unsealed per arrest as to Stephen David Seeger. (snc) (Entered: 07/15/2024) |
| 07/15/2024 | 6 | MOTION for Detention by USA as to Stephen David Seeger. (Attachments: # 1 Proposed Order of Temporary Detention Pending Hearing Pursuant to Bail Reform Act)(Crockett (USA ACCOUNT), Kimberley) (Entered: 07/15/2024) |
| 07/22/2024 | 8 | Rule 5(c)(3) Documents Received as to Stephen David Seeger. (Attachments: # 1 Due Process Protections Act Order, # 2 Order of Detention Pending Trial, # 3 Commitment to Another District, # 4 Transmittal of Documents, # 5 Executed Transmittal of Documents |

| | | |
|---|---|---|
| | | (returned to CAED 7/22/2024), # 6 Envelope) (dk) (Entered: 07/22/2024) |
| 07/23/2024 | 9 | NOTICE OF ATTORNEY APPEARANCE: Thomas G. Dyer appearing for Stephen David Seeger (Dyer, Thomas) (Entered: 07/23/2024) |
| 07/23/2024 | 10 | NOTICE OF ATTORNEY APPEARANCE Andrew R. Cogar appearing for USA. (Cogar, Andrew) (Entered: 07/23/2024) |
| 07/30/2024 | 11 | **PAPERLESS ORDER as to Stephen David Seeger, Arraignment set for 8/1/2024 02:00 PM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. This proceeding will be IN PERSON.Signed by Magistrate Judge Michael John Aloi on 7/30/2024. (nf)** (Entered: 07/30/2024) |
| 08/01/2024 | 12 | MINUTE ENTRY: *** ***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.* Proceedings held before Magistrate Judge Michael John Aloi. Arraignment as to Stephen David Seeger (1) Count 1,2,3,4,5 held on 8/1/2024. (Tape #CBG Aloi 1 24 cr 2 USA v Stephen David Seeger 8 1 2024.). (mas) (Entered: 08/01/2024) |
| 08/01/2024 | 13 | **DUE PROCESS PROTECTIONS ACT ORDER TO ALL COUNSEL REGARDING BRADY OBLIGATIONS as to Stephen David Seeger (1). Signed by Magistrate Judge Michael John Aloi on 8/1/2024. (mas)** (Entered: 08/01/2024) |
| 08/01/2024 | 14 | **PAPERLESS ORDER as to Stephen David Seeger, denying as moot the Government's 6 motion for pre-trial detention, insofar as Defendant's pre-trial detention previously was ordered 8 when he was arrested herein and appeared in the Eastern District of California. Signed by Magistrate Judge Michael John Aloi on 8/1/2024. (nf)** (Entered: 08/01/2024) |
| 08/01/2024 | 15 | **INITIAL SCHEDULING ORDER as to Stephen David Seeger:** ***NOTICE TO ATTORNEYS*** : *Pursuant to Rule 12.4(a)(1) of the Federal Rules of Criminal Procedure, ALL Non-governmental CORPORATE PARTIES must file a DISCLOSURE STATEMENT with the Court. Additionally, per Rule 12.4(a)(2) of the Federal Rules of Criminal Procedure, the GOVERNMENT must file a statement* |

| | | |
|---|---|---|
| | | *identifying all organizational victims. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm*<br><br>**Discovery due by 8/8/2024. Motions due by 8/19/2024. Responses due by 8/23/2024. MJ Motion Hearing set for 8/26/2024 09:00 AM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. Plea Agreement due by 8/29/2024. Pretrial Conference set for 9/10/2024 01:30 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Jury Selection/Jury Trial set for 9/24/2024 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Magistrate Judge Michael John Aloi on 8/1/2024. (Copy USM, USP) (dk)** (Entered: 08/01/2024) |
| 08/02/2024 | 16 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Stephen David Seeger (Dyer, Thomas) (Entered: 08/02/2024) |
| 08/02/2024 | 17 | MOTION to Vacate *Magistrate Detention Order* by Stephen David Seeger. (Dyer, Thomas) (Entered: 08/02/2024) |
| 08/05/2024 | 18 | **ORDER SCHEDULING MOTION HEARING AND DIRECTING RESPONSE as to Stephen David Seeger. The Government is DIRECTED to file a response to Defendant's 17 Motion by August 12, 2024. Motion Hearing set for 8/15/2024 12:00 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Chief District Judge Thomas S Kleeh on 8/5/2024. (Copy USM, USP) (dk)** (Entered: 08/05/2024) |
| 08/07/2024 | 19 | MOTION to Amend/Correct *Clerical Error in Indictment* by USA as to Stephen David Seeger. (Attachments: # 1 Proposed Order Granting Unopposed Motion to Correct Clerical Error in the Indictment)(Crockett (USA ACCOUNT), Kimberley) (Entered: 08/07/2024) |
| 08/08/2024 | 20 | NOTICE *of Discovery Disclosure and Request for Discovery* by USA as to Stephen David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 08/08/2024) |
| 08/08/2024 | 21 | **ORDER GRANTING 19 UNOPPOSED MOTION TO CORRECT CLERICAL ERROR IN THE INDICTMENT as to Stephen David Seeger. The Court ORDERS the clerk of the court shall correct the record with regard to Defendant's first name from STEPHEN to STEVEN. Signed by Magistrate Judge Michael John Aloi on 8/8/2024. (Copy USM, USP) (dk)** (Entered: 08/08/2024) |

| 08/12/2024 | 22 | RESPONSE to Motion by USA as to Steven David Seeger re 17 MOTION to Vacate *Magistrate Detention Order* (Attachments: # 1 Exhibit Transcript)(Crockett (USA ACCOUNT), Kimberley) (Entered: 08/12/2024) |
| --- | --- | --- |
| 08/12/2024 | 23 | First MOTION to Continue *Motions Hearing* by USA as to Steven David Seeger. (Attachments: # 1 Proposed Order)(Crockett (USA ACCOUNT), Kimberley) (Entered: 08/12/2024) |
| 08/12/2024 | 24 | **ORDER CONTINUING MOTION HEARING (ECF NO. 23 ) as to Steven David Seeger (1). The Motion is GRANTED 23 and the hearing is CONTINUED until August 20, 2024, at 10:00 a.m., at the Clarksburg, West Virginia, point of holding court. Signed by Chief District Judge Thomas S. Kleeh on 08/12/2024. (Copy to USM, USP) (snc)** (Entered: 08/12/2024) |
| 08/19/2024 | 25 | MOTION Witness to Appear by Telephone *Gary Seeger* by Steven David Seeger. (Dyer, Thomas) (Entered: 08/19/2024) |
| 08/19/2024 | 26 | *Letter of Support from George Romaniuk* Other Document re 17 MOTION to Vacate *Magistrate Detention Order* filed by Steven David Seeger (Dyer, Thomas) (Entered: 08/19/2024) |
| 08/19/2024 | 27 | **ORDER GRANTING MOTION FOR WITNESS TO APPEAR BY PHONE (ECF NO. 25 ) as to Steven David Seeger. Defendant's Motion [ECF No. 25] is GRANTED. Defense counsel is DIRECTED to ensure that the witness is available and prepared to testify by telephone when called by the Clerk. Signed by Chief District Judge Thomas S Kleeh on 8/19/2024. (Copy USM, USP) (dk)** (Entered: 08/19/2024) |
| 08/20/2024 | 28 | **PAPERLESS ORDER as to Steven David Seeger. There are no motions pending before Magistrate Judge Aloi. Accordingly, the Motion Hearing scheduled before Magistrate Judge Aloi on 8/26/2024 is hereby CANCELLED. Signed by Magistrate Judge Michael John Aloi on 8/20/2024. (nf)** (Entered: 08/20/2024) |
| 08/20/2024 | 29 | MINUTE ENTRY: ***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.* Proceedings held before Chief District Judge Thomas S. Kleeh as to Steven David Seeger. Motion Hearing re 17 MOTION to Vacate *Magistrate Detention Order* held on 8/20/2024. (Court Reporter Rachel Kocher) (snc) (Entered: 08/20/2024) |

| | | |
|---|---|---|
| 08/20/2024 | 30 | *Letter of Support from Charlie Rogers* Other Document re 17 MOTION to Vacate *Magistrate Detention Order* filed by Steven David Seeger (Dyer, Thomas) (Entered: 08/20/2024) |
| 08/28/2024 | 31 | NOTICE *of Discovery Disclosure* by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 08/28/2024) |
| 08/29/2024 | 32 | EXHIBIT LIST by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 08/29/2024) |
| 08/29/2024 | 33 | WITNESS LIST by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 08/29/2024) |
| 08/30/2024 | 34 | First MOTION to Continue *Trial and Relevant Deadlines/Unopposed* by Steven David Seeger. (Dyer, Thomas) (Entered: 08/30/2024) |
| 08/30/2024 | 35 | **ORDER GRANTING UNOPPOSED MOTION TO CONTINUE (ECF NO. 34 ) as to Steven David Seeger. Pretrial Conference set for 12/3/2024 12:30 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S. Kleeh. Jury Selection/Jury Trial set for 12/17/2024 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S. Kleeh. The Court DIRECTS Magistrate Judge Michael J. Aloi to issue a new scheduling order as to all defendants, with additional pretrial motion briefing deadlines in accordance with this Order. Signed by Chief District Judge Thomas S Kleeh on 8/30/2024. (Copy MJ Aloi, USM, USP) (dk)** (Entered: 08/30/2024) |
| 08/30/2024 | 36 | **FIRST AMENDED SCHEDULING ORDER as to Steven David Seeger:**<br><br>***NOTICE TO ATTORNEYS*** *: Pursuant to Rule 12.4(a)(1) of the Federal Rules of Criminal Procedure, ALL Non-governmental CORPORATE PARTIES must file a DISCLOSURE STATEMENT with the Court. Additionally, per Rule 12.4(a)(2) of the Federal Rules of Criminal Procedure, the GOVERNMENT must file a statement identifying all organizational victims. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm*<br><br>**Motions due by 10/15/2024. Responses due by 10/22/2024. MJ Motion Hearing set for 10/28/2024 09:00 AM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. Plea Agreement due by 11/18/2024. Pretrial Conference set for 12/3/2024 12:30 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S** |

| | | |
|---|---|---|
| | | **Kleeh. Jury Selection/Jury Trial set for 12/17/2024 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Magistrate Judge Michael John Aloi on 8/30/2024. (Copy USM, USP) (dk)** (Entered: 08/30/2024) |
| 09/06/2024 | 37 | Other Document filed by Steven David Seeger (Dyer, Thomas) (Entered: 09/06/2024) |
| 09/10/2024 | 38 | **ORDER DENYING DEFENDANT'S MOTION TO RECONSIDER DETENTION (ECF NO. 17 ) as to Steven David Seeger. The Detention Order (ECF No. [8-2]) is AFFIRMED. The Court ORDERS that Defendant remain detained pending trial. Signed by Chief District Judge Thomas S Kleeh on 9/10/2024. (Copy USM, USP) (dk)** (Entered: 09/10/2024) |
| 10/21/2024 | 39 | **PAPERLESS ORDER as to Steven David Seeger. There are no motions pending before Magistrate Judge Aloi. Accordingly, the Motion Hearing scheduled before Magistrate Judge Aloi on 10/28/2024 is hereby CANCELLED. Signed by Magistrate Judge Michael John Aloi on 10/21/2024. (nf)** (Entered: 10/21/2024) |
| 11/05/2024 | 40 | First MOTION to Continue *Trial and Pretrial* by Steven David Seeger. (Dyer, Thomas) (Entered: 11/05/2024) |
| 11/07/2024 | 41 | **ORDER GRANTING UNOPPOSED MOTION TO CONTINUE [ECF NO. 40 ]. Jury Selection and Trial set for 4/22/2025 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Pretrial Conference set for 3/31/2025 3:00 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Chief District Judge Thomas S Kleeh on 11/7/2024. (copy MJA, USP, USMS) (hrc)** (Entered: 11/07/2024) |
| 11/07/2024 | 42 | **SECOND AMENDED SCHEDULING ORDER as to Steven David Seeger**<br><br>***NOTICE TO ATTORNEYS*** : *Pursuant to Rule 12.4(a)(1) of the Federal Rules of Criminal Procedure, ALL Non-governmental CORPORATE PARTIES must file a DISCLOSURE STATEMENT with the Court. Additionally, per Rule 12.4(a)(2) of the Federal Rules of Criminal Procedure, the GOVERNMENT must file a statement identifying all organizational victims. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm* |

| | | |
|---|---|---|
| | | **Motions due by 2/10/2025. Responses due by 2/18/2025. MJ Motion Hearing set for 2/24/2025 09:00 AM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. Plea Agreement due by 3/19/2025. Pretrial Conference set for 3/31/2025 03:00 PM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Jury Selection and Jury Trial set for 4/22/2025 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Magistrate Judge Michael John Aloi on 11/7/2024. (copy USP, USMS) (hrc)** (Entered: 11/07/2024) |
| 11/20/2024 | 43 | NOTICE OF ATTORNEY APPEARANCE: Martin P. Sheehan appearing for Steven David Seeger *with Thomas G. Dyer* (Sheehan, Martin) (Entered: 11/20/2024) |
| 02/14/2025 | 44 | **PAPERLESS ORDER as to Steven David Seeger. There are no motions pending before Magistrate Judge Aloi. Accordingly, the Motion Hearing scheduled before Magistrate Judge Aloi on 2/24/2025 is hereby CANCELLED. Signed by Magistrate Judge Michael John Aloi on 2/14/2025. (nf)** (Entered: 02/14/2025) |
| 03/12/2025 | 45 | MOTION for Release from Custody */Detention* by Steven David Seeger. (Dyer, Thomas) (Entered: 03/12/2025) |
| 03/13/2025 | 46 | NOTICE *of Intent to Offer Certified Electronic Data Pursuant to Fed. R. Evid. 902(14)* by USA as to Steven David Seeger (Attachments: # 1 Exhibit A - Certification in Support of Authenticity of Business Records and Other Evidence, # 2 Exhibit B- CV of Tanner Roney)(Crockett (USA ACCOUNT), Kimberley) (Entered: 03/13/2025) |
| 03/13/2025 | 47 | **ORDER DENYING DEFENDANT'S SECOND MOTION TO RECONSIDER DETENTION ECF NO. 45 ) as to Steven David Seeger. Defendant's Renewed Motion for Release from Detention (ECF No. 45 ) is DENIED and the Detention Order (ECF No. [8-2]) is again AFFIRMED. The Court ORDERS that Defendant remain detained pending trial. Signed by Chief District Judge Thomas S Kleeh on 3/13/2025. (Copy USM, USP) (dk)** (Entered: 03/13/2025) |
| 03/13/2025 | 48 | NOTICE *of Second Supplemental Discovery Disclosure* by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/13/2025) |
| 03/14/2025 | 49 | MOTION for Extension of Time to File *Exhibit Disclosure* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/14/2025) |

| | | |
|---|---|---|
| 03/17/2025 | 50 | **ORDER GRANTING MOTION TO EXTEND EXHIBIT DISCLOSURE DEADLINE (ECF NO. 49 ) as to Steven David Seeger. The Court GRANTS the motion [ECF No. 49] and EXTENDS the exhibit list and disclosure due date to March 26, 2025. Signed by Chief District Judge Thomas S Kleeh on 3/17/2025. (Copy USM, USP) (dk)** (Entered: 03/17/2025) |
| 03/18/2025 | 51 | NOTICE *Request for Judicial Notice* by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/18/2025) |
| 03/18/2025 | 52 | NOTICE *Second Request for Judicial Notice* by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/18/2025) |
| 03/19/2025 | 53 | MOTION in Limine *Regarding Victims' Sexual History* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/19/2025) |
| 03/19/2025 | 54 | WITNESS LIST by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/19/2025) |
| 03/19/2025 | 55 | NOTICE OF ATTORNEY APPEARANCE Daniel Lee Salem appearing for USA. (Salem, Daniel) (Entered: 03/19/2025) |
| 03/19/2025 | 57 | NOTICE *of Third Supplemental Discovery Disclosure* by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/19/2025) |
| 03/19/2025 | 58 | Proposed Jury Instructions by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/19/2025) |
| 03/19/2025 | 59 | Proposed Jury Verdict by USA (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/19/2025) |
| 03/20/2025 | 61 | **\*\*\*SEALED\*\*\* ORDER as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 3/20/2025. (Emailed to USA) (dk)** (Entered: 03/20/2025) |
| 03/20/2025 | 63 | **\*\*\*SEALED\*\*\* ORDER as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 3/20/2025. (Emailed to USA) (dk)** (Entered: 03/20/2025) |
| 03/20/2025 | 66 | MOTION for Leave to File *Motions to Suppress* by Steven David Seeger. (Dyer, Thomas) (Entered: 03/20/2025) |

| 03/20/2025 | 67 | MOTION to Suppress *Evidence Seized on March 29, 2021 with Authorities* by Steven David Seeger. (Attachments: # 1 Exhibit Exhibits)(Dyer, Thomas) (Entered: 03/20/2025) |
|---|---|---|
| 03/20/2025 | 68 | MOTION to Suppress *Evidence Seized on April 26, 2021 with Authorities* by Steven David Seeger. (Attachments: # 1 Exhibit Exhibits)(Dyer, Thomas) (Entered: 03/20/2025) |
| 03/21/2025 | 70 | **ORDER GRANTING MOTION TO ALLOW FILINGS OF MOTIONS TO SUPPRESS (ECF NO. 66 ) as to Steven David Seeger. The Court further ORDERS the Government to respond to the pending motions (ECF Nos. 67 , 68 ) by March 28, 2025. Signed by Chief District Judge Thomas S Kleeh on 3/21/2025. (Copy USM, USP) (dk)** (Entered: 03/21/2025) |
| 03/24/2025 | 72 | Proposed Jury Instructions by USA as to Steven David Seeger (McKee (USA), Morgan) (Entered: 03/24/2025) |
| 03/25/2025 | 74 | MOTION to Continue *Pretrial to Later Date Before Current Trial Date and Motion for Extension of Time to file Response to Motion to Suppress (Unopposed)* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/25/2025) |
| 03/25/2025 | 75 | **ORDER GRANTING UNOPPOSED MOTION FOR EXTENSION TO FILE RESPONSE AND CONTINUE PRETRIAL CONFERENCE (ECF NO. 74 ) as to Steven David Seeger (1). The Court GRANTS the motion (ECF No. 74 ) and EXTENDS the Government's deadline to respond to the pending motions (ECF Nos. 67 , 68 ) to April 4, 2025. Additionally, the pretrial conference is CONTINUED until April 14, 2025, at 3:15 p.m., at the Clarksburg, West Virginia, point of holding court. Signed by Chief District Judge Thomas S. Kleeh on 03/25/2025. (Copy to USM, USP) (snc)** (Entered: 03/25/2025) |
| 03/26/2025 | 77 | EXHIBIT LIST by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 03/26/2025) |
| 04/02/2025 | 79 | **ORDER as to Steven David Seeger. Defendant is DIRECTED to file a response to the United States' Request for Judicial Notice (ECF No. 51 ) and the United States' Second Request for Judicial Notice (ECF No. 52 ) on or before April 7, 2025. Signed by Chief District Judge Thomas S. Kleeh on 04/02/2025. (snc)** (Entered: 04/02/2025) |
| 04/03/2025 | 80 | SUBPOENA RETURNED EXECUTED as to Payton Hirt (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/03/2025) |

| 04/03/2025 | 81 | SUBPOENA RETURNED EXECUTED as to Kaitlin Stewart (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/03/2025) |
| 04/03/2025 | 82 | MOTION in Limine by Steven David Seeger. (Sheehan, Martin) (Entered: 04/03/2025) |
| 04/04/2025 | 83 | RESPONSE (Dyer, Thomas) (Entered: 04/04/2025) |
| 04/04/2025 | 84 | RESPONSE (Dyer, Thomas) (Entered: 04/04/2025) |
| 04/04/2025 | 85 | **ORDER GRANTING UNITED STATES' MOTION IN LIMINE REGARDING VICTIMS' SEXUAL HISTORY (ECF NO. 53 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/4/2025. (dk)** (Entered: 04/04/2025) |
| 04/04/2025 | 86 | SUBPOENA RETURNED EXECUTED as to Trooper Thunder P. Nicholson (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/04/2025) |
| 04/04/2025 | 87 | SUBPOENA RETURNED EXECUTED as to SA Edward Ryan (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/04/2025) |
| 04/04/2025 | 88 | SUBPOENA RETURNED EXECUTED as to SA Edward Ryan (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/04/2025) |
| 04/04/2025 | 89 | **ORDER GRANTING REQUEST TO TAKE JUDICIAL NOTICE (ECF NO. 51 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/4/2025. (dk)** (Entered: 04/04/2025) |
| 04/04/2025 | 90 | **ORDER GRANTING SECOND REQUEST TO TAKE JUDICIAL NOTICE (ECF NO. 52 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/4/2025. (dk)** (Entered: 04/04/2025) |
| 04/04/2025 | 92 | **\*\*\*SEALED\*\*\* ORDER as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/4/2025. (Emailed to Counsel) (dk)** (Entered: 04/04/2025) |
| 04/04/2025 | 94 | CLERK'S PAPERLESS NOTICE: Clerk's Office received 2 thumb drives containing Exhibit 4. One drive delivered to chambers; one retained in Clerk's Office. (dk) (Entered: 04/04/2025) |
| 04/07/2025 | 95 | RESPONSE in Opposition by USA as to Steven David Seeger re 82 MOTION in Limine (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/07/2025) |
| 04/07/2025 | 96 | MOTION to Appear Via Telephone or Video Conference Unopposed by USA as to Steven David Seeger. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Proposed Order)(Crockett (USA ACCOUNT), Kimberley) (Entered: 04/07/2025) |
| 04/08/2025 | 97 | ***SEALED*** ORDER as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/8/2025. (Emailed to Counsel) (dk) (Entered: 04/08/2025) |
| 04/08/2025 | 98 | **ORDER GRANTING 96 UNOPPOSED MOTION FOR JUDGE SHAFFER TO APPEAR VIA VIDEOCONFERENCE OR TELEPHONE as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/8/2025. (dk)** (Entered: 04/08/2025) |
| 04/08/2025 | 99 | NOTICE *of Intention to Introduce Government Exhibit 3* by USA as to Steven David Seeger (Salem, Daniel) (Entered: 04/08/2025) |
| 04/09/2025 | 100 | **ORDER DENYING DEFENDANT'S MOTION IN LIMINE (ECF NO. 82 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 4/9/2025. (dk)** (Entered: 04/09/2025) |
| 04/09/2025 | 102 | SUBPOENA RETURNED EXECUTED as to Lisa Leishman (Dyer, Thomas) (Entered: 04/09/2025) |
| 04/09/2025 | 103 | *Unopposed Motion to Appear via Telephone or VideoConference* filed by Steven David Seeger (Attachments: # 1 Proposed Order)(Dyer, Thomas) Modified to make pending motion on 4/9/2025. NEF regen (dk). (Entered: 04/09/2025) |
| 04/09/2025 | 104 | Other Document *RESPONSE TO UNOPPOSED MOTION TO APPEAR VIA TELEPHONE OR VIDEOCONFERENCING* filed by USA as to Steven David Seeger (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/09/2025) |
| 04/09/2025 | | **ORDER: Motions hearing on Defendant's Motions to Suppress set for 4/14/2025 03:15 PM in Clarksburg District Judge Courtroom, 2nd Floor, before Chief District Judge Thomas S. Kleeh. Signed by Chief District Judge Thomas S. Kleeh on 4/9/25. (sg)** (Entered: 04/09/2025) |
| 04/11/2025 | 105 | SUBPOENA RETURNED EXECUTED as to Keith Lee (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/11/2025) |
| 04/11/2025 | 106 | SUBPOENA RETURNED EXECUTED as to Judge Steven Shaffer (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/11/2025) |
| 04/11/2025 | 107 | *****SEALED*** Order as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 04/11/2025. (Copy to counsel) (snc) (Entered: 04/11/2025)** |

| 04/14/2025 | 109 | MINUTE ENTRY:<br><br>***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.<br><br>Proceedings held before Chief District Judge Thomas S Kleeh as to Steven David Seeger. Motion Hearing held on 4/14/2025 re 68 MOTION to Suppress *Evidence Seized on April 26, 2021 with Authorities* filed by Steven David Seeger, 67 MOTION to Suppress *Evidence Seized on March 29, 2021 with Authorities* filed by Steven David Seeger, Pretrial Conference as to Steven David Seeger held on 4/14/2025. (Court Reporter Rachel Kocher) (dk) (Entered: 04/14/2025) |
|---|---|---|
| 04/14/2025 | 110 | **ORDER: The Motion Hearing is recessed until 4/15/2025 at 10:00 AM in the Clarksburg District Judge Courtroom, 2nd Floor, before Chief District Judge Thomas S. Kleeh. The Pretrial Conference is recessed until 4/15/2025 at 10:00 AM in the Clarksburg District Judge Courtroom, 2nd Floor, before Chief District Judge Thomas S. Kleeh. Signed by Chief District Judge Thomas S. Kleeh on 4/14/25. (sg) (Entered: 04/14/2025)** |
| 04/15/2025 | 111 | MINUTE ENTRY:<br><br>***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.<br><br>Proceedings held before Chief District Judge Thomas S Kleeh: Pretrial Conference as to Steven David Seeger held on 4/15/2025. (Court Reporter R. Kocher.) (cmd) (Entered: 04/15/2025) |
| 04/15/2025 | 112 | MINUTE ENTRY:<br><br>***NOTICE*** THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.<br><br>Proceedings held before Chief District Judge Thomas S Kleeh: Motion Hearing as to Steven David Seeger held on 4/15/2025 re 68 MOTION to Suppress *Evidence Seized on April 26, 2021 with Authorities* filed by Steven David Seeger, 67 MOTION to Suppress *Evidence Seized on March 29, 2021 with Authorities* filed by Steven David Seeger. (Court Reporter R. Kocher.) (cmd) (Entered: 04/15/2025) |
| 04/15/2025 | 113 | Clerk's Exhibit and Witness List for Motions Hearing Held 4/14/2025 - 4/15/2025 as to Steven David Seeger. (Attachments: # 1 Exhibit 1 - Affidavit and Complaint for Search Warrant, # 2 Exhibit 5 - Property |

| | | |
|---|---|---|
| | | Receipt, # 3 Exhibit 6 - WVSP Form 114, # 4 Exhibit 7 - Search Warrant, # 5 Exhibit 8 - Forensic Laboratory Case Submission Form, # 6 Exhibit 9 - Forensic Laboratory Case Submission Form. Exhibit 4 - Thumb Drive retained in Clerk's Office) (dk) (Entered: 04/15/2025) |
| 04/17/2025 | 115 | MOTION for Hearing *Rule 11* by USA as to Steven David Seeger. (Attachments: # 1 Exhibit Partially Executed Plea Agreement)(Crockett (USA ACCOUNT), Kimberley) (Entered: 04/17/2025) |
| 04/17/2025 | 116 | **ORDER GRANTING MOTION FOR CHANGE OF PLEA HEARING (ECF NO. 115 ) as to Steven David Seeger. The Court REFERS this action to the Honorable Michael J. Aloi, United States Magistrate Judge, who is hereby designated and authorized to consider the defendant's plea to the charge(s) contained in the Indictment. Signed by Chief District Judge Thomas S Kleeh on 4/17/2025. (Copy MJ Aloi, USM, USP) (dk)** (Entered: 04/17/2025) |
| 04/17/2025 | 117 | **PAPERLESS ORDER as to Steven David Seeger. Plea Hearing set for 5/8/2025 01:30 PM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. This proceeding will be IN PERSON. Signed by Magistrate Judge Michael John Aloi on 04/17/2025. (nr)** (Entered: 04/17/2025) |
| 04/18/2025 | 118 | MOTION for Hearing *Reschedule Rule 11 Hearing* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/18/2025) |
| 04/18/2025 | 138 | SUBPOENA RETURNED EXECUTED as to Keith Lee (Crockett (USA ACCOUNT), Kimberley) (Entered: 04/18/2025) |
| 04/21/2025 | 139 | **PAPERLESS ORDER as to Steven David Seeger, granting 118 motion to reschedule Plea Hearing. Plea Hearing RESCHEDULED for 4/25/2025 11:00 AM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. This proceeding will be IN PERSON. Signed by Magistrate Judge Michael John Aloi on 4/21/2025. (nf)** (Entered: 04/21/2025) |
| 04/25/2025 | 140 | MINUTE ENTRY:<br><br>***NOTICE*** *THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.*<br><br>Change of Plea Hearing Proceedings held on 4/25/2025 before Magistrate Judge Michael John Aloi as to Steven David Seeger. (Tape #CBG Aloi 1 24 cr 42 USA v Steven David Seeger 4 25 2025). (mas) (Entered: 04/25/2025) |

| | | |
|---|---|---|
| 04/25/2025 | 141 | **PAPERLESS ORDER as to Steven David Seeger. Magistrate Judge Aloi convened a Plea Hearing on 4/25/2025. During the proceeding, the Court determined that a recess would be appropriate, to afford Defendant and his counsel an opportunity to review the matter further. Having been advised that the parties wish to re-convene the Plea Hearing, Plea Hearing RESCHEDULED for 5/2/2025 01:00 PM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. This proceeding will be IN PERSON. Signed by Magistrate Judge Michael John Aloi on 4/25/2025. (nf)** (Entered: 04/25/2025) |
| 04/25/2025 | 142 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE UNITED STATES MAGISTRATE JUDGE as to Steven David Seeger. (mas) (Entered: 04/25/2025) |
| 04/28/2025 | 143 | STATUS REPORT *Disclosure of Additional Precedent* by Steven David Seeger (Sheehan, Martin) (Entered: 04/28/2025) |
| 05/02/2025 | 144 | **\*\*\*SEALED\*\*\* ORDER as to Steven David Seeger (1). Signed by Chief District Judge Thomas S Kleeh on 5/2/2025. (Emailed to Counsel) (dk)** (Entered: 05/02/2025) |
| 05/02/2025 | 145 | **PAPERLESS ORDER as to Steven David Seeger. Magistrate Judge Aloi convened a Plea Hearing on 5/02/2025. During the proceeding, the Court determined that a recess would be appropriate, to afford Defendant and his counsel an opportunity to review the matter further. Having been advised that the parties wish to re-convene the Plea Hearing, Plea Hearing RESCHEDULED for 5/12/2025 02:00 PM in Clarksburg Magistrate Judge Courtroom, 3rd Floor before Magistrate Judge Michael John Aloi. This proceeding will be IN PERSON. Signed by Magistrate Judge Michael John Aloi on 05/02/2025. (nr)** (Entered: 05/02/2025) |
| 05/02/2025 | | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE UNITED STATES MAGISTRATE JUDGE as to Steven David Seeger. (mas) Modified on 5/16/2025 to indicate a duplicate entry to 147 (mas). (Entered: 05/02/2025) |
| 05/02/2025 | 147 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE UNITED STATES MAGISTRATE JUDGE as to Steven David Seeger. (mas) (Entered: 05/02/2025) |
| 05/06/2025 | 148 | **ORDER RESCHEDULING TRIAL as to Steven David Seeger. Jury Selection/Jury Trial set for 5/13/2025 09:30 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Chief District Judge Thomas S Kleeh on 5/6/2025. (Copy MJ Aloi, USM, USP) (dk)** (Entered: 05/06/2025) |

| 05/06/2025 | 149 | MOTION in Limine *to Preclude Introduction of Specific Evidence and Arguments at Trial* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 05/06/2025) |
| 05/06/2025 | 150 | MOTION in Limine *to Preclude Reference to Jury Nullification* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 05/06/2025) |
| 05/06/2025 | 151 | MOTION in Limine *to Protect Identity of Victims* by USA as to Steven David Seeger. (Crockett (USA ACCOUNT), Kimberley) (Entered: 05/06/2025) |
| 05/12/2025 | 153 | WAIVER OF ARTICLE III JUDGE AND CONSENT TO ENTER GUILTY PLEA BEFORE THE UNITED STATES MAGISTRATE JUDGE as to Steven David Seeger. (mas) (Entered: 05/12/2025) |
| 05/12/2025 | 154 | PLEA AGREEMENT as to Steven David Seeger. (mas) (Entered: 05/12/2025) |
| 05/13/2025 | 155 | **REPORT AND RECOMMENDATION CONCERNING PLEA OF GUILTY IN FELONY CASE as to Steven David Seeger. Any party shall have fourteen days from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection. Signed by Magistrate Judge Michael John Aloi on 5/13/2025. (Copy USM, USP) (dk)** (Main Document 155 replaced with corrected document on 5/13/2025. NEF regen) (dk). (Entered: 05/13/2025) |
| 05/13/2025 | 156 | **ORDER FOLLOWING CHANGE OF PLEA HEARING as to Steven David Seeger. For reasons appearing to the Court, the jury trial and all other pretrial deadlines are hereby GENERALLY CONTINUED. All pending motions are hereby TERMINATED. Signed by Chief District Judge Thomas S Kleeh on 5/13/2025. (Copy USM, USP) (dk)** (Entered: 05/13/2025) |
| 05/13/2025 |  | Terminate Deadlines and Hearings as to Steven David Seeger per 156 Order. (dk) (Entered: 05/13/2025) |
| 05/23/2025 | 157 | MOTION for Forfeiture of Property *Preliminary* by USA as to Steven David Seeger. (Attachments: # 1 Proposed Order)(McKee (USA), Morgan) (Entered: 05/23/2025) |
| 05/23/2025 | 158 | **PRELIMINARY ORDER OF FORFEITURE granting 157 Motion for Forfeiture of Property as to Steven David Seeger. Signed by** |

| | | |
|---|---|---|
| | | **Chief District Judge Thomas S Kleeh on 5/23/2025. (Copy USM, USP) (dk)** (Entered: 05/23/2025) |
| 06/06/2025 | 159 | TRANSCRIPT of Proceedings held on 4/14/2025 before Judge Thomas S. Kleeh as to Steven David Seeger. Court Reporter/Transcriber Rachel Kocher, Telephone number (304) 623-7179. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 6/27/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/4/2025. (rak) (Entered: 06/06/2025) |
| 06/06/2025 | 160 | TRANSCRIPT of Proceedings held on 4/15/2025 before Judge Thomas S. Kleeh as to Steven David Seeger. Court Reporter/Transcriber Rachel Kocher, Telephone number (304) 623-7179. Parties have five business days to file a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will become available via PACER to the public without redaction after 90 calendar days. Redaction Request due 6/27/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/4/2025. (rak) (Entered: 06/06/2025) |
| 06/06/2025 | 161 | TRANSCRIPT PURCHASE ORDER for proceedings held on April 14-15, 2025, before Judge Thomas S. Kleeh. (rak) (Entered: 06/06/2025) |
| 06/11/2025 | 162 | **ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION CONCERNING PLEA OF GUILTY IN FELONY CASE (ECF NO. 155 ), ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING as to Steven David Seeger. Sentencing set for 9/18/2025 11:00 AM in Clarksburg District Judge Courtroom, 2nd Floor before Chief District Judge Thomas S Kleeh. Signed by Chief District Judge Thomas S Kleeh on 6/11/2025. (Copy USM, USP) (dk)** (Entered: 06/11/2025) |
| 08/05/2025 | 163 | MOTION for Extension of Time to File *Objections to Pre-Sentence Report* by Steven David Seeger. (Dyer, Thomas) (Entered: 08/05/2025) |
| 08/05/2025 | 164 | **ORDER GRANTING MOTION TO EXTEND DEADLINE TO FILE PSR OBJECTIONS (ECF NO. 163 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 8/5/2025. (Copy USP) (dk)** (Entered: 08/05/2025) |
| 08/07/2025 | 165 | MOTION for Release from Custody *On Conditions* by Steven David Seeger. (Attachments: # 1 Attachment Embedded Flight Systems letter)(Dyer, Thomas) (Entered: 08/07/2025) |

| 08/08/2025 | 166 | RESPONSE in Opposition by USA as to Steven David Seeger re 165 MOTION for Release from Custody *On Conditions* (Crockett (usatty), Kimberley) (Entered: 08/08/2025) |
|---|---|---|
| 08/18/2025 | 167 | **ORDER DENYING DEFENDANT'S THIRD MOTION TO RECONSIDER DETENTION (ECF NO. 165 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 8/18/2025. (Copy USM, USP) (dk)** (Entered: 08/18/2025) |
| 09/11/2025 | 168 | MOTION for Reconsideration by Steven David Seeger. (Attachments: # 1 Attachment Transcription of Trooper Nicholson Body Cam Footage)(Dyer, Thomas) (Entered: 09/11/2025) |
| 09/12/2025 | 169 | SENTENCING MEMORANDUM by USA as to Steven David Seeger. (dk) (Entered: 09/12/2025) |
| 09/15/2025 | 170 | MEMORANDUM *IN SUPPORT OF REQUEST FOR DOWNWARD VARIANCE* by Steven David Seeger (Dyer, Thomas) (Entered: 09/15/2025) |
| 09/15/2025 | 171 | **ORDER DENYING MOTION FOR RECONSIDERATION (ECF NO. 168 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S. Kleeh on 09/15/2025. (Copy to USMS, USPO) (snc)** (Entered: 09/15/2025) |
| 09/16/2025 | 172 | MOTION for Victim to Appear Via Videoconference Unopposed by USA as to Steven David Seeger. (Crockett (usatty), Kimberley) (Entered: 09/16/2025) |
| 09/16/2025 | 173 | **ORDER GRANTING UNITED STATES' MOTION FOR VICTIM TO APPEAR REMOTELY (ECF NO. 172 ) as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 9/16/2025. (Copy USM, USP) (dk)** (Entered: 09/16/2025) |
| 09/18/2025 | 174 | DEFENDANT'S ORAL MOTION FOR RELEASE ON BAIL as to Steven David Seeger. (dk) (Entered: 09/18/2025) |
| 09/18/2025 | 175 | **ORAL ORDER denying Defendant's Oral Motion for Release on Bail as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 9/18/2025. (dk)** (Entered: 09/18/2025) |
| 09/18/2025 | 176 | DEFENDANT'S ORAL MOTION TO STAY IMPOSITION OF FORFEITURE ORDER as to Steven David Seeger. (dk) (Entered: 09/18/2025) |
| 09/18/2025 | 177 | **ORAL ORDER denying as moot Defendant's Oral Motion to Stay Imposition of Forfeiture Order as to Steven David Seeger. Signed** |

| | | |
|---|---|---|
| | | **by Chief District Judge Thomas S Kleeh on 9/18/2025. (dk)** (Entered: 09/18/2025) |
| 09/18/2025 | 178 | DEFENDANT'S ORAL MOTION TO STAY RESTITUTION JUDGMENT as to Steven David Seeger. (dk) (Entered: 09/18/2025) |
| 09/18/2025 | 179 | **ORAL ORDER denying Defendant's Oral Motion to Stay Restitution Judgment as to Steven David Seeger. Signed by Chief District Judge Thomas S Kleeh on 9/18/2025. (dk)** (Entered: 09/18/2025) |
| 09/18/2025 | 180 | MINUTE ENTRY: <br><br> ***_NOTICE_*** ___THE ATTACHED DOCUMENT IS NOT ACCESSIBLE. IT IS FOR STATISTICAL PURPOSES ONLY.___ <br><br> Proceedings held before Chief District Judge Thomas S Kleeh as to Steven David Seeger. Sentencing held on 9/18/2025. Count(s) 1, Defendant committed to custody of the BOP for a term of 360 months, to run concurrent with Count 4 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 4; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture. Count(s) 2, 3, Dismissed on motion of the Government. Count(s) 4, Defendant committed to custody of the BOP for a term of 360 months, to run concurrent with Count 1 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 1; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture. Count(s) 5, Dismissed on motion of the Government. (Court Reporter Rachel Kocher) (dk) (Entered: 09/18/2025) |
| 09/18/2025 | 181 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Steven David Seeger. (dk) (Entered: 09/18/2025) |
| 09/23/2025 | 182 | MOTION for Forfeiture of Property *Final* by USA as to Steven David Seeger. (Attachments: # 1 Exhibit A - Declaration of Forfeiture, # 2 Proposed Order)(McKee (USA), Morgan) (Entered: 09/23/2025) |
| 09/23/2025 | 183 | **JUDGMENT IN A CRIMINAL CASE as to Steven David Seeger (1), Count(s) 1, Defendant committed to custody of the BOP for a term of 360 months, to run concurrent with Count 4 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 4; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture; Count(s) 2, 3, 5, Dismissed on motion of the Government; Count(s) 4, Defendant committed to custody of the BOP for a term of 360 months, to run concurrent** |

| | | |
|---|---|---|
| | | **with Count 1 and with credit for time served since 7/12/2024; Lifetime supervision to run concurrent with Count 1; $100.00 special assessment; restitution in the amount of $24,975, and forfeiture. Signed by Chief District Judge Thomas S. Kleeh on 09/23/2025. (Copy to USMS, USPO) (snc)** (Entered: 09/23/2025) |
| 09/23/2025 | 184 | **\*SEALED\* STATEMENT OF REASONS (Unredacted) as to Steven David Seeger. Signed by Chief District Judge Thomas S. Kleeh on 09/23/2025. (Attachment 1 - Redacted Statement of Reasons) (Redacted copy to counsel; unredacted copy to USPO) (snc)** (Entered: 09/23/2025) |

**FILED**

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUL 0 9 2024

U.S. DISTRICT COURT   WVND
CLARKSBURG, WV 26301

**UNITED STATES OF AMERICA,**

**v.**

**STEPHEN DAVID SEEGER,**

**Defendant.**

Criminal No.    1:24 - cr - 42

Violations:

18 U.S.C. § 2251(a)
18 U.S.C. § 2251(e)
18 U.S.C. § 2252A(a)(3)(B)
18 U.S.C. § 2252A(a)(5)(B)
18 U.S.C. § 2252A(b)(1)
18 U.S.C. § 2252A(b)(2)
18 U.S.C. § 2422(b)

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE

(Coercion and Enticement of a Minor for Sex)

On or about September 2011, in Marion County within the Northern District of West Virginia, and elsewhere, defendant, **STEPHEN DAVID SEEGER**, did knowingly use a facility and means of interstate commerce to persuade, induce, and entice an individual who had not attained the age of 18 years to engage in any sexual activity for which any person could be charged with a criminal offense, which is to say that he did knowingly use the internet to persuade, induce, entice, and coerce an individual who he knew was a minor and who is designated herein as Jane Doe – 1, a 13 year-old girl at that time, to engage in sexually explicit conduct for the purpose of producing images and videos of such conduct, for which **STEPHEN DAVID SEEGER** could be charged with a criminal offense, to wit: Sexual Exploitation of Children, Title 18, United States Code, Section 2251(a), all in violation of Title 18, United States Code, Section 2422(b).

## COUNT TWO

(Production of Child Pornography)

On or about June 25, 2013, in Marion County within the Northern District of West Virginia, and elsewhere, the defendant, **STEPHEN DAVID SEEGER**, did knowingly employ use, induce, entice, and coerce, Jane Doe – 1, a 14 year-old girl at that time, to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct and such person knew or had reason to know that such visual depiction would be transported and transmitted using any means of facility of interstate or foreign commerce, and such visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in or affecting interstate or foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

## **COUNT THREE**

(Solicitation of Child Pornography)

On or about May 26, 2014, in Marion County within the Northern District of West Virginia, and elsewhere, the defendant, **STEPHEN DAVID SEEGER**, did knowingly solicit, using any means and facility of interstate commerce, and in and affecting interstate commerce by any means, including by computer, any material in a manner that reflects the belief, and that is intended to cause another to believe, that the material is and contains a visual depiction of an actual minor engaging in sexually explicit conduct, in violation of Title 18 United States Code, Sections 2252A(a)(3)(B) and (b)(1).

## COUNT FOUR

(Production of Child Pornography)

On or about May 31, 2014, in Marion County within the Northern District of West Virginia, and elsewhere, the defendant, **STEPHEN DAVID SEEGER**, did knowingly employ use, induce, entice, and coerce, Jane Doe – 2, a 15 year-old girl at that time, to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct and such person knew or had reason to know that such visual depiction would be transported and transmitted using any means of facility of interstate or foreign commerce, and such visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in or affecting interstate or foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e).

## COUNT FIVE

(Possession of Child Pornography)

On or about March 29, 2021, in Preston County, within the Northern District of West Virginia, defendant **STEPHEN DAVID SEEGER**, did knowingly possess an image of child pornography, as defined in Title 18, United States Code Section 2256(8), which had been transported in interstate and foreign commerce by computer, all in violation of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2).

## FORFEITURE ALLEGATION

(Sexual Exploitation of Children)

Pursuant to Title 18, United States Code, Section 2253, the government will seek the forfeiture of property as part of the sentence imposed in this case; that is, the forfeiture of any visual depiction described in Section 2251, 2251A, 2252, 2252A, 2252B, or 2260 of Chapter 110 of Title 18, any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of this chapter, any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property, and any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from a violation of Title18, United States Code, Section 2252A, including the following item seized from the defendant:

> Blue WD My Passport Ultra, S/N: WX11A64AHRR7;
> Black WD My Passport, S/N: WX91A92N2294;
> 16 GB Sandisk Ultra;
> Black LG Nexus Model # LG-E960 cellular phone;
> Samsung S21 Ultra cellular phone in Blue Otterbox; and
> Silver Apple Macbook, S/N: W86450CGW0M.

A True Bill,

/s/
Grand Jury Foreperson

/s/
WILLIAM IHLENFELD
United States Attorney

Kimberley D. Crockett
Assistant United States Attorney

Morgan McKee
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
UNITED STATES

UNITED STATES

v.                                                      CRIMINAL NO. 1:24-CR-42

STEPHEN DAVID SEEGER

**MOTION TO SUPPRESS EVIDENCE SEIZED
ON MARCH 29, 2021 WITH AUTHORITIES**

Now comes Stephen David Seeger, by his attorneys, Thomas Dyer, Esq., and Dyer Law, and

Martin P. Sheehan, Esq., and Sheehan & Associates, PLLC, and move this Court to suppress all

evidence seized on March 29, 2021, by Trooper T.P. Nicholson from 310 Hilltop Drive, near

Bruceton Mills, WV, and all evidence derived therefrom, commonly referred to as fruit of the

poisonous tree.

**Introduction**

In moving to suppress, the Defendant raises several separate grounds as appear below.  First,

there is no warrant for a search of 310 Hilltop Drive, near Bruceton Mills, WV on March 29, 2021.

All that was ever done by the investigating officer, Trooper Nicholson, was to have an affidavit for

search warrant completed.  He swore to its truth before a Circuit Judge.  However, no warrant was

ever issued by the Court.

Second, the affidavit, if somehow construed as a warrant, lacks any nexus between Mr.

Seeger and the property at 310 Hilltop Drive.  It appears that Trooper Nicholson may have, as

discussed below, known information from which that nexus might have been established, but that

information was never presented to the judicial officer.  Consequently, there was no basis for a

judicial officer to conclude that Mr. Seeger had anything to do with that address.

Trooper Nicholson could not have obtained information linking Mr. Seeger to that address from his only source, Kaitlin Stewart. The information supplied to the Court does not suggest she was ever at that residence or that she knew where Mr. Seeger lived. Further, from the Affidavit, it does not appear that she ever had any in person contact with Mr. Seeger at his residence. What is disclosed in the affidavit about their "relationship" is that they used "electronic communications" to interact. Otherwise, information attributed to Ms. Stewart about her interface with Mr. Seeger is about a "non-intimate long distant [sic]" relationship.

Obviously, the affidavit depends on information supplied by Kaitlin Stewart. Trooper Nicholson knew that Ms. Stewart had supplied incorrect information to a law enforcement officer in Texas, and that she had recanted information that she had provided to that officer. Judge Shaffer was entitled to be informed of issues, including this information, which bore on Ms. Stewart's reliability. The failure to do so deprived Judge Shaffer of information to which he was entitled. The failure to allow him to assess credibility constituted a reckless disregard for truth under Franks v. Delaware, 438 U.S. 154 (1978) and its progeny. That vitiates whatever effort could now be made to construe the affidavit as a search warrant.

The Defendant also challenges the use of "printed photographs of nude juveniles" as establishing or contributing to the existence of probable cause. Defendant also challenges whether the phrase "all other evidence" of the crime of distribution and exhibition of minors engaged in sexually explicit conduct has independent legal significance. Such language is in the form of a "general warrant" leaving it to the discretion of the searching officer to decide what is relevant evidence. This is a decision that must be made by the judicial officer issuing a warrant.

The Defendant would ask that all materials seized on April 29, 2021 be suppressed and that all information derived therefrom, fruit of the "poisonous tree," be likewise suppressed.

## Standing

For purposes of establishing standing, the Defendant notes that in a report concerning his activities on March 29, 2021, Trooper Nicholson identified 310 Hilltop Drive, as Mr. Seeger's residence.  As the owner and resident, Mr. Seeger had an expectation of privacy in the contents of the building and its contents.  As such the Defendant had rights which were protected by the Fourth Amendment to the Constitution.  The lack of a warrant renders the search unlawful. Steagald v. United States, 451 U.S. 204 (1981) (Absent exigent circumstances or consent, a home may not be searched without a warrant.).

## There Is No Warrant

On March 29, 2021, Trooper T.P. Nicholson executed an affidavit before Circuit Judge Steven Shaffer.  The affidavit seems to have been executed in some contemplation of obtaining a warrant to search all buildings at 310 Hilltop Drive, near Bruceton Mills, West Virginia.  The information to be searched for and seized was described as:

a)      electronic storage devices, including a long list of such devices;

b)      all printed photographs of nude juveniles;[1] and,

c)      all other evidence[2] of the crime of distribution and exhibition of minors engaged in sexually explicit conduct.

In moving to suppress, the Defendant first asserts that materials seized on that day by the Trooper were seized without any warrant at all.  The Trooper seems to have intended to apply for a warrant to Circuit Judge Steven L. Shaffer.  The Trooper was not required to, and did not, use a

---

[1]  Photographs of "nude juveniles" are not necessarily child pornography. United States v. Doyle, 650 F.3d 460, 473 (4th Cir. 2011).

[2]  The Magistrate must define the evidence to be seized. Leaving it to the discretion of the searching law enforcement officer to decide what is "evidence" is the equivalent of a "general warrant." Such warrants are unenforceable. Sales Inc. v. New York, 442 U.S. 319 (1979).

pre-printed form available for applying for a warrant. Instead the Trooper appears to have proceeded from a typewritten document that had been prepared from scratch.[3]

The document is titled Affidavit and Complaint for Search Warrant. The pre-printed form which is Exhibit A contains a space for some person to be identified, and another space to identify the crime. The document used by Trooper Nicholson mirrors the form which is Exhibit A and identifies Steven Seeger as having comrnitted a crime under West Virginia law involving the possession and distribution of material containing images of a minor engaged in sexually explicit conduct. There is no difficulty with this aspect of Exhibit B.

Exhibit B also indicates that the place to be searched is 310 Hilltop Drive near Bruceton Mills, WV. That is a location in Preston County, West Virginia. (The lack of nexus to Mr. Seeger is addressed below.)

An unnumbered paragraph in Exhibit B identifies the materials to be sought in two sentences. The first sentence refers to electronic storage devices, and then identifies a host of such devices. The second sentence seeks "All printed photographs depicting nude juveniles, and all other evidence of the crime of distribution and exhibiting material depicting minors engaged in sexually explicit conduct."

The first two numbered paragraphs identify Trooper Nicholson, and his training, and experience. Paragraph 3 indicates that the Trooper has relied on information learned via training, and as told to the Trooper by others, including other law enforcement personnel.

Numbered paragraphs 4, 5 and 6 appear to contain information learned from his sole source, Kaitlin Stewart on March 29, 2021. She relayed, *inter alia* that when a minor, a fact she had

---

[3] The Defendant does not complain about the failure to use the pre-printed form. Any legally adequate writing, or writings, can constitute a proper affidavit and search warrant.

purportedly told Mr. Seeger, she electronically sent sexually explicit photos and videos to Mr. Seeger.[4]  Paragraph 7 appears to be something that Trooper Nicholson knew and relied upon based on his experience.  He said "it is not uncommon" for people to save photos or digitally record such incidents.

The Affidavit signed by the Trooper then appears to seek a warrant.  The Trooper appears to have signed the document in the presence of Circuit Judge Shaffer on March 29, 2021.  Here, however, the document titled Affidavit and Complaint for Search Warrant varies from the pre-printed form in Exhibit A in a crucial respect.  The pre-printed form of the search warrant provides:

> You are, therefore, commanded in the name of the State of West Virginia to search forthwith the premises above described and all appurtenances appertaining thereto for the property above specified, to seize such property and bring the same before me to be dealt with according to law.

This language, or its equivalent, is not contained in Exhibit B anywhere.[5]

Moreover, there is no authorization from the judicial officer to search, or to seize anything.

Thus, there is no warrant under circumstances where a warrant was required under <u>Steagald</u>.

**Other Defects**
**Nexus of the address to be searched to Stephen David Seeger**

---

[4]  In summarizing this document, the Defendant does not intend to diminish the statements contained in the Affidavit and Complaint for Search Warrant. A complete copy, including a Property Receipt, is attached hereto as Exhibit B.

[5]  In this regard, the pre-printed form would satisfy the obligation in W.Va. R. Crim. P. 41(c).  In pertinent part, that rule requires:
> A warrant shall issue only on an affidavit or affidavits sworn to before the magistrate or a judge of the circuit court and establishing the grounds for issuing the warrant.  If the magistrate or circuit judge is satisfied that grounds for the application exist, or that there is probable cause to believe that they exist, that magistrate or circuit judge shall issue a warrant identifying the property or person to be seized and naming or describing the person or place to be search...It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified.

West Virginia Rules of Criminal Procedure 41.  Federal Rule of Criminal Procedure 41 is similar.

Assuming that Ms. Stewart should have been worthy of belief, and that real property in possession of, or accessible by Stephen David Seeger should be searched, the Affidavit provides no nexus of any kind between any particular real property - that described as 310 Hilltop Drive and Stephen David Seeger.  He is not described as the owner of the property, a resident of the property, or even as a visitor to the property.  The Affidavit contains no information from which anyone could determine any nexus between Stephen David Seeger and that address.

The Affidavit contains no information from Ms. Stewart that she ever visited 310 Hilltop Drive, or had any information about that address at all.  She did not supply the missing information.

The failure to make that connection renders the warrant defective. <u>Zurcher v Stanford Daily</u>, 436 U.S. 547 (1978); <u>United States v. Lalor</u>, 996 F.2d 1578 (4th Cir. 1993); and, <u>United States v. Doyle</u>, 650 F.3d 460, 471 (4th Cir. 2011).

**Report of Trooper - <u>Franks v. Delaware</u> - Nondisclosure**
**of credibility issues involving Ms. Stewart**

The burden in a challenge based on <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) is on the movant, here Mr. Seeger.  As the movant, Mr. Seeger must make a "substantial preliminary showing" that the affidavit is materially false, or recklessly false, in a material respect.  Mr. Seeger proposes to carry that burden by relying on a Report of Criminal Investigation prepared by Trooper Nicholson, a copy of which is attached hereto as Exhibit C.

If successful, then there is a question of whether or not the remainder of the affidavit supports probable cause.

In his undated report, Trooper Nicholson recites that he spoke to Corporal Lee, a member of the Nacogdoches Police Department on March 26, 2021, or three days <u>before</u> the warrant was applied for, and issued.  The report summarizes a conversation between Trooper Nicholson and Cpl.

Lee of the Nacogdoches (Texas) Police Department on that date. The report provides:

> [T]he victim [earlier identified as Kaitlin Stewart] provided a mix of information during said interview that was at times not accurate. The victim would then admit to not telling correct information and recant.

This is information about the credibility, or more accurately, the incredibility of the primary source of information relied upon in the affidavit. The issuing Judge was entitled to this information. <u>United States v. Lull</u>, 824 F.3d 109, 116 (4th Cir. 2016). There is no doubt that the affiant, Trooper Nicholson, possessed this information. It was not disclosed.[6]

In <u>United States v. Lull</u>, 824 F.3d 109 (4th Cir. 2016), the Court of Appeals for the Fourth Circuit sustained the appeal of a defendant who had entered a conditional plea of guilty after losing a motion to suppress. The Court of Appeals found that suppression was required when there was no disclosure of issues affecting an informants credibility, including the informant's arrest following his participation in what was supposed to have been a controlled buy. Finding the affiant to the warrant had acted in reckless disregard of his disclosure obligations by not making such disclosures, the Court of Appeals also concluded that the failure to make that disclosure was material. The Court vacated the conviction and remanded the case for further consideration.

Similarly here, the failure to disclose the credibility concerns about Kaitlin Stewart is equally problematic. The omission renders the remaining information materially misleading in a knowing way, or in reckless disregard of the truth. As such the Affidavit violates the principles of <u>Franks v. Delaware</u>. The materials seized via the warrant must therefore be suppressed.

---

[6] In <u>United States v. Gonges-Medrano</u>, 3 F.4th 708 (4th Cir. 2021), the Court discusses that some indicia of reliability of information from an informant should be present. The court reviews various possibilities including everything from anonymous informants; to informants with a track record; to known informants who information is corroborated in some measure.

JA035

WHEREFORE, the Defendant moves this court to suppress all materials obtained from the search on March 29, 2021, and all fruit of the "poisonous tree", and for such other relief as may be warranted.

*/s/ Thomas G. Dyer*
Thomas G. Dyer, Esq. (WVSB No. 4579)
Dyer Law
347 Washington Avenue
Clarksburg, WV 26301
(304) 622-1635
(304) 624-9334 fax
dyerlawof@aol.com

*/s/Martin P. Sheehan*
Martin P. Sheehan, Esq. (WVSB No. 4812)
Sheehan & Associates, PLLC
1140 Main St., Suite 333
Wheeling, WV 26003
(304) 232-1064
(304) 232-1066 fax
Martin@MSheehanLaw.net
Paralegal@MSheehanLaw.net

## CERTIFICATE OF SERVICE

I, Thomas G. Dyer, did file this document with the Clerk of the District Court for the Northern District of West Virginia on this 20th day of March 2025, via CM/ECF.  That caused service to be made on Assistant United States Attorneys Andrew R. Cogar, Kimberley D. Crockett and Morgan McKee, at their e-mail addresses of record.

**_/s/Thomas G. Dyer_**

## AFFIDAVIT AND COMPLAINT FOR SEARCH WARRANT

**STATE OF WEST VIRGINIA, County of** _____ , **to-wit:**

This day _____ personally appeared before the undersigned, a Magistrate for said County, and after being duly sworn, upon his oath says that on the _____ day of _____ , 20 ____ , in the said County of _____ , prior to the making of this Complaint, _____ did unlawfully.

☐ and feloniously / ☐ but not feloniously, *(state the offense as fully set forth in warrant)*

```
┌─────────────────────────────────────────────────────────────────────┐
│                                                                       │
│                                                                       │
│                                                                       │
│                                    ,                                  │
└─────────────────────────────────────────────────────────────────────┘
```

**and that the affiant has cause to believe and does believe that property** *(check all that apply)*,

a. ☐ stolen/ ☐ embezzled/ ☐ obtained by false pretenses;

b. ☐ designed and intended for use/ ☐ which is and has been used as a means of committing such criminal offense;

c. ☐ manufactured/ ☐ sold/ ☐ kept/ ☐ concealed/ ☐ possessed/ ☐ controlled /
☐ designed and intended for use/ ☐ which is and has been used in violation of the criminal laws of the state;

d. ☐ evidence of a crime.

**Namely** *(state property to be seized)*,

```
┌─────────────────────────────────────────────────────────────────────┐
│                                                                       │
│                                                                       │
│                                                                       │
└─────────────────────────────────────────────────────────────────────┘
```

**is concealed in** *(describe premises)*,          ☐ Check if continuation sheet is included.

**and that the facts for such belief are** *(state facts for belief)*

```
┌─────────────────────────────────────────────────────────────────────┐
│                                                                       │
│                                                                       │
│                                                                       │
└─────────────────────────────────────────────────────────────────────┘
```

_____          _____
Complainant's Name                        Complainant's Signature

Taken, subscribed and sworn to before me, this _____ day of _____ , 20 ____ .

_____
NOTE: *W.Va. Code § 62-1A-4* provides specifically that a warrant
may be executed and returned only within 10 days after its date.          _____
                                                                          Magistrate's Signature

**SCA-M28: Search Warrant** (Affidavit and Complaint, Warrant, and Property Receipt)          Page 1 of 4
Revision Date: 07/15/2016; Docket Code(s): **MMWAS**

**EXHIBIT**
A

USCA4 Appeal: 25-4526   Doc: 16   Filed: 02/25/2026   Pg: 41 of 339

JA038

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 42 of 339

---
### *SEARCH WARRANT*
---

**STATE OF WEST VIRGINIA, County of** _____, **to-wit:**

To the Sheriff or any Deputy Sheriff of the County, to any member of the Department of Public Safety, or to any police officer authorized by law to execute search warrants:

Whereas, _____ has this day made complaint on oath before the undersigned, a Magistrate of said County, that on the _____ day of _____, 20 ___, in the said County of _____, prior to the issuance of this warrant, _____ did unlawfully, ☐ and feloniously / ☐ but not feloniously, *(state the offense)*

[ ]

**and that the complainant has cause to believe and does believe that property** *(check all that apply)*,

a. ☐ stolen/ ☐ embezzled/ ☐ obtained by false pretenses;

b. ☐ designed and intended for use/ ☐ which is and has been used as a means of committing such criminal offense;

c. ☐ manufactured/ ☐ sold/ ☐ kept/ ☐ concealed/ ☐ possessed/ ☐ controlled /

☐ designed and intended for use/ ☐ which is and has been used in violation of the criminal laws of the state;

d. ☐ evidence of a crime.

**Namely** *(state property to be seized)*,

[ ]

**is concealed in** *(describe premises)*,          ☐ Check if continuation sheet is included.

---

**and that the grounds for probable cause for the issuance of this warrant are as follows:** *(state facts for belief)*

[ ]

**and that the name of the person whose affidavit has been taken in support of the issuance of this warrant is** _____ *(complainant's name)*

You are, therefore, commanded in the name of the State of West Virginia to search forthwith the premises above described and all appurtenances appertaining thereto for the property above specified, to seize such property and bring the same before me to be dealt with according to law.

Given under my hand this the _____ day of _____, 20 ___.

NOTE: *W.Va. Code § 62-1A-4 provides specifically that a warrant may be executed and returned only within 10 days after its date.*          _____
                                                                                    Magistrate's Signature

**SCA-M28: Search Warrant** (Affidavit and Complaint, Warrant, and Property Receipt)          Page 2 of 4
Revision Date: 07/15/2016; Docket Code(s): MMWAS

Pg: 43 of 339

Filed: 02/25/2026    Doc: 16

USCA4 Appeal: 25-4526

## PROPERTY RECEIPT

**STATE OF WEST VIRGINIA, County of** _____, **to-wit:**

    I, the undersigned, did execute the within warrant, on the _____ day of _____, 20 ___, time: _____ : _____ ☐ a.m./ ☐ p.m., by searching the premises therein described.

    The following is an inventory of the property seized, hereby receipted:

Dated this _____ day of _____, 20 ___.

                                       _____
                                       Officer

    Receipt of a copy of the within warrant is hereby acknowledged along with the inventory of the property taken as above listed.

Dated this _____ day of _____, 20 ___, time: _____ : _____ ☐ a.m./ ☐ p.m.

                                       _____
                       Person from whose premises the property was taken

**SCA-M28: Search Warrant** (Affidavit and Complaint, Warrant, and Property Receipt)        Page 3 of 4
Revision Date: 07/15/2016; Docket Code(s): MMWAS

**SEARCH WARRANT (Continuation Sheet)**

**STATE OF WEST VIRGINIA, County of** _____ **, to-wit:**

**SCA-M28: Search Warrant** (Affidavit and Complaint, Warrant, and Property Receipt)
Revision Date:  07/15/2016; Docket Code(s): MMWAS

Page 4 of 4

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 44 of 339

Pg: 45 of 339

Filed: 02/25/2026    Doc: 16

USCA4 Appeal: 25-4526

## AFFIDAVIT AND COMPLAINT FOR SEARCH WARRANT

STATE OF WEST VIRGINIA,
COUNTY OF PRESTON, TO-WIT:

This day personally appeared before the undersigned, a Circuit Court Judge for said County, Trooper T.P. Nicholson, Who, after being first duly sworn, upon his oath says:

That on or about 29 March 2021, and prior to making this Complaint, in the said County of Preston, Steven Seeger did knowingly and willfully, sends or causes to be sent or distributes, exhibits, possesses, electronically accesses with intent to view or displays or transports any material visually portraying a minor engaged in any sexually explicit conduct.

**Namely,**

All electronic storage devices, to include but not limited to cellular phones, laptop computers, stand alone computers, memory cards, floppy discs, compact discs, smart televisions, smart photograph frames, etc. All printed photographs depicting nude juveniles, and all other evidence of the crime of distribution and exhibiting of material depicting minors engaged in sexually explicit conduct.

**Is Concealed in:**

All residences, attached garages, detached garages, out buildings, vehicles, and all other curtilage located at the address of 310 Hilltop Drive near the city of Bruceton Mills, WV.

**The facts for such belief are:**

1.  The Affiant, Trooper T.P. Nicholson, is a sworn Member of the West Virginia State Police. That the affiant is assigned to the Kingwood Detachment of the West Virginia State Police. That the affiant has been a sworn member of the West Virginia State Police for 2 years and 2 months, with investigative experience in property crimes, sexual assault, suicide, and other such crimes. That the affiant possesses a Bachelor of Science in Business Administration from West Virginia University, certificates of completion involving Computer Sciences from the United States Marine Corps and is assigned to investigate crimes in all counties of West Virginia.

2.  The affiant has received education through technical schools and universities where parts of the courses of study dealt with computer networking and other parts dealt with computer storage. These institutions of higher learning include West Virginia University and Marine Corps Communication Electronics School.

3.  This affidavit is based upon information that the affiant has gained through training and experience, as well as upon information related to the affiant by other individuals, including law enforcement officers. Since this affidavit is being submitted to show only that there is sufficient probable cause for the requested warrant, it does not set forth all of my knowledge about this matter. This affidavit sets forth only those facts and circumstances that the affiant



EXHIBIT
3

1

JA042

believes are necessary to establish probable cause to believe that evidence relating to the matter under investigation is located within the PROPERTY TO BE SEARCHED.

4.   That Trooper Thunder P. Nicholson took a criminal complaint on Monday, March 29, 2021, in Preston County, West Virginia, from Kaitlin Stewart in reference to sexually explicit photographs and videos she sent electronically to Steven Seeger when she was a minor. Miss. Stewart advised that Mr. Seeger was aware of her status as a minor and proceeded to continue requesting photographs and videos of sexually explicit actions. Miss. Stewart advised that Mr. Seeger would request said videos as a form of payment for Miss. Stewart providing him with false information.

5.   That Miss. Stewart advised Mr. Seeger and she entered a non-intimate long distant relationship while she was a minor.

6.   That Mr. Seeger has sent sexually explicit images of Miss. Stewart to her friends and family.

7.   That it is not uncommon for people to save photos or digitally record such incidents.

Based on the above information, Trooper Nicholson has cause to believe and does believe that evidence of this crime are possessed within the above described residence, and the affiant requests a search warrant be issued to said residence.

Complainant:            Trooper T.P. Nicholson
                        West Virginia State Police
                        Kingwood Detachment, Troop 1, District 2

Complainant Signature:  _T. P. Nicholson_

Taken, subscribed and sworn to before me this 29th day of March 2021.

                                        Circuit Judge

NOTE: W. Va. Code 62-1A-4 provides specifically that a warrant may be executed and returned only within 10 days after its date.

2

## PROPERTY RECEIPT

STATE OF WEST VIRGINIA, County of _PRESTON_____ , to-wit:

I, the undersigned, did execute the within warrant, on the _29_ day of _March_____ , 20_21_.
time: _14:00_ ☐ a.m./ ☒ p.m., by searching the premises therein described.

The following is an inventory of the property seized, hereby receipted:

WD Passport  s/N: WX11AC4AHRR7  -Blue
Sandisk Ultra 16GB
Black 16 Nexus model LG-E960
Black WD Passport s/N: WX91A92N2297
Samsung S21 Ultra in Blue Otterbox
Silver Apple MacBook  Model # A1212

Dated this _29_ day of _March_____ , 20_21_.

_____
Officer

Receipt of a copy of the within warrant is hereby acknowledged along with the inventory of the property taken as above listed.

Dated this _29_ day of _March_____ , 20_21_. time: _7:19_ ☐ a.m./ ☒ p.m.

_____
Person from whose premises the property was taken

**SCA-M28: Search Warrant (Affidavit and Complaint, Warrant, and Property Receipt)**        Page 3
Revision Date: 07/15/2016; Docket Code(s): MMWAS

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 47 of 339

WVSP FORM 17-A
REV. 11/2019

## REPORT OF CRIMINAL INVESTIGATION

Page 1 of 2

| | |
|---|---|
| DETACHMENT FILE NUMBER | 123018324 |
| MODE OF OPERATION | On March 29, 2021, Kaitlin Victoria Stewart contacted the WVSP Kingwood Detachment to file a child porn complaint against Steven Seeger. Mrs. Stewart lives in Texas and Mr. Seeger lives in Preston County, West Virginia. |
| ACTION TAKEN | On Tuesday, March 23, 2021, Trooper T.P. Nicholson (this trooper) was contacted at the WVSP Kingwood Detachment by Professor Jeffery Roth (witness #1) of Stephen F. Austin University in Nacogdoches, Texas, referring a possible child porn incident involving one of his students, Kailin Stewart (victim). Mr. Roth advised that he received an e-mail from Steven Seeger (suspect) that caused him to have some concerns. Mr. Roth advised he then spoke with the victim and she advised the suspect had been blackmailing her for sexual pictures since she was fourteen (14) years old. Mr. Roth advised the victim is currently twenty-one (21) years old. |

This trooper then requested that Mr. Roth provide him with the victim's contact information, and he advised he would obtain said information for this trooper.

On Friday, March 26, 2021, this trooper contacted the Nacogdoches Police Department and spoke with Corporal Lee. Cpl. Lee advised that the victim filed a revenge porn complaint against the suspect. Cpl. Lee advised that the victim provided a mix of information during said interview that was at times not accurate. The victim would then admit to not telling correct information and recant.

On March 29, 2021 at approximately 1227 hours, this trooper was able to contact the victim via telephone. The victim advised during said interview that she met the suspect when she was approximately fourteen (14) years old on the cellphone application known as Kik. The victim advised that when she first met the suspect, she deceived him and did not advised the suspect of her actual age. This trooper noted that the victim did not advised him of the age she claimed to be. The victim advised that when she did reveal her age to the suspect he asked for nude photographs and explicit videos as a "punishment" for lying. The victim advised she is unaware if the suspect retained any photographs. This trooper noted that said conversation was recorded and later transferred to a compact disc. Said compact disc is attached to the file copy of this report as exhibit #1.

At approximately 1249 hours, this trooper received the e-mail that Mr. Roth advised him of several days prior. Said e-mail was then printed out and attached to the file copy of this report as exhibit #2.

At 1300 hours, this trooper completed the proper paperwork and obtained a search warrant for the suspect's house through the Preston County Circuit Court. A copy of said warrant was later attached after being served as exhibit #3.

At approximately 1830 hours, this trooper and Trooper S.W. Morris traveled to the suspect residence, addressed 310 Hilltop Drive near the city of Bruceton Mills, Preston County, and executed said search warrant to obtain electronic storage devices. This trooper noted items listed on the property page were seized and later transferred to the WVSP Kingwood Detachment Evidence Room as exhibits #4, #5, #6, #7, #8, and #9, respectfully.

This trooper noted that while at the suspect's residence, the suspect was advised of his Miranda Rights and interviewed regarding the alleged crime. The suspect advised that he did receive nude images of the victim when she was under the age of eighteen (18), but this was when the victim was lying about her age. The suspect advised when she revealed her actual age, he deleted said images and never asked for more until she was over the age of eighteen (18). The suspect advised he still has the new photographs of the victim above the age of eighteen (18). The suspect did advise he


EXHIBIT
C

USCA4 Appeal: 25-4526      Doc: 16      Filed: 02/25/2026      Pg: 48 of 339

WVSP FORM 17-A
REV. 11/2016

## REPORT OF CRIMINAL INVESTIGATION

Page 2 of 2

MAY 0 5 2021

sent topless pictures of the victim to her friends in spite. The suspect also stated that he recently discovered that the victim was using him to obtain money and monetary items. The suspect was unable to provide any evidence of said claim at this time. The suspect advised he believe the victim is using him and other males to obtain money. This trooper noted that said search and interaction with the suspect was recorded via body camera. Said footage was later transferred to exhibit #1.
On March 30, 2021 at approximately 1000 hours, this trooper received WVSP Form 114, Evidence Room Receipt for exhibits #4 - #9. Said form is attached to the file copy of this report as exhibit #10.

On April 19, 2021, this trooper completed the proper paperwork and obtained a search warrant for the digital contents of exhibits #4 - #9.

On April 26, 2021, this trooper executed said search warrant at the WVSP Digital Forensics Laboratory in Morgantown, WV. A copy of said served search warrant is attached to the file copy of this report as exhibit #11. This trooper also obtained a copy of WVSP Form 53, Forensic Laboratory Case Submission Form and said form is attached to the file copy of this report as exhibit #12.

On May 2, 2021 at approximately 1630 hours, this trooper noted he is awaiting the results of the digital forensics. This trooper was given an approximate wait of two (2) months.

At the submission of this report this investigation is considered active. A supplemental report will be submitted upon obtaining the results from digital forensics or obtaining more information through investigation.

Trooper T.P. Nicholson
West Virginia State Police
Troop 1 – Kingwood

COPY TO        The Superintendent
               Prosecuting Attorney
               Detachment Files

Pg: 49 of 339    Filed: 02/25/2026    Doc: 16    USCA4 Appeal: 25-4526

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
UNITED STATES

UNITED STATES

v.                                                    CRIMINAL NO. 1:24-CR-42

STEPHEN DAVID SEEGER

**MOTION TO SUPPRESS EVIDENCE SEIZED
ON APRIL 26, 2021 WITH AUTHORITIES**

Now comes Stephen David Seeger, by his attorneys, Thomas Dyer, Esq., and Dyer Law, and

Martin P. Sheehan, Esq., and Sheehan & Associates, PLLC, and moves to suppress evidence seized

on April 26, 2021 pursuant to a warrant issued on April 19, 2021 and all evidence derived therefrom,

commonly referred to as fruit of the poisonous tree.

**Introduction**

The Defendant has, by separate motion, moved to suppress evidence seized on March 29,

2021. That motion seeks to suppress certain evidence and to suppress fruit of the poisonous tree.

This motion addresses the suppression of evidence seized from materials seized on March 29, 2021

and so, in the Defendant's view, examination of the seized material pursuant to a warrant issued on

April 26, 2021 is encompassed within the earlier motion. However, because the examination

purports to be pursuant to a separate warrant, that is, in the Defendant's view defective, this motion

has also been filed.

Unlike the earlier motion where there does not appear to have been a search warrant at all,

here there is a search warrant issued by a Preston County Magistrate.[1]  The warrant was issued on

---

[1] Exhibit B, attached hereto is report of Trooper T.P. Nicholson concerning his investigation. He reports that he executed the search warrant issued in Preston County, West Virginia at a location in Monongalia County. The Magistrate lacked jurisdiction to issue a warrant outside the county in which she was serving. The warrant which was issued thus is not lawful.

April 19, 2021, pursuant to an Affidavit of Trooper T.P. Nicholson. A complete copy of the Warrant, the Affidavit and the Property Receipt is attached hereto as Exhibit A.

The Affidavit is very short. It seeks to search six specifically identified electronic devices, being the same six electronic devices seized on March 29, 2021.

The Affidavit seeks permission to search for "photographs, messages, videos and all other evidence of a violation of West Virginia State Code." There is no identification of what crime is being investigated in the portion of the Affidavit quoted above, but the Affidavit does assert that Mr. Seeger has committed a violation of W.Va. Code 61-8C-3. That provision makes it a crime, *inter alia*, to knowingly and willfully send or possess, including via electronic means, materials involving minors engaged is sexually explicit activity.

The facts supporting the application are reported as: "That on March 29, 2021, Trooper Nicholson was contacted by Kaitlin Stewart, who advised him that Steven Seeger blackmailed her into sending nude photographs, and sexually explicit videos to him when she was fifteen years old."

As in the Motion to Suppress Evidence Seized on March 29, 2021, the Defendant raises a challenge under Franks v. Delaware, 438 U.S. 154 (1978) in connection with the failure of Trooper Nicholson to disclose difficulties with the credibility of Kaitlin Stewart.

In addition, the Defendant challenges the specificity of the items which the warrant allowed a search to be made. Some aspect of this challenge rests on the description causing the warrant to be a general warrant.

**Standing**

For purposes of establishing standing, the Defendant notes that in a report concerning his activities on March 29, 2021, Trooper Nicholson identified 310 Hilltop Drive, as Mr. Seeger's residence. The property receipt associated with that seizure identifies six electronic storage devices

seized from that residence.  Mr. Seeger had an expectation of privacy in the contents of the building, including the six electronic storage devices.  As such, the Defendant had rights which were protected by the Fourth Amendment to the Constitution. He has standing to move to suppress.

### Report of Trooper - <u>Franks v. Delaware</u> - Nondisclosure of credibility issues involving Ms. Stewart

The burden in a challenge based on <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) is on the movant, here Mr. Seeger.  As the movant, Mr. Seeger must make a "substantial preliminary showing" that the affidavit is materially false, or recklessly false, in a material respect.  Mr. Seeger proposes to carry that burden by relying on a Report of Criminal Investigation prepared by Trooper Nicholson, a copy of a portion of which is attached hereto as Exhibit B.

In his undated report, Trooper Nicholson recites that he spoke to Corporal Lee, a member of the Nacodgoches Police Department on March 26, 2021.  The report summarizes a conversation between Trooper Nicholson and Cpl. Lee of the Nacgdoches (Texas) Police Department on that date. The report provides:

> [T]he victim [earlier identified as Kaitlin Stewart] provided a mix of information during said interview that was at times not accurate. The victim would then admit to not telling correct information and recant.

This is information about the credibility, or more accurately, the incredibility of the primary source of information relied upon in the affidavit. The issuing Judge was entitled to this information. <u>United States v. Lull</u>, 824 F.3d 109, 116 (4th Cir. 2016).  There is no doubt that the affiant, Trooper Nicholson, possessed this information. It was not disclosed.[2]

In <u>United States v. Lull</u>, 824 F.3d 109 (4th Cir. 2016), the Court of Appeals for the Fourth

---

[2]  In <u>United States v. Gonges-Medrano</u>, 3 F.4th 708 (4th Cir. 2021), the Court discusses that some indicia of reliability of information from an informant should be present.  The Court reviews various possibilities including everything from anonymous informants; to informants with a track record; to known informants who information is corroborated in some measure.

Circuit sustained the appeal of a defendant who had entered a conditional plea of guilty after losing a motion to suppress. The Court of Appeals found that suppression was required when there was no disclosure of issues affecting an informants credibility, including the informant's arrest following his participation in what was supposed to have been a controlled buy.  Finding the affiant to the warrant had acted in reckless disregard of his disclosure obligations by not making such disclosures the Court of Appeals also concluded that the failure to make that disclosure was material. The Court vacated the conviction and remanded the case for further consideration.

Similarly here, the failure to disclose the credibility concerns about Kaitlin Stewart is equally problematic.  The omission renders information from her problematic in a knowing way, or in reckless disregard of the truth.  As such, the Affidavit violates the principles of <u>Franks v. Delaware</u>. The materials seized via the warrant must be suppressed.

As the entirety of the affidavit depends, in this instance on information learned from Ms. Stewart, there are no separate facts to support probable cause.

### Over Broad Descriptions of Items to be Seized

The crime purportedly under investigation outlaws visual depictions of sexually explicit conduct, a term defined in W.Va. Code 61-8C-1(c), as:

> (c) "Sexually explicit conduct" includes any of the following, whether actually performed or simulated: (l) Genital to genital intercourse; (2) Fellatio;(3) Cunnilingus;(4) Anal intercourse; (5) Oral to anal intercourse;(6) Bestiality;(7) Masturbation; (8) Sadomasochistic abuse, including, but not limited to, flagellation, torture or bondage;(9) Excretory functions in a sexual context; or (10) Exhibition of the genitals, pubic or rectal areas of any person in a sexual context.

The search for "photographs, messages, videos and all other evidence of a violation of West Virginia State Code" does not restrict the scope of the warrant to such materials. It is thus over broad.

### General Warrant

In authorizing the seizure of "all other evidence of a violation of West Virginia State Code,"

the warrant leaves to the discretion of the officer what is evidence of a violation of the West Virginia State Code. This is impermissible.  A warrant must describe the items to be searched with specificity and cannot delegate the authority to a law enforcement officer as to what the officer believes should be seized. <u>Sales Inc. v. New York</u>, 442 U.S. 319 (1979).

### Conclusion

WHEREFORE, the Defendant moves this Court to suppress all materials obtained from the search on April 29, 2021, and all information derived therefrom, the fruit of the "poisonous tree", and for such other relief as may be warranted.

Respectfully submitted,

**/s/ Thomas G. Dyer**
Thomas G. Dyer, Esq. (WVSB No. 4579)
Dyer Law
347 Washington Avenue
Clarksburg, WV 26301
(304) 622-1635
(304) 624-9334 fax
dyerlawof@aol.com

**/s/Martin P. Sheehan**
Martin P. Sheehan, Esq. (WVSB No. 4812)
Sheehan & Associates, PLLC
1140 Main St., Suite 333
Wheeling, WV 26003
(304) 232-1064
(304) 232-1066 fax
Martin@MSheehanLaw.net
Paralegal@MSheehanLaw.net

## CERTIFICATE OF SERVICE

I, Thomas G. Dyer, did file this document with the Clerk of the District Court for the Northern District of West Virginia on this 20th day of March 2025, via CM/ECF.  That caused service to be made on Assistant United States Attorneys Andrew R. Cogar, Kimberley D. Crockett and Morgan McKee, at their e-mail addresses of record.

*/s/Thomas G. Dyer*

---

### SEARCH WARRANT

---

STATE OF WEST VIRGINIA, County of _____Preston_____ , to-wit:

To the Sheriff or any Deputy Sheriff of the County, to any member of the Department of Public Safety, or to any police officer authorized by law to execute search wan-ants:

    Whereas, _____Trooper T.P. Nicholson_____ has this day made complaint on oath

before the undersigned, a Magistrate of said County, that on the _1st_ day of _____Januaxy_____ , 20 _14_ .

in the said County of _____Preston_____ , prior to the issuance of this warrant,

_____Steven David Seeger_____ did unlawfully, [Z] and feloniously / C] but not feloniously,

(state the offense)

S61-8C-3. Distribution and exhibiting of material depicting minors engaged in sexually explicit conduct prohibited

(a) Any person who, knowingly and willfully, sends or causes to be sent or disuibutes, exhibits, possesses,

electronically accesses with intent to view or displays or transpons any material visually portraying a minor

engaged in any sexually explicit conduct is guilty of a felony.

and that the complainant has cause to believe and does believe that property (check all that apply),

a.    stolen/ [Z embezzled/ Cl obtained by false pretenses;

b.    12 designed and intended for use/ Owhich is and has been used as a means of committing such criminal offense;

c.    C] manufactured/ C] sold/ kept/ CJ concealed/ C] possessed/ controlled/

    C] designed and intended for use/ C] which is and has been used in violation of the criminal laws of the state;

d.    evidence of a crime.

Namely (state property to be seized),

Photographs. messages. videos, and all other evidence of a violation of West Virginia State Code.

is concealed in (describe premises),    Check if continuation sheet is included.
See Attached.

and that the grounds for probable cause for the issuance of this warrant are as follows: (statefactsfor belief) That on March 29, 2021, Trooper Nicholson was contacted by Kaitlin Stewart, who advised that Steven Seeger

blackmailed her into sending nude photographs and sexually explicit videos to him when she was fifteen years old.

SCA-M28: Search Warrant (Affidavit and    Warrant, and Property Receipt) Revision
Date: 07/15/2016: Docket Code(s):

EXHIBIT
4

USCA4 Appeal: 25-4526     Doc: 16     Filed: 02/25/2026     Pg: 56 of 339

and that the name of the person whose affidavit has been taken in support of the issuance of this warrant is Trooper T.P. Nicholson (complainant's name).

You are, therefore. commanded in the name of the State of West Virginia to search forthwith the premises above described and all appunenances appenaining thereto for the property above specified, to seize such propeny

and bling the same before me to be dealt with accordin o

Given under my hand this the ( QUday

may be

NOTE: W. Va. Code 62-1A-4 provides specifiGlly that a warrant _executed and_ _returned only_ within 10 days after its date.

:cording to law
ny of _April_ , 20 _Ⅵ_ .

lhat a warrant ter its date.

_Rhonda Shipaeot_ Magistrate's Signature

Complaint,

MMWAS                                          RETURN2

## PROPERTY RECEIPT

STATE OF WEST VRGINIA, County of ____Preston____ , to-wit:

did execute the within wan•ant, on the 2 day of      Apr { ( ____ ,

I, the undersigned, di:   20Q_L'

time: _12:57_ ☐ a.m./☒        P.m., by searching the premises therein described.

The following is an inventory ofthe property seized, hereby receipted:

Digital Data, will update upon reciept

SCA-M28: Search Warrant (Affidavit and    Warrant, and Property Receipt)  Page Revision Date: 07/15/2016: Docket Code(s):

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 57 of 339

Pg: 58 of 339        Filed: 02/25/2026        Doc: 16        USCA4 Appeal: 25-4526

Dated this _26_ day of _April_ , 20_21_.

Officer

Receipt of a copy of the within warrant is hereby acknowledged along with the inventory of the property taken as above listed.

Dated _____ : _____ this _____ day of _____ .20 _____
time:_____ : _____O a.m./ O P.m.

Person from whose premises the propeny was takQ

Complaint,    3 bßfWAS

SEARCH WARRANT (Continuation Sheet)

STATE OF WEST vmGm1A, County of _____Preston_____ , to-wit:

Items:

**Blue WD Passport S/N: WX11A64AHRR7**

Blue

Black WD Passport SIN: W*X91A92N2299

Sandisk Ulu•a 16BG

Black LG Nexus Model # LG-E960

Samsung S21 Ultra in blue Otterbox

SCA-M28: Search Warrant (Affidavit and    Warrant, and Property Receipt)  Page Revision Date: 07/15/2016: Docket Code(s):

Silver Apple Macbook Model: A1212

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Complaint,
NªnawAS

4

SCA-M28: Search Warrant (Affidavit and    Warrant, and Property Receipt)  Page Revision Date:
07/15/2016: Docket Code(s):

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 59 of 339

## AFFIDAVIT AND COMPLAINT FOR SEARCH WARRANT

STATE OF WEST VIRGINIA, County of _____ Preston _____, to-wit:

This day        Trooper T.P. Nicholson  personally appeared before the undersWd, a Magsu•ate for said Cotmty, and    being duly sworn, upon his oaå says tut on the

1st day of _____ Jouary _____, 20 14, indxesaidCountyof _____ Preston _____, prior

to åe mayng ofdlis Complaint, _____ Steven David Seege _____ did unlawfully,

@and feloniously / but not feloniously, (state the offmse asßlO' säforth in warrant)

561-8C-3. Disnibuåon exhibiting ofmataial m.inors Qgaged in sexually explicit conduct prohibited (a) Any who, howingly and willftlly, sends or causes to be or **listributes, exhibits,** possesses,

electronically accesses with intQt to view or displays or &anspare    material visually portraying a minor

engaged in any sexually *cit conduct is Blilty of a felony.

and that the amant has cause to believe and doe believe that property (check au that appt'),

a.    stolen/Ü embea.l&i/ O obtained by åke premses;

b.    desigxed and    for use/ Owhich is has been used as a means ofcommitting such criminal offense;

c.    manumctured/ sow kept/ concealed/ O possessed/ conUolled I
  designed and intended for use/ which is and has been used in violation ofthe aiminal laws ofthe state;

d.    evidence ofa

Namely (state property ro be sdzed),

Photographs, messages, videos, and all         ofa violation ofWest        SMe Code.

is conceded in*(describe premises)*,@Geck if coüuation sheet is included.
See Attached.

and that the facts for such bdief are (statefactsror beuq)

That on Mach 29, 2021, Trooper Nicholson was contacted by Kaidin Stewmt, who advised that Steven Seæer blachnailed her sending nude and sexually explicit videos to him whan she was years old.

Trooper T.P. Nicholson
Complainant's Name                                    Complainant's Signature

Taken, subscribed and sworn to before me, this ____ day of April , 20 21 .

NOTE: *W.Va. Code § 62-1A-4* provides specifically that a warrant
may be executed and returned only within 10 days after its date.        Magistrate's Signature

SCA-M28:                          Co*int,                                              1

Search Warrant (Affdavit and     Warrant, and Property Receipt) Page 07/15/2016; Docket
      Code(s):

USCA4 Appeal: 25-4526      Doc: 16      Filed: 02/25/2026      Pg: 60 of 339

RevisionDate:                          remmas

Search Warrant (Affdavit and        Warrant, and Property Receipt)   Page 07/15/2016; Docket
        Code(s):

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 61 of 339

USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 62 of 339



APR 27 2021

P 1:19

FORM 17-A
11/2019
wvsp
REV:Page 1 of2

## REPORT OF CRIMINAL INVESTIGATION

| DETACHMENT FILE NUMBER | 123018324 |
|---|---|

| MODE OF OPERATION | On March 29, 2021, Kaitlin Victoria Stewart contacted the WVSP Kingwood Detachment to file a child porn complaint against Steven Seeger. Mrs. Stewart lives in Texas and Mr. Seeger lives in Preston County, West Virginia. |
|---|---|

MODE    OPERATION

ACTION TAKEN On Tuesday, March 23, 2021, Trooper T.P. Nicholson (this trooper) was contacted at the WVSP Kingwood Detachment by Professor Jeffery Roth (witness of Stephen F. Austin State University in Nacogdoches, Texas, referring a possible child porn incident involving one of his students, Kailin Stewatt (victim). Mr. Roth advised that he received an e-mail from Steven Seeger (suspect) that caused him to have some concerns. Mr. Roth advised he then spoke with the victim and she advised the suspect had been blackmailing her for sexual pictures since she was fouzteen (14) years old. Mr. Roth advised the victim is currently aventy-one (21) years old.

This trooper then requested that Mr. Roth provide him with the victim 's contact information, and he advised he would obtain said information for this trooper.

On Friday, March 26, 2021, this trooper contacted the Nacodgoches Police Department and spoke with Corporal Lee. Cpl. Lee advised that the victim filed a revenge porn complaint against the suspect. Cpl. Lee advised that the victim provided a mix of information during said interview that was at times not accurate. The victim would then admit to not telling conect information and recant-

On March 29, 2021 at approximately 1227 hours, this trooper was able to contact the victim via telephone. The victim advised during said interview that she met the suspect when she was approximately fourteen (14) years old on the cellphone application known as Kik. The victim advised that when she first met the suspect, she deceived him and did not advised the suspect of her actual age. This trooper noted that the victim did not advised him of the age she claimed to be. The victim advised that when she did reveal her age to the suspect he asked for nude photographs and explicit videos as a '{punishment" for lying. The victim advised she is unaware if the suspect retained any photographs. This trooper noted that said conversation was recorded and later transferred to a compact disc. Said compact disc is attached to the file copy of this repolt as exhibit.#l.

At approximately 1249 hours, this trooper received the e-mail that Mr. Roth advised him of several days prior. Said e-mail was then printed out and attached to the file copy of this report as exhibit#2.

At 300 hours, this trooper completed the proper paperwork and obtained a search warrant for the suspect's house through the Preston County Circuit Court. A copy of said warrant was later attached after being served as exhibit #3.

At approximately 1830 hours, this trooper and Trooper S.W. Morris traveled to the suspect residence, addressed 310 Hilltop Drive near the city of Bruceton Mills, Preston County, and executed said search warrant to obtain electronic storage devices. This trooper noted items listed on the property page were seized and later transferred to the WVSP Kingwood Detachment Evidence Room as exhibits #5, #6, and #9, respectfully.



USCA4 Appeal: 25-4526    Doc: 16    Filed: 02/25/2026    Pg: 63 of 339

This trooper noted that while at the suspect's residence, the suspect was advised of his Miranda
Rights and interviewed regarding the alleged crime. The suspect advised that he did receive
nude images of the victim when she was under the age of eighteen (1 8), but this was when the
victim was lying about her age. The suspect advised when she revealed her actual age, he
deleted said images and never asked for more until she was over the age of eighteen (18). The
suspect advised he still has the new photographs of the victim above the age of eighteen (18).
The suspect did advise he

REV.wvsr FORM 17.A

EXHIBIT

2 of2

Page

## REPORT OF CRIMINAL INVESTIGATION

sent topless pictures of the victim to her friends in spite. The suspect also stated that he recently Q.
discovered that the victim was using him to obtain money and monetary items. The suspect was
unable to provide any evidence of said claim at this time. *Ibe suspect advised he believe the victim
: c is using him and other males to obtain money. This trooper noted that said search and
interaction ⅗ ²with the suspect was recorded via body camera. Said footage was later ~~transferred~~ to
exhibit #1. On March 30, 2021 at approximately 1000 hours, this trooper received WVSP Form
114, Evidence Room Receipt for exhibits #4 - #9. Said form is attached to the file copy of this
report as exhibit #10.

On April 19, 2021, this trooper completed the proper paperwork and obtained a search warrant
for the digital contents of exhibits #4 - #9.

On April 26, 2021, this trooper executed said search warrant at the WVSP Digital Forensics
Laboratory in Morgantown, WV. A copy of said served search warrant is attached to the file
copy of this report as exhibit #11. This tmoper also obtained a copy of WVSP Form 53,
Forensic Laboratory Case Submission Form and said form is attached to the file copy of this
report as exhibit

On May 2, 2021 at approximately 1630 hours, this trooper noted he is awaiting the results of
the digital forensics. This trooper was given an approximate wait of two (2) months.

At the submission of this report this investigation is considered active. A supplemental report
will be submitted upon obtaining the results from digital forensics or obtaining more
information through investigation.

Trooper T.P. Nicholson

West Virginia State Police
Troop I — Kingwood

COPY TO          The Superintendent
                 Prosecuting Attomey
                 Detachment Files

JA061

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                         AT CLARKSBURG

 3   ------------------------------x
     UNITED STATES OF AMERICA,      :
 4                                  :
          Plaintiff,                :
 5                                  : CRIMINAL ACTION NUMBER:
       vs.                          : 1:24-CR-42
 6                                  :
     STEVEN DAVID SEEGER,           :
 7                                  :
          Defendant.                :
 8   ------------------------------x

 9        Proceedings had in the pretrial conference and motions
     hearing of the above-styled action on April 14, 2025, before
10   the Honorable Thomas S. Kleeh, Chief District Judge.

11   APPEARANCES:

12    FOR THE UNITED STATES OF AMERICA:

13       Kimberley D. Crockett, Esq.
         Daniel Lee Salem, Esq.
14       U.S. Attorney's Office
         217 W. King Street, Suite 400
15       Martinsburg, WV 25401
         kimberley.d.crockett@usdoj.gov
16       daniel.salem@usdoj.gov

17    FOR THE DEFENDANT:

18       Thomas G. Dyer, Esq.
         Dyer Law Offices
19       P.O. Box 1332
         Clarksburg, WV 26302-1332
20       dyerlawof@aol.com

21       Martin P. Sheehan, Esq.
         Sheehan & Associates, PLLC
22       1140 Main Street, Suite 333
         Wheeling, WV 26003
23       martin@msheehanlaw.net

24    The Defendant was present in person.

25    Proceedings recorded by mechanical stenography.
      Transcript produced by computer-aided transcription.
```

```
1                    W I T N E S S E S

2                                             PAGE

3  KEITH LEE

4  Direct Examination by Ms. Crockett              5

5  Cross-Examination by Mr. Sheehan              15

6  Redirect Examination by Ms. Crockett          17

7  THUNDER NICHOLSON

8  Direct Examination by Ms. Crockett            20

9  Cross-Examination by Mr. Dyer                 54

10 Redirect Examination by Ms. Crockett          71

11 JUDGE STEVEN L. SHAFFER

12 Direct Examination by Ms. Crockett            74

13 Cross-Examination by Mr. Sheehan              80

14 Redirect Examination by Ms. Crockett          84

15

16                   E X H I B I T S

17 IDENTIFICATION                              PAGE

18 Government's Exhibit 1                        35

19 Government's Exhibit 4                        53

20 Government's Exhibit 5                        45

21 Government's Exhibit 6                        46

22 Government's Exhibit 7                        48

23 Government's Exhibit 8                        54

24 Government's Exhibit 9                        51

25
```

3

```
 1                    Monday, April 14, 2025, 3:20 PM
 2                              - - -
 3           THE COURT:  Madam Clerk, would you be kind enough to
 4   call our next case, please.
 5           THE CLERK:  United States of America versus Steven
 6   David Seeger, Criminal Action Number 1:24-CR-42.  Mr. Seeger is
 7   present in person.
 8        Will counsel please note your appearance.
 9           MS. CROCKETT:  Kimberley Crockett and Dan Salem on
10   behalf of the Government.
11           MR. DYER:  Your Honor, Tom Dyer and Martin Sheehan on
12   behalf of the defendant.
13           THE COURT:  All right.  Good afternoon, counsel.  We
14   convene for final pretrial conference and motions hearing.
15        Let me ask this question as an initial matter.  Any
16   obstacles to proceeding as scheduled for trial next week, the
17   22nd, the Government has identified at this point?
18           MS. CROCKETT:  No, Your Honor.  The Government is
19   ready to go.
20           THE COURT:  Okay.  From defense?
21           MR. DYER:  Same here, Your Honor.
22           THE COURT:  All right.  I know we have a couple
23   motions.  I assume we could just dive in and go from there?
24   That work for everybody?
25           MS. CROCKETT:  Absolutely.
```

JA064

 1          THE COURT:  All right.  My understanding was,
 2   Ms. Crockett, the Government was going to call a couple
 3   witnesses.  Is that correct, or --
 4          MS. CROCKETT:  That is, Your Honor.
 5          THE COURT:  All right.  Go ahead.
 6          MS. CROCKETT:  Can I --
 7      Okay, Your Honor.  We're -- I assume we're going to take
 8   up the motion to suppress first, because that could be
 9   dispositive of the *Kennedy* motion.
10          THE COURT:  Yes.
11          MS. CROCKETT:  Okay.  Then I would call Keith Lee,
12   Your Honor.
13          THE COURT:  All right.  Good afternoon, sir.  Could I
14   ask you to make your way all the way to the front of the
15   courtroom?  Thank you.  When you get here, you're going to
16   pause with Madam Clerk so she can swear you in.  Then we'll ask
17   you to take the witness stand.  Thank you.
18              (KEITH LEE, GOVERNMENT'S WITNESS, SWORN)
19          THE CLERK:  Thank you.  If you'd please have a seat
20   here in the witness stand.
21          THE COURT:  Thank you, sir.  Once you're seated and
22   comfortable, if you wouldn't mind adjusting that mic just to
23   make sure everyone can hear you.  Thank you.
24      Ms. Crockett.
25          MS. CROCKETT:  Thank you, Your Honor.

*K. Lee - Direct Examination (Ms. Crockett)*

1                        <u>DIRECT EXAMINATION</u>

2  BY MS. CROCKETT:

3  Q.   If you can identify yourself for the record?

4  A.   My name is Keith Lee, and --

5  Q.   And -- oh, go ahead.

6  A.   -- I'm retired from the Nacogdoches, Texas, Police

7  Department.

8  Q.   Okay.  It looked like you were going to say more and I was

9  about to cut you off.

10 A.   Well, I -- let me state for the record my name is Leighton

11 Keith Lee.

12 Q.   Leighton Keith --

13 A.   Yes.

14 Q.   -- Lee.

15 A.   Yes, ma'am.

16 Q.   Okay.  Thank you.

17      And how are you employed right now?

18 A.   I am retired, happily.

19 Q.   You indicated that you worked for the Nacogdoches Police

20 Department.  How long did you work for them?

21 A.   I was there 20 years and one month.

22 Q.   And did that include the year of 2021?

23 A.   It did.

24 Q.   Okay.  And what rank did you retire as?

25 A.   I retired as a corporal.

*K. Lee - Direct Examination (Ms. Crockett)*

1  Q.   Okay.   In March of 2021, did you come into contact with an
2  individual --
3        MS. CROCKETT:  Before I proceed, Your Honor, just one
4  preliminary issue.
5            THE COURT:  Yes, ma'am.
6        MS. CROCKETT:  And we didn't discuss this, and I
7  should have brought it up before I began questioning.
8      In the indictment in this case, we allege violations of
9  law against a Jane Doe 1 and a Jane Doe 2.
10            THE COURT:  Right.
11        MS. CROCKETT:  In all of our pleadings, we try to
12  reference them still as Jane Doe 1 and 2.  I know defense filed
13  a few pleadings with their names included.  For the record
14  today and for trial, I think we probably should address how the
15  Court will permit us to refer to them at trial.  If we're going
16  to use, like, initials; if we're going to stick with Jane Doe 1
17  and 2.
18            THE COURT:  Let's go with initials, assuming Jane
19  Doe 1 and Jane Doe 2 have different and distinguishable
20  initials.
21        MS. CROCKETT:  They do.
22            THE COURT:  Okay.  All right.
23        MS. CROCKETT:  Okay.
24            THE COURT:  What are Jane Doe 1's -- if that's
25  right -- initials here?

*K. Lee - Direct Examination (Ms. Crockett)*

1      MS. CROCKETT:  Jane Doe 1 is alleged in Count One and
2  Two of the indictment.
3          THE COURT:  Right.
4          MS. CROCKETT:  And her initials are P.G.
5          THE COURT:  Okay.  And Jane Doe 2?
6          MS. CROCKETT:  K.S.
7          THE COURT:  And which counts is Jane Doe 2 covered
8  by?
9          MS. CROCKETT:  Three and Four.
10      And Your Honor, Count Five is a general possession count,
11  and they are both incorporated within Count Five.
12          THE COURT:  Okay.
13          MS. CROCKETT:  All right.
14          THE COURT:  Understood.
15      Mr. Sheehan and Mr. Dyer, you got that straight?
16          MR. SHEEHAN:  I'm fine with that, Judge.  I do have
17  an objection I want to make at this time.
18          THE COURT:  Yes.
19          MR. SHEEHAN:  Your Honor, if the Government is going
20  to rely on good faith -- and they are certainly entitled to try
21  and offer that evidence -- a large amount of testimony is
22  admissible.  If they're not allowed to get to good faith, then
23  evidence will not be admissible.
24      You won't know that until we get further down the road.
25  So I wanted to make sure the objection was clear, and I'll just

8

*K. Lee - Direct Examination (Ms. Crockett)*

1   leave it at that and assume I've made it across the board for

2   the case.

3              THE COURT:  Yes.  Understood.

4              MR. SHEEHAN:  And sequestration --

5              THE COURT:  Oh, I'm sorry.  Go ahead.

6              MR. SHEEHAN:  Yeah.  And I'd like to sequester any

7   other witness.  I know the FBI agent is going to be here, but

8   the other witnesses I'd like to sequester during this

9   testimony.

10             THE COURT:  Okay.

11             MS. CROCKETT:  The only other witness we have in the

12   room is Thunder Nicholson with the West Virginia State Police.

13             THE COURT:  Okay.  Sir, could I ask you to step out

14   and wait in the hallway for me, please.

15             TROOPER NICHOLSON:  Yes, sir.

16             THE COURT:  We'll holler at you when we're ready.

17   Thank you so very much.

18             MS. CROCKETT:  Thank you, Your Honor.

19             THE COURT:  Motion to sequester granted.

20        General continuing -- whatever adjective we want to put on

21   that -- objection, Mr. Sheehan, noted.  We don't have a jury,

22   obviously.  It's an evidentiary hearing.  I think it important

23   the Court to have a full and robust record from which to make

24   decisions, and our ruling will indicate what evidence is

25   considered and not based on the appropriate standards.  I know

*K. Lee - Direct Examination (Ms. Crockett)*

1  we've got a couple different issues to work through.

2       Go ahead, Ms. Crockett.

3            MR. SHEEHAN:  Thank you, sir.

4            MS. CROCKETT:  Thank you, Your Honor.

5  BY MS. CROCKETT:

6  Q.   Mr. Lee, in March of 2021, did you come in contact with an

7  individual whose initials were K.S.?

8  A.   I did.

9  Q.   And how did that come about?

10 A.   She came into our police department lobby wanting to lodge

11 a complaint for improper disclosure of photographs.

12 Q.   Okay.  And I failed to ask you.  What were your duties

13 with the Nacogdoches Police Department?

14 A.   At the time the report was taken, I was the lobby officer.

15 I'd worked in the station.  Any report -- anybody that came in

16 and needed to speak to a police officer spoke to me.

17 Q.   Okay.  And did you have any other duties?

18 A.   I was -- I was also the sex offender registration officer

19 for the City of Nacogdoches.

20 Q.   Okay.  Okay.  So you indicated that she came into the

21 lobby to file a complaint.  Do you know when that occurred?

22 A.   I believe that was March 22nd of 2021.

23 Q.   Okay.  And what was her initial complaint when she came

24 in?

25 A.   Initially she came in and she told me that she had been in

*K. Lee - Direct Examination (Ms. Crockett)*

1  an online relationship with an older gentleman since she was

2  14 years old, and he had recently sent some rather what she

3  considered explicit photographs to her boyfriend and had

4  threatened to send them to her family and college professors.

5  Q.   Okay.  And did she describe for you what she meant by

6  sensitive?  I can't remember what the adjective was that you

7  just used.

8  A.   Yeah.  She -- she made it seem that it was nude

9  photographs.  I think it was explicit photographs from the

10 waist up.  I do not believe it was full frontal nudity, but I

11 believe she was nude from the waist up.

12 Q.   Okay.  And when she came in and made that complaint, did

13 she indicate whether or not she was a minor at the time the

14 images were taken or whether she was an adult at the time?

15 A.   She told me that they -- that no pictures had been

16 transmitted while she was a minor; that they had all taken

17 place after she'd turned 18.

18 Q.   Okay.  Did you take any action to notify law enforcement

19 in West Virginia of the complaint that you had taken?

20 A.   Not at that point.

21 Q.   Okay.  What did you do next?

22 A.   At that point I -- later in the day I wrote the report,

23 and then I contacted Mr. Seeger to let him know -- one of the

24 things she told me in the initial complaint was that he didn't

25 believe -- he wouldn't stop because he didn't believe there was

*K. Lee - Direct Examination (Ms. Crockett)*

1   anything we could do to him in Nacogdoches, Texas.  So I called

2   him to issue him a warning to stop sending these photographs.

3   And I told him that in the state of Texas it was a felony

4   offense and we would get a warrant and we would extradite him.

5   Q.   Okay.  So after speaking with Mr. Seeger, did you then

6   notify West Virginia authorities about the complaint?

7   A.   I do not believe I ever notified them.

8   Q.   Okay.  Do you know how West Virginia became aware of the

9   complaint?

10  A.   I do not.

11  Q.   Okay.

12  A.   I received a phone call from Trooper Nicholson.

13  Q.   Okay.  You received a phone call from Trooper Nicholson?

14  A.   Yes.  A few days later.

15  Q.   Okay.  Do you know what the date was?

16  A.   It was before the 29th.  So it may have been the 25th,

17  22nd, 23rd.  I'm not sure.

18  Q.   Okay.  And did you discuss with him the complaint that

19  K.S. made to you when she came into the lobby?

20  A.   I did.

21  Q.   Okay.  What did you report to Trooper Nicholson?

22  A.   I explained to him I'd been taking these reports for a

23  long time and been dealing with the public for a long time and

24  I did not feel like she was being totally truthful with me that

25  first day she came in.  That's the reason -- in my report, she

*K. Lee - Direct Examination (Ms. Crockett)*

1  told me it all took place after 18.  And I asked her again, did

2  anything happen before the age of 18?  Because I had my doubts,

3  but --

4  Q.    Okay.  And you jumped right in with your doubts with

5  Mr. Nicholson?  Or did you start by telling him what the nature

6  of the complaint was?

7  A.    I told him what the nature of the complaint was.

8  Q.    Okay.

9  A.    I don't have any record of what me and Mr. Nicholson spoke

10 about.

11 Q.    Okay.

12 A.    I think he reported that.

13 Q.    Okay.  Do you recall whether or not you provided him any

14 instances of inconsistencies that she would have shared with

15 you?  Or was this just your intuition?

16 A.    It was -- it was more intuition than anything.  I do not

17 remember sharing any inaccuracies with her.

18 Q.    Okay.  Did you have any further contact with K.S. after

19 her initial report?

20 A.    I did.  Approximately a week later, on the 29th, she

21 came back in and reported to me that all this began when she

22 was 14 years old.  And she lied to him initially about her age,

23 and he'd told her that her punishment for lying was to send him

24 a fully frontal nude photograph of herself.  And she did.

25 Q.    Okay.

*K. Lee - Direct Examination (Ms. Crockett)*

1   A.   And then over the next -- I think she said until she was

2   17 they contacted almost daily, spoke almost daily, and he had

3   her perform explicit sex acts on camera and send them, videos

4   and stills, to him.

5   Q.   When she came back in to report this to you, did you --

6   were you surprised by her appearance?

7   A.   No, ma'am.

8   Q.   And why is that?

9   A.   Because I fully expec- -- I've never known a

10  relationship -- online relationship between an older man and a

11  14-year-old juvenile to be totally platonic for four years and

12  then, all of a sudden, become graphic and sending nude

13  photographs back and forth.

14  Q.   And that would have been at the time that K.S. turned 18.

15  A.   Yes.

16  Q.   Okay.  So if I understand your testimony, she came in

17  earlier -- or the 22nd, I believe you said --

18  A.   Uh-huh.

19  Q.   -- of March of 2021.

20  A.   Correct.

21  Q.   And she made reports about Mr. Seeger providing images of

22  her to third parties.  But she reported to you that those

23  images were all photos taken of her as an adult.

24  A.   Correct.

25  Q.   Okay.

*K. Lee - Direct Examination (Ms. Crockett)*

1  A.    And I might add:  In the second report, she said one of
2  the reasons she was still sending him pictures is because he
3  had threatened to expose her to everybody if she did not
4  continue to send the pictures.  And that's the reason these
5  pictures that she was able to provide to the Nacogdoches Police
6  Department were recent photographs, since she was 18.
7  Q.    Okay.  Following her return to your office, did the
8  Nacogdoches Police Department do anything to advance that
9  investigation further?
10 A.    I am not sure.  Once I take their initial report, it is
11 handed off to detectives.  And Detective Ball was working that
12 case.
13 Q.    Okay.  So this case was handed off to another --
14 A.    Correct.  It was.
15 Q.    -- officer.
16 A.    It was.
17 Q.    Okay.
18         MS. CROCKETT:  I think that's all I have, Your Honor,
19 if you could just give me a quick second.
20         THE COURT:  Understood.
21     Any cross, counsel?
22         MR. SHEEHAN:  Yes, Your Honor.
23     I'm sorry, Your Honor.  I've fallen, and I'm in recovery.
24
25

*K. Lee - Cross-Examination (Mr. Sheehan)*

1                          CROSS-EXAMINATION

2    BY MR. SHEEHAN:

3    Q.    Did you bring your reports with you today?

4    A.    I think the prosecutor has the reports.  And I was able to

5    review the reports from them.

6    Q.    Okay.  You said that, ultimately, the police department

7    did obtain some photos of the girl?

8    A.    I -- that is my recollection, that they are attached to

9    that report.

10   Q.    And those photos of her are after she would have achieved

11   the age of 18.

12   A.    Yes, sir.

13   Q.    Okay.  When you reported to Trooper Nicholson your

14   intuition that she wasn't telling the whole truth, do you

15   remember anything specific about that?

16   A.    I -- I do not other than general cop talk about what I

17   suspected.  Because I told him exactly what I felt like had

18   probably taken place.

19   Q.    Have you had an opportunity to review Trooper Nicholson's

20   report at any time prior to your testimony today?

21   A.    I have not, sir.

22   Q.    Okay.  Do you recall if you told him if she recanted in

23   any way?

24   A.    I do not remember telling him that.

25   Q.    So it's always a terrible question.  I'm going to explore

*K. Lee - Cross-Examination (Mr. Sheehan)*

1  your answer a little.  Are you saying you didn't say "recant"?

2  Or you don't remember if you said "recant"?

3  A.   I do not remember.

4  Q.   Okay.

5  A.   Like I said, I did not document any of our conversation,

6  because he was not part of my reporting.

7  Q.   Okay.  Do you know when the last time was -- so he called

8  you.  You had a conversation.

9  A.   Uh-huh.

10  Q.   Now, you've put that the 25th-ish.

11  A.   Yes.

12  Q.   Somewhere in there.

13  A.   Sometime before the 29th.

14  Q.   Did you have another conversation with him at any time?

15  A.   Not that I remember.

16  Q.   So you would not have had any opportunity to update him

17  and say she came in and she's changed her story to say some of

18  the pictures were when she was a minor?

19  A.   I do not remember ever doing that.  Detective Ball, who

20  was working the case, could have.  I can't speak to what he

21  might have spoken to Mr. Nicholson about.

22  Q.   Okay.  And you talked originally about nude explicit

23  photos.

24       I see you nodding yes.

25  A.   Oh.  Yes, sir.

*K. Lee – Redirect Examination (Ms. Crockett)*

1  Q.   Okay.  And would those -- did you understand the context

2  of the explanation of nude explicit photos to be when she was

3  an adult or when she was a minor?

4  A.   The pictures she told me about the first day was as an

5  adult.

6  Q.   Okay.  Thank you, sir.

7          THE COURT:  Any redirect, counsel?

8          MS. CROCKETT:  Just one follow-up, Your Honor.

9                  <u>REDIRECT EXAMINATION</u>

10 BY MS. CROCKETT:

11 Q.   Mr. Lee, in your experience as a law enforcement

12 officer -- and I probably didn't ask.  How long were you a

13 police officer?

14 A.   Twenty years.

15 Q.   Okay.  In your experience with the Nacogdoches Police

16 Department for 20 years and your interaction with individuals

17 alleged to be victims of sexual misconduct, have you had an

18 experience or is it common for them to supplement a report or

19 provide additional details over time?

20 A.   It is very common.

21          MS. CROCKETT:  Okay.  That's all I have, Your Honor.

22          THE COURT:  Understood.

23     Any recross?

24          MR. SHEEHAN:  No redirect, Your Honor.

25          THE COURT:  All right.

1          MS. CROCKETT:  That's all I have.

2          THE COURT:  May this gentleman be excused?

3          MS. CROCKETT:  Your Honor, he can be excused as it

4 relates to this motion.  But I think he might be a witness for

5 Mr. Salem as well.  There are some areas I didn't cover with

6 him.

7          THE COURT:  Okay.  Sir, you can go ahead and step

8 down for now.

9          THE WITNESS:  Thank you, sir.

10          THE COURT:  Thank you for making the trip from Texas.

11          MS. CROCKETT:  And I'm sorry, Your Honor.

12     But you've been sequestered.  So you'll have to sit down

13 in the hallway.

14          THE WITNESS:  That is fine.  That is fine.

15          MS. CROCKETT:  Thank you, Your Honor.  I'd call

16 Thunder Nicholson.

17          THE COURT:  Okay.  If you wouldn't mind hollering --

18     Sir, if I could trouble you to holler at Mr. Nicholson,

19 please.

20          THE WITNESS:  I will.  No problem.

21          THE COURT:  Thank you.

22          MS. CROCKETT:  Thank you.

23          THE COURT:  Thank you, sir.

24          MS. CROCKETT:  Your Honor, I didn't --

25     Oh, go ahead.  Sorry.

19

```
 1              THE COURT:  You can make your way all the way to the
 2    front, sir.  Madam Clerk will swear you in.  Then you can take
 3    the witness stand.
 4         I'm sorry, Ms. Crockett.
 5              MS. CROCKETT:  Oh.  I'll wait.
 6           (THUNDER NICHOLSON, GOVERNMENT'S WITNESS, SWORN)
 7              THE CLERK:  Thank you.  If you'd please have a seat
 8    here in the witness stand.
 9              THE COURT:  Yes, Ms. Crockett.
10              MS. CROCKETT:  Your Honor, we didn't discuss this
11    beforehand.  I know that when we filed the motions and we filed
12    the response, the Court had at its -- for its consideration
13    many exhibits in this case.
14              THE COURT:  Uh-huh.
15              MS. CROCKETT:  I assume the Court has reviewed the
16    exhibits, including body cam footage, things that I -- I
17    don't --
18              THE COURT:  I have not watched the body cam footage.
19              MS. CROCKETT:  Okay.
20              THE COURT:  But we have it.
21              MS. CROCKETT:  Okay.
22              THE COURT:  And we don't need to play it today.
23              MS. CROCKETT:  Well, that was what I was going to ask
24    the Court.  I mean, I -- it's a two-minute segment for Trooper
25    Nicholson, if that would help the Court.
```

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    THE COURT:  If it -- if it's helpful and you think
2 the record of the -- of Trooper Nicholson explaining it, go
3 ahead.
4    MS. CROCKETT:  Okay.  All right.  Thank you.  I
5 appreciate that, Your Honor.
6    THE COURT:  Uh-huh.
7                   <u>DIRECT EXAMINATION</u>
8 BY MS. CROCKETT:
9 Q.    If you would state your full name for the record.
10 A.    Thunder Nicholson.
11 Q.    And how you're employed.
12 A.    I'm employed with the West Virginia State Police,
13 currently out of the Grafton detachment.
14 Q.    Okay.  And before working in the Grafton detachment, were
15 you assigned to any other areas?
16 A.    I was assigned to the Kingwood detachment.
17 Q.    Okay.  And what is your role with the West Virginia State
18 Police?
19 A.    Investigate violations of West Virginia criminal and
20 traffic law.
21 Q.    Okay.  And are you responsible for investigating any
22 specific type of crimes or just general calls that come into
23 the office?
24 A.    General calls that come to the office.
25 Q.    Okay.  So you're not also assigned to, like, the Internet

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Crimes Against Children unit.  You just -- you just investigate

2  general crime.

3  A.   Yes, ma'am.

4  Q.   Okay.  That having been said, even though you're not on

5  the ICAC unit, do you also investigate allegations of sexual

6  abuse or sexual misconduct?

7  A.   Yes, ma'am.

8  Q.   Okay.  How big is your department?

9  A.   The current department standings I believe is about 500

10  active troopers.

11  Q.   In your detachment.

12  A.   My current detachment is three-man strong.

13  Q.   Three-man strong.

14  A.   In Grafton, yes, ma'am.

15  Q.   Okay.  And when you were in Preston County, how long --

16  how large was your department there?

17  A.   I believe about eight.

18  Q.   Okay.  And how long have you been a law enforcement

19  officer?

20  A.   A little over six years at this point, ma'am.

21  Q.   Okay.  And all of that time, then, has been with the West

22  Virginia State Police?

23  A.   Yes, ma'am.

24  Q.   All right.  Are you familiar with the defendant in this

25  case, Steven David Seeger?

1  A.    Yes, ma'am.

2  Q.    How are you familiar with him?

3  A.    I had cause to investigate him in 2021.

4  Q.    All right.  And in 2021, then, you would have been with

5  the West Virginia State Police for, like, two years.  Two years

6  and two months, maybe?

7  A.    Roughly.  Yes, ma'am.

8  Q.    How did he come to your attention?

9  A.    I received a complaint out of the -- our Fairmont office

10 from a Professor Jeffrey Roth from Stephen A. -- Stephen F.

11 Austin University in Texas about one of his students being what

12 is commonly referred to as "revenge porn" with blackmail.

13 Q.    Okay.  Did he provide you any specific details?

14 A.    He had advised me that he had a student, K.S., that had

15 been the subject of an email he received from Mr. Seeger

16 involving inappropriate relationships -- at least what was

17 perceived as inappropriate relationships in Mr. Seeger's eyes

18 with older gentlemen and taking money from them.

19 Q.    Okay.  And did he indicate to you whether or not K.S. was

20 a minor or an adult at the time of this claim of blackmail or

21 revenge porn?

22 A.    He advised that he was -- she was one of his students and

23 an adult at that point.

24 Q.    Okay.  Who provided you with the contact information,

25 then, for Jeffrey Roth?  He did?  Or you received that from

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  someone else?

2  A.    Mr. Roth had called into the Fairmont detachment.

3  Q.    Okay.

4  A.    Probably basing it upon one of our colored maps and

5  presumed that the Fairmont map covered the entirety of the

6  northern area of West Virginia.  And it's --

7  Q.    And so the --

8  A.    -- disseminated.

9  Q.    I'm sorry.

10       So the case was referred to you from the Fairmont --

11  A.    From a trooper at the Fairmont office.  Yes, ma'am.

12  Q.    Okay.  And what action did you take to follow up on

13  Professor Roth's email or call?

14  A.    I had requested contact information for K.S.  Between that

15  point and then a couple days later, I had received notification

16  a Corporal Lee out of Nacogdoches Police Department wanted to

17  speak to me.  And when I returned to work after my days off, I

18  gave him a call.

19  Q.    Okay.  All right.  When you gave Corporal Lee a call, what

20  did he report to you?

21  A.    He would report to me effectively what I had learned from

22  Mr. -- or from Dr. Roth about a potential revenge porn thing --

23  or as West Virginia refers to it, the nonconsensual disclosure

24  of intimate images -- situation going on with K.S.; that he had

25  spoken with K.S. and received some details about pictures being

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  sent to Mr. Roth and I think some family/friends, and something
2  was mentioned about K.S.'s father as well, and sending some
3  images.
4      After a brief discussion about it, Corporal Lee had
5  advised me, in Texas, the same crime is a felony, whereas here
6  in West Virginia it is just a misdemeanor.  Mr. -- or sorry.
7  Corporal Lee also advised that, based on his experience, he
8  felt as though there was more to the story than what K.S. was
9  kind of giving him at first.  And I believe he was able to
10 provide me with some contact information with K.S.
11 Q.  Okay.  Regarding the "more to the story" you just
12 referenced, did he provide you any examples of what he meant by
13 there being more to the story?
14 A.  He had just advised with his experience and, like, the
15 field that he focused on, which was sexual stuff, that after,
16 like, reading her body language and stuff that maybe she wasn't
17 being completely honest with maybe when some of the pictures
18 were sent and when their relationship originally started.
19 Q.  Okay.  I'll cut right to it.  Did he suggest to you that
20 maybe he thought she had sent pictures to Mr. Seeger when she
21 was a minor and was not disclosing that?
22 A.  Yes, ma'am.
23 Q.  Okay.  Did he provide you -- after reviewing your complete
24 narrative and police report, Trooper Nicholson, you reference
25 K.S. provided him, quote, "mix of information," or there was

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  reference to recanting.

2      Do you have any examples or can you draw today on what

3  he -- you would have referenced when you said a mix of

4  information?

5  A.   I believe when Corporal Lee was speaking to me on the

6  phone that the mix of information came that she would say one

7  thing to him and then kind of, like, when he would revisit the

8  question, just in kind of, like, a typical interviewing

9  scenario, like, her answer would be slightly different or she'd

10 give, like, a slightly more flustered answer just in terms of,

11 like, when they started talking and, like, when they stopped

12 talking and maybe when some of the pictures were sent.

13 Q.   Okay.  So this is -- the mix of information would have

14 been relative to her age and when images were sent.  Is that

15 my -- is that your understanding?

16 A.   Yes, ma'am.

17 Q.   Okay.  Was the information that was provided to you by

18 Corporal Lee included in your PC statement in your affidavit

19 for complaint for search warrant?

20 A.   No, ma'am, it was not.

21 Q.   Okay.  And who was the source of the information that you

22 included in your PC statement?

23 A.   K.S.

24 Q.   Okay.  When did you talk with K.S.?

25 A.   I believe it was a -- I had spoken to Corporal Lee, I

1  believe, on a Friday, and I think I finally got ahold of

2  Kaitlin on a Monday.

3  Q.   Okay.

4  A.   So the following Monday.

5  Q.   Okay.  Would that have been on the same date that you got

6  the search warrant?

7  A.   Yes, ma'am.

8  Q.   Okay.  So would that be March 29th of 2021?

9  A.   Yes, ma'am.

10  Q.   Okay.  And what did she tell you when you spoke with her?

11  A.   When I spoke to her, K.S. gave me a bit more information

12  about the relationship that she had with Mr. Seeger.  She had

13  advised me that the relationship had started when she was

14  approximately 14 years old, but she was not honest with

15  Mr. Seeger in regards to her age.  She did not disclose what

16  age she had alluded to be to Mr. Seeger to me during this phone

17  call.

18      She advised me that once she had revealed to Mr. Seeger

19  what her actual age was, as a form of punishment he had started

20  requesting sexually explicit photos, that eventually migrated

21  into videos, and that this relationship had gone on for several

22  years before kind of it was -- like, it ended, and then it was

23  kind of kicked back up again a few years later once she was an

24  adult.

25  Q.   Okay.  Did she also discuss with you the report that she

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  had made to Nacogdoches Police Department in Texas?

2  A.   She had referenced it a little bit.

3  Q.   Okay.  After speaking with Professor Roth, K.S., and

4  Corporal Lee, what did you do?  How did you advance the

5  investigation forward?  What decision did you make?

6  A.   I ran the investigation by my detachment commander, who is

7  now retired, Sergeant John Wyatt.  He's the one that directed

8  me in that I should get a search warrant for Mr. Seeger's

9  residence through circuit court, since it is a court of record.

10  And he provided me with a template that he had used in the past

11  for the affidavit and complaint of search warrant.

12  Q.   Okay.  Was -- had you ever applied for a search warrant in

13  circuit court before this case?

14  A.   No, ma'am.

15  Q.   Okay.  Had you ever applied for a search warrant in

16  magistrate court before this case?

17  A.   Several times, ma'am.

18  Q.   Can you give us an estimate?  Roughly, in that two and a

19  half years, how many search warrants do you think you had

20  applied for?

21  A.   I'd probably say about two dozen.

22  Q.   Okay.  When you applied for the search warrants before

23  this in magistrate court, can you tell me what your process

24  was?

25  A.   We had a template that was provided to us by the

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Magistrate Court of West Virginia that's on a PDF.  So you'd go
2  in, you'd fill out page 1.  Page 2 would auto-populate with
3  everything that you put on page 1.  But we were only required
4  to sign page 1.
5       So we'd fill it out.  If you needed to add stuff on a
6  continuation sheet, you could, if, like, your narrative and
7  your desire for probable cause was more long-winded than the
8  four lines allowed.  We would print that out, sign it, take it
9  to magistrate court.
10 Q.   And then once you got to magistrate court, what -- how --
11 how did you present the search warrant?
12 A.   Typically, you take it up to the magistrate window,
13 whichever magistrate is not busy and/or in the desire to look
14 at your search warrant at the time.  We'll come up.  They'll
15 swear you to it, and they'll read it over.  If they think it's
16 good, they'll sign it and go make you -- like, get the copies
17 made with one of their secretaries.  If they have issues or
18 questions about it, they'll ask you more questions.  And if
19 it's something that they feel like isn't worth it, then they
20 won't sign it.
21 Q.   Okay.  If they review it and they find that you have
22 probable cause --
23      First of all, do they swear you in before you -- when you
24 appear in front of a magistrate?
25 A.   Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   Okay.  And do they affirm that the information that's

2  contained within the affidavit is true and accurate?

3  A.   Yes, ma'am.

4  Q.   Okay.  And once they've reviewed it, if there's a

5  determination of probable cause, do you then sign it?  Or do

6  you sign it before that determination is made?

7  A.   It's typically my practice to sign it beforehand.  That's

8  how I was trained, to sign it and then hand it to the judge --

9  Q.   Okay.

10 A.   -- to let them review it.

11 Q.   And if they find probable cause, what does the judge then

12 do -- or the magistrate?

13 A.   They would sign it, then hand it off to one of their

14 secretaries, and they would make you copies, let you know that

15 you're good to go.

16 Q.   Okay.  But in this instance, you deviated from the use of

17 the magistrate court form; is that right?

18 A.   Yes, ma'am.

19 Q.   And why did you deviate?

20 A.   It was in circuit court, and all the forms automatically

21 say "Magistrate Court" on top.  And I thought whiting that out

22 would look very bad.

23 Q.   Okay.  And so I think you told me -- you already testified

24 to it, but where -- from where did you get the form at?

25 A.   My detachment commander at the time.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   All right.  Is it -- is it fair to say that everything
2  included in the magistrate court affidavit is also included in
3  your affidavit for complaint for search warrant?
4  A.   Yes, ma'am.
5  Q.   Okay.  Let's talk about a few sections.  Let's start with
6  how did you determine that you wanted to search -- let me back
7  up.
8       In your preparation for this search warrant, where did you
9  identify was the location you wanted to search?
10 A.   I ran Mr. Seeger's name through our DMV database and
11 obtained an address off of his driver's license of 310 Hilltop
12 Drive, Bruceton Mills, West Virginia.
13 Q.   Okay.  And why did you decide you wanted to search his
14 residence as opposed to, like, where he worked?
15 A.   Based on the training and limited experience I had at the
16 time, a lot of times when people have stuff that they don't
17 want other people to know about or a lot of people would
18 consider taboo and inappropriate, they're not going to hide it
19 somewhere where other people could potentially find it.  And
20 then they also like to keep it close on hand.  If they have the
21 urge in the middle of the night, they don't want to have to
22 drive far to go get it.
23 Q.   Okay.  And we discussed a little piece of this.  But in
24 your probable cause statement, it was your testimony you didn't
25 include any of the statements made to you by Corporal Lee.

*T. Nicholson - Direct Examination (Ms. Crockett)*

 1    Can you tell us why you didn't include them?
 2  A.    When I spoke to Corporal Lee, it felt like the majority of
 3  his investigation was kind of geared more toward the revenge
 4  porn side of when the -- when K.S. was already an adult.
 5    And then, also, while I do trust other officers and not
 6  think that they would provide me with any information that is
 7  incorrect, it's kind of hard to testify to someone else's --
 8  what they tell you when they're so far away.  Because if a
 9  judge had an issue with it, then there really wouldn't be a way
10  to back it up.  So I only wanted to use information that I was
11  given directly from the victim as to keep it as honest as it
12  could be.
13  Q.    And along that same vein, you also didn't include
14  statements given to you by Professor Roth.
15    Can you tell the Court why you didn't include those
16  statements?
17  A.    The majority of what Professor Roth talked to me about was
18  solely just the -- again, what is commonly referred to as
19  "revenge porn," which at this point in my investi- -- with what
20  I had learned from K.S. was not geared toward what I was trying
21  to get a search warrant for.
22  Q.    Okay.  And did you have any concern about that information
23  provided to Professor Roth was from another party; it wasn't
24  his information that he knew?
25  A.    That was also a large part of it.  It was very third party

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  in terms of he had heard it -- he was kind of repeating what
2  someone else had told him.  So it kind of loses its credibility
3  as the telephone game gets worse.
4  Q.   Okay.  Regarding the statement that you did include, you
5  included information that was specifically provided to you by
6  K.S.
7  A.   Yes, ma'am.
8  Q.   Did you reference at all in that statement whether or not
9  she had, in the past, provided false information to Mr. Seeger?
10 A.   I did, ma'am.
11 Q.   Okay.  You presented your affidavit and complaint for a
12 search warrant to Judge Shaffer in Preston County?
13 A.   Yes, ma'am.
14 Q.   And did he swear you in?
15 A.   Yes, ma'am.
16 Q.   And did you discuss the affidavit?
17 A.   Yes, ma'am.
18 Q.   And do you know whether he found probable cause?
19 A.   I believed he did, ma'am.  He signed the bottom of it, and
20 he didn't tell me I needed to fix anything.
21 Q.   Okay.  After he signed it, did he give you any
22 instructions of what you were to do with it?
23 A.   He told me it was good, to take it over to his clerk in
24 another office across the hall and they would take care of
25 getting it on record and everything and give me my copies.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   And when you left the courthouse on March 29th of 2021,

2  after swearing out your affidavit, did you believe you had

3  authorization to search Mr. Seeger's residence?

4  A.   Yes, ma'am.

5  Q.   Okay.

6           MS. CROCKETT:  Your Honor, permission to approach the

7  witness?

8           THE COURT:  You may.

9           MS. CROCKETT:  Okay.

10     Marty, I'm just going to show him the --

11           MR. SHEEHAN:  Is that the warrant?

12           MS. CROCKETT:  Uh-huh.

13           MR. SHEEHAN:  Yeah, that's fine.

14  BY MS. CROCKETT:

15  Q.   If you could just look at that and tell me if you can

16  identify it.

17  A.   This is the affidavit and complaint that I filled out on

18  March 29th.

19  Q.   Okay.  And it -- I'm sorry.  I've handed you what's been

20  marked as Government's Exhibit --

21  A.   One.

22  Q.   -- 1.  And you've identified it as the affidavit for

23  complaint for search warrant?

24  A.   Yes, ma'am.

25  Q.   How do you know what that is?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  A.   It's on top, in bold, "Affidavit and Complaint for Search
2  Warrant."
3  Q.   Is that the only way you recognize it, or is there another
4  way?
5  A.   I was the one that filled this out, ma'am.
6  Q.   Okay.  And is that your signature that appears on the
7  second page?
8  A.   Yes, ma'am, it is.
9  Q.   Okay.  And there are two signatures on that affidavit; is
10  that right?
11  A.   Yes, ma'am.
12  Q.   Who is the second signature?  Whose signature is the
13  second signature?
14  A.   To me, that's Judge Shaffer's signature.
15  Q.   Okay.  And did he sign that in your presence?
16  A.   Yes, ma'am.
17  Q.   Okay.  And did you sign it in his presence?
18  A.   I cannot recall whether I signed it in his presence or
19  before I got to his office.
20  Q.   Okay.  Did he swear you in?
21  A.   Yes, ma'am.
22  Q.   And did you affirm for him that the information contained
23  on the affidavit for complaint for search warrant was true and
24  accurate?
25  A.   Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   Okay.  And I think you testified already that that's his
2  signature appearing on there.
3          MS. CROCKETT:  I'd move Government's 1, Your Honor.
4          THE COURT:  Any objection to the Court receiving 1
5  for today's purposes?
6          MR. DYER:  No, sir.
7          THE COURT:  All right.  Without objection, 1 will be
8  received into today's record.
9          MS. CROCKETT:  Thank you, Your Honor.
10     (Government's Exhibit 1 received in evidence.)
11 BY MS. CROCKETT:
12 Q.   Okay.  And so when you also left on March 29th of 2021,
13 that day, after you received the affidavit and complaint for
14 search warrant, did you believe that you had both an affidavit
15 for search warrant and a search warrant?
16 A.   Yes, ma'am.
17 Q.   Okay.  I asked you if you believed you were authorized to
18 search.  And you believed, in fact, that you were authorized to
19 search his residence.
20 A.   Yes, ma'am.
21 Q.   Okay.  When the United States Attorney's Office reached
22 out to you after the filing of the motion to suppress, did you
23 believe that Judge Shaffer issued you a search warrant on
24 March 29th of 2021?
25 A.   Yes, ma'am.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.   And when we met on Friday, April 11th, after you had an
2  opportunity to look at the documents in question, what was your
3  recollection about the search warrant?
4  A.   The page titled "Search Warrant" wasn't present, and I
5  kind of proceeded to have a tad bit of a panic attack about
6  whether or not I messed it up or I lost it between somewhere.
7  Q.   And did you reach out to, like, your agency to see if you
8  could locate it?
9  A.   I contacted the secretary of Kingwood to try to see if she
10 had some copy of it, to which I was advised that everything had
11 been either redacted and/or abolished because of an order that
12 was given by the court.
13 Q.   Is that the order for expungement?
14 A.   Yes, ma'am.
15 Q.   Okay.
16 A.   They tried to find it.  I was going to search my computer,
17 my department-issued laptop, but then I recalled that I've
18 received a new hard drive since then, as well as if I don't
19 purge older stuff off my computer it won't work anymore because
20 it gets too full.
21      And so I -- I had someone search my current desk at my
22 office to try to see if it was in a stack of papers that maybe
23 somehow I carried over from Kingwood, with no avail at that
24 either.  And it's just kind of continued to bother me for quite
25 some time on whether or not -- if it was a mistake of mine or

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  not.

2  Q.   Okay.  You -- so is it fair to say today you don't have

3  any specific recollection of having a search warrant or having

4  any other documents other than what has been provided to the

5  parties in this case?

6  A.   I do not.

7  Q.   Okay.  Moving back to your investigation.  After you

8  received the documents from the clerk -- I think you said you

9  received a packet from the clerk.  Is that right?

10  A.   Yes, ma'am.

11  Q.   Does she provide you that packet in triplicate?

12  A.   Yes, ma'am.  It's triplicate, and then each set is stapled

13  when they give it to you.

14  Q.   Okay.  What did you do next with the documents after they

15  were provided to you?

16  A.   Held onto them for a couple hours until one of the

17  afternoon/evening shift troopers came out to assist me in a --

18  with the search.

19  Q.   Okay.  And so you executed a search at his residence on

20  that same day, March 29th of 2021?

21  A.   Yes, ma'am.

22  Q.   Okay.  Sitting here today, do you still believe that you

23  were authorized to search Mr. Seeger's residence?

24  A.   I do, ma'am.

25  Q.   When did you execute -- or I'm sorry.  Was anyone with you

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  when you executed the search warrant?

2  A.   Trooper Morris was also present.

3  Q.   Okay.  And did he start the search with you?  Or did

4  you-all wait and do that together?  Tell us what happened.

5  A.   When we arrived at the residence, we made contact with

6  Mr. Seeger.  And we kind of stayed out in his front yard for a

7  little bit.  I Mirandized Mr. Seeger, proceeded to ask him some

8  questions in relation to kind of slowly getting to why we were

9  there and K.S.

10     During this time, Trooper Morris was with me.  He was just

11 kind of standing a little bit back behind me, outside of view

12 of my body camera.

13 Q.   And --

14 A.   Sorry.

15 Q.   And was Mr. Seeger under arrest at the time you spoke with

16 him?

17 A.   No, ma'am.

18 Q.   And did he -- was he placed under arrest at any time

19 during your encounter with him on the 29th?

20 A.   No, ma'am.

21 Q.   Okay.  And do you see Mr. Seeger in the courtroom today?

22 A.   I do, ma'am.

23 Q.   If you could identify him.

24 A.   The gentleman on the other side of that box from where I'm

25 sitting.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1          THE COURT:  What's he wearing, trooper?

2          THE WITNESS:  He's wearing orange.  Brown hair,

3  comb-over.

4          THE COURT:  Understood.  The record will reflect the

5  trooper has identified the defendant.

6          MS. CROCKETT:  Thank you.

7  BY MS. CROCKETT:

8  Q.    You've referenced that the search occurred at 310 Hilltop

9  Drive.  And where is that near?

10  A.    Bruceton Mills.

11  Q.    And is that within the Northern District of West Virginia?

12  A.    Yes, ma'am.

13  Q.    Okay.  As part of your duties as a police officer, I think

14  you referenced you were -- you wear or were wearing on that

15  date a body-worn camera.

16  A.    Yes, ma'am.

17  Q.    Okay.  Where do you wear it?

18  A.    Ours is mounted under -- like, inside of our

19  department-issued shirts, in front of our vest in, like, a

20  special mount that the company provides.

21  Q.    And does it record all your interactions, or do you

22  control when it's activated and when it's turned off?

23  A.    We have policy that dictates when it must be on.  We do

24  have a little, like, watch-looking remote control to help us

25  control and turn it on and turn it off when we're done dealing

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  with incidents.

2  Q.   Okay.  And so you -- did you activate your body-worn

3  camera on the day that you spoke with Mr. Seeger?

4  A.   Yes, ma'am.

5  Q.   Okay.  How is that video collected and maintained?

6  A.   It goes from the body camera itself, which is effectively

7  a smart phone that's been revamped with software to limit its

8  functionality, then it goes to what's called a Rocket IT, which

9  is mounted inside of our department-issued cruisers, which is

10  then sent through a secure mobile connection to secure servers

11  that are maintained by a company called Utility.  And then we

12  have access to watch it and review it on a software.  I think

13  they call it Polaris now, if I recall correctly.

14  Q.   Okay.  And after speaking with Mr. Seeger, you learned

15  that he actually had some experience with computers; is that

16  fair to say?

17  A.   Yes, ma'am.

18  Q.   Okay.  Let me back up.  Regarding the body-worn camera,

19  are you able to alter it or modify it in any way?  The video

20  footage.

21  A.   We can change the watermark that's on the video.  In some

22  situations, if we record video but we only need the audio --

23  which is typically only, like, a HIPAA situation, like if we

24  record inside of a hospital -- we can strip the audio from the

25  video and just have audio.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1      We are able to maybe dock a couple minutes off the front

2   or the end of a video, but it's documented and recorded inside

3   the Utility-owned, like, software, and it's heavily monitored

4   as to why we would be taking off time.

5   Q.   Okay.  And you've had an opportunity to review your

6   body-worn camera -- or footage before testifying today?

7   A.   Yes, ma'am.

8   Q.   And so "Nicholson" that appears across the screen when the

9   video footage starts, is that footage -- is that name something

10  that you would have added to it?

11  A.   Yes, ma'am.  It's typically our full email address, which

12  includes my first name, to which I avoid putting on stuff due

13  to questions.  So I change it to just say "Trooper Nicholson."

14  Q.   All right.  And in your review of the body-worn camera

15  footage, at any point during your interaction with Mr. Seeger

16  did you advise him that you had a warrant to search?

17  A.   I did, ma'am.

18  Q.   And in fact, did you advise him you had a warrant that was

19  signed by a judge?

20  A.   Yes, ma'am.

21  Q.   Okay.  And when you spoke to him that day and advised him

22  as such, did you believe, in fact, you had a warrant in your

23  possession?

24  A.   Yes, ma'am.

25  Q.   Okay.  So Mr. Seeger advised you that he worked with

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  computers.  And did he express to you any concerns about your

2  seizing any computers at the time of the search?

3  A.   He advised it would hamper his employment, to which,

4  honestly, I replied roughly that I did not care, as to the

5  purpose of the search warrant is to seize what is listed, not

6  to worry about too much of someone's personal ramifications of

7  taking their items.

8  Q.   Is it fair to say that even though you might have felt

9  that way, you did express care, because you did end up leaving

10  his work computer in his possession?

11  A.   Yes, ma'am, I did.

12  Q.   Okay.  Is Government's 1 still in front of you?

13  A.   Yes, ma'am, it is.

14  Q.   If you could read to us what evidence you were there to

15  seize.

16  A.   It states "all electronic storage devices, to include, but

17  not limited to, cellular phones, laptop computers, standalone

18  computers, memory cards, floppy discs, compact discs, smart

19  televisions, smart photograph frames, et cetera; all printed

20  photographs depicting nude juveniles; and all other evidence of

21  the crime of distribution and exhibiting the material depicting

22  minors engaged in sexually explicit conduct."

23  Q.   Okay.  So you were authorized -- you believed you were

24  authorized to seize anything that fell into that category.  Is

25  that fair to say?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  A.   Yes, ma'am.

2  Q.   Okay.  But from review of the body-worn camera, I mean, we

3  can tell that there are some things that you chose -- you left

4  behind, you chose to leave behind; is that right?

5  A.   Yes, ma'am.

6  Q.   Okay.  You reviewed -- or you searched with Trooper Morris

7  the upstairs of the residence; is that right?

8  A.   Yes, ma'am.

9  Q.   And I think one bedroom.  Is that accurate?

10  A.   Yes, ma'am.

11  Q.   Okay.  Did you search anywhere on the main floor of the

12  residence?

13  A.   No, ma'am.

14  Q.   Did you search his garage or shed?

15  A.   No, ma'am.

16  Q.   And did you take all the electronic devices that you

17  located?

18  A.   No, ma'am.

19  Q.   Did you -- did you even locate any nude photographs?

20  A.   No physically printed-out ones, no, ma'am.

21  Q.   Okay.  Of child pornography, I should say.

22  A.   No, ma'am.

23  Q.   Okay.  And your search lasted roughly about 45 minutes.

24  A.   Yes, ma'am.

25  Q.   Okay.  All right.

44

*T. Nicholson - Direct Examination (Ms. Crockett)*

1    MR. SHEEHAN:  The property receipt?  Yeah, that's

2  fine.

3    MS. CROCKETT:  Your Honor, may I approach again?

4    THE COURT:  You may.

5    MS. CROCKETT:  Thank you.

6  BY MS. CROCKETT:

7  Q.   If you could just -- I'm handing you what's been marked as

8  Government's Exhibit 5?

9  A.   Yes, ma'am.

10  Q.   If you could identify it.

11  A.   This is the property receipt that I filled out on

12  March 29th after searching Mr. Seeger's residence.

13  Q.   Okay.  And does that -- does that include a list of six

14  items seized from Mr. Seeger?

15  A.   Yes, ma'am.

16  Q.   And among those six items is there a black LG Nexus

17  00704D139354EFDC?

18  A.   Yes, ma'am.

19  Q.   And is there also a silver MacBook with a serial number --

20  a silver Apple MacBook W86450CGW0M?

21  A.   Honestly, the serial number is not on this.  It says

22  "silver Apple MacBook" with a model number.  I don't think I

23  was able to locate the serial number at the time.

24  Q.   Okay.  All right.  I have dyslexia.  I wish I had realized

25  that, because I struggled there trying to get through those

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   numbers.

2       Did you have Mr. Seeger confirm your seizure of those

3   items?

4   A.   Yes, ma'am.

5   Q.   And how does he do that?

6   A.   He signed the bottom of it, under the -- above the "Person

7   from whose premises the property was taken" line.

8   Q.   Okay.  And so Mr. Seeger's signature appears at the

9   bottom?

10  A.   It's a squiggle, but he's the one that signed it, ma'am.

11  Q.   Okay.  And your signature appears beside it?

12  A.   Above it.  Yes, ma'am.

13  Q.   Above it?

14          MS. CROCKETT:  Your Honor, I'd move Government's 5.

15          THE COURT:  Any objection to 5?

16          MR. DYER:  No objection.

17          THE COURT:  Without objection, it will be received

18  for today's purposes.

19      (Government's Exhibit 5 received in evidence.)

20          MS. CROCKETT:  Permission to approach again?

21          THE COURT:  You may.

22  BY MS. CROCKETT:

23  Q.   I'm handing you what's marked as Government's Exhibit 6.

24  Can you identify that?

25  A.   This is West Virginia State Police Form 114, the evidence

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  room receipt.

2  Q.   Okay.  And after your search of Mr. Seeger's property that

3  evening, where do you take the evidence?

4  A.   It's taken back to the detachment of which the county that

5  you executed the search warrant.  In this case it was the

6  Kingwood detachment of the West Virginia State Police.

7  Q.   Okay.  And when did you take it back?

8  A.   Immediately following leaving Mr. Seeger's residence.

9  Q.   So on March 29th of 2021?

10  A.   Yes, ma'am.

11  Q.   Okay.  And does anyone confirm receipt of those items once

12  you log them into evidence?

13  A.   The evidence custodian, who at this time was also the

14  detachment commander, is the -- receives them and places them

15  in a secured room after he removes them from the temporary

16  storage.

17       MS. CROCKETT:  Okay.  Your Honor, I'd move

18  Government's 6.

19       THE COURT:  Any objection?

20       MR. DYER:  No, sir.

21       THE COURT:  Without objection, received for today's

22  purposes.

23    (Government's Exhibit 6 received in evidence.)

24       MS. CROCKETT:  Number 7.  Government's 7.

25    Your Honor, permission to approach?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1          THE COURT:  You may.

2   BY MS. CROCKETT:

3   Q.   I'm showing you what's marked as Government's 7.  Can you

4   identify that?

5   A.   This is a search warrant through magistrate court that I

6   completed to obtain the digital contents of the physical items

7   I seized.

8   Q.   Okay.  And that search warrant, you applied for that on

9   April 19th of 2021?

10  A.   Yes, ma'am.

11  Q.   And how many pages is it?

12  A.   Three pages, ma'am.

13  Q.   Okay.  And is -- is -- did I hand you just the search

14  warrant?  What -- tell -- if you could tell us exactly what I

15  handed you.

16  A.   It's a copy of the search warrant, the property receipt,

17  and the search warrant continuation page.

18  Q.   Okay.  And what is on page 2, then?

19  A.   The page labeled 2 on this is for search warrants.

20  Q.   I'm -- the -- what is your second page that I've handed

21  you?

22  A.   It is the property receipt.

23  Q.   And if you could note what you have listed as the

24  property.

25  A.   "Digital data."

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  Q.    Okay.  And on your continuation sheet, do you continue to

2  reference the items that were seized at Mr. Seeger's residence

3  on March 29th of 2021?

4  A.    Yes, ma'am.

5  Q.    Okay.

6         MS. CROCKETT:  I'd move Government's 7.

7         THE COURT:  Any objection?

8         MR. DYER:  What is it?

9         MR. SHEEHAN:  It's the April search warrant.

10        MR. DYER:  Okay.  No objection.

11        THE COURT:  Without objection, so received.

12     (Government's Exhibit 7 received in evidence.)

13 BY MS. CROCKETT:

14 Q.    After you logged in the evidence, after you applied for

15 the secondary warrant to look inside the devices, what did you

16 do with the evidence?

17 A.    The evidence was retrieved out of the secure evidence room

18 of the Kingwood detachment, provided to me, and then I took it

19 straight to the West Virginia State Police Digital Forensics

20 Unit in Morgantown.

21 Q.    Okay.  So looking at the search warrant -- the secondary

22 search warrant from April, you executed that in Preston County?

23 A.    Yes, ma'am.

24 Q.    Okay.  And where is your evidence room located where

25 Mr. Seeger's items were taken after seizure?

*T. Nicholson - Direct Examination (Ms. Crockett)*

1   A.   It would have been the Kingwood State Police detachment --
2   Q.   Okay.  And that is --
3   A.   -- in Preston County.
4   Q.   I'm sorry?
5   A.   In Preston County.
6   Q.   Okay.  And if I understand your testimony, then, after you
7   had the search warrant issued, you then drove the evidence to
8   Morgantown?
9   A.   Yes, ma'am.
10  Q.   Okay.
11          MS. CROCKETT:   Your Honor, permission to approach?
12          THE COURT:   You may.
13  BY MS. CROCKETT:
14  Q.   I'm showing you what's marked as Government's 8.  Can you
15  identify this?
16  A.   This is West Virginia State Police Form 53, the forensics
17  laboratory case submission form.
18  Q.   Okay.  And so is what you just testified to, is this you
19  dropping off the evidence at the digital forensics lab in
20  Morgantown?
21  A.   Yes, ma'am.
22  Q.   And how do you acknowledge that the materials have been
23  dropped off at the lab?  How is that memorialized on the form?
24  A.   At the bottom of the form it's signed by whichever lab
25  custodian takes possession.  In this case, it was Mr. Roony.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  And then he provided it with a laboratory case number, and then
2  I signed it.
3  Q.   Okay.  And what's the date that you dropped it off in
4  Morgantown?
5  A.   April 26th, 2021.
6  Q.   Okay.
7          MS. CROCKETT:  Permission to approach, Your Honor?
8          THE COURT:  You may.
9  BY MS. CROCKETT:
10 Q.   I'm showing you now what's marked as Government's 9.  Can
11 you identify that?
12 A.   This is another copy -- or kind of a future copy of the
13 West Virginia State Police Form 53, Forensics Laboratory Case
14 Submission Form.
15 Q.   Okay.  And what's different about this form as opposed to
16 the previous exhibit?
17 A.   This one documents that the items were returned to me in
18 person on June 21st of 2021.  It's signed by myself and
19 Mr. Roony.
20 Q.   Okay.  So the evidence remained in Mr. Roony's possession
21 until you went back and retrieved them?
22 A.   Yes, ma'am.
23 Q.   Okay.  And so what did you pick up from Mr. Roony when you
24 retrieved the devices?
25 A.   All six devices that I dropped off, as well as a CD that

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  had the forensic download on it.

2  Q.   Okay.  And that's the extraction of the LG Nexus and the

3  silver MacBook?

4  A.   Yes, ma'am.

5         MS. CROCKETT:  I'd move Government's 9, Your Honor.

6         THE COURT:  Any objection to 9?

7         MR. DYER:  No, sir.

8         THE COURT:  Without objection, so received for

9  today's purposes.

10     (Government's Exhibit 9 received in evidence.)

11  BY MS. CROCKETT:

12  Q.   Based upon your reports, there were contraband images and

13  videos of child pornography and evidence of enticement and

14  production of child pornography and solicitation within those

15  extractions?

16  A.   Yes, ma'am.

17  Q.   And the State of West Virginia indicted Mr. Seeger as a

18  result of those extractions?

19  A.   Yes, ma'am.

20  Q.   Ultimately, that matter in state court was dismissed; is

21  that right?

22  A.   Yes, ma'am.

23  Q.   Do you know why the matter was dismissed?

24  A.   I was advised by the Assistant Prosecuting Attorney of

25  Preston County, Ms. Megan Fields, it was due to an issue of

*T. Nicholson - Direct Examination (Ms. Crockett)*

1  jurisdiction given that Mr. Seeger was living in Marion County

2  at the time of some of the counts.  And she just thought it

3  would conflict a little too much with trying to have multiple

4  counties involved towards the same goal and wished to attempt

5  to move it into the federal system.

6  Q.   Was there any concern raised with you that there was an

7  issue with regard to the search warrant or suppression in state

8  court?

9  A.   Never, ma'am.

10 Q.   Okay.  When you retrieved the evidence from Mr. Roony from

11 the digital forensic lab, where did you take the evidence?

12 A.   It returned to the state police detachment in Kingwood.

13 Q.   Okay.  And did it remain there until it was picked up by

14 the FBI as part of the federal investigation?

15 A.   Yes, ma'am.

16 Q.   Okay.  Trooper Nicholson, you had an opportunity -- we

17 talked about this.  You had an opportunity to review your

18 body-worn camera footage?

19 A.   Yes, ma'am.

20 Q.   Okay.  And we have it marked as Government's Exhibit 4; is

21 that right?

22 A.   Yes, ma'am.

23        MS. CROCKETT:  And Your Honor, I know we've provided

24 it to the Court.  Does the Court want me to provide it again?

25        THE COURT:  Sure.

*T. Nicholson - Direct Examination (Ms. Crockett)*

1      MS. CROCKETT:  I'm happy to.  Okay.  All right.  I'd

2   move Government's 4.

3           THE COURT:  Any objection to the body cam footage?

4           MR. SHEEHAN:  Is it a CD or the audio?

5           MS. CROCKETT:  It's a thumb drive.

6           MR. SHEEHAN:  Thumb drive?  Of the body cam?

7           MS. CROCKETT:  Of the body cam footage.

8           MR. SHEEHAN:  No objection.

9           MS. CROCKETT:  All right.

10          THE COURT:  Without objection, we'll receive

11  Number 4.

12      (Government's Exhibit 4 received in evidence.)

13          MS. CROCKETT:  All right.  And all of the exhibits

14  are with you; is that right, Mr. Nicholson?  All the other

15  exhibits?

16          THE WITNESS:  Yes, ma'am.

17          MS. CROCKETT:  All right.  Let's provide those to the

18  clerk.

19          THE CLERK:  Thank you.

20          MS. CROCKETT:  That's all I have.  If you would just

21  give me one second, Your Honor.

22      Okay.  That's all I have.

23          THE COURT:  Any cross?

24          MR. DYER:  Yes, sir.

25          THE COURT:  I assume there's a motion to admit

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1    Government's 8?

2         MS. CROCKETT:  Yes, Your Honor.  My apologies.

3         THE COURT:  Any objection to 8?

4         MR. SHEEHAN:  No, sir.

5         MR. DYER:  Was that the body cam footage?

6         THE COURT:  No.

7         MS. CROCKETT:  That's 3.

8         MS. WALTERS:  That's 4.

9         THE COURT:  Four.

10        MS. CROCKETT:  Four.  That's right.  That's 4.

11        MR. DYER:  What was 8?

12        THE CLERK:  Eight was the forensic lab form.

13        THE COURT:  Can you tell Mr. Dyer what that is?  I'm

14   sorry.

15        MR. DYER:  Oh.  No objection.

16        THE COURT:  All right.  Without objection, it's also

17   received.

18      (Government's Exhibit 8 received in evidence.)

19        MS. CROCKETT:  Thank you, Your Honor.

20        THE COURT:  Go ahead, Mr. Dyer.

21        MR. DYER:  Thank you, Your Honor.

22                      <u>CROSS-EXAMINATION</u>

23   BY MR. DYER:

24   Q.   Trooper, you recall speaking with me on the phone -- I

25   don't know.  It's been a month, six weeks ago, roughly.  You

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  tell me if you remember.

2  A.    I'm not sure to the -- it hasn't been that long, sir.

3  I've only been in a boot for about a month.

4  Q.    Had you spoken with anybody prior to having that

5  conversation with me about this search warrant issue?  Finding

6  a search warrant?

7  A.    No, sir.

8  Q.    Okay.  So I called you.  It seemed to me like that was a

9  matter of first impression for you.

10       The document that has been admitted and called the

11  affidavit, that is not a warrant; correct?  I mean, that's not

12  your idea of a warrant.

13  A.    It is not, sir.

14  Q.    All right.  And to your knowledge there is -- there exists

15  no evidence -- again, to your knowledge -- that there ever was

16  a warrant that was issued.

17  A.    To my knowledge, no, sir.  I can't say that there was.

18  Q.    Okay.  And have you looked at the body cam footage that

19  was produced?

20  A.    Yes, sir, I reviewed by body camera footage.

21  Q.    You can actually see the document that's in your hand --

22  A.    Yes, sir.

23  Q.    -- in that footage.  And that is the document that we've

24  admitted here today as the affidavit and complaint for search

25  warrant.

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  A.   Yes, sir.

2  Q.   Correct?

3  A.   Yes, sir.

4  Q.   All right.  Do you have that in front of you?

5  A.   I turned it all over to the clerk already, sir.

6  Q.   Okay.  Let me -- I hate to jump around so much on you.

7  But do you have any memory at all of the conversation that you

8  had with Judge Shaffer?

9  A.   Not to any specifics, sir, no.

10 Q.   Okay.  Why is it -- when you -- when you decide you're

11 going to go get a search warrant, you say that -- in response

12 to the Government's questioning why you went to Judge Shaffer,

13 you had never done that before, had you?

14 A.   I had not, sir.

15 Q.   You --

16     Okay.  And I asked you this when we were speaking on the

17 phone.  You said you went there because it was a court of

18 record.

19 A.   That's how it was referred to me by my detachment

20 commander.

21 Q.   And that was sergeant who?

22 A.   Sergeant Wyatt.

23 Q.   Wyatt?

24 A.   Yes, sir.

25 Q.   W-Y-A-T-T?

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  A.   Yes, sir.

2  Q.   Okay.  And when you went and told him about this

3  investigation, he suggested to you to use a template, a form

4  that he provided to you.

5  A.   Yes, sir.

6  Q.   Prepare it so it was suitable for the facts of this case.

7  A.   Yes, sir.

8  Q.   And take it to Judge Shaffer, a circuit judge.

9  A.   Yes, sir.

10  Q.   And did he -- was it his words that -- to do that because

11  that's a court of record?

12  A.   Yes, sir.

13  Q.   Okay.  The -- you had used these preprinted forms

14  previously, that you took to magistrate court.

15  A.   The com- -- yes, sir.

16  Q.   Okay.  You -- I believe you had responded you had sought

17  warrants dozens of times in your 24-26 months as a trooper.

18  Yes?

19  A.   Yes, sir.

20  Q.   Okay.  And these forms were available to you at the time

21  that you prepared this form from the template that Sergeant

22  Wyatt gave to you to prepare.  These other forms were available

23  to you.  Yes?

24  A.   Yes, sir.

25  Q.   Okay.  Did you ask him why you wouldn't be using those

1   forms?

2   A.   I did not, sir.  He just said that he had a template and

3   he would provide it to me.

4   Q.   Okay.  But, I mean, you went to him for a reason.  Did he

5   instruct you to not use the forms?

6   A.   He did not, sir.  The forms already come saying

7   "Magistrate."

8   Q.   Right.

9   A.   And being it's an Adobe file, it cannot be altered to say

10  "Circuit Court" where it says, like, "Magistrate Court" in the

11  middle of the paragraphs.  So there's no way to make the forms

12  for circuit court, the ones that we have.  I don't pay for

13  Adobe Pro to alter those.

14  Q.   But I guess my question is why didn't you just

15  automatically assume you could take an application or

16  complaint, an affidavit in support for an application for a

17  search warrant, to the magistrate, as you always had done

18  before?

19  A.   I was going by the recommendation of my detachment

20  commander who had far more years of law enforcement experience

21  than I did.

22  Q.   Okay.  So he kind of interceded and said, "Use this."

23  A.   Roughly.  Yes, sir.

24  Q.   And to your knowledge, was there any other documents

25  provided to you by Sergeant Wyatt other than the document that

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  we've referred to here today thus far?

2  A.   That was the only document I received, sir.

3  Q.   Okay.  So when you meet with Judge Shaffer in his office,

4  he swears you in.

5  A.   Yes, sir.

6  Q.   And you have a discussion about this affidavit and

7  complaint for search warrant.  Does he inquire of you, "Where

8  is the warrant?"  Do you remember?

9  A.   I cannot recall if that was a question that was asked at

10  the time, sir.

11  Q.   Okay.  I mean, you -- were you making an assumption or

12  presumption that his office was going to provide an additional

13  document called a warrant?

14  A.   That's what I believe would happen, sir, yes.

15  Q.   Okay.  So did you -- if you anticipated that, did you go

16  seek that document out from Judge Shaffer or his clerk or

17  anyone else at the courthouse?

18  A.   He had -- after he had signed it, he'd told me to take it

19  over to the clerk's office is what I did.  And then I received

20  stapled papers back, sir.  I believed that everything was there

21  that I needed.

22  Q.   You took this document, this affidavit and complaint, to

23  the -- his law clerk?  His --

24  A.   The --

25  Q.   The circuit clerk?  Or do you know?

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  A.   I believe it's the circuit clerk, sir.

2  Q.   Ms. Leishman?

3  A.   If that's who it was at the time, sir.  I'm not --

4  Q.   You don't -- okay.

5  A.   -- familiar with the names at the time.

6  Q.   Somebody in the circuit clerk's office.

7  A.   Yes, sir.

8  Q.   Did you wait around for this document to be handed back to

9  you?

10  A.   Yes, sir, from my recollection.

11  Q.   Okay.  And then you took the document that was returned to

12  you --

13  A.   Yes, sir.

14  Q.   -- and went to the Seeger residence with that document.

15  A.   Yes, sir.

16  Q.   Okay.  Do you have any prior experience -- before your

17  involvement in this case, did you have any prior experience in

18  investigating any child porn cases?

19  A.   I cannot recall if I have, sir, but I feel as though I

20  would have.

21  Q.   Okay.  Any, I mean, revenge porn?  Anything of that nature

22  that you recall?

23  A.   I cannot recall working any other revenge porn cases, no,

24  sir.

25  Q.   Okay.  The -- this affidavit, you say that you did not

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1   include Corporal Lee's remarks or comments to you because it
2   was a third party making those statements to you and you
3   wouldn't be able to explain or support any other -- any of
4   those kind of remarks to the judge in your discussions with him
5   about the affidavit?
6   A.   In terms of what Corporal Lee advised me, yes.  In terms
7   of if the judge had more questions about what was spoken to
8   Corporal Lee, I couldn't really testify to that.
9   Q.   Okay.  I mean, he is in a better -- did he explain to you
10  that -- I thought your testimony was that he was able to assess
11  the body language of this young lady, K.S., in arriving at the
12  conclusion that she was being somewhat less than truthful,
13  something other than completely truthful.  Yes?
14  A.   Yes, sir.
15  Q.   So, I mean, I -- did that not lead you to conclude he's
16  actually in a better position than you are to assess her
17  credibility?  Yes?
18  A.   I'm not sure, sir.
19  Q.   I mean, you're speaking to her on a telephone; right?  Not
20  a video.
21  A.   Yes, sir.
22  Q.   Okay.  All right.  Did -- he testified that you reached
23  out to him.  You called him.  Did he call you?
24  A.   My report shows that I called him.  So based on my report,
25  I did call him.  I'm not real sure how I got the notice to call

*T. Nicholson - Cross-Examination (Mr. Dyer)*

1  the Nacogdoches Police Department or what led to my desire to
2  do that.  I believe that I may have had a message, but I may be
3  a tad wrong on exactly what caused me to reach out to Corporal
4  Lee.
5  Q.   Okay.  In your -- in your report, I mean, you're
6  confirming you -- and this was a little bit of a concern about
7  including too much about what Corporal Lee said.  Because he's
8  investigating a revenge porn allegation, and you're looking
9  into a child porn case; right?
10 A.   Yes, sir.
11 Q.   Okay.  And at the top of your report of criminal
12 investigation, you say on March 29 you're contacted by K.S. to
13 file a child porn complaint against Steven Seeger.
14 A.   Yes, sir, that's what it says.
15 Q.   All right.  Now, your information, as I review -- this
16 conver- -- you have a telephone conversation back on the 29th
17 of March.
18 A.   Yes, sir.
19 Q.   With K.S.
20 A.   Yes, sir.
21 Q.   And you record that.  Yes?
22 A.   Yes, sir.
23 Q.   She tells you in March of 2021 that, when she was 14, she
24 is providing to Mr. Seeger these purportedly or potentially
25 pornographic images of herself.  Yes?

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  A.    Yes.

2  Q.    All right.  But that the -- the images that she had called

3  to complain about with Corporal Lee were all images of her

4  after she was 18.

5  A.    Yes, sir.

6  Q.    And she says twice, in direct response to your inquiry "Do

7  you know if he stored any of these pictures or he still has any

8  of these pornographic pictures?" and she says, "No.  No idea."

9  Correct?

10  A.    Yes, sir.

11  Q.    So she's telling you she's got no idea whether she's

12  got -- or whether or not Steven Seeger has any pornographic

13  images of her as somebody under 18 years of age; correct?

14  A.    Yes, sir.

15  Q.    Okay.  You had any conversations with Judge Shaffer about

16  this matter?

17  A.    I have not, sir.

18  Q.    No conversations with Corporal Lee.

19  A.    Not since the one that was talked about in the --

20  Q.    That's what I'm talking about.  Yes, sir.

21  A.    Yes.

22  Q.    You said that when you executed this first search warrant

23  that you searched upstairs and one room downstairs and you had

24  left some items behind.

25  A.    Items were left behind.

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  Q.    What items were left behind, trooper?

2  A.    Mr. Seeger had advised that he had a work laptop when we

3  were in the room, and you can also see it on by body camera

4  footage.  It looked like it had a lot of technical information

5  up on the screen and such.  I didn't -- after learning what

6  Mr. Seeger did, I didn't feel as though the laptop was needed

7  to be taken and looked at by our lab.

8  Q.    Okay.  Meaning he -- his work with NASA.

9  A.    Yes, sir.

10 Q.    So you just left that one behind for that reason.

11 A.    Yes, sir.  I didn't think the government would appreciate

12 us taking their stuff.

13 Q.    Okay.  Let me -- when you make the decision that you need

14 a second warrant to take a look at the devices that you seize

15 as a result of the search that followed the first --

16 A.    Yes, sir.

17 Q.    -- complaint and affidavit --

18 A.    Yes, sir.

19 Q.    -- did you make that decision yourself?

20 A.    It's the typical practice when we obtain things that have

21 digital information.  You get one search warrant to get the

22 physical item itself and then a second search warrant to get

23 the digital contents.

24 Q.    Okay.  All right.  The -- and the preprinted forms are

25 used --

65

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  A.   Yes, sir.

2  Q.   -- for the second one.

3  A.   Yes, sir.

4  Q.   Was there a reason that there was a distinction there?

5  A.   I cannot -- I don't know why I decided to do magistrate on

6  that one.  I think that's just what I went with.  So...

7  Q.   Okay.  All right.  The i- -- the devices have to be looked

8  at at this forensic laboratory in Morgantown; right?

9  A.   Yes, sir.

10  Q.   You know, when you make the decision "I need a warrant,"

11  you're getting a warrant for the purpose of actually looking at

12  the information on the devices.

13  A.   Yes, sir.

14  Q.   And the only place in the world -- well, in your

15  neighborhood that can be done is in Morgantown; right?

16  A.   Yes, sir.

17  Q.   Why do you -- why do you seek a warrant in Preston County

18  which, you say yourself, in your own report, is executed in

19  Monongalia County?

20  A.   The items cannot be removed from the Kingwood detachment

21  evidence room without a search warrant from there to get them

22  out to get them downloaded.

23  Q.   Well, who told you that?

24  A.   That was just the practice of the detachment, sir.

25  Q.   Okay.  But, I mean, the purpose of a warrant is not to

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  remove items from one location to another; correct?

2  A.    It was more of the -- when I say that, it's the detachment

3  commander.  Unless you can show him that you have a reason to

4  remove them from the evidence room, he was not going to, like,

5  sign them out and give them to you.  So not necessarily just to

6  physically remove them from the buil- -- like, from that -- the

7  room that they're locked in, but to be able to -- like, you

8  have to have a reason.  So the reason was we got a search

9  warrant to download the items.

10  Q.    Okay.

11  A.    And then they were taken and it was served.

12  Q.    Okay.  But you explain the purpose of this search warrant

13  in this affidavit; right?

14  A.    Yes, sir.

15  Q.    And you meet with a magistrate.

16  A.    Yes, sir.

17  Q.    You have a discussion with him.

18  A.    Yes, sir.

19  Q.    Explain that the exclusive purpose of this document, this

20  search warrant, is to examine these devices, which will be done

21  in Morgantown.

22  A.    Yes, sir.

23  Q.    Okay.  All right.  But that's just the way you had always

24  done it.

25  A.    Yes, sir.

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  Q.   The detachment.

2      Okay.  You had made a comment previously about money being

3  exchanged between K.S. and the defendant, Steve Seeger.  What

4  did you mean by that?  Which direction was that money going?

5  A.   What do you mean by money, sir?

6  Q.   Well, you said when you spoke with her that there was --

7  there was discussion about money being provided.

8  A.   K.S. had said that Mr. Seeger had paid for, I think, some

9  type of college prep course and some -- kind of some other

10  stuff and just in terms of giving her things as part of their

11  relationship when she was an adult.

12  Q.   So your understanding of that was Mr. Seeger was providing

13  money to K.S.

14  A.   In some way, shape, or form, yes, sir.

15  Q.   Let me see if we're about ready to wrap up, trooper.

16      Let me ask you this.  I mean, have you ever since used the

17  template, the --

18  A.   There was --

19      Sorry.  There was one other occasion, sir.

20  Q.   Okay.  Did -- was there a -- was there an actual search

21  warrant that accompanied that complaint and affidavit?

22  A.   I used the exact same template, and it was in the exact

23  same courtroom -- or judge's chambers, sir.  It was an issue of

24  an inmate in Hazelton needing DNA taken from -- an agency, I

25  believe in Colorado, had come over needing DNA from an inmate

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1   at Hazelton.

2   Q.   Okay.  You don't recall the name of that one, do you?

3   A.   The inmate?

4   Q.   Yeah.

5   A.   I do not, sir.  I had no reason to investigate him.  It

6   was just kind of an agency assisting another agency thing.

7       (Pause in proceedings.)

8   BY MR. DYER:

9   Q.   The -- you --

10           MR. DYER:  Your Honor, can I approach the --

11           THE COURT:  You may.

12           MR. DYER:  -- witness?

13           MS. CROCKETT:  Can I see what you're --

14           MR. DYER:  I'm sorry.

15           MS. CROCKETT:  All right.

16   BY MR. DYER:

17   Q.   Trooper, that's the affidavit and complaint that we've

18   been discussing.  Did you read that, review it after you typed

19   it up or before or during your typing that up?

20   A.   It's my typical practice, after I type something, to

21   proofread it to make sure I don't have any grammical [sic]

22   errors.

23   Q.   Is that document prepared by you from scratch?

24   A.   This was -- again, it was a template that was given to me

25   by Sergeant Wyatt in a Word document.

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1  Q.   Okay.
2  A.   I went in and changed the relevant information to the
3  information of this investigation rather than what he had in
4  it.
5  Q.   Okay.
6  A.   I'm unaware of what that was at this time.
7  Q.   I mean, that document -- there's nowhere in that document
8  where the Court is directing or ordering or authorizing you to
9  go to Mr. Seeger's residence and conduct a search; correct?
10  A.   This is just the affidavit and complaint, sir.
11  Q.   Okay.  All right.  The --
12       One last question.  The forms that you use.
13           MR. DYER:  Your Honor, if I might approach again.
14           THE COURT:  You may.
15           MR. DYER:  These are the preprinted forms.
16  BY MR. DYER:
17  Q.   Trooper, those are the --
18       I'm going to ask you.  Are those the preprinted forms that
19  you use when you approach a magistrate in your efforts to
20  secure a search warrant?
21  A.   I believe this might be an older revision, but yes, sir.
22  Q.   Okay.  Well, those forms, at the bottom, say they were
23  last revised July of 2016.
24  A.   Yes, sir.  I thought you were talking about currently,
25  sir.  I apologize.

*T. Nicholson – Cross-Examination (Mr. Dyer)*

1   Q.   Are there more recent revisions to your knowledge?

2   A.   I believe there were, but I may be wrong, sir.  I don't

3   check the revision date.  I just know sometimes, every couple

4   years, they redo them.

5   Q.   Okay.  But at the least, this version of the form, which

6   has a directive to go search, that was available to you.

7   A.   Yes, sir.

8   Q.   Okay.

9            MR. DYER:  Anything?

10        (Pause in proceedings.)

11  BY MR. DYER:

12  Q.   The form property receipt bears the same date of

13  preparation by the document preparer.  It's last revised in

14  July of 2016.  Yes?

15  A.   Yes, sir.

16  Q.   Okay.  All right.  Trooper, I think that may be all for

17  now.

18           THE COURT:  Any redirect, Ms. Crockett?  And you all

19  are --

20           MS. CROCKETT:  One more.

21           THE COURT:  And you all are running out of daylight.

22           MS. CROCKETT:  One question.

23           MR. DYER:  I appreciate your candor.

24           THE COURT:  Famous last words, but go ahead.

25           MS. CROCKETT:  I promise, Your Honor.

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1                    REDIRECT EXAMINATION

2    BY MS. CROCKETT:

3    Q.    Trooper Nicholson, Mr. Dyer asked you whether or not

4    Corporal Lee was in a better position to gauge, I guess, the

5    veracity or truthfulness of K.S.

6         Did you have any question -- or any reason to question her

7    truthfulness with you when she made her report on March 29th

8    of 2021?

9    A.    I did not, ma'am.

10              MS. CROCKETT:  Okay.  That's all I have.

11              THE COURT:  Recross?

12              MR. DYER:  We have nothing further, Your Honor.

13   Thank you.

14              THE COURT:  Thank you, sir.  You can go ahead and

15   step down.  Thank you very much.

16        You can just leave that there, sir, and we'll take care of

17   that.  Thank you so much.

18        Do you need to recall Mr. Lee, or do we need to get Judge

19   Shaffer on the phone?

20              MS. CROCKETT:  Judge Shaffer, Your Honor.  Yeah.

21              THE COURT:  Okay.

22              MS. CROCKETT:  You -- I think you can stay in.

23              THE COURT:  Are you still calling the circuit clerk?

24        I'm sorry.  What?

25              MS. CROCKETT:  He was asking if he had to leave.  And

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1   I'm not recalling him, so...

2           THE COURT:  Do you --

3           MR. SHEEHAN:  No.  He can stay.

4           THE COURT:  You can have a seat, trooper.  Yeah.

5   Thank you.

6       Mr. Sheehan, Mr. Dyer, are you-all calling the circuit

7   clerk today as well?

8           MR. SHEEHAN:  We may.

9           THE COURT:  Okay.

10          MR. SHEEHAN:  It --

11          THE COURT:  You guys have --

12          MR. SHEEHAN:  We might get it out of Judge Shaffer.

13          MS. CROCKETT:  Your Honor, can I ask the Court what

14  its posture will be when we hit the golden hour at five?  Like,

15  I --

16          THE COURT:  You've got until 5:05.

17          MS. CROCKETT:  And then, Your Honor, what --

18          THE COURT:  Uh-huh.

19          MS. CROCKETT:  How will the Court hear the rest of

20  the evidence?  Are we --

21          THE COURT:  That's a wonderful question.  We'll have

22  to figure that out.

23          MS. CROCKETT:  Okay.  All right.  So we'll get

24  another date, then, from the Court, I'm assuming.  Maybe.

25          THE COURT:  We'll try to find one.

*T. Nicholson - Redirect Examination (Ms. Crockett)*

1        MS. CROCKETT:  May I approach the clerk, Your Honor,

2  just to confirm the number?

3        THE COURT:  You may.

4     (Pause in proceedings.)

5        JUDGE SHAFFER:  Hello.  Hello.

6        THE COURT:  Good afternoon.  Judge Shaffer?

7        JUDGE SHAFFER:  Yes, sir.

8        THE COURT:  Hi.  Good afternoon.  This is Tom Kleeh

9  down in Clarksburg.  Thank you so much for --

10       JUDGE SHAFFER:  Okay.  Just a minute, Judge Kleeh.

11  Just a second.

12    (Pause in proceedings.)

13       MS. CROCKETT:  I think he's on the bench, Your Honor.

14       JUDGE SHAFFER:  Okay.  I'm sorry, sir.

15       THE COURT:  Oh, that's all right.  Thank you so much,

16  Judge, for joining us.  I won't belabor the point.  The next

17  voice you'll hear is Madam Clerk, who -- I'm going to ask her

18  to swear you in.  Then Ms. Crockett has some questions for you.

19       JUDGE SHAFFER:  Okay.  And Your Honor, my right hand

20  is in the air, sir.

21       THE COURT:  I'm sorry, Judge.  What was that?

22       JUDGE SHAFFER:  I said my right hand is in the air.

23       THE COURT:  Understood.  Thank you.

24       THE CLERK:  Thank you, Judge.

25    (JUDGE STEVEN L. SHAFFER, GOVERNMENT'S WITNESS, SWORN)

*Judge Steven L. Shaffer – Direct Examination (Ms. Crockett)*

1    THE CLERK:  Thank you.

2    THE COURT:  Go ahead, Ms. Crockett.

3                    DIRECT EXAMINATION

4  BY MS. CROCKETT:

5  Q.   If you would just state your name for the record.

6  A.   My name is Steven Lee Shaffer.

7  Q.   And how are you employed?

8  A.   I am employed through the West Virginia Supreme Court as a

9  Circuit Judge of the 22nd Judicial Circuit, which encompasses

10  Preston and Tucker counties.

11  Q.   And before that were you a circuit court judge in another

12  judicial circuit?

13  A.   Yes.  Prior to -- prior to January 1st of 2025 I was the

14  circuit judge in the 18th Judicial Circuit, which only

15  encompassed Preston County, West Virginia.

16  Q.   Okay.  On a previous date, Judge Shaffer, did the Preston

17  County Prosecuting Attorney's Office file with -- file with you

18  a pleading seeking access to a file involving a Steven David

19  Seeger?

20  A.   Yes.  There had been a case involving Mr. Seeger, and that

21  case got dismissed.  And there was a motion for expungement of

22  those records.  Yes.

23  Q.   Okay.  And that case number would have been 22-F-50?

24  A.   To the best of my knowledge, yes.

25  Q.   Okay.  Let me ask you this.  Judge Shaffer, did you

JA135

75

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  prepare an affidavit entitled "Affidavit of Steven L. Shaffer"

2  and provide it to Megan Fields, Chief Assistant Prosecuting

3  Attorney for Preston County?

4  A.   Yes, ma'am.  Ms. Fields contacted me and asked if I would

5  prepare an affidavit to provide to I guess the Court or to

6  whomever she was going to give it to regarding my involvement

7  with this matter.

8  Q.   And did you execute that affidavit on April 2nd of 2025

9  before Christy Hartsell?

10 A.   I believe that was the date.  I believe it was

11 April 2nd, yes.

12 Q.   Okay.  If that's the date reflected on the affidavit,

13 would that be accurate?

14 A.   Yes.  If that's the date on the affidavit, that would be

15 correct.

16 Q.   Okay.  And in essence, the reason for the affidavit was so

17 that you could explain to the Court what your process was for

18 issuing a search warrant; is that right?

19 A.   Yes.  Yes.

20 Q.   If you could, just for the record, just tell us what your

21 process is, Judge.

22 A.   Okay.  Well, basically, usually officers, if I'm here at

23 the courthouse, they will contact my assistant.  And they'll

24 say they have search warrants and their search warrant, and

25 they'll want to know if they could come to the office.  And,

*Judge Steven L. Shaffer – Direct Examination (Ms. Crockett)*

1  you know, if they do that, I follow the same procedure here at

2  the office as I do at my house, if they happen to come to my

3  house and have a search warrant also.  That would be after

4  hours, on weekends, or whatever.

5       Basically, when they bring the information in to me, there

6  is usually two documents.  Basically I will read through both

7  documents to familiarize myself with them.  There is a search

8  warrant.  There is an affidavit and complaint for the search

9  warrant.  And after I read through it, I will then place the

10 officer under oath, and I will make him swear to the fact that

11 the allegations in the petition are true and accurate; and if

12 they're based upon information provided by a third party, that

13 they believe that to be a credible source.

14 Q.   Okay.  And specifically we were asking you about whether

15 or not there was a search warrant that you would have issued in

16 the case involving Mr. Seeger; is that right?

17 A.   You know, to the best of my knowledge, usually there is

18 a -- like I said, there is a search warrant and an affidavit

19 and complaint for the search warrant.  And I will read both

20 those documents.  A lot of times the same information is on

21 both documents.

22 Q.   Okay.  And --

23 A.   Now, I can't -- I can't sit here and tell you that the

24 title of one of them was a Search Warrant and the title of the

25 other one was Affidavit and Complaint for Search Warrant.

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1    I mean, you know, I can't -- I don't even remember Trooper
2  Nicholson.  So I can't sit here and tell you that that's what
3  it was.
4  Q.    Okay.  I guess what I'm specifically asking is:  Based on
5  the request of the Preston County Prosecutor's Office, you did
6  look in Mr. Seeger's file, and you were able to determine that
7  there wasn't a document inside that file that was titled
8  "Search Warrant."  Is that fair?
9  A.    That is a hundred -- that is a hundred percent clear.
10 When Ms. Fields filed her motion regarding that, basically she
11 had actually used a -- the code section 61-11-26.  And as my
12 law clerk -- I put him on the trail of looking to see about an
13 expungement record.  And basically we found the code section
14 West Virginia Code 61-11-26(m) and 61-11-25(f).
15     And as I looked at those two code sections and -- I knew
16 that Mr. Seeger's would fall under 61-11-25(f).  And so that's
17 the code section I used, which was just a little bit different
18 than 61-11-26(m).
19 Q.    Okay.  And so you're saying you looked at your authority
20 to open an expunged record.  And using that authority, you can
21 confirm that there wasn't a document inside that file titled
22 "Search Warrant."
23 A.    Yeah.  Yeah.  There was not a document in there that said
24 "Search Warrant."  There was an affidavit.  I believe -- I
25 can't remember if it was entitled "Affidavit and Complaint" or

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  "Affidavit for Search Warrant" or what it was called.  But
2  there was not a search warrant in that -- in that sealed file.
3  Q.   Okay.  In your review of the affidavit for -- affidavit
4  and complaint for search warrant, you did notice, though, that
5  your signature was affixed to the affidavit; is that right?
6  A.   Yes, I did.  That's the only way I knew that I had signed
7  that.
8  Q.   Okay.  And then the fact that your signature appears on
9  that document, does that confirm for you that you found
10  probable cause based on your review of the affidavit?
11  A.   Yes.  Because like I said, I read all these that come in.
12  And, you know, matter of fact, the officers I think sometimes
13  get disgusted because I take my time and read through
14  everything.
15  Q.   Okay.  And then if I understood your practice, you said
16  your practice is to review both, swear the officer if you find
17  probable cause, and then have them report to the circuit
18  clerk's office to retrieve whatever copies they take with them.
19       Is that right?
20  A.   Yes.  Once I sign them, the documents are handed back to
21  the officer, and I tell them they have to go to the clerk's
22  office and she will make their copies.
23       And then until this came about, I did not even know what
24  her process was.  You know, I just know that, you know, I make
25  sure that there is probable cause in it.  And once I give it to

*Judge Steven L. Shaffer - Direct Examination (Ms. Crockett)*

1  the officers, that's usually the last I hear of it unless it
2  comes back before me.
3  Q.  Okay.  And you included in your affidavit that, then --
4  consistent with your statement, I think, just now -- for
5  reasons unknown to you, a search warrant is not in that file.
6  A.  Yeah.  I mean, I don't have -- once the officer -- once I
7  hand things back to the officer, that's my last involvement
8  with it.
9  Q.  Okay.
10        MS. CROCKETT:  Your Honor, that's all I have.  I
11  would move the admission of the affidavit if the Court thinks
12  it's necessary.  I don't think it's necessary.  He's testified
13  consistent with it.
14        THE COURT:  Right.
15        MS. CROCKETT:  But I know the Court has it attached
16  to the pleadings.  And so, for that purpose, I guess I'd move
17  its admission.
18        THE COURT:  Understood.  It's already in the record
19  attached to the papers.
20     Cross?
21        MR. SHEEHAN:  A little.
22     Judge, I'm going to do it from here because of the
23  microphone.
24        THE COURT:  Yes.  Please.  Thank you, Mr. Sheehan.
25

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1                    <u>CROSS-EXAMINATION</u>

2  BY MR. SHEEHAN:

3  Q.   Judge Shaffer, my name Martin Sheehan.  I represent

4  Mr. Seeger in the federal proceedings.

5       Sir, do you have a copy of the affidavit for search

6  warrant with you at this time?

7  A.   I think it's over in my cabinet if you want me to grab it.

8  Q.   If you would, sir.

9  A.   Okay.  Hang on there just one second.

10      Okay.  I have it right here.

11 Q.   Sir, typically in a search warrant itself, the search

12 warrant document -- and certainly on the preprinted form that

13 exists -- there is language that says -- and I'm really

14 summarizing a lot -- it says go do a search.

15      Do you find any language in the affidavit for search

16 warrant that you have in front of you that contains any

17 language that directs the officer to conduct a search?

18 A.   May I look at it, sir?

19 Q.   Sure.

20 A.   Okay.  Thank you very much.

21      The only thing that I see in reference to that, sir, is

22 the -- on page number 2 that says, "Based on the above

23 information, Trooper Nicholson has cause to believe and does

24 believe that evidence of this crime are possessed within the

25 above-described residence and the affiant requests a search

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  warrant be issued to said residence."

2  Q.   Okay.  There is no order language saying "Go do that."  Is

3  that correct, sir?

4  A.   I don't see any language telling him to go do that.

5  Q.   Okay.  And that language would typically be part of a

6  search warrant form; is that correct, sir?

7  A.   Are you talking about in a regular search warrant?

8  Q.   Yes, sir.

9  A.   Well, most of them come about on preprinted forms.

10 Q.   Yes, sir.  And if I were to show you the preprinted form,

11 I think I have some language I could read to you.  But I'll --

12 I don't have that in front of me.

13 A.   I am familiar with it.  And basically what they'll

14 normally say is that the officer is commanded to go search

15 these premises.  And I'm paraphrasing.  I can't give you the

16 exact language.  But I can tell you --

17 Q.   Sir, I'm going to suggest some language to you.

18      "You are therefore commanded in the name of the State of

19 West Virginia to search forthwith the premises above-described

20 and all appurtenances appertaining thereto for the property

21 above-specified to seize such property and to bring the same

22 before me to be dealt with according to law."

23      Is that the kind of language that you -- that I -- that

24 you would recognize as an order to conduct a search?

25 A.   That is -- that is either the language or very similar

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  language that would be in the search warrant.

2  Q.   Okay.  Sir, did you -- I think you said that you

3  ultimately -- there was an expungement issued in the matters

4  pertaining to Mr. Seeger.  Is that correct?

5  A.   Yes, sir.

6  Q.   And do you -- have you reviewed the expungement order that

7  was issued with -- relevant to Mr. Seeger?

8  A.   I have probably not looked at that since the order was

9  signed, sir.

10 Q.   Okay.  That would have been assigned a "P" number in the

11 state court system?   "P" is typically for miscellaneous

12 matters; is that correct?

13 A.   It would have -- if the case had been dismissed prior to

14 the expungement request, then yes, it would have been in a P

15 case.

16 Q.   Okay.  Are you familiar with whether or not there is an

17 expungement order in a case numbered 23-P-36, titled

18 "Expungement of Record of Steven David Seeger"?

19 A.   I -- you said records were expunged.  So there would have

20 to be an order for that.

21 Q.   Okay.  And for the record to be expunged, typically what

22 that order would say is that the record is expunged and sealed

23 and is of no further effect; is that correct?

24 A.   That's usually what it says, yes.

25 Q.   Okay.  And that doesn't mean the documents would be

JA143

*Judge Steven L. Shaffer - Cross-Examination (Mr. Sheehan)*

1  destroyed at the courthouse.  That means the documents -- that

2  law enforcement agencies are supposed to report that they've

3  destroyed some records; but ultimately, the clerk would

4  retain -- be the repository of the records as they originally

5  existed.  Is that correct, sir?

6  A.   Yes.  Ms. Leishman should have maintained the records,

7  yes.

8  Q.   Okay.

9        MR. SHEEHAN:  Anything else?

10       (Pause in proceedings.)

11  BY MR. SHEEHAN:

12  Q.   Oh.  When you are issuing a search warrant, is it your

13  understanding that it's your oblig- -- that it's the function

14  of the court to determine if the police officer who's seeking

15  the warrant has supplied you enough information to believe that

16  someone who has supplied him information has been fully

17  truthful and is credible?

18  A.   Yes.  Yes, sir.  I believe I testified to that earlier;

19  that, you know, when I swear the person, that it's based on

20  actual knowledge or, if it's provided information from another

21  person, that they found that source to be credible.

22  Q.   And do you have any specific recollection of the issuance

23  of the -- of the -- the event which led to the signing of the

24  affidavit that was presented to you by Trooper Nicholson in

25  this instance?  Or are you just testifying from pattern and

*Judge Steven L. Shaffer - Redirect Examination (Ms. Crockett)*

1  practice of what you do as a judge?

2  A.   Sir, I'm just -- I'm just testifying as to my procedure

3  that I use.  Like I said, if Trooper Nicholson walked in my

4  office right now, I would not even be able to recognize him.  I

5  don't -- you know, and I really wouldn't.  I mean, that's just

6  that simple.  That's -- you know, yeah.  And, I mean -- I mean,

7  what was that?  In 20- -- 2021?

8  Q.   Yes, sir.  I don't expect you to remember.  I'm confirming

9  that you don't.

10  A.   Yeah.  No.  I have no -- I have no recollection of that

11  specific event at all, sir.

12  Q.   Thank you.

13          MR. SHEEHAN:  I have no further questions, Your

14  Honor.

15          THE COURT:  Any --

16          JUDGE SHAFFER:  Okay.

17          THE COURT:  One second, Judge Shaffer.  Thank you.

18      Any redirect?

19          MS. CROCKETT:  Just one question, Your Honor.  Always

20  one.

21                    REDIRECT EXAMINATION

22  BY MS. CROCKETT:

23  Q.   Judge Shaffer, then, understanding that you're just

24  testifying from your general knowledge, your -- your

25  recognition of your signature upon the affidavit, would that

*Judge Steven L. Shaffer - Redirect Examination (Ms. Crockett)*

1  confirm for you that you found probable cause for the search to
2  occur?
3  A.   Oh, yes.  If I would not have found probable cause, I
4  would have rejected the search warrant.
5  Q.   And so an officer who would have retrieved your signature
6  on an affidavit would have been authorized, according to your
7  procedure, to execute a search.
8  A.   There should have been a search warrant with it.  I don't
9  know what has happened to it.
10          MS. CROCKETT:  Okay.  Thank you.
11          THE COURT:  Recross?
12          MR. SHEEHAN:  No recross, Your Honor.
13          THE COURT:  Judge Shaffer, thank you so very much for
14  letting us intrude in your day.  I know you had a busy docket.
15  We really appreciate your time and your help, sir.
16          JUDGE SHAFFER:  Okay.  Yeah.  No, no.  We're -- I'm
17  going to head back in.  We're still on -- we're still going
18  strong here, probably for another -- at least another
19  45 minutes or better.
20          THE COURT:  All right, sir.
21          MR. SHEEHAN:  Your Honor.
22          THE COURT:  Yes.
23          MR. SHEEHAN:  Before he gets off the phone.  We will
24  not call the clerk.  And if he would like to advise her, that's
25  fine with us.

1           JUDGE SHAFFER:  All right.

2           THE COURT:  Judge, if I can keep you on the federal

3   payroll, if you wouldn't mind letting your circuit clerk know

4   that she's not going to be called as a witness now.

5           JUDGE SHAFFER:  Okay.  Yes.  I can let her know

6   Ms. Leishman is not going to be called.

7           THE COURT:  That is correct, sir.

8           JUDGE SHAFFER:  Okay.  I will have my office go

9   straight down and tell her.

10          THE COURT:  All right.  Thank you so very much,

11  Judge.  Have a wonderful day.

12          JUDGE SHAFFER:  All right.  Thank you guys very much.

13          THE COURT:  Thank you.

14          JUDGE SHAFFER:  Bye-bye.

15          THE COURT:  All right.  Can you all be here at 10:00

16  tomorrow morning?

17          MR. SHEEHAN:  Yes, sir.

18          MS. CROCKETT:  Yes.

19          MR. DYER:  Yes, sir.

20          THE COURT:  All right.  Can your witnesses be here at

21  10:00 tomorrow morning?

22          MS. CROCKETT:  Yes.  Uh-huh.

23          THE COURT:  What about Mr. Lee?  He's all the way

24  here from the great state of Texas.

25          MS. CROCKETT:  Oh.  Mr. Lee flies out --

JA147

```
 1              MR. SALEM:  Do you -- you don't have any other use
 2   for him?
 3              MS. CROCKETT:  Just the call.
 4              MR. SALEM:  Your Honor, I think we'll be able to
 5   continue the other motions without him.  So...
 6              THE COURT:  Okay.  All right.
 7              MS. CROCKETT:  Thank you.
 8              THE COURT:  We're going to stand in recess until
 9   10:00 AM tomorrow morning.  We'll pick up from there, and the
10   Government can call its next witness.  And then the defense can
11   call whomever.
12              MS. CROCKETT:  Your Honor.
13              THE COURT:  Uh-huh.
14              MS. CROCKETT:  A matter unrelated to this.  I was
15   charged with bringing the Court binders for another matter it
16   has, and went to the office and did not see the binders.  But
17   my understanding is that they were there for me.  So I will
18   bring them to the Court tomorrow.  But the fact that they will
19   be delayed a day is attributed to me.
20              THE COURT:  I can't imagine I was going to read those
21   this evening, Ms. Crockett.
22              MS. CROCKETT:  Okay.
23              THE COURT:  If I was, that's news to me.
24              MS. CROCKETT:  Okay.  All right.
25              THE COURT:  I'm going to a middle school softball
```

```
1   game instead.

2           MS. CROCKETT:  Oh, nice.  Okay.

3           THE COURT:  So I'm not going to be reading those

4   there.

5       We'll see you all tomorrow morning at 10:00 AM.  We'll

6   pick up from there.  Thank you all very much.

7       (Proceedings adjourned at 5:05 PM.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3      I, Rachel Kocher, a Registered Merit Reporter and Official

 4  Reporter of the United States District Court for the Northern

 5  District of West Virginia, do hereby certify that the foregoing

 6  is a true and correct transcript of the proceedings had in the

 7  above-styled action as reported by me stenographically, all to

 8  the best of my skill and ability.

 9      I certify that the transcript fees and format comply with

10  those prescribed by the Court and the Judicial Conference of

11  the United States.

12      Given under my hand this 6th day of June 2025.

13

14

15                                  Rachel Kocher
                                    _____
16                                  Rachel Kocher, RMR, CRR

17

18

19

20

21

22

23

24

25
```

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CLARKSBURG

 3   ------------------------------x
     UNITED STATES OF AMERICA,      :
 4                                  :
          Plaintiff,                :
 5                                  : CRIMINAL ACTION NUMBER:
       vs.                          : 1:24-CR-42
 6                                  :
     STEVEN DAVID SEEGER,           :
 7                                  :
          Defendant.                :
 8   ------------------------------x

 9        Proceedings had in the continued pretrial conference and
     motions hearing of the above-styled action on April 15, 2025,
10   before the Honorable Thomas S. Kleeh, Chief District Judge.

11   APPEARANCES:

12   FOR THE UNITED STATES OF AMERICA:

13        Kimberley D. Crockett, Esq.
          Daniel Lee Salem, Esq.
14        U.S. Attorney's Office
          217 W. King Street, Suite 400
15        Martinsburg, WV 25401
          kimberley.d.crockett@usdoj.gov
16        daniel.salem@usdoj.gov

17   FOR THE DEFENDANT:

18        Thomas G. Dyer, Esq.
          Dyer Law Offices
19        P.O. Box 1332
          Clarksburg, WV 26302-1332
20        dyerlawof@aol.com

21        Martin P. Sheehan, Esq.
          Sheehan & Associates, PLLC
22        1140 Main Street, Suite 333
          Wheeling, WV 26003
23        martin@msheehanlaw.net

24   The Defendant was present in person.

25   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
```

*Rachel Kocher, RMR, CRR*
*500 West Pike Street, Clarksburg, WV 26301*
*(304) 623-7179*

JA151

2

1                        W I T N E S S E S

2                                                           PAGE

3   **EDWARD RYAN**

4   Direct Examination by Mr. Sheehan                        3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*E. Ryan - Direct Examination (Mr. Sheehan)*

1                              Tuesday, April 15, 2025, 10:03 AM

2                                   - - -

3          THE COURT:  We convene for a continuation of

4    yesterday and our evidentiary hearing in U.S. v. Seeger.

5    Counsel is present.  Mr. Seeger is present as well.

6       Any additional witnesses the Government --

7          MS. CROCKETT:  No, Your Honor.

8          THE COURT:  -- would like to call?

9          MS. CROCKETT:  No.

10         THE COURT:  No?  All right.

11         MS. CROCKETT:  We're not going to call any other

12   witnesses.

13         THE COURT:  Any from the defense?

14         MR. SHEEHAN:  We would call Agent Ryan briefly, Your

15   Honor.

16         THE COURT:  Understood.

17      Sir, can I ask you to step forward?  Thank you.  Madam

18   Clerk will swear you in.  Then we'll ask you to take the

19   witness stand.  Thank you so much.

20         (EDWARD RYAN, GOVERNMENT'S WITNESS, SWORN)

21         THE CLERK:  Thank you.  If you'd please have a seat

22   here in the witness stand.

23                         <u>DIRECT EXAMINATION</u>

24   BY MR. SHEEHAN:

25   Q.   Would you tell us your name, please.

4

*E. Ryan - Direct Examination (Mr. Sheehan)*

1    A.    Edward Ryan.

2    Q.    And your occupation.

3    A.    I'm an FBI agent.

4    Q.    And you've been generally assigned to do the investigation

5    that's led to the indictment of Mr. Seeger.  Is that fair to

6    say, sir?

7    A.    Yes, sir.

8    Q.    The person that we've referred to as K.S. is the person

9    that came forward to the police in Texas and then ultimately

10   was known to the state trooper who testified yesterday.

11   A.    Yes.

12   Q.    Okay.  The other person that we referred to as being by

13   her initials -- and I've forgotten, quite honestly, what they

14   are.  I know they're not K.S., so I'll leave it at that.  How

15   was that --

16              THE COURT:  Well, what initials did we settle on for

17   Jane Doe Number 2?

18              MS. CROCKETT:  Jane Doe Number 2 is K.S.

19              THE COURT:  Okay.  And Jane Doe Number 1, then?

20              MS. CROCKETT:  P.G.

21              THE COURT:  "P.G."  Okay.  All right.

22              MR. SHEEHAN:  So --

23              THE COURT:  Sorry, Mr. Sheehan.  Go ahead.

24              MR. SHEEHAN:  Thank you, Your Honor.

25

*E. Ryan - Direct Examination (Mr. Sheehan)*

1  BY MR. SHEEHAN:

2  Q.   How was P.G. identified, sir?

3  A.   P.G. was identified through a text message that contained

4  a CSAM image.

5  Q.   And was -- where was that text message recovered from?

6  A.   From Mr. Seeger's LG Nexus phone.

7  Q.   So from the material that was seized in the warrant that

8  was obtained from -- or in the search that was conducted by

9  Trooper Nicholson.

10 A.   Yes.

11 Q.   All right.  So without that information, you would not

12 have learned the identity of P.G.  Is that correct, sir?

13 A.   That's correct.

14        MR. SHEEHAN:  That's all I have, Your Honor.  Thank

15 you.

16        THE COURT:  Understood.

17     Any cross?

18        MS. CROCKETT:  Just one second, Your Honor, if you

19 would.

20     (Pause in proceedings.)

21        MS. CROCKETT:  Okay.  I don't have anything, Your

22 Honor.

23        THE COURT:  All right.  Special agent, thank you,

24 sir.  You can step down.

25        THE WITNESS:  Thank you, sir.

6

1           THE COURT:  Thank you.

2      Any other witness from the -- excuse me -- witnesses from

3  the defense?

4           MR. SHEEHAN:  No, Your Honor.

5           THE COURT:  Okay.  All right.  I guess, technically,

6  it's your motion, Mr. Sheehan, Mr. Dyer.  So go ahead on the

7  suppression issue.  And I've read everything the parties have

8  briefed, but there are a few things I want to talk through.

9           MR. SHEEHAN:  Yes, sir.  I've prepared some thoughts.

10           THE COURT:  And if you're more comfortable seated,

11  sir.

12           MR. SHEEHAN:  I fell going to visit Mr. Seeger in

13  January, Judge.  And transitioning from standing to sitting and

14  sitting to standing is my problem.

15           THE COURT:  Okay.

16           MR. SHEEHAN:  It is not actually being on my feet.

17  So I --

18           THE COURT:  Okay.  All right.

19           MR. SHEEHAN:  But I appreciate you --

20           THE COURT:  No.  Wherever you're more comfortable.

21           MR. SHEEHAN:  Yeah.  The -- if Mr. Dyer wasn't there,

22  I would not have a good witness as to my clumsiness on the ice.

23           THE COURT:  Your workers' comp claim?

24           MR. SHEEHAN:  I haven't made a claim, Judge.  I don't

25  expect to.  But I'm optimistic I will recover in a way that

1   makes my life more tolerable.

2       Judge, it is our motion, and so we have an initial burden

3   to establish standing.

4               THE COURT:  Right.

5               MR. SHEEHAN:  I think, very briefly, yesterday

6   Trooper Nicholson said that he was aware, had done some

7   pre-investigation to establish that 310 Hilltop was, in fact,

8   Mr. Seeger's residence.  I think that is all that we really

9   need to do to establish standing.

10      The complicated part of this case, the issue I raised with

11  the Court yesterday as we started, has to do with there are

12  different evidentiary rules that apply to your analysis of this

13  case if it's a search pursuant to a warrant --

14              THE COURT:  Uh-huh.

15              MR. SHEEHAN:  -- or if there's no warrant.

16              THE COURT:  Right.

17              MR. SHEEHAN:  And so the case law indicates that you

18  can either determine a warrant -- a valid warrant is a valid

19  warrant, or you could skip that step and go to good faith as a

20  rule.

21              THE COURT:  And I have an initial question.

22              MR. SHEEHAN:  Yes, sir.

23              THE COURT:  And Ms. Crockett, I'll give you a chance

24  to speak to this question too.

25      Can I, if there is no warrant?

1           MR. SHEEHAN:  That is the magic question, Judge, that
2    I've looked at for a long time.  And I do not believe that you
3    can get to good faith if there's no warrant.  I've looked at
4    this a good deal.
5           THE COURT:  And if I could.  And I apologize for
6    interrupting in your chain of thought -- train of thought.
7    Geez.
8        I guess my question has a couple layers to it.  Because
9    there is no physical warrant.  Okay?  We have the affidavit;
10   that the testimony is clear between Judge Shaffer and Trooper
11   Nicholson that there was an affidavit that both Trooper
12   Nicholson and Judge Shaffer signed and it -- and, certainly,
13   all the testimony about Judge Shaffer's practice when warrants
14   are presented -- warrant applications are presented to him for
15   consideration, et cetera.
16       So there's no physical warrant.  There is evidence in the
17   record that, arguably, the Court could infer that the warrant
18   existed at that point in time and it has just been lost in the
19   shuffle.  And so I guess my question is, first, if that is the
20   scenario or if that's the conclusion the Court draws from the
21   record before it, can the Court, if necessary, proceed to a
22   good faith *Leon* analysis?
23       Or in the alternative, there simply was never a warrant.
24   There was an affidavit that was presented to the Judge, that
25   both Trooper Nicholson and Judge Shaffer signed; but for

9

1    whatever reason, there simply was never a warrant.  And in that
2    scenario, can the Court undertake a good faith analysis?  I'll
3    give you a chance to hammer off of the tee I've set up on both
4    sides, Mr. Sheehan.
5              MR. SHEEHAN:  Yes.  I've prepared some remarks that I
6    hope will answer that.  And I'm going to go through that in
7    that order, because I have spent a lot of time trying to
8    organize my thoughts to address those issues --
9              THE COURT:  Okay.
10             MR. SHEEHAN:  -- seriatim for you.
11        Historically when we looked at a valid -- a warrant in
12   terms of its validity, we looked at the four corners of the
13   warrant.
14             THE COURT:  Right.
15             MR. SHEEHAN:  That's easy.
16        When there's a technical issue with the warrant, then
17   we've allowed good faith.  And the best example of a good faith
18   problem is one that's been raised in this case and is addressed
19   by a Fourth Circuit case called *United States v. Thomas*.  And
20   that is the problem with linking the address to Mr. Seeger's
21   conduct.  *Thomas* says there's -- if there's a warrant, then you
22   can jump that gap because the officer testified he had that
23   information.  If you -- and so that whole issue of is there a
24   warrant or isn't there a warrant has a significant evidentiary
25   effect.

1    Now, the Government has cited a couple of cases. I recall

2  one from the Tenth Circuit where people appeared at a

3  magistrate's office, presented a lot of documents, apparently

4  had the warrant with them, and it never got signed. So they

5  went out and did the search, and they came back. They asked

6  the judge to sign the warrant after the fact. He acknowledged

7  that he was going to do so, indicated he was signing it after

8  the fact, wasn't sure what the rules were, and the Tenth

9  Circuit ultimately affirmed that situation.

10    There's a similar case in another circuit. They're both

11  2014 cases. But the interesting thing in those two cases, from

12  my perspective, was that the Court said that signing a warrant

13  was not a requirement of the rules. And I was a little

14  shocked. So I went back and looked at both the state Rule of

15  Criminal Procedure 41 and Federal Rule of Criminal Procedure

16  41, and that analysis is correct. But both of those rules

17  require that there be a warrant.

18         THE COURT: Right.

19         MR. SHEEHAN: More importantly, the Fourth Amendment

20  requires that a warrant issue on probable cause. And I believe

21  that if we're looking at the practice in 1792, when the Fourth

22  Amendment was adopted, that the historical record would be

23  there's a piece of paper that is a warrant.

24    And so I am troubled by the ability to forgo the warrant

25  requirement and make a guess, as well as -- as well intentioned

 1  as the officer may have been.  And I would have to concede I

 2  think that he was well intentioned trying to get a warrant.

 3  But I don't think he did.  And I -- and so he knew --

 4          THE COURT:  Well, what the Government is going to

 5  say, presumably, is that vein of argument is a form over

 6  substance argument.

 7      And I realize my initial questions to you, Mr. Sheehan,

 8  were form over substance of -- because, like you, the complete

 9  absence of an actual warrant is of grave concern.  Because

10  respectfully, whatever circuits have said whatever, the Fourth

11  Amendment itself has the "W" word in it; right?

12          MR. SHEEHAN:  Yes, sir.  Yes, sir.

13          THE COURT:  And then from there flows all this other

14  analysis.  So -- I'm inclined to believe there is some weight

15  behind the form over substance argument; but then, of course,

16  comes *Leon*.

17          MR. SHEEHAN:  Well, and at the end of the day, as I

18  make this presentation, I do want to address *Leon* and its

19  context and its historical stuff in the particular context of

20  where we are.  So I'm going to defer your discussion unless you

21  want me to address it now.  I'll be happy to do so --

22          THE COURT:  No.  That's okay.  Go ahead.

23          MR. SHEEHAN:  -- in any order that you want, Judge.

24          THE COURT:  I'm merely throwing my thoughts out as

25  they come so that we check all the boxes that I...

12

 1          MR. SHEEHAN:  Oh, I'm happy to do so.  I -- as a
 2  young lawyer, and as an old one, I have -- it is my
 3  understanding that my obligation is to answer the Court's
 4  questions as they are put, Judge.
 5      The -- I want to emphasize whether there was or wasn't a
 6  warrant.  Because what the trooper said yesterday was he knew
 7  he needed two documents: the affidavit and another document.
 8  And so we talked about the two documents.  And at some point he
 9  said, "I thought I would get the second document when I went
10  over to court."  I think the practice actually has been is that
11  the requesting officer prepares both documents --
12          THE COURT:  Right.
13          MR. SHEEHAN:  -- and brings them both over.  That --
14  anyway.  But I understand how he could have been somewhat
15  confused.
16      Judge Shaffer was equally clear, I think, that there
17  needed to be two documents.  You know there needs to be two
18  documents.  There is some theoretical possibility I'll give out
19  that an affidavit could also be a warrant if it had a lot of
20  language in it.
21          THE COURT:  Right.
22          MR. SHEEHAN:  But that's not the situation here.  So
23  the two-document requirement makes me believe fairly clearly
24  that there was no -- there wasn't a warrant, sir.
25      Now, the suggestion has been made that the document was

1    somehow lost in the expungement process.  And I -- we spent
2    some time examining that before we got here.  And in the
3    expungement -- and I went through this language with Judge
4    Shaffer yesterday.  And obviously, he wasn't necessarily
5    looking at the order.  But he did understand that what happens
6    in an expungement is that you tell police agencies to destroy
7    their files.

8              THE COURT:  Right.

9              MR. SHEEHAN:  But the court maintains a file under
10   seal, and that file should be fully available.  In examining
11   that aspect of it, if there was a warrant, it should have been
12   lodged there.  The West Virginia Rule of Criminal Procedure
13   says -- and the subparagraphs are slightly different in state
14   and federal law.  It says that the clerk should possess all
15   those documents after the fact.

16        And so the fact that the clerk doesn't have those
17   documents is of -- has really led us to the conclusion that
18   there never was a warrant in this case.  And so that's where I
19   think I come up factually, and that leads to various
20   conclusions.

21        Now -- okay.

22        Now, it is pretty clear to me that -- and I spent a lot of
23   time thinking about this.  Because the *Leon* case, and then
24   later some Fourth Circuit cases that incorporate this language,
25   say that you don't -- you can't use good faith if there's a

1  *Franks* issue --

2                THE COURT:  Right.

3                MR. SHEEHAN:  -- in a case.  And so I started to

4  actually explore the issue of whether there could be a *Franks*

5  issue, but it could be saved on other grounds, and whether

6  there was some hybrid between good faith sometimes.  And

7  ultimately, after spending a lot of time thinking about that,

8  Judge, I think the answer to that question is no.  I think that

9  if there's a *Franks* issue, it's out.  We can't get to good

10 faith --

11               THE COURT:  Uh-huh.

12               MR. SHEEHAN:  -- because of the -- I think, really,

13 the lack of good faith by the officer is reflected in the fact

14 that he wasn't candid in a way that he needed to be.

15               THE COURT:  But has the defense made the requisite

16 showing to get to the point where we have a *Franks*

17 conversation.

18               MR. SHEEHAN:  I think --

19               THE COURT:  Not a frank conversation, but a *Franks*,

20 capital F with an S --

21               MR. SHEEHAN:  No, no.  I followed you, sir.

22               THE COURT:  -- conversation.

23        No.  It's --

24        Yeah, okay.  I was just making sure --

25               MR. SHEEHAN:  For the record?  Yes, sir.

          THE COURT:  -- the court reporter got that.

          MR. SHEEHAN:  Yeah.  The -- but what we know is that
the police officer wrote a report.  While we didn't put the
report in yesterday, Mr. -- my co-counsel, whose name --

          THE COURT:  Dyer.

          MR. SHEEHAN:  Mr. Dyer.  Thank you, Judge.

          THE COURT:  I'm very familiar with him.

          MR. SHEEHAN:  -- has cross-examined the officer about
what he knew about the girl's candor.  And basically, he got
the information out of him that was in the report, which is
that he had received some information from the Nacogdoches
police officer that was negative as to her credibility.

     Now, the -- I assume they called the police officer of
Nacogdoches yesterday to say that that error, that lack of
credibility runs in my client's favor, and so it wasn't a
problem to make the disclosure.  I'm not really sure why they
called him other than that.

     But he said that she was -- he thought she had a lack of
candor based on her body language versus what she said.  And so
if you -- if you assume that that sort of ran in my client's
favor, I understand how the Government makes that argument.
But the difficulty, Judge, is that once you are not truthful or
you're not candid across the board -- I mean, we typically give
jurors an instruction that if you're false in one thing, you're
false in many -- you could be false in many things.  And while

1  that's not an -- it's an inference that's drawable, it's not an

2  inference that's required.

3      But I do think that because there's an issue with her

4  credibility and because there was no effort to address it at

5  all -- I mean, had the officer taken --

6          THE COURT:  Well, Trooper Nicholson interviewed the

7  alleged victim at that point; right?

8          MR. SHEEHAN:  Yes.

9          THE COURT:  After this report from Officer Lee.

10         MR. SHEEHAN:  Yes, he did, Judge.

11         THE COURT:  And he made his own assessment about her

12  as a potential witness, complainant, whatever title she should

13  have had at that point in time; right?  That -- that was --

14  that was what I took from the testimony of yesterday.

15         MR. SHEEHAN:  Yes, he did.

16         THE COURT:  Okay.

17         MR. SHEEHAN:  But I still think that because he

18  bothered to write in the report, his own report --

19         THE COURT:  Absolutely.

20         MR. SHEEHAN:  And I'm going to say that if you take

21  those two paragraphs out of his report --

22         THE COURT:  Uh-huh.

23         MR. SHEEHAN:  -- and they were in a proper affidavit

24  and then there's a warrant issued, then a judge -- if Judge

25  Shaffer had then concluded that there was no problem with him

1  issuing a warrant despite the disclosed lack of credibility,

2  then I think that -- I am actually confident that I wouldn't

3  have an issue here at all.  That would be un- -- something I

4  could not get into.

5          THE COURT:  Right.

6          MR. SHEEHAN:  It would never make a *Franks* issue.

7  And so -- and that kind of disclosure is the attaboy on the

8  good faith of the officer for having, I'm going to say, thrown

9  up or fully disgorge the information at his hand.  And that he

10 did not do in this case.  And I think that that gets us to the

11 *Franks* issue in this case.  All right.

12         THE COURT:  And I just want to make sure I've got it,

13 counsel.  That is your belief of the substantial showing

14 required to unlock the next steps of a *Franks* analysis.

15         MR. SHEEHAN:  Yes, sir.

16         THE COURT:  Okay.

17         MR. SHEEHAN:  It's also true in this particular case

18 that the warrant information is stale.  The offi- -- the young

19 lady who was giving information in 2021 was 21 years old.  She

20 was talking about information that was substantially in the

21 past; at a minimum, it was while she was a minor.  So it's

22 three years earlier, okay, when she was -- just before her

23 18th birthday.

24     The reality is that if you look at the warrant -- I'm

25 going to call it the digital warrant -- issued subsequently in

1  Preston County, the complaint there is that Mr. Seeger

2  committed a violation in 2014.

3      So, arguably, now we're talking about pictures that are as

4  much as seven years old.  Okay?  And in which she said to the

5  officer that she didn't know if Seeger had any such documents,

6  if he'd kept any of those documents.  And so all of that

7  underlies whether there really would be probable cause to do

8  so.  All of that has to rest on the affidavit language that

9  says, "It's my experience as an officer that people keep stuff

10 and keep it for long periods of time."

11     I'm not sure that that's enough.  I do think that it's

12 a -- it raises a staleness issue that is pretty significant.

13     There's the address problem.  And if there's no good -- if

14 you don't get to good faith, you can't solve that problem under

15 *Thomas*.

16         THE COURT:  Explain to me what you mean by the

17 address problem.

18         MR. SHEEHAN:  Oh.  He asked for a warrant to search

19 310 Hilltop Drive.

20         THE COURT:  Okay.

21         MR. SHEEHAN:  Nowhere in the affidavit does it say

22 that that is Mr. Seeger's residence.

23         THE COURT:  Okay.

24         MR. SHEEHAN:  And so the only reason to search

25 310 Hilltop Drive would be if that had some nexus to Mr. Seeger

1  that was outlined in the four corners of the affidavit.

2       And so in the *Thomas* case, where they say you can solve

3  that problem with good faith, they also seem to say to me that

4  that is a historical defect in the issuance of a warrant.  And

5  so the case supports my analysis of this defect.  The case says

6  to me I don't get any relief if there's good faith.  And so I

7  have to -- there's some path in there where, if there is no

8  good faith, then it, in fact, is a defect.  Okay.

9       Trooper Nicholson then divides his search -- he talked

10  about the physical search.  And in this regard I think he was

11  referring to seizing the six electronic devices he ended up

12  seizing.  Then he talks about getting a warrant to do the

13  search of that material for its digital content.

14       Pretty clearly, if the search that allowed the securing of

15  those six electronic devices is defective, then the search for

16  the digital information is fruit of the poisonous tree.

17            THE COURT:  Right, right, right.

18            MR. SHEEHAN:  We don't really need to do a lot of

19  analysis of the second warrant.  But I do want to say --

20       And I was a little surprised by the officer's testimony.

21  Because we have questioned whether he could get a warrant in

22  Preston County to actually search material in Monongalia

23  County.  Now, his explanation was that he repossessed those six

24  items in Preston County from the evidence locker.

25            THE COURT:  Uh-huh.

1          MR. SHEEHAN:  That's not a search.  And in fact, he

2    couldn't do the search.  I mean, he needed the technical

3    experience of the people in Morgantown --

4          THE COURT:  Right.  To do the --

5          MR. SHEEHAN:  -- which is in Mon County, to actually

6    do the search.

7          THE COURT:  -- data extraction.  Right.

8          MR. SHEEHAN:  Right.  And so we think that the

9    warrant to do the extraction should have been issued in

10   Monongalia County and that that is, again, a flub-up in this

11   particular case.

12         THE COURT:  Okay.

13         MR. SHEEHAN:  The -- I will say this.  Pretty

14   clearly, the Court knows this.  The court in Preston County has

15   no jurisdiction to order anything to be done outside the

16   county.

17      The information search was delayed.  The digital search

18   was delayed.  We believe that's a problem.  My client was

19   entitled to get his data back if it wasn't properly seized and

20   to do that promptly.  And the delay in executing that -- the

21   digital search was a problem.

22      Now, I do -- I was a little surprised, and this threw me

23   off.

24         THE COURT:  The delay in the digital search.  How --

25         MR. SHEEHAN:  It's about -- it's about -- the

 1  materials are seized on March 29.

 2           THE COURT:  Uh-huh.

 3           MR. SHEEHAN:  And I think the digital search is

 4  April 19th.  So it's a 20-day delay before they get around to

 5  doing the next step of their investigation.

 6           THE COURT:  Okay.

 7           MR. SHEEHAN:  And that is some deprivation of my

 8  client's possessory --

 9           THE COURT:  But how does that rise to the level that

10  requires this Court to exercise its authority to provide a

11  remedy under the Fourth Amendment?

12           MR. SHEEHAN:  We think that the withholding of that

13  information is a -- it's an independent Fourth Amendment

14  violation, Judge.

15           THE COURT:  Okay.

16           MR. SHEEHAN:  All right.  The other thing that

17  surprised me that Officer Nicholson said, he did not seize all

18  the electronic devices that were called for to be seized in the

19  warrant.

20      Now, again, this is one of those odd things to say.  But

21  the officer did not do what he thought the warrant commanded

22  him to do, which is to seize all the electronic devices on

23  site.  Now, arguably, that cut in my favor, because he didn't

24  take a device.  But at the same time, to me, it represents a

25  flouting of what he thought was court authority.  Because a

1   warrant says go do stuff.  The reason we distinguish general
2   warrants from valid warrants --
3            THE COURT:  Constitutional warrants.
4            MR. SHEEHAN:  -- valid warrants --
5            THE COURT:  Right.
6            MR. SHEEHAN:  -- is that we do not leave to the
7   discretion of the officer what to take.
8        And so here the officer I think was exercising discretion
9   that it was not his to exercise, and I think that that is a
10  problem that impacts the viewing of good faith in this
11  particular case.
12           THE COURT:  Sure.
13           MR. SHEEHAN:  Now, the question that you have
14  really -- I think is at the heart of your concerns is where are
15  we with the lack of a warrant and the whole thing and how does
16  this relate to *Leon*?  And I think I may be the only lawyer in
17  the room who practiced before *Leon* was the law.  It is a long
18  time ago, and I have lived with that for a long time.  I was
19  chatting about that with Mr. Dyer, and he confirmed that he had
20  come to practice somewhat afterwards.
21       And so the -- in 1983, the -- I'm -- I -- this case is a
22  winner for the defense.  In 1984, *Leon* changes the character.
23  And basically what *Leon* says is that -- we were trying to stop
24  use of the exclusionary rule where the police officers made
25  technical mistakes.  Okay?  And so, like I said, the address

23

1   issue, a technical kind of mistake.  It's a very simple one to

2   define.

3        But in this particular case, if you're trying to -- the

4   theory behind the exclusionary rule was that we're going to

5   exclude evidence in order to make the police better educated

6   moment by moment so that, ultimately, we understand how the law

7   works and they do a better job.

8             THE COURT:  Uh-huh.

9             MR. SHEEHAN:  If, in this case, you were to say,

10  yeah, you thought about getting a warrant; you didn't really

11  get one; it sort of says this; you executed it in part; you

12  really -- there's some staleness issues, and we're going to

13  overlook all that and still find good faith, then, Judge, I

14  think we have used the good faith exception to really

15  eviscerate everything that's left in the Fourth Amendment.  And

16  so that is --

17            THE COURT:  There are some law review articles that

18  take the same position.

19            MR. SHEEHAN:  And so -- well, this is -- I have to

20  say I've been practicing a long time.  Mr. Dyer and I talked

21  about this at some length.  And while we have a good bit of

22  experience before the -- for the bar, this is one of the more

23  extreme problems with a search that I've ever encountered.  And

24  I --

25       You know, there's no warrant.  And then we've started to

1  articulate some difficulty.  And so that -- all in all, that
2  gives me great pause.
3       I know you can't do this.  But if I don't ask, I can't ask
4  a higher court later.
5            THE COURT:  Understood.
6            MR. SHEEHAN:  So, Judge, I would suggest that if
7  that's going to be the outcome under *Leon*, then *Leon* itself
8  needs to be revisited.  I know you appreciate exactly why I've
9  made those comments and the other comments that preceded it.
10 And so that's really where I am.
11      If there's other questions you have, Judge, I'm happy to
12 address them one on one.  But I hope that in the banality of
13 what I've said, I've addressed everything that you've asked
14 for.
15           THE COURT:  No.  You have.  Thank you, sir.
16           MR. SHEEHAN:  Thank you.
17           THE COURT:  Ms. Crockett.
18           MS. CROCKETT:  Thank you, Your Honor.  Thank you for
19 highlighting my argument, which is form over substance.  I
20 appreciate that.
21      Let me start by just saying that, Your Honor, we didn't --
22 we're not trying to suggest to the Court that the search
23 warrant is missing in this case because of the expungement
24 proceedings.  We just knew that there was a way to get behind
25 the clerk file, which was why we asked the Preston County

 1  Prosecutor's Office to seek those records.  So I don't want the
 2  Court to think that we're suggesting to the Court that it's
 3  Mr. Seeger's fault we don't have a search warrant.
 4         THE COURT:  No.  And I --
 5     No.  I would never intuit that or infer that.  And I'm
 6  sure it's addressed, but just so it's fresh:  The application
 7  was found via the efforts to access the sealed expunged file.
 8  Is that correct?
 9         MS. CROCKETT:  Your Honor, we actually had in our
10  discovery already the affidavit and complaint for search
11  warrant --
12         THE COURT:  Okay.
13         MS. CROCKETT:  -- and didn't -- none of us --
14         THE COURT:  Okay.
15         MS. CROCKETT:  -- recognized that the search warrant
16  wasn't there until we received a motion to suppress.
17         THE COURT:  Okay.
18         MS. CROCKETT:  So that was how we learned of it.
19     When the State dismissed its case and it bundled up its
20  discovery, it provided it to the FBI as they had it.
21         THE COURT:  Okay.  All right.
22         MS. CROCKETT:  And so we went on a mission to search
23  for the search warrant.
24         THE COURT:  Okay.  So the effort to pierce the seal,
25  for lack of better term, via the expungement statutes was to

 1  try and find the actual warrant itself.

 2          MS. CROCKETT:  That's right.

 3          THE COURT:  Okay.  All right.  Understood.

 4          MS. CROCKETT:  That's right.

 5          THE COURT:  Okay.

 6          MS. CROCKETT:  And the officer, you know, went to his

 7  agency to see if he could get it that way, and he couldn't.  He

 8  couldn't access it from his computer.  The Court heard all the

 9  testimony related to that.  We made those efforts.

10      Okay.  So let me start by agreeing with the Court and

11  agreeing with defense counsel we don't have a document that

12  says "Search Warrant."  We're not disputing that.

13      What we are disputing is whether or not we have a warrant

14  to search.  And the Court heard testimony from Trooper

15  Nicholson that this is the first search warrant he had ever

16  sought in circuit court.  In their efforts, seeing this as a

17  serious case, they sought to go to a court of record.  He

18  didn't understand what a court of record meant.  But

19  regardless, following his detachment commander, that's what he

20  did.

21          THE COURT:  Uh-huh.

22          MS. CROCKETT:  And I think in their efforts to be

23  overzealous in doing things right, now we have a situation

24  where we don't have a search warrant.  That's one scenario.

25      Another scenario is -- is that listening to the testimony

1  of Judge Shaffer, who says it's his practice to always sign
2  both documents and then hand them to the judge -- or hand them
3  to the officer and then take them to the clerk, Trooper
4  Nicholson believed that, while he was waiting for those
5  documents, the search warrant and the affidavit would be part
6  of the packet provided to him.  And he acted believing he had
7  authorization to search.

8      The Court also heard Judge Shaffer say, you know, my
9  signature on that document tells me he had authorization to
10  search.

11          THE COURT:  Right.

12          MS. CROCKETT:  So the question really is:  If we
13  don't have the physical document in our hand, does that mean
14  that the officer is not authorized to search?  And we believe
15  that the document is, again, an example of form over substance.
16  He, in fact, was authorized to search based on the facts of
17  this case as they came out before the Court.

18      I didn't see any cases that suggested to me that if we
19  didn't have the actual warrant in our hand it meant the Court
20  couldn't get to good faith arguments.  And we believe that the
21  Court can find good faith in this case.  We believe that *Leon*
22  is satisfied.  This isn't before 1983, and so the Government
23  does get the benefit of *Leon* if it applies.  And so, you know,
24  the question is whether or not it applies.

25      The exclusionary rule I think is -- is -- it's an

 1  extraordinary remedy.  I think it's not to be used in every

 2  case.  Suppression is appropriate when, and only when, its

 3  substantial social costs are outweighed by the benefits of

 4  deterring deliberate, reckless, and grossly negligent

 5  misconduct.  And I don't think the Court has that here.  I

 6  think Trooper Nicholson testified credibly.

 7       You know, does the Government want to stand before the

 8  District Court and say we don't have a physical warrant in our

 9  hand?  No.  These aren't the ideal facts.  But the fact that we

10  don't have it, I think, doesn't mean that he wasn't authorized

11  to do his search.  I think it is an example -- his testimony

12  was an example that the actions weren't deliberate, that they

13  weren't reckless, they weren't grossly negligent.

14       Also, when a warrant states -- I want to go to a couple of

15  their arguments specifically to the warrant itself.  Assuming

16  the Court accepts my argument that we have a warrant here, then

17  they do have a few challenges to the warrant itself.

18            THE COURT:  Well, let's talk about that before we get

19  into assumptions or hypos.

20       Can the Court infer the existence of a warrant?  Let me

21  start that again.  Is it constitutionally permissible for a

22  Court to infer existence of a warrant based on the record

23  before it?

24            MS. CROCKETT:  Your Honor, I believe that it is under

25  these facts.  What -- so an affidavit -- we heard testimony

 1  about this.  An affidavit sets forth probable cause.  And it
 2  has various elements throughout it.
 3      The warrant mirrors the affidavit.  But what it doesn't --
 4  what the warrant has that the affidavit doesn't have is the
 5  command to search; right?  So we're talking about that one
 6  little sentence that is right next to the judge's signature.
 7      The affidavit also bears the affiant's signature, and it
 8  bears the signature of a neutral and detached magistrate.  And
 9  so in this case -- I was going somewhere else, and I changed
10  my -- my --
11          THE COURT:  Sorry.  My fault.
12          MS. CROCKETT:  -- changed my direction.  So let me
13  just get my bearings.
14      The Court asked me constitutionally.  Because the
15  affidavit has all the information that the search warrant has
16  on it, but it's missing that command language, I argue to the
17  Court that Trooper Nicholson received the command to search.
18      So he takes to Judge Shaffer the affidavit.  He swears it
19  out.  Don't know what the issue is with the search warrant.
20  Because I don't think we can tell the Court specifically what
21  happened with regard to why we don't have a search warrant.
22  But he told Trooper Nicholson, "You're good to go.  Take the
23  documents down to the clerk's office, and you'll get what you
24  receive in order to execute that warrant."
25      And so he received a command --

```
 1              THE COURT:  Mr. Sheehan, I want to make sure there's
 2    no dispute.  And I'll take a look at the transcript.  But Judge
 3    Shaffer's testimony was he never signs one; he signs either
 4    none or both documents.
 5              MS. CROCKETT:  That's right.
 6              THE COURT:  Is that your recollection?
 7              MR. SHEEHAN:  Yes, sir.
 8              THE COURT:  Okay.
 9              MR. SHEEHAN:  I think it was pattern and practice was
10    his testimony.
11              THE COURT:  Understood.
12              MS. CROCKETT:  That's my recollection as well.
13              THE COURT:  And I realize that merely is a practice,
14    which requires this Court to make inferences therefrom, which
15    was my question.  Can I even do that?
16              MS. CROCKETT:  Right.
17         And Your Honor, I don't know if Trooper Nicholson, you
18    know, believed that that second document would be signed by the
19    Judge and provided to him.  I don't know the -- I don't know
20    what his thought process was on that.  I know that he believed
21    that when he left the courthouse that day he had a search
22    warrant in his hand.  And I know, based on Judge Shaffer's
23    testimony, he authorized Nicholson to search.
24              THE COURT:  Right.
25              MS. CROCKETT:  So I believe he had both -- all of the
```

1  factors that are laid out in the affidavit for -- affidavit and
2  complaint for search warrant, and he had the command that would
3  have been listed on that warrant itself from Judge Shaffer.

4      The other issues, if the Court will indulge me just a
5  minute --

6          THE COURT:  Uh-huh.

7          MS. CROCKETT:  They raised some issues with regard to
8  nexus.  And the Court heard testimony that -- and the affidavit
9  shows that it was searching the residence at 310 Hilltop Drive
10 near Bruceton Mills in -- within the Northern District of West
11 Virginia in Preston County; that in his experience, you know,
12 devices of this sensitive nature, you know, subjects want to
13 keep it close to them.  They want to keep it private.  And so
14 the residence was where he chose to search.  So that was listed
15 on there.

16     Regarding issues about the credibility of K.S. and whether
17 or not we've reached the threshold where a *Franks* hearing is
18 required.  The Government doesn't believe we've reached the
19 threshold where a *Franks* hearing is required here.  Trooper
20 Nicholson --

21         THE COURT:  Well, I don't believe so either.

22         MS. CROCKETT:  Okay.

23         THE COURT:  I don't think there's a sufficient record
24 before the Court of the substantial showing that *Franks*, and
25 the Fourth Circuit progeny in particular, speak to, to call

1  into question the veracity or reckless disregard for veracity
2  in the application, given the record before the Court.  So I
3  don't think we have a *Franks* issue to talk about.  I don't
4  think we've unlocked the door to an actual *Franks* analysis or a
5  *Franks* hearing at this point.  My concern is that there is
6  simply no warrant.
7          MS. CROCKETT:  I'm sorry?  There is simply no
8  warrant?  Yeah.
9          THE COURT:  But my concern is there simply is no
10  warrant.
11          MS. CROCKETT:  Yeah.  Again, Your Honor, I understand
12  what the Court is saying.  Again, I didn't see any cases that
13  suggested that the absence of the warrant itself, particularly
14  under these facts, meant we couldn't even get to a good faith
15  argument.  I do believe that *Leon* applies if the Court finds
16  that there is no warrant in this case.
17      Regarding overbreadth, because it's another issue that was
18  raised in the motion to suppress, if the Court would just
19  indulge me for a second.  I don't believe that the affidavit,
20  which would have been what was included on a search warrant,
21  has any overbroad language in it.  It does reference nude
22  photographs of minors or juveniles.
23      This is a case that involved a minor sending images of
24  themselves to Mr. Seeger.  So the possibility that he might
25  have printed those images, I don't think it's overbroad to look

1   for images that would constitute CSAM.

2       As far as it relates to all other evidence, I think, of

3   distribution or exhibition of minors engaged in sexually

4   explicit conduct, I don't believe that that provides for, like,

5   general exploratory rummaging of Mr. Seeger's belongings.  The

6   fact that it says "any and all evidence" is qualified by the

7   rest of the sentence which restricts any and all evidence to

8   that evidence of sexually explicit material involving minors.

9   So I think it specifically tailors or narrows the search with

10  regard to that, those devices.

11      Staleness.  I don't recall that being an issue that was

12  raised in the suppression motion.  But Trooper Nicholson,

13  nevertheless, testified, in his experience, individuals who

14  maintain this type of -- this type of material store and save

15  them.  And so I think, you know, even though some time had

16  passed from when she was a minor, the fact that she is

17  disclosing that she is required to send sexually explicit

18  images and videos of herself to Mr. Seeger, there's reason to

19  believe that those images would still be maintained on any

20  devices that were contained in the affidavit.

21      The secondary warrant, Your Honor.  It's -- my practice as

22  a state court prosecutor was that we would do one search

23  warrant that would authorize search and seizure and review of

24  items.  Since I've been in -- you know, in the prosecutor's

25  office here in federal court, it's always been the practice to

1  get a secondary warrant.  And the secondary warrant always is

2  issued in the location where the devices are located at the

3  time you seek the warrant.  And so, in this case, the devices

4  were located in the evidence room in Preston County.  They

5  sought the warrant in Preston County, and then they transported

6  the images where they needed them to be.

7      I've had cases where we get the devices in the location

8  where the devices are located and then we ship them to

9  Pittsburgh or we ship them to Charleston or we ship them

10  somewhere where there's a digital forensic analyst available

11  who can -- who has the time in order to analyze those devices.

12  So I -- you know, we believe that it's -- it's accurate that

13  we -- that that warrant was sought through Preston County.

14      I mean, I think the only -- I think the real issue for the

15  Court is going to be the warrant.

16          THE COURT:  I would concur.

17          MS. CROCKETT:  Yeah.  And again, you know, of course,

18  we wish we had a document in front of the Court and we weren't

19  here, you know, arguing this.  But I don't think that that

20  negates that Trooper Nicholson's reliance in good faith on the

21  fact that he had a warrant was the authorization he had to

22  search Mr. Seeger's residence on March 29th of 2021.

23      Is there any other question the Court might have?

24          THE COURT:  I do not believe so.

25          MS. CROCKETT:  Okay.  Thank you, Your Honor.

1           THE COURT:  Thank you.

2      You get last word, Mr. Sheehan.  Not to make you get up

3  again.

4           MR. SHEEHAN:  No.  I'm good.

5      I'm going to restrict my remarks really to, I think, the

6  Court's focus on the warrant question.

7      When the warrant was executed, there was introduced some

8  body camera footage.  We didn't actually look at it in court,

9  but it's here in evidence.  We would suggest that the Court

10  look at that body cam -- at that footage at the six- and

11  seven-minute marks.  The -- at that point in time, there's some

12  interplay between Mr. Seeger and the officer.  And Mr. Seeger

13  asks if there's a warrant.  The officer has something in his

14  hand.  It is pretty clearly the affidavit.  I can't tell you

15  what's on page 2, but it does look like it's a three-page

16  document, and that affidavit is a three-page document.

17      The officer ends up saying, "I will show it to you at the

18  end."  And I think the inference I would draw is that he didn't

19  have a warrant and he knew he didn't have a warrant and that he

20  was bluffing.

21           THE COURT:  So *Mapp v. Ohio*.

22           MR. SHEEHAN:  Well...

23      And so I will concede, Judge, he doesn't have to have the

24  warrant in his hand.

25           THE COURT:  Right.

1        MR. SHEEHAN:  The warrant could still be back at the

2   ranch.  But I think the warrant has to exist.  And I think

3   that -- and to me that's -- it is a useful piece of inference

4   that draws the in- -- that helps you draw an inference the way

5   that we think it should be drawn and not as the Government is

6   suggesting to you.

7        The -- I will simply comment that Ms. Crockett has

8   suggested that the lack of a command to go do a search is a

9   little detail.  It is certainly in the fine print in the

10  preprinted orders.  I would say it is a crucial part of what,

11  in fact, is a warrant.

12       And I'd also note -- and I think that -- I respect the

13  troopers, and everybody has to start somewhere.  I know I did.

14  But the *Leon* contemplates that we have well-trained police

15  officers.  And if this officer was inadequately trained and

16  didn't understand these basic rules, then I have some problems

17  with this.

18       I would comment on the nude pictures just briefly.  I

19  cited a case that said nude pictures are not enough.  They have

20  to be nude pictures of minors engaged in sexually explicit

21  activity.

22       And with that, I will shut up, Judge, unless you have some

23  questions.

24       All right.  Thank you.

25            THE COURT:  No, sir.  Okay.

```
 1            MS. CROCKETT:  Your Honor, can I just comment briefly
 2    on the first comments by defense counsel?
 3            THE COURT:  Motion for surreply granted, briefly.
 4            MS. CROCKETT:  And Your Honor, that was just that the
 5    officer knew that he didn't have the warrant at the time.  He
 6    gave you a minute mark to look at at the body-worn camera, and
 7    that's because he knew he didn't have a search warrant.
 8        Your Honor, Trooper Nicholson was on the stand yesterday,
 9    and he could have asked him those questions directly.  And to
10    suggest that to the Court now, I think he's speculating as to
11    why he held those documents.  And speculation isn't necessary.
12    He asked for a copy of the warrant, and Trooper Nicholson told
13    him that he was going to leave him a copy but he was going to
14    hold on to it because he was writing on the property receipt
15    those items that he was seizing.  And then when he left that
16    day, he left Mr. Seeger with a copy of the document.
17        So to suggest that he was bluffing or he was waffling, I
18    just don't think that that's genuine.
19            THE COURT:  You get last word, Mr. Sheehan, if you
20    want it.
21            MR. SHEEHAN:  I think she's fairly presented it, and
22    I think I have as well.  And I think that you can -- you have
23    the hard job.  You have to draw the inferences and you have to
24    make the legal decisions in this particular case.
25            THE COURT:  Understood.  Okay.
```

1       All right.  We'll keep stewing on that issue.  There was

2   the notice of *Kennedy* evidence.  Is there any objection or

3   anything on that from the defense?

4            MR. DYER:  Your Honor, could I consult with counsel

5   briefly?

6            THE COURT:  You may.  And I'll posit this, because I

7   know the notice is submitted as sort of an alternative.  I --

8       Go ahead.  Go ahead.

9       (Pause in proceedings.)

10           MR. DYER:  We have no objection, Your Honor.

11           THE COURT:  Okay.  All right.  We'll assess that

12  evidence as it comes.  But let's -- let's sort of workshop it

13  in advance.  I know the Government's primary position is that

14  it is intrinsic evidence and, therefore, wouldn't be subject to

15  a 404(b) analysis.

16       Mr. Salem, is this your issue, sir?

17           MR. SALEM:  Yes, Your Honor.

18       So does Your Honor have a copy of the exhibits up there?

19  I can provide additional ones to the Court if --

20           THE COURT:  I do not, handy, but it's --

21           MR. SALEM:  Okay.

22           THE COURT:  -- it's okay.  Just reference them clear

23  enough for the record.  We can --

24           MR. SALEM:  Understood.

25       So we're moving the admission -- or a pretrial ruling on

1   the admission of 13 specific exhibits.  Just to get one out of
2   the way, we had marked Exhibit 2.  Exhibit 2 is three clips
3   taken from what is also marked as Exhibit 1.  We're not going
4   to be using those at this point.
5           THE COURT:  Okay.
6           MR. SALEM:  So Exhibit 2 is out.  We're just simply
7   using the full phone call, which is Exhibit 1.
8       I'll just kind of tick through them as we go.
9       Exhibit 1 is the phone call we heard about between
10  Keith Lee and the defendant from March 22nd of 20- --
11          THE COURT:  Right.
12          MR. SALEM:  -- 2021.  Our argument is that that is
13  intrinsic to the crime.  It's how the whole thing started to
14  begin with.  He also makes a number of statements --
15          THE COURT:  It's how the investigation starts.
16          MR. SALEM:  It --
17          THE COURT:  Not necessarily the crime itself; right?
18          MR. SALEM:  Correct, Your Honor.  It's how the crime
19  itself is discovered, how it comes to light to law enforcement.
20      He makes a number of statements in that that sort of
21  corroborate, to some degree, what the victim in this matter,
22  the original victim, JD2, says to the police; acknowledges the
23  existence of a relationship; and although he doesn't make any
24  admissions regarding underage photographs, certainly does make
25  a number of admissions about other photographs and the

1  existence of the relationship.  And that gets the ball rolling

2  on all of this.

3      We don't really believe -- I mean, my argument would be

4  that there's nothing really prejudicial in it at all.

5  Certainly, he's sort of providing a defense to the charges

6  presented here.  We do believe it's highly relevant because,

7  again, it's how the criminal investigation starts behind this.

8  So we would ask that the Court admit that as *Kennedy* intrinsic

9  evidence.

10     Exhibit 3 --

11     Again, Exhibit 2 we're not moving the admission of.

12     Exhibit 3 -- Exhibits 3 through 13 all deal with items

13  that were taken from the -- I call them "phone dumps" or

14  "computer dumps," the items that were seized in the search

15  warrant.  Two of those resulted in having items of CSAM, and

16  other evidence relevant to the charges here, taken off of them.

17  That was an LG Nexus cell phone and a MacBook Pro that again

18  were seized from his house during the search warrant.

19     Specifically, Exhibit 3.  There's going to be testimony

20  that one of the applications that he used to communicate with

21  his victims and sort of recruit victims is an application

22  called Kik.  It's basically just a variety of messaging apps.

23  The Court may be familiar with it.

24     Found on those devices was a Kik conversation.  This --

25  Exhibit 3 relates specifically to Count Three, which was the

1  solicitation count.  It involves K.S., who is also known as

2  JD2.  These conversations themselves relate specifically to the

3  date in question for Count Three, which are May 26, 2014.

4     In that, he specifically solicits underage photographs.

5  And in it, that is where he also finds out her true age.  This

6  is within, I believe, weeks of them meeting.  She tells him

7  that her birthday is coming up.  He states that he believes

8  that she's going to be turning 18, at that point acknowledging

9  that he knows she's 17.  And further in the conversation she

10  says that she's actually going to be 15 -- or that she's

11  turning 16, acknowledging that she's 15 at that point.

12     His reaction in those conversations is not sort of, "Oh,

13  my goodness.  This isn't right.  We need to stop talking."  At

14  that point in time he then proceeds to -- what he terms as

15  "punish her," requesting nude photographs from her, at that

16  point having learned that she is, in fact, underage.

17     So this is even sort of beyond intrinsic.  It is the crime

18  itself.  It's him actually soliciting CSAM materials from the

19  victim charged in Counts Three and Four.  That is Exhibit

20  Number 3.

21     Exhibit Number 4 is two images of JD2, also known as K.S.

22  In these, we see her.  These are reference to the images

23  requested in Exhibit 3.  These are her sending those images

24  which make up Count Three to the defendant.  In those images we

25  can identify them as such, as referring to Exhibit 3, because

1  he also asks her to write statements on her, including

2  "Steven's slut" on her stomach.  She took photographs of that,

3  sent those to him as requested in Exhibit 3.  Those are

4  Exhibit 4.

5      So, again, intrinsic.  It is the crime itself, the counts

6  involved.

7      Count Five is another item.  It is actually five

8  individual pictures of CSAM materials.  Those are involving

9  P.G., also known as JD Number 1.  These relate to specific

10 requests that he made of her that we will hear.  I'd proffer to

11 the Court there will be testimony from P.G. regarding requests

12 that the defendant made of her, knowing that she was underage,

13 specifically inserting specific objects into herself.

14     This is a theme that plays itself out throughout a number

15 of conversations both with her and with other victims,

16 conversations of which are included in other exhibits.  And I

17 listed them for the Court because it is relevant, because it

18 does repeat over and over again.  But those specific objects

19 that were requested to be inserted included a hairbrush and a

20 marker.  And there are also videos included in some of the

21 accounts -- sorry -- in some of the counts that refer

22 specifically to those objects.  So, again, we're arguing that

23 Exhibit 4 and Exhibit 5 are, in fact, intrinsic.

24     Exhibit 6 is -- refers to Counts One, Two, and Five.  It

25 involves a single image of CSAM involving KD1 [sic]; again,

1   P.G.  In that, she has "kitten" written on herself.  We're
2   arguing that this is intrinsic because it relates to Count One
3   and Two.  It involves the same victim.  Also Count Five,
4   because that involves possession of CSAM.

5        Additionally, even if the Court were to find that it was
6   not intrinsic, it relates to a common scheme throughout many of
7   these conversations.  And we'll hear testimony from both P.G.
8   and K.S. that "kitten" was a name that he repeatedly used for
9   his victims throughout the conversations and throughout the
10  relationships they were involved in with him.  So, again, it
11  shows a common scheme, motivation that he took throughout this.

12       Exhibit 7.  This is where we're moving from more -- we're
13  not so much arguing that this is *Kennedy* evidence, but it's
14  404(b) in that it shows his intent and also commonality of
15  plan.  The reason we're arguing that is because these are
16  different victims not simply charged in the counts.  But they
17  are all from the same general time period, involving victims of
18  the same age, involving the same types of chat platforms,
19  common language.

20       A theme that is seen throughout almost all of the
21  conversations:  The defendant engages in sort of, for lack of a
22  better term, a fantasy with the victims where he terms himself
23  a master and refers to them as slave.  He has them refer to him
24  by name as master throughout these conversations.

25       Exhibit Number 7 involves specifically a female juvenile

1  who -- these happened June through September of 2013; again, in

2  the same time period as charged in the counts.  The counts

3  involve, I believe, a September 2011 into 2014 specifically.

4  And then, obviously, the possession of child pornography on the

5  date of the search warrant, which occurred in 2021.

6      But in these, again, repeatedly, he makes requests that

7  the victim, the person on the other end of the chat, write on

8  their stomach "Property of Steven."  Refers throughout those

9  conversations -- there's talk of master, slave, sort of a

10  subservient-type relationship.

11      Exhibit 8 is a similar chat.  In that, he refers to the

12  subject on the other end, who is Rosie White.  The chat

13  occurred between December of 2012 and January of 2013.

14  Throughout those chats, the victim, although she does not

15  identify herself by age, repeatedly talks about going to

16  school, mentions that she's on winter break at that time,

17  mentions that she's not going to be able to continue talking to

18  him as much because she has to return to school.  She also

19  repeatedly talks about classes that she's engaged in, including

20  algebra two and precalculus, classes that would be associated

21  with a high school age juvenile.

22      There's similar language involved in that.  Again, he

23  repeatedly refers to her as "kitten."  She refers to him as

24  "master."  He repeatedly, again, asks for her to write words on

25  her body, frequently including "Steven's slut."  And again,

45

1  that goes on for -- throughout December and January.

2        Exhibit Number 9 is a -- three images of CSAM.  They

3  relate to the conversations themselves and also the charged

4  counts in that they are images of juvenile females, also

5  including images of a vibrator and an individual -- what

6  appears to be a juvenile female with writing on their body.

7  Again, it goes under 404(b) to the commonality of plan.  He

8  keeps repeating this over and over again with different

9  victims.

10        Exhibit Number 10 is seven images, some of which are CSAM,

11  some of which are not.  Throughout those images -- actually, in

12  every single image the victims are holding up -- actually, I

13  believe Exhibit 10 is not CSAM.  I apologize.  We are riddled

14  with CSAM throughout this entire thing.  But the Court actually

15  has Exhibit 10.

16            THE COURT:  Uh-huh.

17            MR. SALEM:  Each one of those seven images involves a

18  juvenile subject.  Some of them refer specifically to K.S.,

19  also known as JD2, holding up signs that say "Property of

20  Steven."  Again, these images refer to the commonality of plan.

21        And specifically regarding K.S., which I believe are the

22  last two images.  In those, those refer to a person who was a

23  victim in both Count Three and Four, and also whose CSAM images

24  are included in Count Five, the possession of child pornography

25  count.

1    Exhibit Number 11.  Again, we're moving this.  I believe

2  it is *Kennedy* evidence because it does relate specifically to

3  Count Five.  It involves a mix of three CSAM images and four

4  non-CSAM images, again, with writing on the body.  Some of

5  these individuals were identified; some were not able to be

6  identified.  Again, though, it shows a commonality of plan,

7  same modus operandi over and over again.

8    That brings us to Exhibit Number 12, which is Kik messages

9  from -- these are from May of 2014, again relating specifically

10  to the same time frame that he's communicating with both P.G.

11  and K.S.  It shows again what his intent was at the time,

12  specifically, with these.  Because in these messages he's

13  speaking to underage girls.  In one of them, actually, I

14  believe --

15    Is it all right if I bring this up for the Court, Your

16  Honor?  Because I do think this one is important.

17    Are we able to bring up pages 6 through 9?  Or start with

18  page 6 of Exhibit Number 12.

19    And Your Honor, throughout this conversation he's

20  communicating with a female.  She refers to him as master.  She

21  brings up the fact that her birthday --

22    And can we scroll to the bottom of the page?  Is this

23  Exhibit Number 12?  Could you go to the next page?

24    And we have at the bottom --

25    Keep going down a little bit.

1      -- "Are you all right, master?"

2      He asks, "Why do you ask?"

3      "Just asking how you are, master.  You seem" -- "You seem

4  tense."

5      He replies, "Because you are 17."

6      She says, "Yes, I am, master."

7      "Your Twitter says you turn 15 on Saturday."

8      "I was afraid when you found out I was 15 you would stop

9  talking to me, master."

10      "I just" -- "I'm more concerned about the lying."

11      "I just lied about my age, I swear.  I know you probably

12  won't believe me now, master."

13      He refers to her as a "stupid slut."

14      She replies, "Yes, master."

15      He says, then, "Write what I said earlier on your

16  stomach."

17      "Yes, master."

18      "Show me.  I guess you got busy or don't want to take your

19  punishment for lying."

20      So, again, this specifically shows what his intent was at

21  the time.  He's clearly aware of the underage status of the

22  girls that he's talking to.  He continues to solicit

23  photographs of the nature which we see throughout the other

24  exhibits, where he's having them write on their body, having

25  them send CSAM images to him over and over again.

1       Exhibit 13 is a similar email interaction with a female by
2   the name of Reni Moore.  At that time he asks her specifically
3   whether or not she has ever, his term, "sucked a dick."  She
4   says no, and he asks why not.  She says, "Because I'm 14 years
5   old."  He then proceeds throughout that conversation to solicit
6   her to engage in sex acts with him.  So, again, all of these go
7   specifically to intent.
8       We do anticipate that based on Exhibit 1 and also
9   statements made throughout the body-worn camera -- the
10  defendant repeatedly states that he was not aware of the age of
11  the actual victims in this: K.S.  Obviously, he was not aware
12  of the allegations at that time involving P.G.  But it does --
13  we, as an element of these offenses, have to show that he had
14  reason to believe or in fact believed that the individuals he
15  was receiving pictures of and engaging with in these actions
16  were under the age of 18.  And again, these are on point and
17  show directly his intent and what his belief was in relation to
18  that.
19      The final exhibit, Exhibit Number 14, is a CSAM image of a
20  third identified underage female.  It goes directly to Count
21  Five because, again, it is a CSAM image that was in his
22  possession, another identifiable victim that Agent Ryan was
23  able to establish the age and identity of.
24      In terms of all of these, as I stated, we believe there is
25  a valid reason for the admission of each of them under 404(b).

1      In terms of the 403 balancing that the Court has to
2  perform on top of that, each of them is highly relevant.  We
3  don't believe that the prejudicial value substantially
4  outweighs the probative value under the rule.  And we would ask
5  that the Court admit them in regards to this matter.
6          THE COURT:  Understood.  Thank you, counsel.
7          MR. SALEM:  Thank you, Your Honor.
8          THE COURT:  And no objection, Mr. Dyer?
9          MR. DYER:  Not at this time, Your Honor.  No, sir.
10          THE COURT:  Okay.  Understood.
11      The Court would grant the motion.  We'll treat it as a
12  motion.  I do believe the exhibits Mr. Salem identified are
13  intrinsic to the crimes charged in the indictment and,
14  therefore, are admissible under *U.S. v. Kennedy* and its
15  progeny.  Moreover, Rule 404(b) would also provide for their
16  admission for the reasons Mr. Salem stated.  The Court would
17  find that Rule 403 does not preclude admission under either
18  theory.
19      That is a pretrial ruling at this point.  If there is an
20  objection as trial develops, counsel, note it, and we can
21  revisit it on a case-by-case; or if there's a categorial or
22  broader objection, we can do it then.
23          MR. DYER:  Understood, Your Honor.  Thank you.
24          THE COURT:  Okay.  All right.  Any other motions we
25  need to talk about pretrial?

```
 1            MR. SALEM:  Not so much a motion, Your Honor, but we
 2   did provide notice of our intent to introduce the contents of
 3   both the LG Nexus cell phone and the MacBook --
 4            THE COURT:  Right.
 5            MR. SALEM:  -- as self-authenticating under 902(11)
 6   and (14).  There hasn't been an objection filed to that notice.
 7   I just wanted to make sure that we were all on the same page,
 8   because we don't plan to call the forensic examiner.  So...
 9            MR. SHEEHAN:  That's fine, Judge.  That's fine.
10            THE COURT:  Okay.  All right.  Without objection, we
11   would anticipate receiving that evidence, assuming other
12   predicates are established and satisfied.
13       Okay.  Any other motions -- obviously, other than the
14   suppression motion -- from the defense --
15            MR. DYER:  None from the defense, Your Honor.
16            THE COURT:  -- that you're aware of at this point?
17   Okay.
18            MR. DYER:  No.  No, sir.
19            THE COURT:  Okay.  We will get counsel, in
20   anticipation of next week, the Court's planned voir dire and
21   our current, initial state of the charge - jury instructions,
22   the charge.  We will convene, as is my usual practice, at 9:00
23   on Tuesday, the 22nd, upstairs in the magistrate courtroom to
24   review the Court's planned voir dire and talk through it and
25   also take up any other matters that we may need to address
```

 1  before we come downstairs for jury selection.

 2      I know everyone has -- most everybody has been here for a

 3  trial.  I'll just -- I'll mention it next Tuesday morning.

 4  I'll mention it here as well today.  Of course, all of our

 5  prospective jurors will be here in the courtroom when we come

 6  downstairs from the third floor magistrate courtroom to here.

 7  Just be mindful of that as you come into the courtroom, that it

 8  will be full of our prospective jurors.

 9      The Court, of course, will conduct voir dire, and we'll go

10  from there.

11      If that process goes efficiently, then there is a prospect

12  we would get to opening statements before lunch.  I mention

13  that just for counsel's planning purposes; that we -- if we

14  have time, we would proceed directly to that.

15      One other just sort of logistical nightmare that is

16  inherent to our space here.  To the extent we need to have

17  individual voir dire with a prospective juror, we would most

18  likely go back into the jury suite to do that.  The space and

19  acoustics here at the bench are so poor that if you're more

20  than one person removed from the speaker, you can't -- you

21  can't hear.  And so, largely, what we've been doing is going

22  back to the jury suite to take up any individual follow-up or

23  responses or questions of a more private and confidential

24  nature.

25      I'll ask counsel Tuesday morning how long you request for

an opening statement.  I've learned some hard lessons.  They're

now treated as requests.  I don't think I've denied a request

yet since I transformed that process into a request for a time

allotment, reserving the right to do so.

If, as the trial progresses, we make revisions to our jury

charge, you will continue to receive updates during the course

of the trial.

Other logistical things:  Depending on the composition of

our jury, we usually start at 9:30.  As everyone knows, we draw

from a pretty vast geographic area for our jurors.  And if we

have folks coming from further points, I hate to inconvenience

their day by trying to start earlier.  We'll take that by ear.

Along the same lines, we'll run to somewhere between 4:30

and 5:00 every day, when we find a good spot to break, to

maximize out our time with our jurors.  But also, given folks

may have commutes of significance, I do hate to keep them here

too-too late.

I would ask counsel, of course, be in communication

throughout trial about expected witnesses, scheduling of those

witnesses, and the rest.  If there are any scheduling issues or

scheduling predicaments, please let us know, too, so we can be

prepared to deal with that as well.

Any sort of trial management or logistical questions from

the Government?

MS. CROCKETT:  Yes, Your Honor.  Last time I appeared

 1  before the Court in a similar case, the Court required to see

 2  the CSAM images before trial.  I don't know if the Court is

 3  making that same request, but we do have -- we have the images

 4  with us.

 5          THE COURT:  Not -- in that case there was evidentiary

 6  issues we needed to take up on this front.  At this point, no.

 7          MS. CROCKETT:  Okay.  How we handle the CSAM, Your

 8  Honor.  I'm assuming that what we will do is we will, you know,

 9  admit the images through individuals, but we will actually not

10  provide it to the clerk.  We will maintain it on a thumb drive

11  that will continue to be locked up throughout the case; if

12  there's a conviction, throughout appeal.  But it's my

13  understanding that we will maintain those images for the clerk.

14      Is that right?

15          THE COURT:  Any objection to that process and

16  procedure?

17          MR. SHEEHAN:  No, Judge.  I think that's great

18  procedure.

19          THE COURT:  Yeah.  We will follow that practice,

20  Ms. Crockett, yes.

21          MS. CROCKETT:  Okay.  And Your Honor, it would be my

22  preference to maintain all those images on one thumb drive so

23  that we don't have a lot of thumb drives --

24          THE COURT:  Might as well.

25          MS. CROCKETT:  Okay.

1          THE COURT:  Yes, might as well.

2          MS. CROCKETT:  Your Honor, I don't know if it's your

3   practice to ask if any pleas have been offered.  There was a

4   plea offered that was not accepted.  And then there was a

5   request for a conditional plea that expires at the close of

6   evidence on the suppression issue.  So just making the Court

7   aware of that.

8          THE COURT:  We'll get there.  Thank you, ma'am.

9          MS. CROCKETT:  Thank you.

10         THE COURT:  All right.  Any management or logistical

11  questions or issues from the defense?

12         MR. DYER:  Your Honor, actually, my understanding was

13  that the -- the opportunity to accept the conditional plea was

14  going to expire upon the rendering of a decision by the Court.

15  And hence, my question was going to be:  Does the Court have

16  any anticipation at this point at all as to when it -- that

17  decision may be rendered?  I mean --

18         THE COURT:  It is at the top of our priority list.

19  So we will work on that.  Could be as soon as today, but I

20  would anticipate tomorrow at the latest.

21         MR. DYER:  Thank you, Your Honor.

22         THE COURT:  If that changes as we continue our work,

23  we will let counsel know.

24         MR. DYER:  Understood.

25         THE COURT:  Yeah.  Okay.

1              MR. DYER:  Thank you.

2              THE COURT:  Any disclosures still outstanding from

3    the Government?  Discovery?  *Brady*?  *Jencks*?  *Giglio*?  Anything

4    at all?

5              MS. CROCKETT:  No, Your Honor.

6              THE COURT:  Okay.  Anything, counsel, you're aware of

7    that's not been provided?

8              MR. DYER:  I don't believe so, Your Honor, no.

9              MS. CROCKETT:  And Your Honor, if I could just

10   qualify that answer just for the record.  Much of the evidence

11   in this case isn't evidence that we could just turn over to the

12   defense.  So what we did was we made --

13             THE COURT:  Made it available?

14             MS. CROCKETT:  Yes.

15             THE COURT:  Okay.  That --

16             MS. CROCKETT:  And met with them on several occasions

17   for them to review the devices in their entirety.

18             THE COURT:  No.  Understood.  Understood.  Just

19   making --

20             MR. DYER:  Yeah.  They've been very forthcoming with

21   disclosure of the evidence.  I'll agree.

22             THE COURT:  Understood.  Okay.  Thank you.  Just

23   making sure there weren't any loose ends.

24        Okay.  Mr. Seeger, sir, can I ask you to stand so that

25   Madam Clerk can swear you in.  Thank you so much.

1    (Defendant sworn.)

2            THE CLERK:  Thank you.

3            THE COURT:  Thank you, sir.  You can take your seat,

4    Mr. Seeger.

5        Obviously, sir, you've been sworn in, so you are under

6    oath.  I do just have a couple questions for you.  But because

7    you're under oath, please keep in mind any false statements you

8    may make or false answers you give in response to any of my

9    questions, those can form the basis of a separate criminal

10   action against you for false swearing or for perjury.

11       Do you understand that, sir?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  All right.  If I ask a question or say

14   anything at all or for any other reason that prompts you to

15   want to have a conversation with your counsel, just let either

16   of those gentlemen know or let me know, and we'll take a break

17   so you-all can talk.

18       Do you understand that?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Okay.  My questions, sir, are about the

21   plea agreements that have been tendered to you.  I do not want

22   you, however, Mr. Seeger, to tell me about any of the

23   conversations you've had with either or both of your lawyers.

24   None of my questions are meant to get at substantive

25   conversations you've had with your lawyers.  No one, including

1  me, has a right to know anything that you and your lawyers have

2  talked about.  Those conversations and communications are

3  protected by the attorney-client privilege.  So I don't want

4  you to assume that I'm asking you a question that you need to

5  tell me about conversations you're had with your counsel.

6       Do you understand that, sir?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  Okay.  The Government indicates they've

9  made two different plea proposals to you.  Have you been made

10  aware of both of those plea proposals, sir?

11            THE DEFENDANT:  Yes.

12            THE COURT:  Okay.  And do you believe you've had --

13  up to now, anyway -- sufficient time to not only review those

14  plea proposals, but discuss them thoroughly with your counsel?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Okay.  Thank you so much, sir.

17       Anything else, Mr. Sheehan or Mr. Dyer, you believe I need

18  to cover with Mr. Seeger?

19            MR. SHEEHAN:  Not prior to trial, Judge, no.

20            THE COURT:  Okay.  All right.  Understood.

21       All right.  Anything else, then, from the Government at

22  this point?

23            MS. CROCKETT:  No, Your Honor.

24            THE COURT:  Okay.  From the defense?

25            MR. DYER:  Your Honor, I don't --

58

1              THE COURT:  Yes, sir.

2              MR. DYER:  I don't want to create an issue where

3     there is none.  But I didn't detect any response, verbally or

4     nonverbally, from Ms. Crockett when I brought to the Court's

5     attention that defense's understanding is that this plea offer,

6     this most recent conditional plea offer which would preserve

7     unto the defendant the right to appeal any adverse decision of

8     the suppression issue, was going to remain available up until

9     the point that the decision was made.  And I just want to be

10    clear about that.  Because, I mean, it's rather meaningless

11    otherwise.  I mean, we -- and that's what Mr. Seeger has

12    anticipated.  And frankly, that's what we'd told him that would

13    be the -- you know, the anticipation of that agreement.

14        Is there an issue?  I mean, that's -- is that going to be

15    an issue?

16             MS. CROCKETT:  I don't believe it's going to be an

17    issue, Your Honor.

18             THE COURT:  Well, I --

19             MS. CROCKETT:  I said --

20             THE COURT:  I'm not going to get involved in the --

21             MS. CROCKETT:  Okay.

22             THE COURT:  -- plea negotiations and discussions,

23    obviously.

24             MR. DYER:  Right.

25             THE COURT:  I'll leave that to your-all's

```
 1  conversations --
 2           MS. CROCKETT:  Thank you.
 3           THE COURT:  -- after we recess here this morning.
 4           MS. CROCKETT:  Thank you, Your Honor.
 5           MR. DYER:  That will be fine.
 6           THE COURT:  That's probably an overly cautious
 7  approach to that issue, but it's mine so far.  Okay.
 8           MR. DYER:  Understood.
 9           THE COURT:  I'll leave that to you-all.  All right?
10           MR. DYER:  Understood.
11           THE COURT:  We will continue our work on the motion
12  to suppress.  I realize where we are in terms of trial prep,
13  trial calendar, possible plea discussions, and all that.  It is
14  top priority.  I would anticipate tomorrow.  And if that
15  changes at all, we'll keep counsel posted.  Okay.
16           MR. DYER:  Thank you, Your Honor.
17           THE COURT:  All right.  We'll stand adjourned until
18  further order of the Court.  Thank you all.
19       (Proceedings concluded at 11:20 AM.)
20
21
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3       I, Rachel Kocher, a Registered Merit Reporter and Official

 4  Reporter of the United States District Court for the Northern

 5  District of West Virginia, do hereby certify that the foregoing

 6  is a true and correct transcript of the proceedings had in the

 7  above-styled action as reported by me stenographically, all to

 8  the best of my skill and ability.

 9       I certify that the transcript fees and format comply with

10  those prescribed by the Court and the Judicial Conference of

11  the United States.

12       Given under my hand this 6th day of June 2025.

13

14

15                                   Rachel Kocher
                                     _____
16                                   Rachel Kocher, RMR, CRR

17

18

19

20

21

22

23

24

25
```

**FILED**

MAY 1 2 2025

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301



**United States Department of Justice**

*RANDOLPH J. BERNARD*
*Acting United States Attorney*
*United States Attorney's Office*
*Northern District of West Virginia*

April 10, 2025

Thomas G. Dyer, Esq.
Dyer Law
349 Washington Avenue
P.O. Box 1332
Clarksburg, WV 26302-1332

     RE: *United States v. Steven Seeger* (1:24-CR-42)
        *Conditional Plea Agreement Amended 5/6/25*

Dear Mr. Dyer:

    This will confirm conversations with you concerning your client, Steven David Seeger, (hereinafter referred to as "Defendant"). All references to the "Guidelines" refer to the guidelines established by the United States Sentencing Commission, effective November 1, 1987, as amended.

    It is agreed between the United States and your client as follows:

    1.    Defendant will plead guilty to **Count One** charging **Coercion and Enticement of a Minor for sex**, in violation of Title 18, United States Code, Section 2422(b), and Defendant will plead guilty to **Count Four** charging **Production of Child Pornography**, in violation of 18 U.S.C. § 2251(a) and (e).

    2.    The statutory maximum penalty to which Defendant will be exposed by virtue of his plea of guilty to Count One is imprisonment for a period not less than 10 years and not more than Life, a fine of $250,000.00, and a term of at least 5 years and up to a lifetime of supervised release.

    The statutory maximum penalty to which Defendant will be exposed by virtue of his plea of guilty to Count Four is imprisonment for a period not less than 15 years and not more than 30 years, a fine of $250,000.00, and a term of at least 5 years and up to a lifetime of supervised release.

_____        5-12-25
Steven Seeger                      Date
Defendant

                                    5/12/25
_____        Date
Thomas Dyer, Esq.
Counsel for Defendant

                        - 1 -        5/12/25

It is further understood by Defendant that there is a special mandatory assessment of $200.00 (18 U.S.C. § 3013), **which must be paid within 40 days following entry of his plea** by money order or certified check to the United States District Court. It is also understood that Defendant may be required by the Court to pay the costs of his incarceration, supervision, and probation.

If determined to be applicable as a matter of law, Defendant is aware that, unless he is determined to be indigent, he will be required to pay an additional special assessment of $5,000.00 under the Justice for Victims of Trafficking Act, Title 18, United States Code, Section 3014(a)(3) and up to $50,000.00 for Amy, Vicky, and Andy Child Pornography Assistance Act under Title 18, United States Code, Section 2259.

3.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agree to a binding condition that each count shall run concurrent to one another and the sentence shall be capped at 30 years. The parties understand that if the Court does not accept the binding provisions of this paragraph, then Defendant will have the right to withdraw his plea of guilty.

4.    Defendant will be completely forthright and truthful with regard to all inquiries made of him and he will give signed, sworn statements and grand jury and trial testimony relative thereto. Defendant will agree to submit to a polygraph examination if requested to do so by the United States Attorney's Office for the Northern District of West Virginia.

5.    A.    Nothing contained in any statement or any testimony given by Defendant, pursuant to paragraph 5, will be used against him as the basis for any subsequent prosecution. It is understood that any information obtained from Defendant in compliance with this cooperation agreement will be made known to the sentencing court; however, pursuant to Guideline 1B1.8, such information may not be used by the Court in determining Defendant's applicable guideline range.

B.    This agreement does not prevent Defendant from being prosecuted for any violations of other Federal and state laws he may have committed should evidence of any such violations be obtained from an independent legitimate source, separate and apart from that information and testimony being provided by him pursuant to this agreement.

C.    In addition, nothing contained in this agreement shall prevent the United States from prosecuting Defendant for perjury or the giving of a false statement to a federal agent, if such a situation should occur by virtue of his fulfilling the conditions of paragraph 4 above.

Steven Seeger
Defendant

Thomas Dyer, Esq.
Counsel for Defendant

Date    5-12-25

Date    5/12/25

5/12/55

-2-

JA212

6.    At final disposition, the United States will advise the Court of Defendant's forthrightness and truthfulness, or failure to be so, and ask the Court to give the same such weight as the Court deems appropriate. The United States will also move to dismiss the remaining counts of the indictment; however, should this matter be remanded for new trial, the dismissed counts will be reinstated.

7.    There have been no representations whatsoever by any agent or employee of the United States, or any other law enforcement agency or Defendant's counsel as to what the final disposition is this matter should and will be. This agreement includes a binding recommendation by the United States, pursuant to Rule 11(c)(1)(B); however, Defendant understands that the Court is not bound by these sentence recommendations, and that Defendant has no right to withdraw his guilty plea if the Court does not follow the sentencing recommendations set forth in this plea agreement.

8.    The United States will make the following **nonbinding** recommendations:

A.    If, in the opinion of the United States Attorney's Office, Defendant accepts responsibility and if the probation office recommends a two-level reduction for "acceptance of responsibility," as provided by Guideline 3E1.1, then the United States will concur in and make such recommendation;

B.    Plea Agreement expires upon notification of the District Court's ruling on the suppression motions, which occurred on April 16, 2025; however, the parties amended the relevant conduct stipulation and if the plea is executed by May 12, 2025, it is agreeable to the Government but is not considered timely acceptance.

C.    The United States will recommend a term of imprisonment of at least fifteen years, but not more than thirty years.

9.    If in the opinion of the United States, the Defendant either engages in conduct defined under the Applicable Notes of Guideline 3C1.1, fails to cooperate as promised, or violates any other provision of this plea agreement, then the United States will not be bound to make the foregoing recommendations, and the Defendant will not have the right to withdraw the plea.

10.    Pursuant to Sections 6B1.4 and 1B1.3 of the Guidelines, the parties hereby stipulate and agree as follows:

On March 29, 2021, West Virginia State Police (WVSP) received a lead that Defendant was involved in an online relationship with a minor. The lead noted that Defendant exercised ownership over the minor, even enticing her to send nude photographs of herself to him using computer. On March 29, 2021, West Virginia State Police executed a search at Defendant's residence located at

Steven Seeger
Defendant                                    Date    5-10-25

Thomas Dyer, Esq.
Counsel for Defendant                        Date    5/12/25

                                                     5/12/25

- 3 -

JA213

310 Hilltop Drive, Bruceton Mills, WV. Defendant was interviewed during the search of his residence, and said he received videos from the minor, but she was lying about her age and he deleted the images and never asked for more until she was 18.

The WVSP Digital Forensic Lab (WVSP DFL) located images, video, and conversations on two of the items seized from Defendant that contained child sexual abuse material (CSAM). On Defendant's Silver Apple Macbook was a 34-second video created on June 25, 2013, at Defendant's demand of Jane Doe – 1 masturbating utilizing a Crayola marker. On the Black LG Nexus smartphone there were 50 images of child sexual abuse material, 2 videos of child sexual abuse material, and 11 images of child erotica. The images were linked to conversations that Defendant was having with two minor females ~~who clearly identified themselves as minors~~. WVSP DFL analysis established the devices contained images and videos of minor females performing masturbation, applying clotheslines to their nipples and labia, writing "Stevens Slut" on their abdomens, and general nude images identified as child erotica. One such video produced at Defendant's enticement is 1 minute and 5 seconds and depicts Jane Doe – 2 masturbating with her fingers with the camera close to her genitals before ending by capturing her face. The visual depictions produced at Defendant's enticement were produced knowing they would be transmitted in interstate commerce by computer from the minors to Defendant. ~~The chat communications tied to the images established Defendant knowledge they were minors and he in fact enticed them for more.~~

All offense conduct was committed within the Northern District of West Virginia and elsewhere.

These are the only facts to which the parties agree, and any other facts relative to the nature and circumstances of the offense may be argued by the parties at sentencing.

The parties understand that pursuant to Section 6B1.4(d), the Court is not bound by the above stipulation and is not required to accept the same. Defendant understands and agrees that should the Court not accept the above stipulation, Defendant will not have the right to withdraw his plea of guilty.

11.    Defendant is aware that 18 U.S.C. § 3742 affords a Defendant the right to appeal the sentence imposed. Acknowledging this, and in exchange for the concessions made by the United States in this plea agreement, Defendant waives the following rights:

A. Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all rights to appeal the Defendant's conviction on the ground that the statute(s) to which the defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

_____
Steven Seeger
Defendant

Date   5-12-25

_____
Thomas Dyer, Esq.
Counsel for Defendant

Date   5/14/25

5/13/25

-4-

JA214

B. The Defendant knowingly and expressly waives all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

C. The Defendant knowingly and expressly waives the right to challenge the conviction or the sentence which is within the binding range of imprisonment, not less than 15 and not more than 30 years, or the manner in which it was determined in any post-conviction proceeding, including any proceeding under 28 U.S.C. § 2255.

D. The Defendant reserves a limited ability to appeal adverse rulings on his motions to suppress.

Nothing in this paragraph, however, will act as a bar to Defendant perfecting any legal remedies he may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. Defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct.

This waiver of appellate rights is not intended to represent the defendant's estimation of what an appropriate or reasonable sentence would or should be. Nor does this waiver of rights prevent the defendant from arguing for any sentence within the binding range of imprisonment, not less than 15 nor more than 30 years. The United States waives its right to appeal any sentence within the binding range of imprisonment. Both parties have the right during any appeal to argue in support of the sentence.

12.     The United States reserves the right to provide to the Court and the United States Probation Office, in connection with any presentence investigation that may be ordered pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, or in connection with the imposition of sentence should the Court, pursuant to Rule 32(c)(1), not order a presentence investigation, relevant information, including information regarding Defendant's background, criminal record, the offense charged in the Indictment and other pertinent data appearing at Rule 32(c)(2) of the Federal Rules of Criminal Procedure, as will enable the Court to exercise its sentencing discretion. The United States also retains the right to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the anticipated presentence investigation report to be prepared by the Probation Office of the Court, and to respond to any written or oral statements made by the Court, by Defendant or his counsel.

13.     The defendant agrees that all monetary penalties imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided in 18 U.S.C.

Steven Seeger
Defendant

Date     5-25

Thomas Dyer, Esq.
Counsel for Defendant

Date     5/12/25

-5-

5/12/25

JA215

§ 3613. Furthermore, the defendant agrees to provide all requested financial information to the United States and the U.S. Probation Office and agrees to participate in a pre-sentencing debtor examination if requested by the U.S. Attorney's Office. The defendant also authorizes the Financial Litigation Unit in the U.S. Attorney's Office to access the defendant's credit report from any major credit reporting agency prior to sentencing in order to assess his financial condition for sentencing purposes. The defendant agrees to complete a financial statement, under penalty of perjury, and to submit the financial statement on the date specified and in accordance with instructions provided by the U.S. Attorney's Office. The defendant further agrees that any schedule of payments imposed by the Court represents the defendant's minimal financial obligation and shall not constitute the only method available to the United States to enforce or collect any criminal monetary penalty judgment. If the defendant is sentenced to a period of incarceration, the defendant agrees to participate in the Federal Bureau of Prisons' Inmate Financial Responsibility Program, even if the Court does not specifically direct participation. In addition, the defendant agrees that the United States, through the Financial Litigation Unit, may submit any unpaid criminal monetary penalty to the United States Treasury for offset in accordance with the Treasury Offset Program, regardless of the defendant's payment status or history at that time.

In order to pay any outstanding criminal monetary penalties, the defendant agrees to a voluntary garnishment of 25% of all nonexempt net disposable earnings from any job or employment, to be withheld from his wages, salary or commissions, without prior demand for payment under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3205. The defendant hereby also waives any exceptions that may be applicable under the Consumer Credit Protection Act, 15 U.S.C. § 1673.

14.    The defendant understands that he will be required to pay restitution to victims Jane Doe 1 and Jane Doe 2, and by agreement he will pay restitution to KD (identified in the discovery), who shall be considered a victim, with a right to be heard, of Defendant's uncharged conduct in an amount to be determined by the Court at sentencing, or at a separate hearing on the issue of restitution within (90) ninety days of sentencing, pursuant to 18 U.S.C. §§ 3663 & 3663A. The defendant further understands that he will be required by the Court to pay restitution in the amount of at least $3,000 to victims Jane Doe 1, Jane Doe 2, and KD, and who specifically requests restitution prior to sentencing, and who can show proof of losses. 18 U.S.C. §2259(b)(2)(B) [Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018].

15.    Defendant understands that the United States Sentencing Guidelines are now advisory and no longer mandatory. It is therefore understood that the sentencing court may ascertain and impose a sentence below or above the applicable Guideline range, so long as that sentence is reasonable and within the binding range of imprisonment set forth by this agreement.

If the defendant's plea is not accepted by the Court or is later set aside or if he breaches any part of this Agreement, then the Office of the United States Attorney will have the right to void this Agreement.

_____    Date _5-12-25_
Steven Seeger
Defendant

_____    Date _6/.12/25_
Thomas Dyer, Esq.
Counsel for Defendant

- 6 -    5/12/25

16.     Defendant understands that the forfeiture of property will be part of the sentence imposed in this case and agrees to their forfeiture. Defendant stipulates to the existence of the requisite forfeiture nexus between the offense conduct underlying this agreement and the foregoing specified property, which is property used or intended to be used to commit or to promote the commission of such offense, or is a visual depiction described in Section 2251, 2251A, 2252, 2252A, 2252B, or 2260 of Chapter 110 of Title 18, or is any book, magazine, periodical, film, videotape, or cellular phone or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped or received in violation of Chapter 110 of Title 18: images, DVDs, and electronic devices seized from the defendant, including:

Blue WD My Passport Ultra, S/N: WX11A64AHRR7;
Black WD My Passport, S/N: WX91A92N2294;
16 GB Sandisk Ultra;
Black LG Nexus Model # LG-E960 cellular phone;
Samsung S21 Ultra cellular phone in Blue Otterbox; and
Silver Apple Macbook, S/N: W86450CGW0M
Hitachi 100GB Travelstar SATA Hard Drive, S/N MPDZP7Y0H46DGL

Defendant warrants that he is the owner of all property seized in this investigation and understands that the property will be forfeited and destroyed. Defendant hereby waives all interest in any property subject to this plea agreement in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. Defendant also agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, the announcement of the forfeiture at sentencing, and the incorporation of the forfeiture in the judgment. Defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding.

Defendant also waives all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. Defendant further waives any failure by the Court to advise the defendant of the applicable forfeiture at the time the guilty plea is accepted as required by Rule 11(b)(1)(J).

17.     Defendant has been advised and understands that he will be required to register as a sex offender under the Sex Offender Registration and Notification Act, a federal law, and keep such registration current in each of the following jurisdictions: the location of the defendant's residence; the location of Defendant's employment; and, if the defendant is a student, the location of Defendant's school. Registration will require that the defendant provide information that includes name, address of residence, and the names and addresses of any places where the defendant will be employed or a student. The

Steven Seeger
Defendant                                            Date    5-12-25

Thomas Dyer, Esq.                                    Date    5/12/15
Counsel for Defendant

-7-                                                          5/12/19

JA217

defendant further understands that he must update his registrations within three business days after any change of name, residence, employment, or student status. Defendant understands that failure to comply with these obligations subjects him to prosecution for Failure to Register [18 U.S.C. §2250], a federal felony offense.

18.    The above 17 paragraphs constitute the entire agreement between Defendant and the United States of America in this matter.  **There are no agreements, understandings, or promises between the parties other than those contained in this Agreement.**

Very truly yours,

RANDOLPH J. BERNARD
Acting United States Attorney

By:    Kimberley D. Crockett
Assistant United States Attorney

*As evidenced by my signature at the bottom of the 8 pages of this letter agreement, I have read and understand the provisions of each paragraph herein and, hereby, fully approve of each provision.*

Steven Seeger
Defendant

Thomas Dyer, Esq.
Counsel for Defendant

Date    5-12-25

Date    6/12/25

5/12/25

- 8 -

JA218

1

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF WEST VIRGINIA

3    United States of America,
            Plaintiff,

4                  VS.              CRIMINAL ACTION NO.
                                    1:24-cr-42

5    Steven David Seeger,

6          Defendant.

7                      - - -

8         Proceedings had in the plea hearing of the above-styled
     action on May 12, 2025, before Honorable Michael John Aloi,

9    Magistrate Judge, at Clarksburg, West Virginia.

10                     - - -

11     APPEARANCES:

12     On behalf of the United States of America:

13     Kimberley D. Crockett (via videoconference)
       Daniel Lee Salem (via videoconference)

14     Assistant United States Attorneys
       United States Attorney's Office

15     217 W. King Street, Suite 400
       Martinsburg, WV  25401

16     304.281.5452

17     On behalf of the Defendant:

18     Thomas G. Dyer
       Dyer Law Offices

19     PO Box 1332
       Clarksburg, WV  26302-1332

20     304.622.1635

21     Martin P. Sheehan
       Sheehan & Associates, PLLC

22     1140 Main Street, Suite 333
       Wheeling, WV  26003

23     304.232.1064

24     The defendant was present in person.

25     Proceedings recorded utilizing tape.
       Transcript produced by computer-aided transcription.

Cindy L. Knecht, RMR/CRR/CBC/CCP
PO Box 326  Wheeling, WV  26003  304.234.3968

JA219

2

```
 1                              Monday Afternoon Session,

 2                              May 12, 2025, 2:08 p.m.

 3                    - - -

 4          THE COURT:  If the clerk would please call the next

 5  case.

 6          THE CLERK:  United States of America versus Steven

 7  David Seeger, Criminal Case Number 1:24-CR-42.  Mr. Seeger is

 8  present in person.

 9          Counsel, please note your appearance for the record.

10          MR. SALEM:  Daniel Salem on behalf of the United

11  States.

12          MS. CROCKETT:  Also appearing is Kim Crockett.

13          THE COURT:  Okay.  Thank you, counsel.

14          MR. DYER:  Martin Sheehan and Tom Dyer for the

15  defendant.

16          THE COURT:  Let me say for the record, as the parties

17  are aware, we had previously had this scheduled for a plea

18  proceeding and we got into the proceedings somewhat on two

19  different occasions and then thought it was best to continue

20  the plea hearing.  I only give that as a backdrop, because at

21  that time the Court indicated that counsel for the government,

22  the Assistant US Attorneys, could appear for this plea by

23  video, since it's a long trip for them from Martinsburg.  And

24  there was no objection by the defendant; is that correct Mr. --

25          MR. DYER:  That's correct, Your Honor.
```

3

1          THE COURT:  And so with that, that's why they're

2    appearing, with permission of the Court, and there being no

3    objection by the defendant.

4          So Mr. Dyer, it's now my understanding that

5    Mr. Seeger does desire to plead guilty to Count 1 and Count 4

6    of the indictment?

7          MR. DYER:  That is correct, Your Honor.

8          THE COURT:  Count 1 charging him with coercion and

9    enticement of a minor for sex, and Count 4, production of child

10    pornography.

11          MR. DYER:  Yes, sir.  Yes, sir.

12          THE COURT:  Mr. Seeger, would you please stand, raise

13    your right hand, and be sworn by the clerk.

14          (Defendant sworn.)

15          THE COURT:  Mr. Seeger, do you understand that you're

16    now under oath, and that if you answer any of my questions

17    falsely, your answers may later be used against you in another

18    prosecution for perjury or for making a false statement?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And do you understand that if you lie, it

21    may result in a higher sentence for you?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Now, Mr. Seeger, during the course of

24    this hearing, I will be asking you several questions.  At any

25    point you should feel free to ask questions, ask for an

4

1   explanation if you do not understand any of my questions, or

2   ask me to pause the proceedings so that you may discuss matters

3   with your lawyers before answering the question.  Do you

4   understand that, Mr. Seeger?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  And Mr. Seeger, I'll be asking you a lot

7   of questions.  If at any time, Mr. Seeger, you have any

8   questions about anything, your answer with any question, all

9   you need to do is say, Judge, may I speak with my lawyers.

10  I'll give you the opportunity to do so.  And then after you do

11  it, we'll address it on the record.  You may not feel the need

12  to do that at all, Mr. Seeger.  You may feel the need to do it

13  several times.  And if you do, that's just fine.

14             So Mr. Seeger, would you state your full name for the

15  record, please.

16             THE DEFENDANT:  Steven David Seeger.

17             THE COURT:  How old are you, Mr. Seeger?

18             THE DEFENDANT:  46.

19             THE COURT:  How much education have you had?

20             THE DEFENDANT:  I have a master's degree in computer

21  science.

22             THE COURT:  So can you read, write, and understand

23  English?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And again, Mr. Seeger, I ask these

5

1   questions because I'm required to make a finding on the record

2   that you're competent.

3           Mr. Seeger, have you recently been under the care of

4   a doctor or psychiatrist or other medical professional for any

5   serious physical or mental illness, including addiction to

6   drugs or alcohol?

7           THE DEFENDANT:  No.

8           THE COURT:  Are you currently using any form of

9   controlled substance or any medication or alcohol that might

10  affect your ability to understand this proceeding today?

11          THE DEFENDANT:  No.

12          THE COURT:  Mr. Dyer, do you have any reason to

13  question the competence of your client, Mr. Seeger?

14          MR. DYER:  I do not, Your Honor.

15          MR. SHEEHAN:  Your Honor, as a matter of fact, I

16  think we said this before, we had Mr. Seeger examined by a

17  psychologist, Dr. Saar.  He's reported to us that he was fine,

18  in his opinion, and as a result, we have no such reservations

19  that Mr. Seeger -- I thought I'd augment the record in that

20  particular way.

21          THE COURT:  Thank you, Mr. Sheehan.

22          So Mr. Seeger, are you here today to enter a guilty

23  plea as part of a written plea agreement?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Mr. Seeger, I find that you're competent

6

1   and capable of entering an informed plea.

2           Ms. Crockett -- they have presented to me, Mr. Dyer,

3   a -- it's I guess a new plea agreement, perhaps where you

4   changed a few things in it.  They have all signed it it.  But I

5   don't have one with your signature on it, so -- what's your

6   position on that?

7           MS. CROCKETT:  Your Honor, if it was signed in

8   advance, I asked that a PDF be emailed to me and I would affix

9   my signature to it and send it back to the Court.  We can still

10  do it that way.  I'm not allowed to execute the plea agreement.

11          THE COURT:  I understand, Ms. Crockett.  Just send it

12  to your normal email address?

13          MS. CROCKETT:  That's fine, Your Honor.  You can also

14  send it to Dan Salem.  I have another matter that starts at

15  3:00, and I couldn't anticipate how long this hearing would

16  take.

17          THE COURT:  I understand.

18          MS. CROCKETT:  He's going to take the lead for the

19  government.

20          THE COURT:  Mr. Salem, what is your email address?

21          MR. SALEM:  And, Your Honor, that's Daniel.Salem,

22  just like Salem, Massachusetts, at usdoj.gov.

23          THE COURT:  Okay.  Thank you.

24          Ms. Ridgeway, if you don't mind, if you would come

25  down to the courtroom, we will go ahead, email this copy, email

7

1   it directly to Mr. Salem and Ms. Crockett, and then if you all

2   would sign it and email it directly to Nakia Ridgeway and

3   she'll bring it right to me.

4           Okay.  So now the other thing is this one is dated,

5   Ms. Crockett, April 10th.  They signed it today, May 12th.  I

6   didn't know how you want to handle that.  I don't think it

7   matters, Mr. Dyer, but go ahead.

8           MS. CROCKETT:  In the "regarding" line, it should say

9   that it was amended the date that below was amended, but the

10  date that it's signed by Mr. Seeger is of no consequence,

11  because he won't receive timely acceptance.

12          THE COURT:  Okay.  And that's understood?

13          MR. DYER:  Yes, it is, Your Honor.

14          THE COURT:  Okay.  So we're going to get --

15          So Mr. Seeger, I am a United States Magistrate Judge.

16  Did I give you all the consent?

17          THE DEFENDANT:  I think I signed it twice before.

18          THE COURT:  This is a new day, new proceeding,

19  Mr. Seeger, so --

20          THE DEFENDANT:  I really don't understand it.  I

21  mean, Article III establishes the Supreme Court and allows

22  Congress to create any other courts that it so deems to do, and

23  the Federal Magistrate Act created your position just as well

24  as -- I believe it was called the congressional -- I forget.  I

25  think it was 1789 when Congress established the District

8

1   Courts.  So how are you any less an Article III Judge than

2   Judge Kleeh?

3             MR. SHEEHAN:  He does not have life tenure.

4             THE COURT:  Although there's some differences -- I

5   appreciate that -- I appreciate the promotion, Mr. Seeger, and

6   I don't know how influential it would be on others, but your

7   lawyers are right.  At least if it's a guilty plea to a felony,

8   I can hear it, but I can only hear it with your consent, so

9   we've had a good discussion about that.  Are you agreeable for

10  me to hear your plea today?

11            THE DEFENDANT:  Yes, sir.

12            THE COURT:  Okay.  And have you discussed that with

13  your lawyers?

14            THE DEFENDANT:  Yes, sir.

15            THE COURT:  And is that correct, Mr. Sheehan and

16  Mr. Dyer?

17            MR. SHEEHAN:  Yes, Your Honor.

18            THE COURT:  I'm getting the waiver down here.

19            And Mr. Seeger, I understand what you're saying, but

20  I think it's important, to keep things clean, that we have a

21  waiver form of today's proceedings, and so I will order that be

22  filed herein, once we get it signed, and my clerk will bring it

23  down, but we'll continue.

24            Mr. Seeger, do you understand you have a right to be

25  represented by counsel at every stage of these proceedings,

9

1  including sentencing, and if you can not afford counsel, you

2  have the right to have an attorney appointed to represent you?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And Mr. Dyer, do you or any member of

5  your office or firm represent anyone who might be interested in

6  the outcome of this matter?

7          MR. DYER:  Do not, Your Honor.

8          THE COURT:  Same for you, Mr. Sheehan.

9          MR. SHEEHAN:  I do not, Your Honor.

10          THE COURT:  Mr. Seeger, when I ask this question,

11  I'll use your attorneys in the plural.  So have you had

12  adequate time to discuss your case fully with your attorneys,

13  Mr. Dyer and Mr. Sheehan?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Have they been able to answer your

16  questions about how best to proceed in this case?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Mr. Seeger, is there anything that your

19  lawyers have not done which they've asked you to do?  Which

20  you've asked them to do.  I'm sorry.  Let me ask that again.

21          Is there anything that your lawyers have not done

22  that you've asked them to do?

23          THE DEFENDANT:  Yes, but I'm sure that always

24  happens.

25          THE COURT:  Okay.  And so, for example --

```
 1            THE DEFENDANT:  None that would impact my decision to
 2    plead guilty today.
 3            THE COURT:  Well, and let me say that.  I think
 4    that's a fair response.  Certainly there can be things that you
 5    ask your lawyers to do and they have a discussion with you that
 6    they either believe they can't do it under their roles as
 7    professionals, or they have discussions with you and a decision
 8    is made, we could do that, but we're of the opinion that it
 9    would have no impact on the case, and then you're satisfied
10    with that explanation.  So are you satisfied that your lawyers
11    have done what you've wanted them to do to the extent that it
12    would make a difference in the outcome of this case?
13            THE DEFENDANT:  Yes.
14            THE COURT:  Are you completely satisfied then with
15    the legal advice that you've received from your attorneys?
16            THE DEFENDANT:  Yes.
17            THE COURT:  Mr. Dyer, during the time that you've
18    represented Mr. Seeger, has he been cooperative with you?
19            MR. DYER:  He has, Your Honor.
20            THE COURT:  And Mr. Sheehan.
21            MR. SHEEHAN:  Yes, Your Honor.
22            THE COURT:  And Mr. Dyer, have you and Mr. Sheehan
23    had time to discover the government's case?
24            MR. DYER:  We have, Your Honor.
25            THE COURT:  Have you had adequate time to consider
```

11

```
 1   possible defenses?
 2              MR. DYER:  Yes, sir.
 3              THE COURT:  And do the two of you know of any viable
 4   defense to the charges in Count 1 and 4 of the indictment?
 5              MR. DYER:  In the wake of the motion hearing,
 6   unfortunately, the answer is no.
 7              THE COURT:  And you're referring to -- I know y'all
 8   made a motion to suppress.  The Court denied it; is that
 9   correct?
10              MR. DYER:  Correct, yes, sir.
11              THE COURT:  Have you had adequate time to consider
12   possible sentences?
13              MR. DYER:  Yes, sir.
14              THE COURT:  And have you discussed all of these
15   issues with your client, Mr. Seeger?
16              MR. DYER:  We have.
17              THE COURT:  I know you all signed the waiver.
18              MR. DYER:  Yes, sir.
19              THE COURT:  So if you'll present it to me and we'll
20   go ahead and get that taken care of.
21              So Mr. Seeger, I do have the original waiver of
22   Article III and consent to enter your guilty plea before a US
23   Magistrate Judge.  Did you sign it, Mr. Seeger?
24              THE DEFENDANT:  Yes, sir.
25              THE COURT:  Okay.  And did you discuss it with your
```

12

1   lawyers?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  And Mr. Dyer, is it your understanding

4   your client is agreeable -- I'm sorry, that your client's

5   agreeable to the waiver?

6           MR. DYER:  Yes, I do.

7           THE COURT:  I'll note the signature of Mr. Seeger as

8   well as Mr. Dyer and Mr. Sheehan.

9           At least for the record, Ms. Crockett and also

10  Mr. Salem, do you concur with this waiver and consent?

11          MR. SALEM:  We do, Your Honor.

12          THE COURT:  Okay.  I will note that on the record and

13  we will make sure it either gets to you, Ms. Crockett, or

14  Mr. Salem, to make sure that that gets signed.

15          And Ms. Crockett, I do understand that you -- have

16  you now received an email with the plea agreement signed?

17          THE LAW CLERK:  Judge, it should be in their inbox

18  here in the next minute or so.

19          THE COURT:  Okay.  So Mr. Dyer, is there a proposed

20  plea agreement in this case?

21          MR. DYER:  Your Honor, there is.

22          THE COURT:  Ms. Crockett, would you please summarize

23  the contents of that agreement.

24          MR. SALEM:  Your Honor, if it's all right with the

25  Court, I, Daniel Salem --

13

```
 1              THE COURT:  That's fine.  Then Mr. Salem, if you
 2    would please summarize the contents of the agreement.
 3              MR. SALEM:  Certainly, Your Honor.  The plea in this
 4    matter was originally offered on April 10th, 2025.  It was also
 5    amended on May 6, 2025.  It was signed by the defendant and his
 6    counsel today, May 12th, '25.  It is in letter form, over 18
 7    numbered paragraphed on eight pages.  It bears no
 8    modifications.  Defendant and defendant's counsel have signed
 9    and dated the bottom of each page.  That is our understanding
10    based on the proceedings that occurred in court there today.
11              Paragraph one holds the defendant will plead guilty
12    to Count 1, coercion/enticement of a minor for sex, in
13    violation of Title 18, United States Code, Section 2422(b), and
14    also to Count 4, production of child pornography, in violation
15    of Title 18, United States Code, Sections 2251(a) and (e).
16              Paragraph two states that the penalty the defendant
17    will be exposed to as a result of his guilty plea to Count 1 is
18    imprisonment for a period not less than ten years and not more
19    than life in prison, a $250,000 fine, and at least five years
20    and up to lifetime of supervised release.
21              The penalty defendant will be exposed to as a result
22    of his guilty plea to Count 4 is imprisonment for a period of
23    not less than 15 years and not more than 30 years, a fine of
24    $250,000, and at least five years and up to a lifetime of
25    supervised release.
```

14

```
 1          It also explains that there's a special mandatory

 2   assessment of $100, and if determined to be applicable, as a

 3   matter of law, there's an additional special assessment under

 4   the Justice for Victims of Trafficking Act of $5,000, and up to

 5   $5,000 for Amy, Vicky and Andy Child Pornography Assistance

 6   Act.

 7          Paragraph three explains that pursuant to Rule

 8   11(c)(1)(C) of the Federal Rules of Criminal Procedure, the

 9   parties have agreed to a binding condition that Counts 1 and 4

10   will run concurrently to one another, and the sentence for each

11   shall be capped at a maximum of 30 years' imprisonment.  If the

12   Court does not accept the binding provision, the defendant

13   shall have the right to withdraw his plea of guilty.

14          Paragraph four requires the defendant to be

15   completely forthright and truthful with regard to all inquiries

16   made of him and to submit to polygraph examination if requested

17   to do so.

18          Paragraph five explains that no statement or

19   testimony given by defendant under paragraph four will be used

20   against him as the basis for a subsequent prosecution, nor may

21   be used in the present case to determine the defendant's

22   applicable guideline range.

23          The agreement does not prevent defendant from being

24   prosecuted for any violations of other federal and state laws

25   he may have committed if evidence of other violations is
```

15

1    obtained from an independent, legitimate source.  Nothing in

2    this agreement prevents the United States from prosecuting the

3    defendant for perjury or for giving a false statement.

4         Paragraph six holds that at sentencing, the United

5    States will advise the Court of defendant's forthrightness and

6    truthfulness or his failure to be so.  The United States agrees

7    to dismiss the remaining counts at sentencing.  If the

8    defendant's sentence is remanded for a new trial, all counts

9    dismissed pursuant to the plea agreement will be reinstated.

10        Paragraph seven explains the United States and law

11   enforcement agencies have not made any representations as to

12   what the final disposition in this matter should and will be.

13   Aside from the binding recommendation provided for in paragraph

14   three, this is a nonbinding plea agreement and defendant has no

15   right to withdraw his plea if the Court does not follow any

16   sentencing recommendation set forth in the agreement.

17        Paragraph eight holds that the United States will

18   make the following nonbinding recommendations:  It will

19   recommend a two-level reduction for acceptance of

20   responsibility if defendant accepts responsibility in the

21   opinion of the United States Attorney's Office and the

22   probation office recommends such a reduction.  The plea

23   agreement expires upon notification of the District Court's

24   ruling on the suppression motions which occurred on April 16th,

25   2025.  However, the parties went forward and amended the

1  relevant conduct stipulation and changed it so that if the plea

2  is executed by May 12th, 2025, it is agreeable to the

3  government but is not considered timely accepted.  It will

4  further recommend a sentence of imprisonment of at least 15

5  years but not more than 30 years.

6        Paragraph nine holds that the United States is not

7  bound to make the sentencing recommendations if defendant

8  engages in conduct defined under the applicable notes of

9  Guideline 3C1.1, fails to cooperate as promised, or violates

10  any other provisions of the plea agreement, and the defendant

11  will not have the right to withdraw the plea.

12        Paragraph ten holds that pursuant to Sections 6B1.4

13  and 1B1.3 of the guidelines, the parties hereby stipulate and

14  agree that on March 29th, 2021, West Virginia State Police

15  received a lead that the defendant was involved in an online

16  relationship with a minor.  The lead noted the defendant

17  exercised ownership over the minor, even enticing her to send

18  nude photographs of herself to him using a computer.

19        On March 29th, 2021, West Virginia State Police

20  executed a search at defendant's residence located at 310

21  Hilltop Drive, Bruceton Mills, West Virginia.  Defendant was

22  interviewed during the search of his residence and said he

23  received videos from the minor but that she was lying about her

24  age, and he deleted the images and never asked for more until

25  after she was 18 years of age.

17

1          The West Virginia State Police digital forensic lab

2     located images, video, and conversations on two of the items

3     seized from defendant that contained child sexual abuse

4     materials.  On defendant's silver apple MacBook was a 34-second

5     video that was created on June 25th, 2013, at defendant's

6     demand.  It contained Jane Doe Number One masturbating

7     utilizing a Crayola marker.  On the black LG nexus smartphone,

8     there were 50 images of child sexual abuse material, two videos

9     of child sexual abuse material, and eleven images of child

10    erotica.

11          The images were linked to conversations that

12    defendant was having with two minor females who clearly

13    identified themselves as minors.  West Virginia State Police

14    digital forensics lab analysis established the devices

15    contained images and videos of minor females performing

16    masturbation applying clotheslines to their nipples and labia,

17    writing "Steven's slut" on their abdomens, and general nude

18    images identified as child erotica.

19          One such video produced at defendant's enticement is

20    one minute and five seconds and depicts Jane Doe Number Two

21    masturbating with her fingers with the camera close to her

22    genitals before ending by capturing her face.

23          Visual depictions produced at defendant's enticement

24    were produced knowing that they would be transmitted in

25    interstate commerce by computer from the minors to defendant.

18

1  The chat communications tied to the images established

2  defendant's knowledge that they were minors and he, in fact,

3  enticed them for more.

4          All offense conduct was committed within the Northern

5  District of West Virginia and elsewhere.  These are the only

6  facts to which the parties agree.  Any other facts relative to

7  the nature and circumstances of the offense may be argued by

8  the parties at sentencing.

9          The paragraph also states that the Court is not bound

10 by the parties' stipulation and defendant understands that

11 should the Court not accept the stipulation, the defendant will

12 not have a right to withdraw the plea of guilty.

13         Paragraph eleven contains a waiver of defendant's

14 appellate rights and the ability to challenge the conviction or

15 the sentence in any postconviction proceeding.  Specifically,

16 defendant knowingly waives all right pursuant to 28 USC Section

17 1291 or any other statute or constitutional provision to appeal

18 defendant's conviction on any ground whatsoever.  Defendant

19 knowingly and expressly waived all rights conferred by 18 USC

20 Section 3742 to appeal whatever sentence is imposed for any

21 reason.  Defendant waives the ability to challenge the

22 conviction or sentence that is within the binding range of

23 imprisonment, not less than 15 and not more than 30 years, in

24 any proceeding, under 28 USC Section 2255, and the defendant

25 retains the limited ability to appeal any adverse rulings on

19

1  his motions to suppress.

2          Paragraph 12 reserves the right of the United States

3  to provide the Court and United States Probation Office with

4  information for the presentence investigation and any other

5  pertinent data that will enable the Court to exercise its

6  sentencing discretion.  It further reserves the right of the

7  United States to respond to questions raised by the Court, to

8  correct any inaccuracies or inadequacies in the anticipated

9  presentence investigation report, and respond to any written or

10 oral statements made by the Court, by the defendant, or by his

11 counsel.

12         Paragraph 13 states that the defendant agrees that

13 all monetary penalties imposed by the Court are due and payable

14 immediately and are subject to immediate enforcement by the

15 United States as provided in Title 18, United States Code,

16 Section 3613.

17         The defendant agrees to provide all requested

18 financial information to the United States to assist in the

19 collection of any monetary penalties that are imposed, and to a

20 voluntary garnishment of 25 percent of all nonexempt earnings.

21         Paragraph 14 states that the defendant understands

22 that restitution is a condition of this agreement the defendant

23 will be required to pay to Jane Doe One and Jane Doe Two and

24 has agreed to pay restitution to KD.  The amount of restitution

25 to be determined by the Court will be at least $3,000 payable

20

1  to each victim.

2        Paragraph 15 explains the United States Sentencing

3  Guidelines are advisory and not mandatory.

4        Paragraph 16 is a forfeiture paragraph.  Defendant

5  understands that forfeiture of property will be part of the

6  sentence imposed, and he stipulates to the existence of the

7  requisite forfeiture nexus between the offense conduct and all

8  items seized, including specifically a blue WD My Passport

9  Ultra, bearing serial number WX11A64AHRR7; a black WD My

10  Passport bearing serial number WX91A92 and 2294; a 16 gigabyte

11  Sandisk Ultra; a black LG Nexus model number LG-E960 cellular

12  phone; a Samsung S21 Ultra cellular phone in blue Otter Box;

13  and a silver Apple MacBook bearing serial number W86450CGW0M,

14  as well as a Hitachi 100-gigabyte Travelstar SATA hard drive

15  bearing serial number MPDZP7Y0H46DGL.

16        Defendant waives any interest in said property

17  subject to this agreement in any proceedings, and further

18  agrees to consent to entry of forfeiture for said property,

19  waiving the requirements of Rule 32.2, 43(a), or otherwise.

20        Paragraph 17 explains the defendant's obligations to

21  register as a sexual offender under the Sex Offender

22  Registration and Notification Act, and that failure to do so

23  will subject him to prosecution for failure to register as set

24  forth in Title 18, United States Code, Section 2250.

25        Paragraph 18 states that the above 17 paragraphs are

1  the entire agreement.  There are no other agreements,

2  understandings, or promises between the parties other than

3  those contained in this agreement.

4          And, Your Honor, I have received a copy of the

5  agreement in my email, which I will sign and return to

6  Ms. Ridgeway as soon as I have a chance to scan it.

7          THE COURT:  And I will indicate that I have -- I know

8  that Ms. Crockett did sign the original and returned it to the

9  Court.  Is that acceptable that the Court treat the signed copy

10  by you, Ms. Crockett?

11          MS. CROCKETT:  It is, Your Honor, and I did that

12  because I didn't see Mr. Salem's name on my email, and so I

13  thought she just did that for ease, since he was summarizing

14  the plea.

15          THE COURT:  Okay.  Is that acceptable, Mr. Salem?

16          MR. SALEM:  That's acceptable to me, Your Honor.

17          THE COURT:  Okay.  Any objection to Ms. Crockett

18  signing on behalf of the government?

19          MR. SHEEHAN:  No, Your Honor.

20          MR. DYER:  No, sir.

21          THE COURT:  So Ms. Crockett, is what you've just

22  presented to the Court -- I know it's not the sole agreement

23  that was offered to Mr. Seeger, but I don't know the history.

24  Was this the second one or --

25          MS. CROCKETT:  The history of the number of pleas,

1   Your Honor?

2           THE COURT:  Yes.

3           MS. CROCKETT:  Yes.  Yes.  And actually I've just

4   gotten a communication from Mr. Dyer about it.  He thought one

5   sentence was removed from the plea, and I'm sorry to deviate

6   just briefly, Your Honor.  It looks like the sentence "The chat

7   communication" --

8           THE COURT:  Why don't you tell us, Ms. Crockett, what

9   page and paragraph.

10          MS. CROCKETT:  It's the second page of the

11  stipulation, the very last portion of the stipulation.  And

12  it's "The chat communication tied to the images establish

13  defendant's knowledge they were minors and he, in fact, enticed

14  them for more."

15          Is that the sentence you're talking about, Mr. Dyer?

16          MR. DYER:  That's it, Kim, yes.

17          MS. CROCKETT:  And I think we established, Your

18  Honor, last time we were there, that his knowledge of age is

19  not an element, so he thought that sentence was struck.  I

20  don't have a problem with striking it.

21          THE COURT:  Okay.  If that's the case, I will go

22  ahead and strike it now on the original.

23          Any objection, Mr. Dyer?

24          That's acceptable to you, Ms. Crockett?

25          MS. CROCKETT:  It is, Your Honor.  It's not an

1  element of that offense.

2          THE COURT:  So what I am marking out as the last

3  sentence that says "The chat communications tied to the images

4  established defendant's knowledge they were minors and he, in

5  fact, enticed them for more," that whole sentence?

6          MS. CROCKETT:  Yes.  You can strike it.

7          MR. DYER:  Yes, sir.

8          Thank you, Kim.

9          MS. CROCKETT:  And then to answer your question more

10  fully, Judge Aloi, yes, this is the second -- this was the

11  second plea agreement that was reached.  As the Court will

12  recall, Mr. Seeger raised some limited objections before, and

13  we advised the Court we would take a look at the relevant

14  conduct stipulation and see if there were agreements to be

15  made.  We modified that provision and then provided it to

16  defense counsel.

17          THE COURT:  Is that a fair summary, Mr. Dyer, of the

18  plea agreement?

19          MR. DYER:  I believe it is, Your Honor, yes.

20          THE COURT:  Did you present both of these plea

21  agreements to your client and resume -- review them with him?

22          MR. DYER:  Yes.  Mr. Sheehan and I did that, yes,

23  sir.

24          THE COURT:  And, in fact, the Court can indicate that

25  I do have a copy of the earlier plea agreement, the April 10,

24

1    2025, and we were discussing it, and it was signed by all the

2    parties, so I have a factual basis to know that it was

3    presented and discussed with Mr. Seeger.

4             MR. DYER:  Yes.

5             THE COURT:  Mr. Dyer, just for your comfort and the

6    comfort of your client, you can see where I struck this out.

7             MR. DYER:  Your Honor, could you look -- we have one

8    other -- it's a typo, but Mr. Seeger considers it significant.

9    If you look on page 2 --

10            THE COURT:  Are you with us, Kim?  And I'm sorry,

11   Ms. Crockett and Mr. Salem, they're looking at page 2.

12            MR. DYER:  I texted Ms. Crockett this concern.  I

13   apologize to the Court.  I was texting during the proceeding.

14            But anyway, paragraph 5A, the first sentence,

15   "nothing contained in any statement or any testimony given by

16   defendant pursuant to paragraph" -- we believe should be a

17   four, not a three there.

18            MS. CROCKETT:  It should.  It should be a four, Your

19   Honor, and we can initial that change.

20            MR. DYER:  Thank you.

21            THE COURT:  No objection, I'll go ahead and make that

22   four and --

23            MR. DYER:  Thank you, Your Honor.

24            THE COURT:  So Mr. Dyer, I'm going to give you both

25   page 2 and page 4.  You all can go ahead and initial that now

```
 1   and then --
 2              MR. DYER:  Thank you, sir.
 3              THE COURT:  So Mr. Salem, is what you've presented to
 4   the Court with the two changes made, is that the entire
 5   agreement between the government and Mr. Seeger in this matter?
 6              MR. SALEM:  It is, Your Honor.  That is the entirety
 7   of our understanding and agreement.
 8              THE COURT:  Is that correct, Ms. Crockett?
 9              MS. CROCKETT:  That is correct, Your Honor.  That's
10   the entirety of the agreement.
11              THE COURT:  I'm going to go ahead, Ms. Crockett, and
12   I'll have Ms. Ridgeway, if you will, come down and get this
13   plea agreement.  I'll let you, Ms. Crockett or Mr. Salem, we'll
14   send it to you, but initial those two changes and then get it
15   back to me and so we can have that for the record.  Nakia will
16   be coming towards the door.
17              So Mr. Dyer, is the summary given by --
18              MR. DYER:  Mr. Salem.
19              THE COURT:  -- Mr. Salem, is that a fair summary of
20   the entire agreement?
21              MR. DYER:  I believe it was, yes, sir.
22              THE COURT:  And Mr. Salem, Ms. Crockett, is what
23   you've presented, that is the entire agreement between the
24   government and Mr. Seeger?
25              MR. SALEM:  It is, Your Honor.
```

26

1          THE COURT:  And Mr. Salem, again, just to make it

2  clear, the agreement is dated April 10, 2025, but if you look

3  under the reference, it will say conditional plea agreement,

4  amended 5-6-25, and that is the agreement we're working from;

5  is that correct?

6          MR. SALEM:  It is, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          So Mr. Seeger, do you understand what this plea

9  agreement does?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  Do you understand what it requires of

12  you?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Do you have any questions about the plea

15  agreement at this time?

16         THE DEFENDANT:  No.

17         THE COURT:  So Mr. Seeger, I am showing you the

18  original conditional plea agreement, amended 5-6-25, dated

19  April 10, 2025.  Is that your signature, Mr. Seeger, at the

20  bottom of all eight pages of the plea agreement?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Is it dated 5-12-25?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  And Mr. Seeger, did you read each page of

25  this plea agreement before you signed the bottom of that page

1    and before you reached an agreement with the government?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  And just to make it clear, Mr. Seeger,

4    paragraph 5A on page 2 has been modified -- not modified,

5    corrected, that it should reflect -- 5A, it should reflect

6    paragraph four, not paragraph three; is that correct?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  And you initialed that; is that correct?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  And then on page 4, at the top, the full

11   paragraph on that page, the last sentence that says, "The chat

12   communications tied to the images established defendant's

13   knowledge they were minors and he, in fact, enticed them for

14   more," that has been stricken and is not considered something

15   that is part of the factual basis.  Do you understand that,

16   Mr. Seeger?

17           THE DEFENDANT:  Yes.  Although there's a very similar

18   sentence in the middle of the paragraph that basically says the

19   same thing, so I don't know if that matters.

20           THE COURT:  Do you see, Ms. Crockett, what he's

21   talking about?  "The images were linked to conversations that

22   defendant was having with two minors who clearly identified

23   themselves as minors."  Are you all with me?

24           MS. CROCKETT:  I am with you.

25           THE COURT:  Do you have any position on that?

28

```
1           MS. CROCKETT:  If the Court wants to strike a line
2    after --
3           THE COURT:  And by the way, Ms. Crockett, I'm asking.
4    It's not my direction or anything, so but if you're asking.
5           MS. CROCKETT:  I understand, Your Honor.
6           THE COURT:  Strike that on your behalf.
7           MS. CROCKETT:  I understand, Your Honor.  If the line
8    could end here, "The images were linked to conversations he was
9    having with two minor females," period, you can strike "who
10   clearly identified themselves as minors."
11          THE COURT:  Okay.  Would that be --
12          MS. CROCKETT:  For purposes of the stipulation, it's
13   not necessary.
14          THE COURT:  Okay.  I did mark that out.
15          Would that be agreeable, Mr. Dyer?
16          MR. DYER:  It would, Your Honor, yes.
17          THE COURT:  I'll go ahead and do that.
18          MR. DYER:  Thank you.
19          THE COURT:  And we'll have that signed off.
20          MS. CROCKETT:  And, Your Honor, my apologies.  I'll
21   watch for Nakia to send that to me to add my initials.
22          THE COURT:  Yeah.  And if you want to go ahead and
23   mark that out and you initial it, then we'll be moving
24   smoothly.
25          MS. CROCKETT:  Okay.  But unfortunately, Your Honor,
```

1    I have another --

2                THE COURT:  That's okay.  Mr. Salem can do it.

3    That's fine.

4                So Mr. Salem, when you get page 4, I've already

5    marked out that last line.  If you'll mark out the one, that

6    will be great.  Okay?

7                MR. SALEM:  Certainly, Your Honor.

8                THE COURT:  Thank you so much.

9                Okay.  So Mr. Seeger, did you review this plea

10   agreement with your attorneys?  So Mr. Seeger, did you review

11   this plea agreement with your attorneys before signing it?

12               THE DEFENDANT:  Yeah, we've been over it.

13               THE COURT:  And if you had questions, and I'm sure

14   you had questions, did they answer them in a way that you

15   understood?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Now, this plea agreement -- did you feel

18   that you had the time that you needed to consider the plea

19   agreement, Mr. Seeger?

20               THE DEFENDANT:  Yes.  Yes, I did.

21               THE COURT:  And I know it's signed today, the day of

22   the plea agreement, or dated 5-12-25, which is today's date,

23   but you all have been talking about this for some time; is that

24   correct?

25               THE DEFENDANT:  Yes, sir.

30

1              THE COURT:  Okay.  Now, this plea agreement,

2  Mr. Seeger, contains nonbinding recommendations and

3  stipulations.  So do you understand that the Court must defer

4  its decision to accept or reject recommendations and

5  stipulations until it considers the presentence investigation

6  report.  Do you understand that?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Now, let me make it clear, though,

9  Mr. Seeger, that it is -- in regard to the sentencing, it's a

10  binding plea agreement, meaning that if the Court, and this is

11  Judge Kleeh's decision alone, if he agrees that the sentence --

12  if it's no less than 15 or no more than 30, if he sentenced you

13  to 30 years, you understand you're bound by this agreement.  Do

14  you understand that?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  And if they sentence you to 15 years, the

17  government's bound by it.  Do you understand that?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  Or anywhere in between.

20              So if the judge -- judge may look at that and say,

21  Mr. Seeger, that it's not enough, and if he does, then you

22  would have the right to withdraw your plea agreement.  Do you

23  understand that?

24              THE DEFENDANT:  Yes, sir.

25              THE COURT:  But if he accepts it, then you're bound

31

```
 1   by it.  Do you understand that?
 2             THE DEFENDANT:  Yes, sir.
 3             THE COURT:  Okay.  So and we've talked about a
 4   presentence investigation report, Mr. Seeger, but what happens
 5   with that is that probation will do a presentence investigation
 6   report.  A probation officer will be appointed to do that.
 7   Your attorneys will make arrangements with the probation
 8   office, so they'll talk to you about what information, if any,
 9   you want to share with them.  The government has the right
10   under the plea agreement to share with the probation office
11   their -- any information they have that they think is relevant
12   to your sentencing in this matter.
13             Now, what will happen is that they'll prepare the
14   report, Mr. Seeger.  Your lawyers will get it.  They'll go over
15   it with you.  If you have any disagreement with that report,
16   the presentence investigation report, you have a right to
17   object to it through your attorneys.  If the government has any
18   objection, they may.
19             But just let me make it clear, Mr. Seeger, in the
20   end, it is the government's decision -- I'm sorry.  It is the
21   Court's decision, Judge Kleeh's decision, his decision alone,
22   as to how you'll be sentenced, and as long as it's 15 to 30
23   years, you're bound by it.  Do you understand that?
24             THE DEFENDANT:  Yes, sir.
25             THE COURT:  Now, other than this binding plea of the
```

1   years of the sentence, anything else contained in it, the

2   Court's not bound by that.  Do you understand that?  It's

3   purely recommendations to the Court.

4            THE DEFENDANT:  Right, right.

5            THE COURT:  Do you understand under a concept known

6   as relevant conduct, that the Court may take into account any

7   circumstances, conduct, and injuries relevant to the crimes to

8   which you plead guilty?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Mr. Seeger, there are two paragraphs that

11   deal with that.  I mean, certainly on page 2, paragraph three,

12   both you and the government have agreed to a binding condition

13   that each count shall run concurrent to each other and the

14   sentence shall be capped at 30 years.  And that's -- and the

15   parties understand that if the Court does not accept the

16   binding provision, the defendant will have the right to

17   withdraw his plea of guilty.  So do you see that paragraph,

18   Mr. Seeger?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  And then also certainly is the paragraph

21   ten where you and the government have stipulated and agreed as

22   follows.  You have paragraph ten in front of you; is that

23   correct, Mr. Seeger?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  And it's in bold print.  And you have --

33

1   Mr. Salem read it on the record.  I know you have it in front

2   of you, that we have now deleted a portion of one sentence and

3   a complete whole sentence.  What's been deleted in the middle

4   paragraph number two, "the images were linked to conversations

5   that defendant was having with two minor females," period.

6   We've marked out "who clearly identified themselves as minors."

7          And then when you get to the last sentence, it has

8   marked out "the chat communications tied to the images

9   established by -- established defendant's knowledge that the

10  minors -- that they were minors, in fact, and he enticed them

11  for more."  That sentence is also marked out.

12         Taking out those two sentences or portion of a

13  sentence, a complete sentence, do you understand you're bound

14  by that stipulation and you agree with it, Mr. Seeger?

15         THE DEFENDANT:  Yes, I understand.

16         THE COURT:  So Mr. Seeger, do you understand that,

17  again, this stipulation is what the parties have agreed to, but

18  the Court may have additional facts through its presentence

19  investigation and it will ultimately make its own findings, but

20  this is what you and the government have agreed to.  Do you

21  understand that?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  And if the Court doesn't accept this

24  stipulation, you're still bound by your guilty plea.  Do you

25  understand that?

34

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Now, does this written plea agreement,

 3    Mr. Seeger, does it represent the complete agreement between

 4    you and the government in this matter?

 5              THE DEFENDANT:  Yes, sir.

 6              THE COURT:  Mr. Seeger, another way to ask that, is

 7    there anything that you and government have agreed to that's

 8    not in the plea agreement?

 9              THE DEFENDANT:  No, sir.

10              THE COURT:  Mr. Seeger, do you want me to recommend

11    the plea agreement be accepted?

12              THE DEFENDANT:  Yes, sir.

13              THE COURT:  Mr. Seeger, I find that you understand

14    and you agree with the terms contained in the plea agreement,

15    and I order that the original be filed herein and made a part

16    of the record in this case.

17              Well, just let me ask you this, Mr. Salem.  I have

18    this here.  On page 2, paragraph 5A, we've corrected three to

19    four.  Is there -- is that agreeable to the government?

20              MR. SALEM:  Yes, Your Honor, that is agreeable to the

21    government.

22              THE COURT:  And then on page 4, halfway down the big

23    paragraph, we've stopped it at "two minor females" and marked

24    out "who clearly identified themselves as minors."  Is that

25    agreeable to the government?
```

1          MR. SALEM:  Just to make sure I'm clear, Your Honor,

2   that sentence will now read, "The images were linked to

3   conversations that defendant was having with two minor

4   females," period.

5          THE COURT:  Correct.

6          MR. SALEM:  Yeah.

7          THE COURT:  And then the last line, "The chat

8   communications tied to the images established defendant's

9   knowledge they were minors and he, in fact, enticed them for

10  more," that's completely omitted; is that correct?

11         MR. SALEM:  That is our understanding and agreement,

12  Your Honor.

13         THE COURT:  Okay.  Thank you.

14         Now, Mr. Seeger, have you received a copy of the plea

15  agreement -- I'm sorry, a copy of the indictment filed against

16  you in this matter?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  Have you read that indictment?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Have you reviewed it with your attorneys?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  So is it necessary to read it on the

23  record again?

24         THE DEFENDANT:  No, sir.

25         THE COURT:  Can I take that as a waiver then,

36

1   Mr. Seeger?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  So Mr. Seeger, you're pleading to Count

4   1, which is coercion and enticement of a minor for sex, and

5   Count 4, which is production of child pornography.

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  So how do you plead, Mr. Seeger, to Count

8   1, guilty or not guilty?

9           THE DEFENDANT:  Guilty.

10          THE COURT:  And as to Count 4, guilty or not guilty?

11          THE DEFENDANT:  Guilty.

12          THE COURT:  Now, Mr. Seeger, before I accept your

13  plea, I want to make sure there's a factual basis for the plea,

14  that you understand the nature of the charge against you and

15  the consequences of your pleading guilty to the charge, that

16  you understand the constitutional and other legal rights that

17  you will give up by pleading guilty, and that you are pleading

18  guilty voluntarily.

19          So Mr. Seeger, as to Count 1, which is coercion and

20  enticement of a minor for sex, it's in violation of Title 18,

21  US Code, Section 2422(b), and it provides whoever uses the mail

22  or any other facility or means of interstate or foreign

23  commerce or within the special maritime and territorial

24  jurisdiction of the United States, knowingly persuades,

25  induces, entices, or coerces any individual who has not

37

1   attained the age of 18 years to engage in prostitution or any

2   sexual activity for which any person can be charged with a

3   criminal offense or attempts to do so, is in violation of this

4   statute.

5          Now, if the government had to go to trial in this

6   case, they would have to prove the following elements of this

7   offense.

8          So first of all, do you understand the statute,

9   Mr. Seeger?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  So if the government had to go to trial

12   in this case, they'd have to prove the following elements of

13   Title 18, US Code, Section 2422(b):  First, that you persuaded,

14   induced, enticed, or coerced; second, another person who has

15   not attained the age of 18 years; third, to engage in

16   prostitution or in any sexual activity for which any person

17   could be charged with a criminal offense, that being sexual

18   exploitation of children; fourth, that in doing so, you used

19   the mail or any facility or means of interstate or foreign

20   commerce, or the conduct occurred within the special maritime

21   and territorial jurisdiction of the United States; and fifth,

22   that you did this act knowingly.

23          Now, again, just to make it clear -- and we've talked

24   about this, Mr. Salem -- it's that the acts took place, not

25   that you knew that the person was under 18; that they actually

38

```
 1   were.  So do you understand the elements of the offense,
 2   Mr. Seeger?
 3            THE DEFENDANT:  Yes, sir.
 4            THE COURT:  Given the statute and the elements of the
 5   offense, do you consider yourself to be guilty of coercion and
 6   enticement of a minor for sex?
 7            THE DEFENDANT:  Yes, sir.  I have a question.
 8            THE COURT:  You're always welcome -- I always -- you
 9   can ask your question.
10            THE DEFENDANT:  I mean, I've tried to get my
11   attorneys to get me this answer, so there's Count 1 and Count
12   4.  They're two different charges.  But discovery of the
13   evidence presented for both counts was, in each case, two
14   videos, so why are they different charges?
15            THE COURT:  Well, let me say -- did you hear this,
16   Mr. Salem?
17            MR. SALEM:  I did, Your Honor.
18            THE COURT:  I mean, I assume one factual scenario can
19   be the basis for one or two or three or four crimes.
20            MR. SALEM:  That is correct, Your Honor.  That's our
21   position.
22            MR. SHEEHAN:  The alleged victim in Count 1, the
23   alleged victim in Count 2 and Count 4, are different people,
24   and that gives rise to separate charges.
25            THE DEFENDANT:  But I'm wondering, why aren't both of
```

39

1   them coercion and enticement or both of them production of

2   child pornography?

3         THE COURT:  Did you get your question answered,

4   Mr. Seeger?

5         THE DEFENDANT:  It sounds like one of those things,

6   that it's just the government's choice which charge they want

7   to file, so I guess there's -- it's just their choice, and

8   maybe they don't have to disclose that.

9         THE COURT:  Let me ask you this, Mr. Seeger.  And

10  you're obviously a very bright man, and I appreciate your

11  questions.  Would the answer to it make a difference to your

12  decision to plead today or not?

13        THE DEFENDANT:  No.

14        THE COURT:  And that's what I need to know.  I mean,

15  I understand that.

16        So now we're going to talk about Count 4, which

17  charges you with production of child pornography.  And it

18  reads -- it's in violation of Title 18, United States Code

19  Section 2251(a) -- any person who employs, uses, persuades,

20  induces, entices, or coerces any minor to engage in, or who has

21  a minor assist any other person to engage in, or who transports

22  any minor in or affecting interstate or foreign commerce, or in

23  the territory or possession of the United States with the

24  intent that such minor engage in any sexually explicit conduct

25  for the purpose of producing any visual depiction of such

1   conduct, or for the purpose of transmitting a live visual

2   depiction of such conduct, shall be punished as provided under

3   the penalty provisions, if such person knows or has reason to

4   know that such visual depiction will be transported or

5   transmitted using any means or facility of interstate or

6   foreign commerce or in or affecting interstate or foreign

7   commerce or mail, if that visual depiction was produced or

8   transmitted using materials that have been mailed, shipped, or

9   transported in or affecting interstate or foreign commerce by

10  any means, including computer, or such visual depiction has

11  actually been transported or transmitted using any means or

12  facility of interstate or foreign commerce, or in or affecting

13  interstate or foreign commerce, if mailed.

14          So do you understand the statute under which you've

15  been charged for Count 4, Mr. Seeger?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Now, if the government had to go to trial

18  in regard to Count 4, they'd have to prove the following

19  elements to a jury's satisfaction, each one beyond a reasonable

20  doubt:  One, that you knowingly employed, used, persuaded,

21  induced, enticed, or coerced any minor to engage in or who has

22  a minor assist any other person to engage in any sexually

23  explicit conduct; that the defendant had the intent that such

24  minor engage in any sexually explicit conduct; that defendant

25  did so for the purpose of producing any visual depiction of

41

1    such conduct, or for the purpose of transmitting a live visual

2    depiction of such conduct; and fourth, that the defendant knew

3    or had reason to know that such visual depiction would be

4    transported or transmitted using any means or facility of

5    interstate or foreign commerce, or in or affecting interstate

6    or foreign commerce.

7            So do you understand the elements of the offense of

8    Count 4, Mr. Seeger?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Considering the statute and the elements

11   of the offense, do you consider yourself to be guilty of

12   production of child pornography?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Now, Mr. Seeger, the government is

15   required to provide a factual basis for your plea in this

16   matter.

17           Mr. Salem, I'm assuming that you'll do that by

18   proffer?

19           MR. SALEM:  I am, Your Honor.  In fact, in this

20   matter, because of the nature of the agreement, we would be

21   relying on the relevant conduct stipulation that was stated

22   within the written plea agreement and placed on the record as

23   the factual basis.

24           THE COURT:  Okay.  So -- well, let me ask you,

25   Mr. Dyer, do you have any objection to the factual proffer as

42

 1   set forth in paragraph ten of the plea agreement with the

 2   corrections or -- corrections made by the parties?

 3            MR. DYER:  I do not, Your Honor.

 4            THE COURT:  Do you, Mr. Sheehan?

 5            MR. SHEEHAN:  No, Your Honor.

 6            THE COURT:  Okay.  Do you, Mr. Seeger?

 7            THE DEFENDANT:  No.

 8            THE COURT:  And Mr. Seeger, does the factual proffer

 9   in paragraph ten or the factual stipulations the parties have

10   agreed to, is it substantially correct?

11            THE DEFENDANT:  I mean, I would say so.

12            THE COURT:  Okay.  Does it accurately reflect your

13   involvement in what occurred?

14            THE DEFENDANT:  Yeah, I would say so.

15            THE COURT:  Okay.  So Mr. Seeger, does paragraph ten

16   then, does it represent what you agreed to as a fair factual

17   statement concerning these two offenses, 1 and 4?

18            THE DEFENDANT:  Yeah.  All except the last sentence.

19            THE COURT:  Is that the one we took out?

20            THE DEFENDANT:  No.  About all conduct was committed

21   within the Northern District of West Virginia and elsewhere.

22            THE COURT:  So let me just say this -- and your

23   lawyers can speak about it.

24            MR. SHEEHAN:  Your Honor, if I may, Your Honor.

25   Ultimately, Judge, the minors involved in this particular case

43

1   are out of state.  Ultimately, the state's -- the government's

2   key evidence in this case was located on a computer that was at

3   Mr. Seeger's residence in Preston County, West Virginia.  So

4   there is an interstate commerce element, and because the end of

5   that is that those documents -- that those pictures are on

6   digital within the state of West Virginia, we believe that that

7   certainly satisfies the technicality of that particular

8   requirement.

9           THE COURT:  So is that, of course -- they mention

10  Marion County in the indictment.

11          MR. SHEEHAN:  There was some dispute in the state

12  court case over whether documents -- in state court, Mr. Seeger

13  was originally charged in Preston County, but was a dispute

14  about venue between Preston and Marion Counties, but ultimately

15  the seizure of materials in this particular case occurred by

16  the state trooper in Preston County.  And then there was a

17  question about where they may originally have been received by

18  my client, but certainly both of those counties are in the

19  Northern District of West Virginia.

20          THE COURT:  So Mr. Seeger, I know you heard just what

21  Mr. Sheehan said.

22          THE DEFENDANT:  Yeah.

23          THE COURT:  So Mr. Seeger -- and again, just assuming

24  that what your lawyer said is correct, and I'm accepting that

25  it is factually correct, that that's where these items were

44

1   seized, the Northern District of West Virginia includes Preston

2   County, Marion County, the top half of the state.  So given

3   that, and assuming the correctness of your lawyer's

4   representations, did this happen within the Northern District

5   of West Virginia?

6           THE DEFENDANT:  Yeah, but I would -- I mean, I have

7   to be honest.  I'm going to point out -- I would like to put on

8   the record, first of all, that not only was video an issue in

9   the state case, but we did file a motion to dismiss for lack of

10  evidence, because there was no evidence produced at discovery,

11  and the prosecutor refused to show up for the hearing to defend

12  the evidence.

13          THE COURT:  That was in the state case?

14          THE DEFENDANT:  That was in the state case, yes, that

15  my family spent over 60 grand on between attorney fees and

16  bail.  And I would also like to say that Count 4 of the

17  indictment, the evidence clearly shows and can be proven beyond

18  a reasonable doubt that I was not in the Northern District of

19  West Virginia on those dates for Counts 3 and 4, and I just

20  wanted to be sure that you have the authority to take the plea

21  to Count 4, knowing that that's true.  And I have made a

22  discovery request that was never passed on to the government

23  that would further prove that.

24          MR. SHEEHAN:  Your Honor, venue is -- under existing

25  Fourth Circuit case law, has to be proved by a preponderance of

45

1    the evidence, not beyond a reasonable doubt.  We have taken

2    that factor into account as well in this particular matter.

3              THE COURT:  As to Count 4.  So he's not raising this

4    as to Count 1; is that correct?

5              MR. DYER:  That's correct, Your Honor.

6              THE COURT:  So as to Count 4 -- let me ask the

7    lawyers who have looked at the discovery.  Do you have -- I

8    mean, are the dates alleged, I mean, correct, based upon the

9    discovery that you've seen?

10             MR. DYER:  Your Honor, there is some evidence that

11   Mr. Seeger was working in South Carolina, I believe

12   specifically Myrtle Beach, during the time frames that are

13   covered in Counts 3 and 4 of the indictment, and frankly, there

14   is -- other evidence to the contrary with respect to the other

15   counts in the indictment.  There's a lot of different things

16   going on in Mr. Seeger's life at that time.  Factoring in the

17   reduced burden of proof on the government and a number of other

18   factors that Mr. Sheehan and I have considered, not the least

19   of which would be prevailing on the issue of venue would

20   potentially, which we're not -- certainly not certain we could

21   prevail, but even if we did, that wouldn't lead to anything but

22   a further indictment charging many additional counts and would

23   probably result in a bigger problem for the defendant than he

24   faces under this indictment.

25             So all of those things considered, we have concluded

46

1    that the venue issue was not worth pursuing into the courtroom

2    as a defense, but again, as I pointed out at the last hearing,

3    this is complicated on a lot of levels, and Mr. Seeger is a

4    high-level thinker, and so we -- he doesn't view this

5    necessarily as two 40-year veterans of the legal profession

6    have.  And but in the end, he'd come to the conclusion that

7    certainly it's in his best interest to enter these pleas.  We

8    just kind of get stuck moving through some of these little

9    issues during the Rule 11 process, so forgive us for that --

10              THE COURT:  But let me say, Mr. Dyer and Mr. Sheehan,

11   and to you, Mr. Seeger, I don't -- I mean, it is -- I mean, to

12   the extent that he raises that it's a -- perhaps if he says

13   he's in another state, it could be a jurisdictional issue, but

14   from what I understand that you all have had -- two lawyers

15   have had those discussions with Mr. Seeger.

16              MR. DYER:  Right.

17              THE COURT:  Have you come to the conclusion that

18   jurisdiction is properly before this Court?

19              MR. DYER:  That venue is.

20              THE COURT:  Venue is as well.

21              MR. DYER:  Again, we have some belief -- I'm speaking

22   Mr. Seeger has some belief -- we don't have proof of that, but

23   yes, the answer to your question is yes, it's been thoroughly

24   considered, yes, sir.

25              THE COURT:  And let me say this.  Mr. Seeger, it's

47

```
 1   not an uncommon thing that a defendant in a criminal case may
 2   view something very different, and venue and jurisdiction is
 3   both legal and factual, but certainly, I mean, I have to -- we
 4   ask that question for a reason, and certainly it sounds like
 5   the lawyers and Mr. Seeger have talked about that issue far
 6   more than I've seen in about any other case.
 7            THE DEFENDANT:  I know that the standard for venue is
 8   preponderance of the evidence.  I chose my words carefully when
 9   I said beyond a reasonable doubt, because there is a photo on
10   the camera roll of the cell phone, the nexus for, that will
11   prove where I was.
12            THE COURT:  Okay.  So --
13            THE DEFENDANT:  That's a discovery request that I
14   made that was never --
15            THE COURT:  Let's just slow down now.  You know,
16   Mr. Seeger, I have to make decisions.  You do.  But you don't
17   have to do any of this.  You got a trial scheduled tomorrow
18   morning.  Your lawyers can raise that issue again.  The judge
19   can make his rulings.  You can raise these things.  The judge
20   will make the rulings.  I don't know whether it will change
21   anything.
22            What I need to know, Mr. Seeger, at the end,
23   certainly are you entering into this guilty plea with your eyes
24   open, knowing what's happened, and that you acknowledge and
25   recognize the authority of this Court to accept your plea.  If
```

48

1    you don't, then we'll stop.  I can't do anything without -- I

2    mean, and I don't -- I hope you heard my tone.  I'm not saying

3    that in a coercive way.  I -- everything is based upon that.  I

4    know your lawyers believe I have it.  But there's a factual

5    issue on that, and then we can stop, or if you -- if it's just

6    something -- everyone makes decisions that they have to make,

7    but that's up to you, Mr. Seeger.

8              (Pause in proceedings.)

9              MR. DYER:  I think we're ready, Your Honor.

10             THE COURT:  So again, Mr. Seeger, venue and

11   jurisdiction at times can be complex legal issues driven by

12   factual issues, but I -- it's almost a nonstarter.  If you

13   believe that we don't have authority to accept your plea in

14   this matter -- are you agreeable for me to accept your plea in

15   this matter?

16             THE DEFENDANT:  I'm agreeable for you to accept my

17   plea.

18             THE COURT:  Okay.  Can I take from that that you

19   would then accept that I have jurisdiction to do so, and venue?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Okay.  Counsel, in regard to the time

22   periods, are they as set forth in the indictment?  Based upon

23   the discovery that you've seen, are they within the time

24   frames, Count 1 and 4?

25             MR. DYER:  Your Honor, I'm sorry.  Would you mind

49

1    repeating that last question?

2              THE COURT:  Sure.  We talked about at least in order

3    for me to have jurisdiction or venue, it needs to be the

4    Northern District of West Virginia, and lately Mr. Seeger

5    indicated that he agreed that I have venue and jurisdiction to

6    hear your plea.

7              THE DEFENDANT:  Yeah.  Yeah.  I thought I said that

8    already.

9              THE COURT:  As far as the time periods that they

10   allege, Mr. Seeger, what do you have to say about those?

11             THE DEFENDANT:  I mean, I was definitely not in West

12   Virginia, but I do know -- I don't disagree that you have

13   authority to take the plea.  I just didn't know -- that was why

14   I raised that question.

15             THE COURT:  Well, that includes, though, the only

16   authority I would have is in the Northern District of West

17   Virginia, and that includes Marion and Preston.

18             Well, let's -- Mr. Dyer, are you satisfied if this

19   case went to trial, there would be no meritorious legal defense

20   to the charge?

21             MR. DYER:  I am, Your Honor.

22             THE COURT:  Both charges.

23             What about you, Mr. Sheehan?

24             MR. SHEEHAN:  I concur, Your Honor.

25             THE COURT:  And that's in regard to Count 1 and Count

1  4; is that correct?

2          MR. SHEEHAN:  Yes, sir.

3          THE COURT:  Are you satisfied Mr. Seeger's

4  constitutional rights and other rights have been observed

5  fully?

6          MR. DYER:  I am.

7          MR. SHEEHAN:  Yes.

8          THE DEFENDANT:  Well, not my Fourth Amendment rights.

9          MR. SHEEHAN:  Your Honor, we filed a motion with

10 Judge Kleeh.  He has ruled against Mr. Seeger.  And other than

11 that, and --

12         THE DEFENDANT:  I did say my Fourth Amendment rights

13 were violated and the search was unconstitutional and unlawful,

14 which I appreciate.

15         THE COURT:  No, no.  But let me -- I know that, but I

16 know that -- and, in fact, you reserved the right to appeal

17 that issue; is that correct?

18         THE DEFENDANT:  Yes.

19         THE COURT:  But when you say your Fourth Amendment

20 right, you're referring to the motion to suppress made by your

21 attorneys; is that correct?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  You understand that the Court did not

24 agree with your position and denied your motion to suppress.

25 Do you understand that, sir, Mr. Seeger?

51

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  You also understand you have a right

3     to -- you preserved the right to appeal that to the Fourth

4     Circuit; is that correct?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Okay.  Now, that will be their decision.

7     Okay.  Was there anything other than that in regard to your

8     Fourth Amendment rights, Mr. Seeger?

9              THE DEFENDANT:  No, sir.  I would have liked to

10    exercise my Sixth Amendment right, though, and go to trial in

11    the state case.  I would like to say I just find it abhorrent

12    that I can prove that --

13             (Pause in proceedings.)

14             MR. DYER:  We're back on track, Your Honor.

15             THE COURT:  Okay.  So Mr. Seeger, let me say this,

16    just so that the record can be clear.  I understand that this

17    may have initiated, there was a state case, and I'm not sure

18    what happened with it, but all I can address is the issues

19    before me as the US Magistrate Judge, the charges brought

20    against you by the US Attorney for the Northern District of

21    West Virginia, and that's all we can deal with, and so your

22    decision needs to be made -- and undo any of that.  Decision

23    needs to be made whether you're going to enter a guilty plea in

24    the federal case that's before us now.  I understand you have

25    those thoughts, but you understand that that's the business

52

1   before the Court today?

2           THE DEFENDANT:  Yes, I understand.

3           THE COURT:  Okay.  Now, if you feel so strongly about

4   that and what happened there that you want to go to trial in

5   this case, you can.

6           THE DEFENDANT:  Apparently, I wouldn't be allowed to

7   defend myself, Your Honor.

8           THE COURT:  Well, you have two good attorneys who

9   would defend you.

10           THE DEFENDANT:  I can prove I didn't know how old

11   Jane Doe Two was despite --

12           MR. SHEEHAN:  Which is not a relevant consideration.

13           THE DEFENDANT:  That's why I can't defend myself, but

14   I could defend myself in a state case.  And by the way, the

15   statute of limitations for her stealing over $10,000 from me

16   under false pretenses will start to run out in about two or

17   three weeks, if anyone's interested in justice for someone who

18   actually lived in the Northern District of West Virginia.  Just

19   wanted to throw that out there.

20           THE COURT:  So let me unpack that a bit.

21           I mean, these are your lawyers.  You have a trial

22   scheduled for tomorrow.  I mean, we've talked about this

23   before.

24           THE DEFENDANT:  My understanding is the trial date

25   has already been rescheduled.  It won't be tomorrow.  Or it

1  will be rescheduled.  Excuse me.

2           THE COURT:  Well, I mean, it's scheduled for

3  tomorrow.  Certainly if there's a plea, but I mean, what is

4  that all about?  I understood that the Court entered an order.

5  That's all I know.

6           MR. DYER:  Your Honor, it's still scheduled for

7  tomorrow.

8           THE COURT:  Okay.

9           MR. DYER:  There's practical concerns, but it is

10 still -- by court order, it is scheduled for tomorrow.

11          THE COURT:  Okay.  That's the order I saw.

12          Okay.  Let's go on.  Do you -- Mr. Dyer, do you

13 concur in Mr. Seeger's now-stated intention to enter a guilty

14 plea?

15          MR. DYER:  110 percent.

16          THE COURT:  Do you, Mr. Sheehan?

17          MR. SHEEHAN:  I believe so, Your Honor.

18          THE COURT:  Is it your intention to plead guilty to

19 these two offenses?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Okay.  Mr. Seeger, I do find that there's

22 a sufficient factual basis for your plea of guilty based upon

23 the factual stipulation entered into by the parties in writing

24 in the plea agreement, as well as has been verified by everyone

25 here in the courtroom today.

54

1              THE DEFENDANT:  I'm sorry, Judge.  I thought you were

2       pausing.

3              THE COURT:  I did take a pause to catch my breath,

4       but go ahead.

5              THE DEFENDANT:  I would like to put one other thing

6       on the record before we conclude, because I -- just in case

7       there might be --

8              THE COURT:  We have not concluded yet, but go ahead.

9              THE DEFENDANT:  Yes.  I have a concern.  I've done a

10      lot of research on these types of cases, and I found two that

11      struck me as quite interesting.  I just wanted to bring up one

12      via the Subway guy that everyone remembers.  He traveled, had

13      sex with two minors, had a bunch of child pornography with

14      victims as young as six years old.  He was offered a plea deal

15      for 15 and a half years in prison.

16              I didn't touch anyone.  I didn't travel, nor did I

17      discuss traveling, and yet I'm being offered a plea deal for 15

18      years in prison.  I think there might be an issue here with

19      regards to how people were treated back in 2015, which is when

20      this alleged conduct was supposedly occurred, and how people

21      are being treated today.  And I may want to consider raising

22      that issue someday on a Fourteenth Amendment grounds for due

23      process, but I don't know that that will work, but I just

24      wanted to put that on the record.

25              And there's other cases similar to that.  I mean, I'm

55

1   getting the same deal as people who actually violated children

2   in person.  And I don't think that's right.

3           THE COURT:  Well, let's go back to that.  First of

4   all, Mr. Seeger, the sentence that will be imposed upon you

5   will be imposed by Judge Kleeh.

6           THE DEFENDANT:  Right.  And it can be even higher.

7           THE COURT:  Well, but let me say this.  You have

8   agreed to a binding plea that basically has a bottom of 15

9   years, because it's a mandatory minimum, but no greater than 30

10  years.  When we say binding, I'm going to write a report to the

11  Court that you've agreed to that.

12          Now, if you don't agree to that -- this is not

13  academic.  This is serious as can be.  You're representing to

14  the Court when you get to that, you start having this talk and

15  they'll say, let's just go back to square one, because this is

16  probably the most serious thing you've agreed to in the

17  agreement.  Now --

18          THE DEFENDANT:  I'm agreeing to this for the sake of

19  expedient appeal, because I think this is a serious issue for

20  the country.  I do not agree at all with the terms of

21  imprisonment, but that's where I am.  I'm not allowed to defend

22  myself.  Nobody cares about the truth.  So I just want to get

23  to the Fourth Circuit, where hopefully there will be some

24  principles for the Constitution.  That's where I'm going.  So

25  let's get there.

56

1          MR. DYER:  He's speaking of the Fourth Amendment

2     issue, Your Honor, motion to suppress.  That's what he's

3     speaking of.

4          THE COURT:  That doesn't sound like that.  He's

5     talking about another issue as to what's -- what is a -- how

6     they -- what his sentence should be in this matter, and it may

7     be so extreme that it's unconstitutional.

8          THE DEFENDANT:  Just wanted it on the record, in case

9     I want -- if I'm not successful on appeal of the motion to

10    suppress, I just wanted to make sure that I had something on

11    the record so that I have an avenue for appealing down the road

12    on constitutional grounds.  That's why I wanted it on the

13    record.

14         THE COURT:  Okay.  Well --

15         THE DEFENDANT:  I don't know that anyone has

16    challenged a plea agreement that -- for a crime from long ago

17    and the standards people were given then for a future date.

18         THE COURT:  I appreciate what you're saying, but

19    here's why I can't accept that, Mr. Seeger.  First of all, I'm

20    not going to sit here and have you look at me and say I agree

21    to 15 to 30 years, 'cause this is a binding agreement.  You're

22    telling me that, and then on the other side of your mouth

23    you're saying, I'm taking it up because I think it's

24    unconstitutional.  If you're telling me that, then you have not

25    agreed to that, and that's critical to this.

57

1              THE DEFENDANT:  So the alternative thought -- I

2    understand what you're saying, by the way.  But what I will say

3    is that because I'm not allowed to defend myself at trial, I

4    don't expect to win at trial.  Therefore, it's in my best

5    interest to take the plea agreement, whether it's fair or not.

6    It doesn't mean I have to agree with it.  I agree by the terms.

7    I agree to abide by the terms, of course, but it doesn't mean

8    that I think it's fair or just.

9              THE COURT:  What if the Fourth Circuit says, didn't

10   you agree to 15 to 30, and that's the end of that discussion?

11   Do you understand that?

12             THE DEFENDANT:  Yeah, they may very well do that.

13   The issue is that there's -- as far as I can tell, there might

14   be some new ground to be broken on the question of the

15   standards under certain sentencing agreements from a decade ago

16   to now.  And I just wanted it on the record.

17             THE COURT:  Well --

18             THE DEFENDANT:  That's all, really.

19             THE COURT:  I know you're saying that's all,

20   Mr. Seeger, but -- and it may make some sense in your mind, but

21   it's just --

22             MR. DYER:  Your Honor, if it brings any consolation

23   to the Court, the idea in Mr. Seeger's mind arose months ago

24   that he may be the victim or target of a selective prosecution.

25             THE COURT:  Sure.

58

1    MR. DYER:  And we had addressed that with him on a

2    number of different occasions, and Steven has always felt that

3    as a matter of fairness to him, he should be able to voice his

4    concern, though he accepted Mr. Sheehan and I's advice and

5    counsel that he did not have a legitimate selective prosecution

6    case or defense in this matter, and Mr. Seeger ultimately and

7    wisely, sagely, agreed with that advice from Mr. Sheehan and I.

8    And for some reason he just wanted it to be known that that had

9    been given consideration by him.  He accepts that he does not

10    have that claim available to him in this case.  I hope that

11    helps.

12    MR. SHEEHAN:  I concur wholly with Mr. Dyer's

13    thoughts.

14    THE COURT:  Let me say this, Mr. Seeger.  I just want

15    you to understand my thinking on this.  I can accept your

16    feeling that you've been treated differently or unfairly

17    compared to how other people have.  That's not an uncommon

18    feeling in front of me, why did I get this sentence and someone

19    else didn't.  And then you talk about the Subway guy and how

20    that feels unfair to you.

21    THE DEFENDANT:  Or why I can't find a case with this

22    fact pattern that's more than three years old and mine's over

23    ten years old.

24    THE COURT:  Oh, no, no.  I understand that.  But

25    here's what it does, though, Mr. Seeger.  Here's my focus,

59

1  Mr. Dyer and Mr. Sheehan.  And I think it is more than

2  academic.  Do you understand when you agree to a binding plea

3  to 15 to 30, you've given up all those arguments?  You've given

4  them up because you have agreed to it.  And if you don't accept

5  it as such, then I don't -- and I'm trying to be careful how I

6  say that, because I don't want to mislead you, Mr. Seeger, but

7  that's what I'm focusing on is, this is a binding plea that

8  you've agreed to, and if you don't agree to that, then you

9  don't, and --

10        THE DEFENDANT:  I do agree.  I agree to the binding

11  terms of the plea.  It doesn't mean that I agree that it's

12  fair.  That's the point I was trying to make.  I wanted to put

13  that on the record.  I have been told that Randolph Bernard

14  himself said the plea agreement is unfair but he's not willing

15  to do anything, so maybe that's not true.  That's what I was

16  told.  So here I am.  The State of West Virginia charged me

17  with over --

18        MR. SHEEHAN:  Stop talking about the state case.

19        THE COURT:  You know, let me say this to you,

20  Mr. Seeger.  I don't have any question that your attorneys have

21  worked hard in this because they truly, truly do believe it's

22  in your best interest and they -- they're not saying that to be

23  casual about it.  I mean, they believe that.  And as seasoned

24  attorneys, they understand the risk that you expose yourself

25  to, but you're a bright and intelligent man and you -- and

60

1    maybe that's part of the struggle.  But the more time I spend

2    with you, Mr. Seeger, how it feels to me is, I don't know if I

3    agree with anything, but it's what I have to do.  And I

4    understand that, but, boy, you push the edges of it and --

5            MR. DYER:  I think he would acknowledge it's in his

6    best interest to do this as well, which I think is important,

7    even though he believes there would be fairer deals that could

8    have and should have, in his mind, been offered to him.  Well,

9    they weren't.  But this is clearly in his best interest to see

10   this deal through, and he had every intention when he showed up

11   here to enter these guilty pleas pursuant to this agreement,

12   which he knew and understood to be binding.  I think he'll be

13   glad to confirm what I just said as true on the record, Your

14   Honor.

15           Steven, is what I just said true?

16          THE DEFENDANT:  I absolutely agree that what he said

17   is true.  It's in my best interest to take this plea deal.   I

18   just think it's in the best interest of public awareness that I

19   have done something else, but that's not in my best interest.

20          THE COURT:  Well, okay.

21          THE DEFENDANT:  So that's why I'm struggling with

22   this.  I think that people need to know what happened here.  In

23   fact, I'm dong my best to get the judge's ruling on the

24   suppression issue to the news media so that people can find out

25   what's going on.

61

1          THE COURT:  Well, let me say this.  I do -- the way

2     you framed it, Mr. Seeger, is an important distinction to me,

3     because there are times when you may feel that in the public's

4     interest this should all see the light of day or whatever, get

5     to trial, do what you do, but that -- in your own personal

6     interest, that it may be the best thing is for you to plead to

7     this and get it behind you.  Not only that; if you go to trial

8     and do that, you understand through your attorneys that you may

9     expose yourself to more time.  And I've heard you say before in

10    other pleadings that you really don't want to put at least one

11    particular alleged victim through all this.

12          THE DEFENDANT:  That's true.  So I struggled with

13    that a lot, but I did find out recently that we could just

14    stipulate to the factual description of the images and not have

15    to show them, and therefore if the government chose to present

16    those images, it would be on them and not me.  But that's why I

17    was considering going to trial, but I really do think that this

18    Fourth Amendment issue is so important for the country that I

19    just want to get to the Fourth Circuit as fast as I can, so I

20    would like to do that.

21          THE COURT:  And again, that's the --

22          THE DEFENDANT:  I do not want to make either girl,

23    even the one who hurt me, have to sit there and have other

24    people view these.  It's not right and it's not fair.

25          THE COURT:  You do want to enter a guilty plea.  You

62

1  want to appear before the judge --

2              THE DEFENDANT:  Yes.

3              THE COURT:  -- understanding what you've agreed to,

4  15 to 30 years.

5              THE DEFENDANT:  Uh-huh.

6              THE COURT:  And that he could sentence you to 30

7  years and you can then not change your mind; is that correct?

8              THE DEFENDANT:  Right.  Right.

9              THE COURT:  Okay.  Well -- okay.  I do want to talk

10 to you about the penalties, Mr. Seeger.  And Mr. Seeger, I'm

11 going to find there is a sufficient factual basis for your plea

12 of guilty.  I don't have to believe things beyond a reasonable

13 doubt.  That's not my job.  But I think there's a sufficient

14 factual basis, simply based upon the plea agreement that you've

15 agreed to, that you've signed, that you've verified on the

16 record here.

17             You understand, Mr. Seeger, you're pleading guilty to

18 a felony offense, and if your plea is accepted, you will be

19 adjudged guilty of that felony offense?

20             THE DEFENDANT:  Yes, sir.  Correct me if I'm wrong,

21 Judge, is it Judge Kleeh that ultimately accepts the plea of

22 guilt?  You don't do that.

23             THE COURT:  What I will do is -- and you're correct

24 on that.  What I will do is enter a written report and

25 recommendation that he accept the plea.  Now, that -- there's a

63

1    14-day time period to file objections to it, because I don't

2    have the authority, so it will be received by your attorneys.

3    I do an R and R, which I will find there's a sufficient factual

4    basis that you are doing this knowingly and voluntarily and

5    there's a factual basis for it.  So, I mean, do you understand

6    that's what I do, Mr. Seeger?

7              THE DEFENDANT:  Yes, sir.  I just wanted to clarify

8    and make sure I had the right idea.

9              THE COURT:  That's fine.

10             THE DEFENDANT:  Thank you.

11             THE COURT:  So do you understand that such judgment,

12   Mr. Seeger, may deprive you of valuable civil rights, such as

13   your right to vote, your right to hold public office, your

14   right to serve on a jury, your right to possess a firearm or

15   gun, and that's for the rest of your life.  Do you understand

16   that?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Do you understand you expose yourself, as

19   to Count 1, to a maximum penalty of a term of life

20   imprisonment, a fine of $250,000, and a lifetime term of

21   supervised release.  Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  And as to Count 1, you also expose

24   yourself to a mandatory minimum sentence of ten years and a

25   term of at least five years of imprisonment.  Do you understand

64

1  that?  I'm sorry.  Five years of supervised release.

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Do you understand that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  As to Count 4, the production of child

6  pornography, the maximum penalty is a term of 30 years of

7  imprisonment, a fine of 250, and a lifetime term of supervised

8  release, but you also expose yourself to a mandatory minimum

9  penalty of a term of 15 years of imprisonment and at least five

10 years of supervised release.  So do you understand that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  And the reason it's important for you to

13 understand that, the Court, while you've agreed to a binding,

14 it's not binding on the Court, and you need to be aware of what

15 your maximums are and mandatory minimums.

16          Do you understand as to supervised release, what that

17 means is that after imprisonment, you'll be supervised by the

18 probation office under conditions that will be set by this

19 Court.  Do you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  And do you understand that if you violate

22 any of those terms of supervision -- and they could be for

23 life, if the Court imposed it -- then the Court could revoke

24 the term of your supervised release and order you to serve

25 additional time in prison.  Do you understand that?

65

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  You understand you'll be required to pay

3     a special assessment of $100, for a total of 200, for having

4     been convicted of a felony offense?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  You understand that you've agreed that

7     you'll do that within 40 days of entry of your guilty plea?

8              THE DEFENDANT:  Yes, sir.  If I'm able to, I will.

9              THE COURT:  Okay.  No.  That's a fair thing.  It's

10    commonly provided in plea agreements, but I think there's also

11    understanding with people incarcerated that --

12             Well, just let me ask you, Mr. Salem, I've never seen

13    anyone want to set aside a plea agreement because of someone's

14    failure to -- inability to pay the special assessment.  Has

15    that been your experience?

16             THE DEFENDANT:  Can I pay with suits?

17             THE COURT:  Go ahead, Mr. Salem.

18             MR. SALEM:  I've never observed that, Your Honor, no.

19             THE COURT:  And would you have any intention to do

20    so?

21             MR. SALEM:  We would not.

22             THE COURT:  Okay.  You understand unless you're

23    determined to be indigent and financially unable to do so,

24    Mr. Seeger, you'd be required to pay an additional $5,000

25    special assessment under the Justice for Victims of Trafficking

JA283

66

1    Act, Title 18, US Code, Section 3014(a)(3), and up to 50,000

2    for the Amy, Vicky and Andy Child Pornography Assistance Act.

3    And I do know that in the plea agreement, Mr. Seeger, that

4    there is a provision that provides that, if it is found to be

5    applicable.  So do you understand that?

6              THE DEFENDANT:  Yes, Judge.  Because I pointed out

7    that the Amy, Vicky and Andy law was passed in 2018.  I also

8    just found out a few days ago, doing some research, that the

9    Justice for Victims of Trafficking Act appears to have been

10   passed in 2015, which is also past the period of the

11   indictment, so I may also not be subject to that.  Just wanted

12   to bring it up, but I guess we can bring that up at the

13   sentencing hearing.

14             THE COURT:  I understand that your position is, and I

15   think it's a fair one, if the penalty was not in effect at the

16   time this occurred, as a matter of law, it wouldn't apply to

17   you; is that correct?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  And is that the plea agreement.  Now, the

20   other one, it's not.

21             But Mr. Salem, would the government acknowledge

22   certainly that if these offenses occurred before a statute

23   enacted in regard to penalties that he at least would preserve

24   his right to raise that issue?

25             MR. SALEM:  I think he preserves his right.  Without

1   having researched it, though, I'm not sure whether or not

2   they'd be subject to the ex post facto clause.  It's just being

3   raised now, but certainly I think he does preserve the right to

4   raise the issue.

5           THE COURT:  Okay.  And that's -- I'm sorry.  Did you

6   have something else, Mr. Seeger?

7           THE DEFENDANT:  It's fine.

8           THE COURT:  So certainly you can raise that.  Judge

9   Kleeh will make that decision, and if you disagree with it,

10  then that's a sentencing -- I think it's a sentencing issue.

11          Do you understand that as part of your fine, you

12  could be required to pay the costs of incarceration and/or the

13  costs of supervision on release, Mr. Seeger, if you're

14  financially able to do so?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Do you understand that it now costs

17  $4,309 per month for prison, $395 per month for supervised

18  release, $3,453 per month for a residential reentry center.  Do

19  you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  As to paragraph -- do you understand that

22  the Court does have the authority to order restitution, if

23  appropriate, in this matter?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And in fact, paragraph 14 of your plea

68

```
1   agreement talks about restitution as statutorily required.  Did
2   you see that in paragraph 14, Mr. Seeger?
3              THE DEFENDANT:  Yes, sir.  I just got to the
4   paragraph.
5              THE COURT:  And that provides that in an amount to be
6   determined by the Court at sentencing or at a separate
7   sentencing issue on the issue within 90 days of sentencing.
8   Procedurally, typically what will happen is the government may
9   not pursue it.  If they do, the Court may set a hearing within
10  90 days so the parties can determine if there are any victims
11  under the law and to what amount they should get and then there
12  can be a hearing on that.  So do you understand that process?
13             THE DEFENDANT:  I understand.  I still -- I raised
14  this last time.  I still don't know who KD is, and it hasn't
15  been presented to me.  I have no idea who she is.  And I don't
16  know if that's relevant.
17             THE COURT:  I'm sorry.  What is --
18             MR. DYER:  Your Honor, there were three victims that
19  were produced at a discovery meeting.
20             THE COURT:  Okay.
21             MR. DYER:  Months ago.  One was a young lady that
22  Steven had no recollection of, but there was more than ample
23  proof of his involvement over the Internet with this young
24  lady.  And his only concern now is that he doesn't remember who
25  she was, but it's of no consequence or relevance whatsoever to
```

69

```
 1   the outcome of any aspect of this agreement or this case,
 2   period.  And he understands that as well.
 3           THE COURT:  Is that correct, Mr. Seeger?
 4           THE DEFENDANT:  Definitely that wasn't part of any
 5   indictment, so it wouldn't have affected the outcome of the
 6   case.  I just -- you know.  I dispute the ample proof
 7   statement.  But it doesn't matter.
 8           THE COURT:  Do you understand that you have agreed in
 9   the plea agreement to pay restitution to any such victim
10   regardless of whether you plead guilty to the count with which
11   the victim is associated?
12           THE DEFENDANT:  Yes.
13           THE COURT:  Okay.  Do you understand all monetary
14   penalties imposed by the Court will be due and payable
15   immediately, and you agree to provide financial information to
16   the US Probation Office to assist in doing so?
17           THE DEFENDANT:  Yes.  But I -- again, being
18   incarcerated, I won't be able to provide a lot of assistance.
19           THE COURT:  Oh, no.  I understand.  They'll talk to
20   you and -- but the point is, you're required to cooperate with
21   probation to provide them certain information.
22           THE DEFENDANT:  Right, right.
23           THE COURT:  Do you understand -- let's take a look at
24   paragraph 16 of your plea agreement.  We're typically talking
25   about forfeiture now.  Forfeiture is a penalty in your case,
```

70

```
 1   Mr. Seeger, and are you looking at paragraph 16 now?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  In that you will see that there are a

 4   list of one, two, three, four, five, six items -- seven:  A

 5   blue WD MyPassport Ultra; black WD My Passport; 16-gigabyte

 6   Sandisk; black LG Nexus; Samsung S21; silver Apple MacBook;

 7   Hitachi 100GB Travelstar.  Just understand those items have

 8   been taken from you by law enforcement and they're not going to

 9   be returned to you.  Do you understand that?

10              THE DEFENDANT:  Yes, sir.  I wanted to raise one

11   question.  I have talked to my attorney about this, so although

12   these items listed here, there were only issues with two of

13   them, so I don't see any reason why I couldn't get the rest of

14   them back.  One of these hard drives has some photos we took of

15   Jupiter with a high-altitude balloon mission with NASA, and

16   they're very important to me.

17              THE COURT:  Well, I mean, have you all had those

18   discussions with --

19              THE DEFENDANT:  I don't think it's been discussed yet

20   with the government, but I would just like to raise that issue

21   at some point.

22              THE COURT:  Well, let me ask you, Mr. Salem, I know

23   you're new to the case, but I mean, to the extent that there

24   may be something on these items, as he just said, that are not

25   pornographic in the least bit, but they seized everything, and
```

71

1   if that is factually correct, would the government consider

2   returning those to him?

3           MR. SALEM:  We'd consider it, Your Honor.  We'd

4   engage in further discussions with counsel for the defense.

5           THE COURT:  Okay.

6           THE DEFENDANT:  Thank you, Mr. Salem.

7           THE COURT:  So now, do you understand -- and I think

8   this is the case.  Is this the case where he would be required

9   to register as a sex offender?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  And now, let me say as to that

12  regard, Mr. Seeger, that can be for a lifetime.  And each state

13  has their own registration requirements.  And the point is you

14  go from one state to another, you have to let the one know

15  you're leaving, the one you get to, what their requirements

16  are.  And it can be employment, where you live, your car,

17  all -- your phone, all those things, but you understand that

18  you violate any of that, that's its own separate criminal

19  offense, your failure to register.  Do you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Do you understand you must update those

22  things within three business days, if you have any change of

23  your name, residence, employment, or status?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Do you understand it's a federal felony

72

1    if you fail to register?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Now, I know you're a citizen, but do you

4    understand that if you're not a citizen of the United States,

5    by pleading guilty to a felony charge, you may be subject to

6    deportation at the conclusion of any sentence, that you may be

7    denied future entry into the United States, and that you may be

8    denied citizenship if you ever applied for it.  Do you

9    understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Gentlemen, I'm going to go over the

12   sentencing guidelines.

13             You understand the US Sentencing Guidelines do play

14   an important role in determining a sentence in your case,

15   Mr. Seeger?

16             THE DEFENDANT:  Yes, sir.  I do know everything I

17   need to know about the sentencing guidelines, honestly.

18             THE COURT:  Have you discussed that with your

19   attorneys?

20             THE DEFENDANT:  Yeah.  In some detail.  I do know

21   that there is one enhancement that might be applied to my case

22   that I believe was enacted into law after the alleged conduct,

23   so --

24             THE COURT:  Well --

25             THE DEFENDANT:  -- might have to bring that up later

73

1   at sentencing.  We have time before we're there.

2           THE COURT:  So what will happen is -- I'm just

3   showing you the sentencing table.  I'm sure you've looked at

4   that.  There's an offense level, criminal history category.  So

5   what will happen is that probation is required in their

6   presentence investigation report, they'll make a specific

7   recommendation, Mr. Seeger, to the judge as to what your

8   sentence should be, what they recommend it will be.  In that

9   sentence [sic] you'll see what they believe your offense level

10  is, are there any enhancements.  If there's anything in that

11  recommend -- their recommendation to the Court that they

12  believe's applicable but you disagree with through your

13  attorneys, you have a right to object to it.

14          Ultimately, though, Mr. Seeger, is that the Court's

15  going to look at that to get its own idea whether they think

16  the agreement that the parties have reached on 15 to 30 years,

17  is it reasonable under the guidelines.  But that's why the

18  Court will look at the guidelines.

19          So do you understand that this will happen?

20  Probation will prepare a presentence investigation.  You're

21  going to get it, and you'll go over it with your attorneys.

22  And if you do disagree with it, you have a right to file

23  objections with the Court.  Do you understand that?

24          THE DEFENDANT:  Yes, sir.  That's what I was just

25  talking about, that enhancement, I think that's the process.

74

1          THE COURT:  But do you also understand, though,

2    that -- I mean, if the Court accepts your agreement to the

3    binding plea and sentences you at 30 years, you're bound by

4    that, just as the government's bound if it's 15.  Do you

5    understand that?

6          THE DEFENDANT:  Yes, sir.  The United States has

7    seven times the rate of incarcerated people than big, evil

8    Russia, so I understand that we love locking people up.

9          THE COURT:  Do you understand the sentence -- well,

10   you have a binding plea.  We've talked about that.

11         Now, do you understand the Court must calculate the

12   guidelines and consider that range before they determine what

13   your sentence is.  Do you understand that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Can be increased if you had a prior

16   firearm offense, violent felony conviction, or prior drug

17   conviction.  Do you understand that?

18         THE DEFENDANT:  I have no criminal history at the

19   date of these alleged offenses, sir.

20         THE COURT:  And --

21         THE DEFENDANT:  Should work for me, I guess.

22         THE COURT:  Sure.  Do you understand that the Court

23   is not bound by the guideline range.  It has the authority to

24   impose a sentence that is more severe or less severe than the

25   sentence called for by the guidelines?  Now, again --

75

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Okay.

 3              THE DEFENDANT:  I believe the Supreme Court made

 4    those more suggestions than mandatory.

 5              THE COURT:  That's correct.

 6              THE DEFENDANT:  Not too long ago.

 7              THE COURT:  You understand there is no parole in the

 8    federal system, so what will happen is if -- when the judge

 9    sentences you, if he accepts 15 years or the 30 years, you'll

10    have to spend every one of those years, and you don't get out

11    halfway through on parole.  The only way you can serve less

12    time is if you get good-time credit.  That's controlled by the

13    warden and staff where you're incarcerated, but the Court has

14    no say in that.  Do you understand that?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  Okay.  Now, this is important.  Do you

17    understand that if the Court accepts the binding plea and

18    sentences you within the 15 to 30 years, you are bound by your

19    guilty plea and you will then have no right to withdraw it.  Do

20    you understand that?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  You understand you will have a right to

23    testify at your sentencing hearing if you so desire?

24              THE DEFENDANT:  Yes, sir.

25              THE COURT:  Gentlemen, I had a scheduled call at 4:00
```

JA293

76

1    that has to do with my disclosure.  It shouldn't take more than

2    five or 15 minutes, but I got to do it, so we're going to take

3    about a 15-minute break.  Hang in there, guys.  I'll be back.

4    We're going to take a recess and we'll be back.  Thank you all.

5             (Recess taken, 3:58 to 4:13 p.m.)

6             THE COURT:  Do we have Mr. Salem?  There he is.

7             Okay.  Mr. Salem, able to hear me?

8             MR. SALEM:  I am, Your Honor.

9             THE COURT:  Okay.  Thank you.

10            The record should indicate we're back on the record

11   in the matter of United States of America versus Steven Seeger,

12   Case Number 1:24-CR-42.  We've taken just about a 15-minute

13   break.  I apologize to the parties.  I've always had that

14   scheduled at 4:00 and -- but we've taken care of it, so we're

15   back on.

16            We left off talking about the sentencing guidelines.

17   I think I finished with advising you, Mr. Seeger, that you have

18   a right to testify at your sentencing hearing if you so desire.

19   Do you understand that?

20            THE DEFENDANT:  Yes, sir.

21            THE COURT:  Now we're going to talk about your

22   appellate rights, and they're on there on the -- paragraph

23   eleven, and it is on page -- well, starts on the bottom of page

24   4, goes on to page 5.

25            And we've already talked a bit about your right to

1    appeal, but do you understand, Mr. Seeger, that in your plea

2    agreement that you have agreed to give up your right to appeal

3    your sentence under many circumstances.  Do you understand

4    that?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  And again, let me just say this exception

7    right in the beginning.  In paragraph 11D of the plea agreement

8    you are reserving limited ability to appeal the adverse rulings

9    on your motions to suppress, so you've preserved that, but

10   otherwise you're waiving your appellate rights.  Do you

11   understand that?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  So Mr. Seeger, everyone does have a right

14   to -- found guilty of a crime in District Court has the right

15   to appeal their conviction and sentence to the Fourth Circuit

16   Court of Appeals in Richmond.  A three-judge panel will review

17   that conviction and sentence to see if it was done correctly.

18   They'll also certainly consider any motion you may -- or appeal

19   you may file with the Court regarding the adverse ruling on

20   your motion to suppress.  So do you understand that?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  Paragraph 11A, you've given up your right

23   to appeal your sentence on any grounds whatsoever.  Do you

24   understand that?

25           THE DEFENDANT:  Yes, sir.

78

1          THE COURT:  Paragraph 11B, you've given up your right

2     to appeal your -- I'm sorry, 11A is you've given up your right

3     to appeal your conviction on any grounds whatsoever.  Do you

4     understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And 11B is that you've given up your

7     right to appeal your sentence on any grounds whatsoever, and

8     that includes the length, whatever forfeiture they may have, or

9     whatever penalties or fines there may be.  Do you understand

10    that?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Do you understand then that you would

13    only have the right to appeal your guilty plea if you believed

14    it was unlawful or involuntary or that there was some other

15    fundamental defect in the proceedings.  Do you understand that,

16    Mr. Seeger?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  As you sit here today, do you consider

19    your guilty plea to be lawful?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Do you consider it to be voluntary?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Do you know of any fundamental defects in

24    these proceedings so far?

25         THE DEFENDANT:  No, sir.

 1          THE COURT:  Mr. Seeger, do you understand that

 2   everyone has the right to challenge their conviction or

 3   sentence or manner in which it was determined in a

 4   postconviction proceeding, sometimes called a habeas corpus or

 5   collateral attack, and that's another way that the law gives

 6   you to challenge your sentence or conviction.  Do you

 7   understand that?

 8          THE DEFENDANT:  Yes, sir.

 9          THE COURT:  But do you also understand in paragraph

10   11C that you've knowingly and expressly waived that right to

11   challenge your conviction, your sentence, if it was within the

12   binding range of imprisonment, not less than 15, not more than

13   30 years, or the manner in which it was determined in any

14   postconviction proceeding.  Do you understand that?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  You understand then that your only legal

17   remedies on appeal or collateral attack would be for claims of

18   ineffective assistance of counsel -- that has to do with the

19   conduct of your attorneys -- or prosecutorial misconduct.  That

20   has to do with the conduct of Mr. Salem, Ms. Crockett, or

21   anyone else in the US Attorney's Office.  Do you understand

22   that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  As we sit here today, do you know of any

25   evidence that would suggest in any way that your lawyers have

1    been ineffective in representing you?

2            THE DEFENDANT:  I'll take the Fifth.

3            THE COURT:  I don't know if that was an attempt to be

4    humorous or --

5            THE DEFENDANT:  I will say no, but I will -- I mean,

6    I definitely think there's some prosecutorial misconduct that

7    my lawyers didn't want to pursue, and I may pursue that later.

8    I don't know.

9            THE COURT:  Well -- and I'll have to see what the US

10   Attorneys think about it, but let's go back to this.  I -- no

11   question, at least from what I see, had a lot of discussions

12   with your lawyers.  You've been before me.  I mean, this is

13   important, because if you are, I need to know whether you

14   have -- whether you feel you have claims and would make claims

15   that your lawyers have been ineffective representing you based

16   upon what you know up to this date, at this time.

17           THE DEFENDANT:  No.  It's just the whole sentence.

18   It doesn't matter.  I can --

19           THE COURT:  Well, no.  There's a -- now, I haven't

20   gotten to the prosecutorial misconduct.

21           THE DEFENDANT:  No.  I will say I don't know of any

22   evidence of ineffective assistance of counsel.  I was referring

23   to the whole sentence.

24           THE COURT:  Okay.

25           THE DEFENDANT:  Yes.

81

```
 1              THE COURT:  So as you sit here today, do you then
 2    know of any evidence that would suggest that there is -- by
 3    Mr. Salem, Ms. Crockett, or anyone else in the US Attorney's
 4    Office?  This the US Attorney's Office.  This does not have to
 5    do with what happened in the state, because I'm just taking
 6    care of the federal.  Do you know of any evidence of
 7    prosecutorial misconduct in that regard?
 8              THE DEFENDANT:  Not presently.  I was not referring
 9    to the state case.
10              THE COURT:  Okay.  Well, and I didn't know.  But in
11    regard to the US Attorney's Office, do you have any evidence of
12    prosecutorial misconduct?
13              THE DEFENDANT:  Not presently.
14              THE COURT:  Okay.  And now, just let me say when we
15    get to it, now, if there's something afterwards, you couldn't
16    have never known of it up to now, but -- because you couldn't
17    have, but up till now, if you understand you've, in essence,
18    waived that, if anything you come up with factually that has
19    occurred beforehand.  Do you understand that?
20              THE DEFENDANT:  Yes.  Yes.
21              THE COURT:  Okay.  Have you discussed the waiver of
22    these important appellate rights with your lawyers, Mr. Seeger?
23              THE DEFENDANT:  Yes.  I understand them.
24              THE COURT:  Having done so, do you still wish to
25    waive those rights?
```

82

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  Mr. Dyer, do you believe your client

3  fully understands the importance of the rights he's waiving?

4    MR. DYER:  I do, Your Honor.

5    THE COURT:  Mr. --

6    MR. SHEEHAN:  I concur with that, Your Honor.

7    THE COURT:  Thank you, Mr. Sheehan.

8    Mr. Seeger, do you understand with few exceptions,

9  any notice of appeal must be filed within 14 days of judgment

10  being entered in your case.  Do you understand?

11    THE DEFENDANT:  Yes, sir.

12    THE COURT:  Mr. Seeger, I find that you understand

13  the nature of the charge, the consequences of your guilty plea,

14  and the important appellate rights that you've waived and also

15  that you've preserved in regard to your motion to suppress.

16    I do want to talk to you about some other

17  constitutional rights.  Mr. Seeger, do you understand that you

18  have a right to continue to plead not guilty and go to trial in

19  this matter.  Do you understand that?

20    THE DEFENDANT:  Yes, sir.

21    THE COURT:  Do you understand that by pleading guilty

22  here today that -- and when you do plead guilty and the Court

23  accepts it, you then give up your right to a speedy and public

24  trial by jury.  Do you understand that?

25    THE DEFENDANT:  Yes, sir.

83

1          THE COURT:  Do you understand that by pleading

2    guilty, you give up your right to force the government to come

3    forward with witnesses and evidence to prove your guilt.  Do

4    you understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Do you understand you would have been

7    presumed innocent till the government presented enough evidence

8    to satisfy both a judge and a jury of your guilt beyond a

9    reasonable doubt.  Do you understand that?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  You understand that when you admit your

12   guilt, as you've done here today, that you relieve the

13   government of the burden of proving your guilt?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Do you understand that you would have had

16   the right to the assistance of counsel, your lawyers, at every

17   stage of trial?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  You understand that you and your

20   attorneys, Mr. Dyer, Mr. Sheehan, that you would have had the

21   right to confront and cross-examine your accusers, witnesses

22   called by the government, to test the truth of what they said.

23   Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  You understand by pleading guilty, you

84

1  give up that right of cross-examination?

2        THE DEFENDANT:  Yes, sir.

3        THE COURT:  Do you understand that had you desired to

4  go to trial and you wished to call witnesses, you would have

5  been entitled to the services of the US Marshal to bring

6  witnesses to court under subpoena?

7        THE DEFENDANT:  Yes, sir.

8        THE COURT:  You understand that by pleading guilty,

9  you give up your right to call witnesses except at your

10  sentencing hearing?

11        THE DEFENDANT:  Yes, sir.

12        THE COURT:  We've talked about this next one a lot,

13  Mr. Seeger.  Do you understand that you would have had the

14  right to move to suppress, and that means to file a motion to

15  keep away from a jury's hearing and consideration any evidence

16  of any nature that had been illegally or unlawfully obtained.

17  And you understand that right and, in fact, you exercised it

18  and filed a motion through your attorneys; is that correct?

19        THE DEFENDANT:  Yes, sir.

20        THE COURT:  You understand that had you desired to go

21  to trial, Mr. Seeger, you would have had the right to testify

22  at trial?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Do you also understand, though, that you

25  cannot be compelled or forced to testify?

85

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  You understand you would have had the

3    right to go to trial and remain silent.  And what that means is

4    not to take the witness stand or not to call any witnesses or

5    not to present any evidence whatsoever on your own behalf?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Okay.  I saw you nod, Mr. Seeger.  It's

8    important that you answer orally.

9              Do you understand the Court would have instructed and

10   told the jury that they could not convict you because of the

11   exercise of your constitutional right to remain silent, but

12   only based on an offer of proof from the government of your

13   guilt beyond a reasonable doubt?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Do you understand that you give up your

16   right to a unanimous verdict from a jury when you plead guilty,

17   as you've done here today?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Mr. Dyer, do you believe that your client

20   fully understands the consequences of his guilty plea and the

21   important constitutional rights he gives up by doing so?

22             MR. DYER:  I do, Your Honor.

23             THE COURT:  Mr. Sheehan?

24             MR. SHEEHAN:  I concur, Your Honor.

25             THE COURT:  Mr. Seeger, I find that you understand

JA303

86

1  the constitutional and other legal rights that you're giving up

2  by pleading guilty.

3       Now, knowing all of these things, Mr. Seeger, do you

4  still wish to plead guilty at this time?

5       THE DEFENDANT:  Yes, sir.

6       THE COURT:  Mr. Seeger, has anyone forced you,

7  threatened you, coerced you, or intimidated you, or just talked

8  you into entering a guilty plea against your will?

9       THE DEFENDANT:  No, sir.

10       THE COURT:  Are you acting voluntarily and of your

11  own free will in entering this guilty plea?

12       THE DEFENDANT:  Yes, sir.

13       THE COURT:  Are you pleading guilty because you are

14  guilty of the crimes charged in Count 1 and 4 of the

15  indictment?

16       THE DEFENDANT:  Yes, sir.

17       THE COURT:  Mr. Seeger, has anyone promised you or

18  told you something that is different from what I have told you

19  today?

20       THE DEFENDANT:  No, sir.

21       THE COURT:  Are the only promises made to you the

22  promises in the written plea agreement?

23       THE DEFENDANT:  Yes, sir.

24       THE COURT:  Are you pleading guilty to protect

25  anyone?

87

 1            THE DEFENDANT:  No, sir.

 2            THE COURT:  Has anyone promised or predicted the

 3   exact sentence which will be imposed upon you in this matter?

 4            THE DEFENDANT:  I am pleading guilty to keep -- like

 5   I said about the forcing people to see that in front of these

 6   girls.  That's part of it.

 7            THE COURT:  I understand.

 8            THE DEFENDANT:  But yes, sir.

 9            THE COURT:  Well, the question was, has anyone

10   predicted the exact sentence that will be imposed upon you?

11            THE DEFENDANT:  No, sir, no.  No one has predicted

12   that.

13            THE COURT:  Let's go back -- are you pleading guilty

14   to protect anyone?  At least my understanding has been,

15   Mr. Seeger, that part of your -- everyone has different reasons

16   for -- a variety of reasons for pleading guilty, one of which

17   is they desire to protect certain people.  And is that what you

18   were getting at?

19            THE DEFENDANT:  Yes, sir.

20            THE COURT:  Okay.  You understand at this time,

21   Mr. Seeger, no one can tell you what the exact sentence will

22   be?

23            THE DEFENDANT:  Yes, sir.

24            THE COURT:  Mr. Seeger, have you been able to fully

25   understand what is going on in these proceedings today?

88

```
1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Mr. Seeger, I find your guilty plea is

3   voluntary.

4              This is what you want to do, Mr. Seeger; is that

5   correct?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Okay.

8              THE DEFENDANT:  Did I understand you correctly that I

9   have 14 days to object to it?

10             THE COURT:  So you did -- you mean -- there are two

11  things.  I will do a written report and recommendation

12  recommending that the Court accept your plea of guilty.  That

13  will go out to both parties.  Anytime I do a report and

14  recommendation, it's subject to review by the Court.  And so

15  if -- and if you do file objections, the Court will take it

16  into consideration and determine whether to accept it or not.

17  That'll be up to the Court.  And you can talk to your lawyers

18  about that.

19             Now, as to the notice of appeal, that's within 14

20  days, and it's actually a -- you seem like you've done a lot of

21  research, but there's --

22             THE DEFENDANT:  Sentencing hearing.

23             THE COURT:  Yeah, from the judgment, the Court will

24  enter a judgment.  That's 14 days from then.  And the notice of

25  appeal's really a very short document.  You just file a notice,
```

1  and then there are more significant things that happen after.

2          So Mr. Seeger, at this time do you have any questions

3  or second thoughts about entering a plea of guilty?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  You want me to recommend to the Court

6  that they accept your plea of guilty?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Okay.  You've spent a lot of time

9  thinking about this, haven't you?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And I've given you, I think, my plea

12  script, so you knew what I was going to be asking you, right?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  If you would please stand, Mr. Seeger.

15          Mr. Seeger, how do you plead to Count 1 of the

16  indictment, coercion and enticement of a minor for sex, do you

17  plead guilty or not guilty?

18          THE DEFENDANT:  Guilty.

19          THE COURT:  As to Count 4, production of child

20  pornography, how do you plead, guilty or not guilty?

21          THE DEFENDANT:  Guilty.

22          THE COURT:  You all may be seated.  And the record

23  should reflect the guilty plea by Mr. Seeger to Count 1 of the

24  indictment, coercion and enticement of a minor for sex; Count

25  4, production of child pornography.

1          In the case of the United States of America versus

2    Steven Seeger, I find that Mr. Seeger's fully competent and

3    capable of entering an informed plea; that there is a

4    sufficient factual basis for his plea of guilty; that he

5    understands the nature of the charge and the consequences of a

6    guilty plea to the charge; that Mr. Seeger understands the

7    constitutional and other legal rights that he gives up because

8    of his plea; and that Mr. Seeger's plea is voluntary.

9          And while I defer accepting the terms of the plea

10   agreement -- this is what I was talking about, Mr. Seeger.

11   While I defer accepting the terms of the plea agreement and

12   adjudging you guilty to the sentencing court -- that's what

13   Judge Kleeh does -- I will enter a written report and

14   recommendation recommending that Judge Kleeh accept your guilty

15   pleas to Count 1 and 4.

16         Now, Mr. Seeger, the sentencing court must consider

17   the following factors when determining the sentence that you

18   will receive: one, the nature and circumstances of the offense;

19   two, your history and characteristics; three, the necessity of

20   punishing you, deterring you, protecting the public from you,

21   or providing you with training, medical care, or other

22   treatment; four, the kinds of sentences and the sentencing

23   range established by the guidelines; five, the need to give

24   defendants with similar criminal records similar sentences; and

25   six, the need to provide restitution to any victims of the

91

1   offense.  And we've talked about a lot of those things,

2   Mr. Seeger.  Now, again, it's the Court's decision, but the

3   kinds of sentences and the sentencing range established by the

4   sentencing guidelines and the need to give defendants with

5   similar criminal records similar sentences.

6          So do you understand those factors the Court will

7   consider?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  In order to help the Court consider these

10  factors, probation will do their presentence investigation.

11  They'll prepare the report.  You'll have a chance to comment on

12  it, as well as the government.

13         Now, you must not commit any crimes between now and

14  sentencing, because if you do, there are additional punishments

15  that may be imposed for committing additional crimes.  Do you

16  understand that, Mr. Seeger?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  Mr. Seeger, pursuant to 6A1 of the United

19  States Sentencing Guidelines, probation will conduct a

20  presentence investigation of you.  They'll prepare a draft

21  presentence investigation report and they'll disclose its

22  contents to the government and to you, Mr. Seeger.

23         I further direct that the probation officer and all

24  parties comply with Federal Rule of Criminal Procedure 32, US

25  Sentencing Guideline 6A1.2 regarding deadlines for disclosure,

1    objections, and departure or sentencing statement requirements.

2         Now, the sentencing court will set this matter for

3    sentencing, and when it does so, Mr. Seeger, the Court will

4    enter an order to tell you when it will be.  It'll take --

5    you've met Judge Kleeh.  It'll take place before Judge Kleeh,

6    the second floor of this courthouse.

7         Mr. Dyer, Mr. Sheehan, and certainly, Mr. Salem, if

8    you'll pass this this on to Ms. Crockett, if you anticipate a

9    lengthy sentencing hearing, please notify the Court so that an

10   adequate amount of time can be scheduled for it.

11        So did you have anything further, Mr. Dyer or

12   Mr. Sheehan?

13        MR. DYER:  No, sir.

14        MR. SHEEHAN:  No, sir.

15        THE COURT:  Mr. Salem, do you have anything further?

16        MR. SALEM:  Nothing further from the government.

17   Thank you, Your Honor.

18        THE COURT:  Certainly appreciate you being available

19   today for this and assisting Ms. Crockett.

20        Any questions before we conclude, Mr. Seeger?

21        THE DEFENDANT:  No, sir.

22        THE COURT:  Okay.  By the way, Mr. Seeger, I've -- I

23   want you to know this.  I don't think in any way the questions

24   that you have, I don't find them in any way any desire to be

25   difficult in the least bit.  I think that you're a bright man

93

1  and that you know there are many laws and consequences there

2  are a lot of us that just don't agree with, but it's what it

3  is.  And we can only do what we can within the system that we

4  have, but --

5         THE DEFENDANT:  It's not that I don't agree with laws

6  and consequences.  I just don't believe that two adults should

7  have an argument and one person goes to jail for 15 years.

8         THE COURT:  Well --

9         THE DEFENDANT:  But that's the United States now, so

10  okay.

11         THE COURT:  That's where it is right now.  So anyway,

12  if there's nothing further, remand you to the custody of the US

13  Marshal pending further proceedings.

14         Thank you all.  Have a good day.

15         (Proceedings concluded at 4:35 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3           I, Cindy L. Knecht, Registered Professional Reporter

 4    and Official Reporter of the United States District Court for

 5    the Northern District of West Virginia, do hereby certify that

 6    the foregoing is a true and correct transcript to the best of

 7    my ability of the taped proceedings had in the above-styled

 8    action on May 12, 2025, as reported by me in stenotypy.

 9       I certify that the transcript fees and format comply with

10    those prescribed by the Court and Judicial Conference of the

11    United States.

12           Given under my hand this 24th day of November 2025.

13                          /s/Cindy L. Knecht
                            _____
14                          Cindy L. Knecht, RMR/CRR
                            Official Reporter, United States
15                          District Court for the Northern
                            District of West Virginia
16                             -  -  -

17

18

19

20

21

22

23

24

25
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

    **v.**

**STEVEN DAVID SEEGER,**

        **Defendant**.

**Criminal Action No.: 1:24-CR-42
(JUDGE KLEEH)**

## REPORT AND RECOMMENDATION
## CONCERNING PLEA OF GUILTY IN FELONY CASE

This matter has been referred to the undersigned Magistrate Judge by the District Judge for purposes of considering the record, the Indictment, and the proposed plea agreement in this matter, conducting a hearing, and entering into the record a written report and recommendation memorializing the disposition of Defendant's guilty plea, pursuant to Federal Rule of Criminal Procedure 11. [ECF No. 116]. Defendant, Steven David Seeger, in person and by counsel, Martin P. Sheehan and Thomas G. Dyer, appeared before me on May 12, 2025[1], for a Plea Hearing to an Indictment. The Government appeared by Assistant United States Attorneys, Kimberly D. Crockett and Daniel Lee Salem.

The Court determined that Defendant was prepared to enter a plea of "Guilty" to Count One and Count Four of the Indictment, that being Coercion and Enticement of a Minor for Sex and Production of Child Pornography, respectively.

The Court proceeded with the Rule 11 proceeding by first placing Defendant under oath

---

[1] The undersigned convened prior plea hearings on April 25, 2025 and May 2, 2025. During each of those proceedings, the Court determined that a recess would be appropriate, to afford Defendant and his counsel an opportunity to review the matter further. Thus, a plea hearing ultimately was rescheduled to May 12, 2025. [ECF Nos. 141, 145].

and inquiring into Defendant's competency. The Court determined Defendant was competent to proceed with the Rule 11 plea hearing and cautioned and examined Defendant under oath concerning all matters mentioned in Rule 11.

The Court next inquired of Defendant concerning his understanding of his right to have an Article III Judge hear the entry of his guilty plea and his understanding of the difference between an Article III Judge and a Magistrate Judge. Defendant thereafter stated in open court that he voluntarily waived his right to have an Article III Judge hear his plea and voluntarily consented to the undersigned Magistrate Judge hearing his plea. Defendant tendered to the Court a written Waiver of Article III Judge and Consent to Enter Guilty Plea before Magistrate Judge. The waiver and consent was signed by Defendant, countersigned by Defendant's counsel, and concurred by the signature of the Assistant United States Attorney.

Upon consideration of the sworn testimony of Defendant, as well as the representations of his counsel and the representations of the Government, the Court finds that the oral and written waiver of an Article III Judge and consent to enter a guilty plea before a Magistrate Judge was freely and voluntarily given. Additionally, the Court finds that the written waiver and consent was freely and voluntarily executed by Defendant Steven David Seeger, only after having had his rights fully explained to him and having a full understanding of those rights through consultation with his counsel, as well as through questioning by the Court.

The Court **ORDERED** the written Waiver and Consent to Enter Guilty Plea before a Magistrate Judge filed and made part of the record. [ECF No. 153].

Thereafter, the Court determined that Defendant's plea was pursuant to a written plea agreement and asked the Government to tender a copy to the Court. The Court asked counsel if

the agreement was the sole agreement offered to Defendant. Counsel for the Government stated that it was <u>not</u>. Counsel for the Government noted that one prior plea agreement had been extended to Defendant, but that the agreement into which Defendant entered was more favorable to Defendant. The Court asked counsel for the Government to summarize the written plea agreement. Counsel for the Government noted two handwritten changes to the plea agreement: (1) an elimination of two parts of the stipulation in Paragraph 10 regarding Defendant's knowledge of the victims' ages, and (2) a correction in Paragraph Five to the reference of a different paragraph. Counsel for the parties, and Defendant himself, initialed these changes to indicate their agreement with them. Counsel for Defendant and Defendant stated on the record that the agreement as summarized by counsel for the Government was correct and complied with their understanding of the agreement.

The undersigned further inquired of Defendant regarding his understanding of the written plea agreement. Defendant stated he understood the terms of the written plea agreement and stated that it contained the whole of his agreement with the Government and no promises or representations were made to him by the Government other than those terms contained in the written plea agreement. The Court **ORDERED** the written plea agreement filed and made a part of the record. [ECF No. 154].

The undersigned then reviewed with Defendant Count One and Count Four of the Indictment and the elements the Government would have to prove, charging him in Count One with Coercion and Enticement of a Minor for Sex, in violation of Title 18, United States Code, Section 2422(b), and in Count Four with Production of Child Pornography, in violation of Title 18, United States Code, Sections 2251(a) and (e). Subsequently, Defendant Steven David Seeger,

pled **GUILTY** to the charges contained in Count One and Count Four of the Indictment. However, before accepting Defendant's plea, the undersigned inquired of Defendant's understanding of the charges against him, inquired of Defendant's understanding of the consequences of his pleading guilty to the charges, and obtained the factual basis for Defendant's plea.

The Government proffered a factual basis for the plea, insofar as the Government relied on the stipulation reflected in Paragraph Ten of the plea agreement. Neither Defendant nor Defendant's counsel disputed the proffer when given the opportunity to do so. Additionally, Defendant provided a factual basis for the commission of the offenses. The undersigned Magistrate Judge concludes the offenses charged in Count One and Count Four of the Indictment is supported by an independent basis in fact concerning each of the essential elements of such offenses, and that independent basis is provided by the Government's proffer.

The undersigned then reviewed with Defendant the statutory penalties applicable to an individual adjudicated guilty of the felony charges contained in Count One and Count Four of the Indictment and the impact of the sentencing guidelines on sentencing in general. From said review, the undersigned Magistrate Judge determined Defendant understood the nature of the charges pending against him and that the possible statutory <u>maximum</u> sentence which could be imposed upon his conviction or adjudication of guilty on <u>Count One</u> was imprisonment for a period of life, a fine of $250,000.00, and a term of a lifetime of supervised release. From said review, the undersigned determined that Defendant understood the statutory <u>minimum</u> sentence which could be imposed upon his conviction or adjudication of guilty on <u>Count One</u> was imprisonment for a period of not less than 10 years and a term of at least five years of supervised release. Additionally, from said review, the undersigned determined Defendant understood the

JA316

possible statutory <u>maximum</u> sentence which could be imposed upon his conviction or adjudication of guilty on <u>Count Four</u> was imprisonment for a period of not more than 30 years, a fine of $250,000.00, and a term of a lifetime of supervised release. And from said review, the undersigned determined Defendant understood the statutory <u>minimum</u> sentence which could be imposed upon his conviction or adjudication of guilty on <u>Count Four</u> was imprisonment for a period of not less than 15 years and a term of at least five years of supervised release. <u>The undersigned also reviewed with Defendant the *binding* condition in Paragraph Three of the plea agreement that the sentence for each count would run *concurrently* to one another, with a cap of the sentence of 30 years</u>.

Defendant also understood that the Court would impose a total special mandatory assessment of $100.00 per felony conviction, for a total of $200.00, payable within forty (40) days of entry of the plea. Defendant further understood that his sentence could be increased if he had a prior firearm offense, violent felony conviction, or prior drug conviction. He also understood that he might be required by the Court to pay the costs of his incarceration, supervision, and probation.

The undersigned also inquired of Defendant whether he understood that by pleading guilty, he was forfeiting other rights such as the right to vote, right to serve on a jury, and the right to legally possess a firearm. Additionally, the undersigned asked Defendant whether he understood that if he were not a citizen of the United States, by pleading guilty to felony charges he would be subject to deportation at the conclusion of any sentence; that he would be denied future entry into the United States; and that he would be denied citizenship if he ever applied for it. Defendant stated that he understood.

The undersigned also reviewed with Defendant his waiver of appellate and collateral

5

JA317

attack rights. <u>Defendant understood that, under Paragraph Eleven, he reserved the right to appeal adverse rulings on his motions to suppress.</u> Otherwise, Defendant understood that he was waiving his right to appeal his conviction and sentence, to the Fourth Circuit Court of Appeals on any ground whatsoever, including those grounds set forth in 18 U.S.C. § 3742. Defendant further understood that under his plea agreement was waiving his right to challenge his conviction and sentence in any post-conviction proceeding, including any proceeding under 28 U.S.C. § 2255, <u>if sentenced within the binding range of imprisonment of not less than 15 and not more than 30 years</u>. Defendant understood, however, that he was reserving the right to raise claims of ineffective assistance of counsel or prosecutorial misconduct that he learned about after the plea hearing and agreed that he was unaware of any ineffective assistance of counsel or prosecutorial misconduct in his case at this time. From the foregoing, the undersigned determined that Defendant understood his appellate rights and knowingly gave up those rights pursuant to the conditions contained in the written plea agreement.

The undersigned Magistrate Judge further examined Defendant relative to his knowledgeable and voluntary execution of the written plea agreement and determined the entry into said written plea agreement was both knowledgeable and voluntary on the part of Defendant.

The undersigned Magistrate Judge further inquired of Defendant, his counsel, and the Government as to the non-binding (and <u>binding</u>) recommendations and stipulations contained in the written plea agreement and determined that Defendant understood, with respect to the plea agreement and to Defendant's entry of a plea of guilty to the felony charges contained in Count One and Count Four of the Indictment. The undersigned Magistrate Judge informed Defendant that he would write the subject Report and Recommendation, and that a pre-sentence

investigation report would be prepared for the District Court by the probation officer attending.

The undersigned advised the Defendant that the District Judge would adjudicate the Defendant guilty of the felonies charged under Count One and Count Four of the Indictment. Only after the District Court had an opportunity to review the pre-sentence investigation report would the District Court make a determination as to whether to accept or reject any recommendation or stipulation contained within the plea agreement or pre-sentence report. The undersigned reiterated to Defendant that the District Judge may not agree with the recommendations or stipulations contained in the written agreement. The undersigned Magistrate Judge further advised Defendant, in accord with Federal Rule of Criminal Procedure 11, that in the event the District Court Judge refused to follow the non-binding recommendations or stipulations contained in the written plea agreement and/or sentenced him to a sentence which was different from that which he expected, he would not be permitted to withdraw his guilty plea. Defendant and his counsel each acknowledged their understanding and Defendant maintained his desire to have his guilty plea accepted.

Defendant also understood that his actual sentence could not be calculated until after a pre-sentence report was prepared and a sentencing hearing conducted. The undersigned also advised, and Defendant stated that he understood, that the Sentencing Guidelines are no longer mandatory, and that, even if the District Judge did not follow the Sentencing Guidelines or sentenced him to a higher sentence than he expected, he would not have a right to withdraw his guilty plea. Defendant further understood there was no parole in the federal system, but that he may be able to earn institutional good time, and that good time was not controlled by the Court, but by the Federal Bureau of Prisons.

Defendant, Steven David Seeger, with the consent of his counsel, Martin P. Sheehan and Thomas G. Dyer, proceeded to enter a verbal plea of **GUILTY** to the felony charges in Count One and Count Four of the Indictment.

Upon consideration of all of the above, the undersigned Magistrate Judge finds that Defendant is fully competent and capable of entering an informed plea; Defendant is aware of and understood his right to have an Article III Judge hear and accept his plea and elected to voluntarily consent to the undersigned United States Magistrate Judge hearing his plea; Defendant understood the charges against him, as to Count One and Count Four of the Indictment; Defendant understood the consequences of his plea of guilty, in particular the maximum statutory penalties to which he would be exposed for Count One and Count Four; Defendant made a knowing and voluntary plea of guilty to Count One and Count Four of the Indictment; and Defendant's plea is independently supported by the Government's proffer which provides, beyond a reasonable doubt, proof of each of the essential elements of the charges to which Defendant has pled guilty.

The undersigned Magistrate Judge therefore **RECOMMENDS** Defendant's plea of guilty to Count One and Count Four of the Indictment herein be accepted conditioned upon the Court's receipt and review of this Report and Recommendation.

The undersigned Magistrate Judge **remanded Defendant to the custody of the U.S. Marshals Service.** [ECF Nos. 8, 38, 47].

**IF COUNSEL ANTICIPATES A LENGTHY SENTENCING HEARING, PLEASE NOTIFY THE DISTRICT COURT SO THAT AN ADEQUATE AMOUNT OF TIME CAN BE SCHEDULED FOR IT.**

Any party shall have fourteen days from the date of service of this Report and

Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to send a copy of this Report and Recommendation to counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on May 13, 2025.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.                          Crim. Action No.: 1:24-CR-42
                                       (Judge Kleeh)

STEVEN DAVID SEEGER,

        Defendant.

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION CONCERNING PLEA OF GUILTY IN FELONY CASE [ECF NO. 155], ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING**

On May 12, 2025, the Defendant, Steven David Seeger ("Seeger"), appeared before United States Magistrate Judge Michael J. Aloi and moved for permission to enter a plea of **GUILTY** to Counts One and Four of the Indictment. In Count One, Seeger is charged with Coercion and Enticement of a Minor for Sex, in violation of 18 U.S.C. § 2422(b). In Count Four, Seeger is charged with Production of Child Pornography, in violation of 18 U.S.C. §§ 2251(a) and (c).

This Court referred Seeger's plea of guilty to the magistrate judge for the purpose of administering the allocution, pursuant to Federal Rule of Criminal Procedure 11, making a finding as to whether the plea was knowingly and voluntarily entered, and recommending to this Court whether the plea should be accepted. Seeger stated that he understood that the magistrate judge is not

JA322

USA v. SEEGER                                                    1:24-CR-42

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION CONCERNING PLEA OF GUILTY IN FELONY CASE [ECF NO. 155], ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING**

a United States District Judge, and Seeger consented to pleading before the magistrate judge.

Based upon Seeger's statements during the plea hearing and the Government's proffer establishing that an independent factual basis for the plea existed, the magistrate judge found that Seeger was competent to enter a plea, that the plea was freely and voluntarily given, that Seeger understood the charges against him and the consequences of his plea, and that a factual basis existed for the tendered plea. The magistrate judge issued a *Report and Recommendation Concerning Plea of Guilty in Felony Case* ("R&R") [ECF No. 155] finding a factual basis for the plea and recommending that this Court accept Seeger's plea of guilty to Counts One and Four of the Indictment.

The magistrate judge **remanded** Seeger to the custody of the United States Marshals Service.

The magistrate judge also directed the parties to file any written objections to the R&R within fourteen (14) days after service of the R&R. He further advised that failure to file objections would result in a waiver of the right to appeal from a judgment of this Court based on the R&R. Neither Seeger nor the Government filed objections to the R&R.

USA v. SEEGER                                                    1:24-CR-42

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION CONCERNING PLEA OF GUILTY IN FELONY CASE [ECF NO. 155], ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING

Accordingly, this Court **ADOPTS** the magistrate judge's R&R [ECF No. 155], provisionally **ACCEPTS** Seeger's guilty plea, and **ADJUDGES** him **GUILTY** of the crimes charged in Counts One and Four of the Indictment.

Pursuant to Fed. R. Crim. P. 11(c)(3) and U.S.S.G. § 6B1.1(c), the Court **DEFERS** acceptance of the proposed plea agreement until it has received and reviewed the presentence investigation report prepared in this matter.

Pursuant to U.S.S.G. § 6A1 et seq., the Court **ORDERS** the following:

1.    The Probation Officer shall undertake a presentence investigation of Seeger, and prepare a presentence investigation report for the Court;

2.    The Government and Seeger shall each provide their narrative descriptions of the offense to the Probation Officer by **June 16, 2025**;

3.    The presentence investigation report shall be disclosed to Seeger, his counsel, and the Government on or before **July 21, 2025**; however, the Probation Officer shall not disclose any sentencing recommendations made pursuant to Fed. R. Crim. P. 32(e)(3);

USA v. SEEGER                                              1:24-CR-42

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
CONCERNING PLEA OF GUILTY IN FELONY CASE [ECF NO. 155],
ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING**

4.    Written objections to the presentence investigation report, if any, shall be submitted to the opposing party and to the probation officer on or before **August 4, 2025**;

5.    Responses to objections to the presentence investigation report, if any, shall be submitted to the opposing party and to the probation officer on or before **August 11, 2025**;

6.    The Office of Probation shall submit the presentence investigation report with addendum to the Court on or before **September 2, 2025**; and

7.    Counsel may file any written sentencing memoranda or statements and motions for departure from the Sentencing Guidelines, including the factual basis for the same, on or before **September 9, 2025**.

The Court further **ORDERS** that prior to sentencing, Seeger's counsel shall review with him the revised Standard Probation and Supervised Release Conditions adopted by this Court on November 29, 2016, pursuant to the standing order entered by Chief Judge Groh, In Re: Revised Standard Probation and Supervised Release Conditions, 3:16-MC-56. The Office of Probation and the United States are **DIRECTED** to sit at separate tables throughout the sentencing hearing.

USA v. SEEGER                                              1:24-CR-42

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
CONCERNING PLEA OF GUILTY IN FELONY CASE [ECF NO. 155],
ACCEPTING GUILTY PLEA, AND SCHEDULING SENTENCING HEARING**

The Court will conduct the **Sentencing Hearing** for Seeger on **September 18, 2025**, at **11:00 a.m.**, at the **Clarksburg, West Virginia**, point of holding court. If counsel anticipates having multiple witnesses or an otherwise lengthy sentencing hearing, please notify the Judge's chamber staff so that an adequate amount of time can be scheduled.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record, the Office of Probation, and the United States Marshals Service.

DATED: June 11, 2025

*Tom S Kleeh*
_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

AO 245B (Rev. 09/19)   Judgment in a Criminal Case                    1125
Sheet 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| Steven David Seeger | ) | Case Number: 1:24CR42 |
| | ) | USM Number: 25025-511 |
| | ) | Thomas G. Dyer |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)    One and Four

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor for Sex | 09/30/2011 | 1 |
| 18 U.S.C. §§ 2251(a) and 2251(e) | Production of Child Pornography | 05/31/2014 | 4 |

☐ See additional count(s) on page 2

The defendant is sentenced as provided in pages 2 through    8    of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Counts  2, 3, and 5  are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 18, 2025
Date of Imposition of Judgment

*Tom S Kleeh*
Signature of Judge

Thomas S. Kleeh, Chief United States District Judge
Name and Title of Judge

September 23, 2025
Date

JA327

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   2   of   8

DEFENDANT:  Steven David Seeger
CASE NUMBER:  1:24CR42

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:  360 months on each of Cts. 1 and 4 to run concurrently to one another.

☑  The court makes the following recommendations to the Bureau of Prisons:
  ☑  That the defendant be incarcerated at an FCI or a facility as close to <u>San Francisco, California</u> as possible;
    ☐  and at a facility where the defendant can participate in substance abuse treatment, as determined by the Bureau of Prisons
      ☐ including the 500-Hour Residential Drug Abuse Treatment Program.

  ☐  That the defendant be incarcerated at _____ or a facility as close to his/her home in
    _____ as possible;
    ☐  and at a facility where the defendant can participate in substance abuse treatment, as determined by the Bureau of Prisons
      ☐ including the 500-Hour Residential Drug Abuse Treatment Program.

  ☑  That the defendant participates in a Sex Offender Treatment Program, as determined by the Bureau of Prisons.

    ☑  That the defendant be given credit for time served since July 12, 2024.

  ☑  That the defendant be allowed to participate in any educational or vocational opportunities while incarcerated, as determined by the Bureau of Prisons.

☑  Pursuant to 42 U.S.C. § 14135A, the defendant shall submit to DNA collection while incarcerated in the Bureau of Prisons, or at the direction of the Probation Officer.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

  ☐  at _____  ☐ a.m.  ☐ p.m.  on _____

  ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐  before  12:00 pm (noon)   <u>on</u> _____ .

  ☐  as notified by the United States Marshal.

  ☐  as notified by the Probation or Pretrial Services Office.

  ☐  on _____ , as directed by the United States Marshals Service.

☐

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

1127

DEFENDANT:  Steven David Seeger
CASE NUMBER:  1:24CR42

Judgment—Page  3  of  8

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Lifetime Supervision on each of Counts 1 and  4 to be served concurrently to one another.

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☑  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court in its November 29, 2016, Standing Order, as well as with any other conditions on the attached page (if applicable).

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

DEFENDANT: Steven David Seeger
CASE NUMBER:   1:24CR42

Judgment—Page   4   of   8

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and wh... you must report to the probation officer, and you must report to the probation officer as instructed.
3. You shall not commit another federal, state or local crime.
4. You shall not unlawfully possess a controlled substance. You shall refrain from any unlawful use of a controlled substance. You shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by t... probation officer.
5. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
6. You must answer truthfully the questions asked by your probation officer.
7. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
9. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
10. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
11. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
12. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
13. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
14. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
15. You shall not purchase, possess or consume any organic or synthetic intoxicants, including bath salts, synthetic cannabinoids or other designer stimulants.
16. You shall not frequent places that sell or distribute synthetic cannabinoids or other designer stimulants.
17. Upon reasonable suspicion by the probation officer, you shall submit your person, property, house, residence, vehicle, papers, computers, or other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition.
18. You are prohibited from possessing a potentially vicious or dangerous animal or residing with anyone who possesses a potentially vicious or dangerous animal. The probation officer has sole authority to determine what animals are considered to be potentially vicious or dangerous.
19. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature

Date

Sheet 3D — Supervised Release                                   1129

**DEFENDANT:** Steven David Seeger                Judgment—Page  5  of  8
**CASE NUMBER:** 1:24CR42

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

2. If you are prescribed medication through your mental health treatment program, you must disclose the prescription information immediately to your supervising probation officer, and you must also very carefully follow the instructions on the prescription to include dosages and how frequently or often you are instructed to take those dosages.

3. You must not communicate, or otherwise interact, with victims of the offenses of conviction, either directly or through someone else, without first obtaining the permission of the probation officer.

4. You must participate in a sex offense-specific assessment.

5. You must participate in a sex offense-specific treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

6. You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program.

7. You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation officer may share financial information with the U. S. Attorney's Office.

8. You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.

9. You must not view or possess any "visual depiction" (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of "sexually explicit conduct" (as defined in 18 U.S.C. § 2256), that would compromise your sex offense-specific treatment.

10. You must not access the Internet except for reasons approved in advance by the probation officer. Probation shall approve the use of the internet, unless it provides access to any items, information, or areas that provide contact with minors, chatrooms, or peer-to-peer filing sharing.

11. You must submit your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search.

12. You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and reasonable manner.

13. You must provide the probation officer with accurate system information, such as hardware/software on all computers (as defined in 18 U.S.C. § 1030(e)(1)); all passwords used by you, and your Internet Service Provider.

14. To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | | | |
|---|---|---|---|
| Judgment—Page | 6 | of | 8 |

DEFENDANT:  Steven David Seeger
CASE NUMBER: 1:24CR42

## SPECIAL CONDITIONS OF SUPERVISION

15. You must not have direct contact with any child you know or reasonably should know to be under the age of 18, not including your own children, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, not including your own children, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

16. You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, and childcare facilities.

17. You must not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of 18.

18. During your period of supervision, you must notify your employers, family, friends, and others with whom you have regular contact of your conviction and/or history as a sex offender and that you are being supervised by a U. S. Probation Officer.

19. You must not engage in any forms of exhibitionism, voyeurism, obscene phone calls, or other lewd or lascivious behavior, nor must you engage in any form of "grooming" behavior that is meant to attract, seduce, or reduce resistance or inhibitions of a potential victim.

20. You must not possess sado masochistic/MASO bindings, restraints, handcuffs, or similar items.

21. You must not be employed in any position or participate as a volunteer in any activity that involves direct or indirect contact with children under the age of eighteen (18) without written permission from the Court. Under no circumstances must you be engaged in a position that involves being in a position of trust or authority over any person under the age of eighteen (18).

DEFENDANT: Steven David Seeger
CASE NUMBER: 1:24CR42

Judgment — Page  7  of  8

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 24,975.00 | $ 0.00 | $  0.00 | $  0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be enter after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

The victim's recovery is limited to the amount of their loss and the defendant's liability for restitution ceases if and when the victim receives full restitution.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| JD1 | 15,600 | 15,600 | |
| JD2 | 6,375 | 6,375 | |
| KD | 3,000 | 3,000 | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 24,975.00 | $ 24,975.00 | |

☑ See Statement of Reasons for Victim Information

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine  ☐ restitution.

☐ the interest requirement for the    ☐ fine  ☐ restitution is modified as follows:

*Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page  8  of  8

DEFENDANT:  Steven David Seeger
CASE NUMBER:  1:24CR42

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  200.00      due immediately, balance due

        ☐  not later than                                    , or
        ☑  in accordance with  ☐  C    ☐  D,   ☐  E,   ☑  F, or ☐ G below; or

B  ☐  Payment to begin immediately (may be combined with    ☐ C,   ☐ D,   ☐ F, or   ☐  G below); or

C  ☐  Payment in equal                *(e.g., weekly, monthly, quarterly)* installments of $                    over a period of
        *(e.g., months or years)*, to commence                  *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal                *(e.g., weekly, monthly, quarterly)* installments of $                    over a period of
        *(e.g., months or years)*, to commence                  *(e.g., 30 or 60 days)* after release from imprisonment to a
        term of supervision; or

E  ☐  Payment during the term of supervised release will commence within                  *(e.g., 30 or 60 days)* after release from
        imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
        Financial obligations ordered are to be paid while the defendant is incarcerated, and if payment is not completed during
        incarceration, it is to be completed by the end of the term of supervised release; or

G  ☐  Special instructions regarding the payment of criminal monetary penalties:
        The defendant shall immediately begin making restitution and/or fine payments of $_____ per month, due on the first
        of each month.  These payments shall be made during incarceration, and if necessary, during supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to Clerk, U. S. District Court, Northern District of West Virginia, P.O. Box 1518,
Elkins, WV 26241.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Case Number                                                          Joint and Several        Corresponding Payee,
    Defendant and Co-Defendant Names                                     Amount                   if appropriate
    *(including defendant number)*        Total Amount

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    Black LG Nexus - LG-E960 and Silver Apple Mac Book - Serial No.: W86450CGW0M

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES

v.                                          CRIMINAL NO. 1:24-CR-42

STEPHEN DAVID SEEGER

### NOTICE OF APPEAL

Now comes Stephen David Seeger, by his attorneys, Thomas Dyer, Esq., and Dyer Law

Offices, and  Martin P. Sheehan, Esq., and Sheehan & Associates, PLLC, and files this Notice of

Appeal.

Mr. Seeger was sentenced on September 18, 2025.

Entry of a Judgment and Commitment Order was entered on September 23, 2025 at

Doc 183.

                                          Respectfully submitted,

s/ *Thomas G. Dyer*                       s/ *Martin P. Sheehan*
Thomas G. Dyer, Esq.                      Martin P. Sheehan, Esq.
W.Va. Bar No. 4579                        W.Va. Bar No. 4812
Dyer Law                                  Sheehan & Associates, PLLC
P.O. Box 1332                             1140 Main St., Suite 333
Clarksburg, WV 26302                      Wheeling, WV 26003
(304) 622-1635                            (304) 232-1064
(304) 622-1870 fax                        (304)232-1066 fax
dyerlawof@aol.com                         Martin@MSheehanLaw.net
                                          Paralegal@MSheehanLaw.net

JA335

## CERTIFICATE OF SERVICE

I, Martin P. Sheehan, did file this document with the Clerk of the District Court for the

Northern District of West Virginia on this 24th day of September 2025 via CM/ECF. That caused

service to be made on Assistant United States Attorneys Andrew R. Cogar, Kimberley D.

Crockett and Morgan McKee, at their e-mail addresses of record.


s/ *Martin P. Sheehan*
Martin P. Sheehan, Esq.

SHEEHAN & ASSOCIATES, PLLC
1140 Main St., Suite 333
Wheeling, WV 26003
(304) 232-1064
(304)232-1066 fax
Martin@MSheehanLaw.net
Paralegal@MSheehanLaw.net